[C]**COPY**   FILED

1 | AZRA Z. MEHDI (220406)
   | THE MEHDI FIRM
2 | One Market
   | Spear Tower, Suite 3600
3 | San Francisco, CA 94105
   | Telephone: (415) 293-8039
4 | Facsimile: (415) 293-8001
   | azram@themehdifirm.com
5 |
   | CLAYTON D. HALUNEN
6 | SUSAN M. COLER
   | MELISSA W. WOLCHANSKY
7 | HALUNEN & ASSOCIATES
   | 1650 IDS Center
8 | 80 South Eighth Street
   | Minneapolis, MN 55402
9 | Telephone: (612) 605-4098
   | Facsimile: (612) 605-4099
10 | halunen@halunenlaw.com
   | coler@halunenlaw.com
11 | wolchansky@halunenlaw.com

2013 MAR -7 PM 2: 23

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY:_____

BY FAX

12 | Attorneys for Plaintiffs and the [Proposed] Class

13 |            UNITED STATES DISTRICT COURT

14 |            CENTRAL DISTRICT OF CALIFORNIA

15 |                 EASTERN DIVISION

16 | ALEC FISHER, MATTHEW                ) Case No.: EDCV12-02188 VAP (OPx)
   | TOWNSEND, and CONNOR RUCKS, on )
17 | Behalf of Themselves and All Others  ) Class Action
   | Similarly Situated,                  )
18 |                                      ) AMENDED COMPLAINT
   |                 Plaintiffs,          )
19 |         vs.                          )
   |                                      ) DEMAND FOR JURY TRIAL
20 | MONSTER BEVERAGE                      )
   | CORPORATION, MONSTER ENERGY          )
21 | COMPANY, and DOES 1-20, inclusive,   )
   |                                      )
22 |                 Defendants.          )

23

24

25

26

27

28

# TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................... 1

JURISDICTION AND VENUE .......................................................... 5

PARTIES ........................................................................................... 7

SPECIFIC ALLEGATIONS REGARDING PLAINTIFFS .................... 9

COMMON FACTUAL ALLEGATIONS ........................................... 14

A.    Company Background ............................................... 14

B.    A Monster Was Born ................................................ 15

C.    Ingredients in Monster Energy® Branded Drinks ......................................... 16

D.    Defendants' Labeling, Advertising and Marketing of the Monster Energy® Branded Drinks Targets, Is Intended to and Does Connect Directly with Teenagers and Youth ......................................... 18

E.    The Labeling on Monster Energy® Branded Drinks Is Designed to Be Attractive to Adolescents and Youth ......................................... 27

F.    Monster Cons Its Consumers into Believing that the Celebrities and Athletes Endorsing Monster Energy® Branded Drinks Are Consuming Such Drinks When They Are Not ......................................... 33

G.    Defendants' Labeling, Advertising and Marketing of Their Monster Energy® Branded Drinks Is False and Misleading and Fails Adequately to Warn of Dangers of Frequent and Excessive Consumption ......................................... 35

H.    Defendants' Failure to Properly Label Monster Energy® Branded Drinks Has Caused Serious Bodily Injury to Consumers and Continues to Pose a Danger ......................................... 46

I.    Defendants Have Profited Immensely from Their False and Misleading Labeling and Advertising and Failure to Warn ......................................... 51

J.    The Company's Energy Drink Labeling Continues to Be Under Investigation ......................................... 53

CLASS ACTION ALLEGATIONS ................................................... 58

COUNT I ........................................................................................ 64

COUNT II ....................................................................................... 68

COUNT III ...................................................................................... 70

COUNT IV ...................................................................................... 72

COUNT V ........................................................................................ 77

COUNT VI ........................................................................................ 78

PRAYER FOR RELIEF .................................................................. 79

DEMAND FOR JURY TRIAL ........................................................ 80

Plaintiffs Alec Fisher, Matthew Townsend, and Connor Rucks, by and through their undersigned counsel, bring this consumer class action on behalf of themselves and all others similarly situated, against defendants Monster Beverage Corporation ("MBC") and Monster Energy Company ("MEC") (collectively, "Defendants," "Monster" or the "Company"). Plaintiffs' allegations are based on information and belief formed after an inquiry reasonable under the circumstances and are likely to have evidentiary support after reasonable opportunity for further investigation and discovery, except where specifically so identified as being based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a consumer class action seeking redress for Defendants' unfair and deceptive business and trade practices on behalf of anyone who purchased for personal consumption any of the Monster Energy® branded energy drinks, including any of the following (hereinafter "Monster Energy® Branded Drinks"):

| | |
|---|---|
| Monster Energy® | Java Monster® Kona Blend |
| Lo-Carb Monster Energy® | Java Monster® Loca Moca® |
| Monster Energy® Assault® | Java Monster® Mean Bean® |
| Monster Khaos® | Java Monster® Vanilla Light |
| Monster M-80® | Java Monster® Irish Blend® |
| Monster MIXXD® | Java Monster® Toffee |
| Monster Energy® Absolutely Zero | Monster Energy Extra Strength Nitrous Technology® Super Dry™ |
| Monster Energy® Import | |
| Monster Energy® Import Light | Monster Energy Extra Strength Nitrous Technology® Anti-Gravity® |
| Monster Energy® Dub Edition Baller's Blend | |
| Monster Energy® Dub Edition Mad Dog | |
| Monster Rehab™ Tea + Lemonade + Energy | Monster Energy Extra Strength Nitrous Technology® Killer B® |
| Monster Rehab™ Rojo Tea + Energy | |
| Monster Rehab™ Green Tea + Energy | Monster Energy Extra Strength Nitrous Technology® Black Ice™ |
| Monster Rehab™ Protean + Energy | |
| Monster Energy® M3™ Super Concentrate | X-Presso Monster® Hammer |
| | X-Presso Monster® Midnite |
| | Übermonster® Energy Brew |

1

2.    Monster develops, markets, sells, and distributes beverages, soft drinks and "alternative" beverages in the United States and internationally. Monster is the largest energy drink maker by sales volume in the United States. In 2010, the original Monster Energy® drink became the No. 1 selling energy drink in the United States. The Monster Energy® Branded Drinks represented 92.3%, 91.2% and 89.9% of the Company's net sales for the years ended December 31, 2012, 2011 and 2010, respectively.

3.    Defendants falsely or misleadingly label, market and advertise for sale a highly caffeinated concoction – the Monster Energy® Branded Drinks – as if it were a conventional beverage or food. The drinks are sold in colorful beverage-sized containers alongside soft drinks and juices.

4.    Until recently the Company classified the Monster Energy® Branded Drinks as "dietary supplements" rather than as beverages or food precisely because such classification allowed it to avoid disclosing the powerful caffeine content of its drinks on its labels. Meanwhile even the Company's public filings have never described the Monster Energy® Branded Drinks as dietary supplements but instead as "carbonated energy drinks." Thus the Company engages in a deception: it produces a beverage that it knows and has acknowledged is a powerful dietary supplement, but it then markets the beverage to as wide an audience as possible – including children – as if it were an innocuous soft drink or juice.

5.    The initial complaint in this matter filed on December 12, 2012, pointed out the irony that while Monster Energy® Branded Drinks (sold minimally in 16-oz. drink cans) were sold as a "dietary supplement," the No. 2 energy drink Red Bull (sold in 8-oz. cans) is sold as a traditional beverage. ECF No. 1. Since then, on February 13, 2013, the Company announced that it was changing the labeling on its cans so that Monster Energy® Branded Drinks will no longer be considered dietary supplements, but rather a traditional beverage.

AMENDED COMPLAINT

2

6.    Monster's decision is a reluctant one. The Company really had no choice. The intense scrutiny on the Company's labeling from the regulatory, government, congressional as well private sector seemed to have left Monster with little choice. Moreover, the 2009 Federal Drug Administration ("FDA") guidance has noted that products that use terms such as "drink," "juice" and "beverage" suggest they are conventional foods, rather than supplements. Coincidentally, Monster will now have a collateral benefit from changing its classification – the Company will no longer have to report adverse events that invariably end up in the Drug Abuse Warning Network ("DAWN")[1] reports recording the number of emergency room ("ER") visits due to consumption of Monster Energy® Branded Drinks.[2]

7.    Monster Energy® Branded Drinks contain a dangerously high amount of caffeine and other ingredients that have thus far not been subjected to any kind of pre-market review by any regulatory authority prior to them being put in the stream of commerce. Numerous scientific studies have shown that the consumption of large amounts of caffeine, in combination with other active ingredients like guarana, taurine, carnitine, sugar, among others, by consumers can have serious health consequences such as: insomnia, palpitations, tachycardia, hypertension, dehydration, kidney failure, headaches and other more serious health complications Yet, Monster knowingly or with reckless indifference, markets, advertises and sells

---

[1] DAWN is a public health surveillance system that monitors drug-related emergency department (ED) visits in the United States and can be used as a source of information for assessing the more negative medical consequences associated with consuming energy drinks.

[2] Many of the Monster Energy® Branded Drinks have the same caffeine content per ounce, but some are slightly higher due to the same energy blend being used in drinks with less volume. The caffeine content is less per ounce in countries with stricter caffeine laws such as Australia and New Zealand which indicates Defendants' knowledge and awareness of the impact of excessive caffeine consumption.

AMENDED COMPLAINT

Monster Energy® Branded Drinks as completely safe via playful/seductive advertising and strategic product placement to attract both youth and adults alike.

8.     Internal Company documents demonstrate that Monster intends to reach out not only to the youth that it fails to warn, but also children as young as nine years old. *See* excerpts attached as Exhibit A. Since the label on Monster Energy Branded Drinks specifically states "Not recommended for children," it begs the question, why market to children? Monster is the "Joe Camel" of the 21st century. California courts found that the Joe Camel campaign constituted an unfair, unlawful, and fraudulent business practice because it targeted minors, specifically holding that "the targeting of minors is oppressive and unscrupulous, in that it exploits minors by luring them into an unhealthy and potentially life-threatening addiction before they have achieved the maturity necessary to make an informed decision whether to take up smoking despite its health risks."

9.     A similar document was produced in the Joe Camel litigation, where the Vice President of Marketing for R.J. Reynolds told company executives of the importance of 14- to 24-year-old smokers, or the "young adult market." According to the document, "They represent tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume-for at least the next 25 years." Not unlike the tobacco industry in the 70's and 80's, Monster here recognized that the youth market represented the core of the existing and future of the Monster Energy® Branded Drink business market. Capturing it was the key to maintaining and growing market share for Monster.

10.     Monster also knowingly and misleadingly perpetuates the perception that the Company's celebrity musicians' and athletes' sponsors are actually consuming Monster Energy® Branded Drinks, when in fact, they are consuming water. Monster does this by creating imposter cans of Monster Tour Water that look exactly like the Monster Energy® brand, but are not sold to the general public. Monster Tour Water was created solely to influence the audience's

perception that their much-admired and beloved idols are drinking Monster Energy® Branded Drinks.

11.    Just like Joe Camel, kids recognize Monster from the action sports and the music.  Joe Camel always seemed to be on the move, riding motorcycles or joining racing tournaments, jamming with a jazz band, playing pool with his cool female Camel-buddies or just hanging out with other hip young camels.

12.    Notwithstanding the high caffeine levels in Monster Energy® Branded Drinks and the scientific evidence of serious health risks these levels may pose for all consumers, especially adolescents and youth, Monster's advertising, marketing and promotions expressly target the 13- to 24-age group and those efforts have been successful in capturing teenagers and other youth as intended. Yet, Defendants' advertising and labeling fails miserably at providing any warning regarding the dangers of frequent or excessive consumption of Monster Energy® Branded Drinks.

13.    As a result of the false and misleading labeling, marketing and advertising, and failure to warn of risks, the Company has profited immensely from its Monster Energy® Branded Drinks' sales, capturing almost 35% of the market share and 35% of the youth market and generating sales of over $2.2 billion and just under $2 billion annually in 2012 and 2011, respectively.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over all the causes of action asserted herein. The Court has jurisdiction over the Magnuson-Moss Warranty Act ("MMWA") claim pursuant to 28 U.S.C. §1331 because a federal question is involved and pursuant to 15 U.S.C. §2310(d) because (a) the amount in controversy of any individual claim may be less than the sum or value of $25.00; (b) the amount in controversy is greater than the sum or value of $50,000 computed on the basis of all claims in the suit; and (c) the number of plaintiffs is more than 100. The Court has supplemental jurisdiction over state law claims

under 28 U.S.C. §1367(a) as claims herein arise under the same set of facts comprising a single case or controversy.

15.    This Court has jurisdiction over the subject matter presented by this complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332, *et seq*., which explicitly provides for the original jurisdiction of the federal courts over any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million, exclusive of interest and costs.

16.    More than two-thirds of the members of the class are citizens of a state other than California and, as set forth below, the Company is a citizen of California. Therefore, diversity of citizenship exists under CAFA, as required by 28 U.S.C. §1332(d)(2)(A).

17.    The total claims of the individual members of the class in this action are in excess of $5 million in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332(d)(2), (6).

18.    As stated above, more than two-thirds of all of the members of the proposed class in the aggregate are citizens of a state other than California, where this action was originally filed, and the total number of members of the proposed class is greater than 100, pursuant to 28 U.S.C. §1332(d)(5)(B).

19.    The Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business within the State of California by marketing, advertising and selling the Monster Energy® Branded Drinks to Plaintiffs and members of the proposed class, as well as generally maintaining systematic and continuous business contacts within the State of California.

20.    Venue is proper pursuant to 28 U.S.C. §1391(a) because the Company conducts substantial business in this District, has sufficient minimum contacts with

this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, marketing and administration of its products in this District. Filed concurrently with this complaint is the Declaration of Azra Z. Mehdi Pursuant to California Civil Code Section 1780(d) of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq.*, which is incorporated by reference herein.

21.   California has numerous contacts with the conduct alleged herein and a strong interest in applying its laws to that conduct. Monster is found, does business or transacts business within California. Monster maintains its principal offices, as well as agents, in California and is licensed to do, has done, and continues to do business in California. Defendants' advertising, marketing, pricing, sales and distribution operations for their Monster Energy® Branded Drinks sold throughout the United States, which form the basis of this litigation, originated from and/or are controlled by, Defendants' offices in California. In addition, the Company directly advertised, marketed and sold its energy drinks to consumers in California as well as the other states in the country. As such, California's interest in applying California law in this litigation outweighs any interests other states or their laws may have.

## PARTIES

22.   Plaintiff Alec Fisher ("Fisher") is, and during the period relevant herein was, a citizen of California. Fisher currently resides in Baltimore, Maryland. Plaintiff has been purchasing and consuming a variety of the Monster Energy® Branded Drinks for the past five (5) years, since he was about 16 years old.

23.   Plaintiff Matthew Townsend ("Townsend") is and during the period relevant herein was a resident of Los Angeles County, California. Plaintiff Townsend has been purchasing and consuming a variety of the Monster Energy® Branded Drinks for the past six (6) years.

24. Plaintiff Connor Rucks ("Rucks") is, and during the period relevant herein was, a citizen of Florida who currently resides in Miami, Florida. Plaintiff has been purchasing and consuming a variety of the Monster Energy® Branded Drinks for the past nine (9) years, since he was about 17 years old.

25. Defendant Monster Beverage Corporation, f/k/a Hansen Natural Corporation (MBC), is a Delaware corporation with its principal place of business at 550 Monica Circle, Suite 201, Corona, California 92880. MBC is a publicly traded company whose stock trades on the NASDAQ under the ticker symbol MNST. MBC's business is listed under the Consumer Goods category and identifies its operations as falling in the beverage and soft drink industry. MBC is a holding company that carries no operating business, except through its wholly owned subsidiaries. MBC through its subsidiaries, develops, markets, sells, and distributes alternative beverages in the United States and internationally.

26. Defendant Monster Energy Company, f/k/a Hansen Beverage Company (MEC), is a Delaware corporation with its principal place of business at 550 Monica Circle, Suite 201, Corona, California 92880. MEC is a wholly owned subsidiary of MBC. MEC produces and distributes a variety of sodas, fruit juices, teas, energy drinks and waters. MEC conducts substantially all of MBC's operating business and generates substantially all of the Company's operating revenues.

27. The Company was engaged in and continues to be engaged in and responsible for the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of the various Monster Energy® Branded Drinks as described in ¶1, *supra*.

28. Plaintiffs are currently unaware of the true names, capacities, or basis for liability of defendants Does 1 through 20, inclusive, and therefore sue said defendants by their fictitious names. Does 1-20 are individuals, associations or corporations who/that are affiliated or related to the Company, who will be specifically identified and named as discovery progresses and their roles in the

wrongdoing at issue is revealed. At all times mentioned in the Counts alleged herein, each and every defendant was an agent, representative, affiliate, or employee of each and every other defendant, and in doing the things alleged in the Counts stated herein, each and every defendant was acting within the course and scope of such agency, representation, affiliation, or employment and was acting with the consent, permission and authorization of the other defendants. During the relevant time period, Defendants agreed to misrepresent to Plaintiffs and class members the material facts at issue herein and/or not to notify class members about the scope and nature of the unfair and illegal business practices as detailed herein that resulted in injury in fact to Plaintiffs and members of the class, which misconduct is still on-going. All actions of each defendant, as alleged in the Counts stated herein, were ratified and approved by the other defendants or their respective directors, officers and/or managing agents, as appropriate for the particular time period alleged herein. Plaintiffs are informed and believe, and on that basis allege, that defendants Does 1 through 20, inclusive, and each of them, are in some manner liable to Plaintiffs, and/or are proper and necessary parties to this action in light of the relief requested. Plaintiffs will amend the complaint (if necessary) to allege their true names, capacities or basis for liability when the same have been ascertained.

## SPECIFIC ALLEGATIONS REGARDING PLAINTIFFS

**Plaintiff Alec Fisher**

29.     Plaintiff Fisher first consumed a Monster Energy® Branded Drink at the age of sixteen (16) when he was a junior in high school. The Company was parked outside his high school in trucks handing out free cans of Monster Energy® Branded Drinks to everyone. Fisher believed that Monster Energy® Branded Drinks were safe for consumption by persons of all ages since the guys in the Monster Energy® Branded Drink truck were not asking kids how old they were prior to handing out the Monster Energy® Branded Drinks. Further, Fisher saw

nothing on the labeling of the Monster Energy Drink can that would lead him to believe that drinking the Monster Energy® Branded Drink could be bad for his health especially since he had also seen Monster trucks at various sporting events where the vendors doing the giveaways are generally presumed to be health-conscious. Had Fisher known these facts, he would not have accepted Defendants' freebie cans or subsequently continued to purchase and consume Monster Energy® Branded Drinks for years after.

30.    Fisher has most frequently consumed the original Monster Energy® drink (hereinafter Monster Energy®) with the green tab and the Lo-Carb version. At various times, he also has consumed Absolutely Zero, Mixxed, Assault, Khaos as well as a number of other varieties depending on what varieties were available at the store or what varieties were on sale or had special offers. Going back five years, Fisher consumed an average of two to three cans per week, with that number going up significantly during the weeks prior to and during exams, as well as on the weekends when he needed to stay up late into the night to study or party. Fisher has mixed Monster Energy® Branded Drinks with alcohol at various times, which is commonly done in the college and university party scene.

**Plaintiff Matthew Townsend**

31.    Plaintiff Townsend has been purchasing and consuming a variety of the Monster Energy® Branded Drinks for the past six (6) years, since he was about 37 years old. Townsend first tried the original "green M" Monster Energy® in early June 2007, which he purchased from a vitamin store. Townsend had never tried any energy drinks before even though he often saw his friends drinking Red Bull because he had always been repulsed by the smell. That particular morning, he had accompanied a friend to the store and was waiting for him while he purchased protein supplements to add to smoothies. Townsend recalled feeling weary and a little run-down that morning. While waiting for his friend to complete

his purchase, he was reading the labeling on a 16-oz. Monster Energy® Branded Drink and decided to try it.

32.    Townsend was not repulsed by the smell of the Monster Energy® Branded Drink and he felt like he got an immediate energy boost. Within minutes, he felt stronger and less lethargic. A few days later when he was meeting a friend for their weekly coffee, he opted for a Monster Energy® Branded Drink instead of coffee. After drinking the Energy® Branded Drink, Townsend's friend commented on and made fun of him because he was talking very fast. Townsend himself felt that everything was accelerated with the Monster Energy® Branded Drink boost. He noticed from the label that the Monster Energy® Branded Drink had lots of B vitamins listed as well as supplements like taurine and ginseng. He also read that one should not consume more than three cans a day. So, as time progressed, Townsend made sure to drink no more than three cans a day. He noticed as time progressed, however, that he had started depending on Monster Energy® Branded Drinks each morning to get him going and keep him going. Over the next five years or so, he was on a steady diet of Monster Energy® Branded Drinks. Townsend has tried every variety ever created, with his favorites being the NUT UP coffee blend, the M-80, and the original Monster Energy®. He has also tried Monster Energy® shots, which he thought were convenient. Townsend was also amused by Monster's comments on the back of the cans, which he thought were very clever.

33.    In addition to drinking various Monster Energy® Branded Drinks, Townsend frequently mixed the original "green M" Monster Energy® with alcohol. It was common for him to see a good number of people at bars and parties consuming alcoholic mixed drinks containing some type of energy drink. Some of the more popular ones include: Jägerbombs, Irish car bombs, Hulks, VodkaMonster, Monster rum, or a variant, like Mango (rum) Monsters, also known

as "Horni Monster," a mix of Hornitos tequila and Monster Energy® Branded Drinks.

34.     It became so common for Townsend's friends to see him with a Monster Energy® Branded Drink in his hand, that they started gifting him Monster apparel and other merchandise for every occasion. Townsend's addiction to Monster Energy® Branded Drinks resulted in him having serious health issues beginning in the summer of 2012. His heart frequently pounded too fast and he began to have chest pains. He also had trouble sleeping. He tried to cut back on the Monster Energy® Branded Drinks, but he found that skipping Monster Energy® Branded Drinks even one day caused him to have severe headaches from the lack of caffeine. He noticed that he would feel better shortly after he consumed a Monster Energy®. But, he observed that he continued to be constantly fatigued because he was unable to sleep well. He began to have mood swings and was cranky.

35.     Sometime in September 2012, he became faint and feverish, and his heart felt like it was pounding through his chest. He tried to sleep but sensed that something was seriously wrong. He ended up going to the ER at a local hospital where he was prioritized for treatment once his vital signs were taken. The attending physicians and nurses took his blood pressure four times, and found that he was averaging 225 over 139, which, he was informed was critically high. Blood pressure readings such as these are indicative of Stage 3 hypertension or hypertensive crisis putting one in the highest risk category for heart attack, stroke and other acute life threatening problems. Townsend was admitted for the night and several tests were run, and many questions were asked of him, including several regarding his diet. He was then told by several physicians that his blood pressure was dangerously high, and that they would prescribe him something to help, but that he would have to cease drinking the Monster Energy® Branded Drinks altogether.

36.     Upon Townsend's release, he began the process of eliminating Monster Energy® Branded Drinks from his diet entirely, suffering severely through harsh headaches. It has been a very difficult process because Townsend feels he was addicted to the Monster Energy® Branded Drinks. Although his blood pressure has lowered significantly, he feels his body still craved for Monster Energy® Branded Drinks on a regular basis. All told, Townsend believes that he had consumed well over 4,000 cans of Monster Energy® Branded Drinks. Based on the labeling, Townsend believed that Monster Energy® Branded Drinks were safe for consumption in the manner that was identified on the labeling of the cans. He never exceeded the limit set on the Monster Energy® Branded Drink cans. Townsend saw nothing on the labeling of the Monster Energy® Branded Drink cans that would lead him to believe that drinking the Monster Energy® Branded Drinks consistent with the labeling on the cans could be bad for his health and in fact result in him having Stage 3 hypertension and other health related concerns. Had plaintiff Townsend known these facts, he would not have purchased and consumed Monster Energy® Branded Drinks.

**Plaintiff Connor Rucks**

37.     Plaintiff Rucks began consuming Monster Energy® Branded Drinks when he was seventeen (17) and a junior in high school. Rucks has consumed Monster Energy® with the green tab and the Lo-Carb version most frequently. At various times, he also has consumed other varieties. Going back nine years, Rucks consumes an average of five to six cans per week, with that number going up significantly during the weeks prior to and during exams, as well as on the weekends. Rucks believed that Monster Energy® Branded Drinks were safe for consumption by persons of all ages. Further, Rucks saw nothing on the labeling of the Monster Energy® can that would lead him to believe that drinking it could be bad for his health. Had Rucks known these facts, he would not have purchased and consumed Monster Energy® Branded Drinks.

1

2

3 **COMMON FACTUAL ALLEGATIONS**

4 **A.      Company Background**

5          38.     Monster's beverage business is divided into (i) Direct Store Delivery

6 ("DSD"), whose principal products comprise Monster Energy® Branded Drinks,

7 and (ii) Warehouse, whose principal products comprise juice based and soda

8 beverages under many different brand names. The Company generated $2.4

9 billion, $1.95 billion, $1.5 billion and $1.3 billion in gross sales in 2012, 2011,

10 2010 and 2009, respectively. The vast majority of Monster's gross sales are

11 derived from their Monster Energy® Branded Drinks division. In 2012, $2.21

12 billion in gross sales was attributable to the Monster Energy® Branded Drinks. In

13 2012, the Company sold two billion-plus cans of Monster Energy® Branded

14 Drinks in the United States and elsewhere. During the period relevant herein,

15 92.3%, 91.2% and 89.9% of the Company's net sales for 2012, 2011 and 2010,

16 respectively, were attributable to the Monster Energy® Branded Drinks division.

17 The Company acknowledges that any decrease in sales of Monster Energy®

18 Branded Drinks could have a ***significant adverse effect*** on the Company's

19 revenues and income.

20          39.     Monster Energy® Branded Drinks are the number one top selling

21 energy drinks worldwide. Although energy drinks generally make up only a tiny

22 portion of the entire beverage market, it is the fastest-growing segment. The

23 growth of energy drinks is directly attributable to its popularity among pre-teens

24 and teens. Energy drink sales rose by more than 16% in 2011 and Monster was in

25 the lead with 35% of the market.

26          40.     In fact, to capitalize on the success of its Monster Energy® Branded

27 Drinks, the Company which used to be known as the Hansen Natural Corporation

28 and Hansen Beverage Company (collectively, "Hansen"), officially changed its

name to Monster Beverage Corporation and Monster Energy Company, respectively, on January 5, 2012.

**B.    A Monster Was Born**

41.    In the mid-90's, after narrowly escaping bankruptcy, the Company hired Mark Hall ("Hall") as President of the MEC division. Hall is credited as being the energy behind Monster Energy® Branded Drinks. Hall's skill as a marketer and branding strategist helped Monster claw its way to the top of the energy drink pile.

42.    In the late 90's, Company CEO Rodney Sacks ("Saks") and President Hilton Schlosberg, realized that there was a disconnect between the Company's natural line and energy brands. They worked with Hall to branch out from the Hansen's trademark and develop an energy drink that could effectively go after the proper demographic. In an interview, Sacks said,

> We walked that tightrope for many years and eventually came to the decision that if we were going to make a real impression in this category, we needed to create a brand that really spoke for, looked like and conveyed what the category really wanted, ***what young, male consumers really wanted and felt like. . . . It's their lifestyle***. So when Monster was born we were able to do things such as go into extreme sports. It just never was possible before.

43.    As a name, "Monster" seemed most appropriate to the Company's executives because it was aggressive and with a motto like "Unleash the beast" conveyed what the Company's targeted young, male consumer really wanted. Indeed, the Company reportedly selected the name "Monster Energy" after consulting with a focus group of teenage males.

44.    Monster's logo with its sinister-looking claw marks, in bright neon green against a black background are unmistakable – not unlike the cigarette company RJR Reynolds' "Joe Camel" logo. Some reports indicate that the

Monster's neon green claw logo ranks close behind the boogeyman or Frankenstein. Now, that's brand recognition.

45.     Few people dispute the "cool factor" of Monster Energy® Branded Drinks. This is by design and Monster's marketing team has done a phenomenal job through sports, music, sex, girls and partying to inject Monster Energy® Branded Drinks into the lifestyle of its consumers. Indeed, internally Defendants describe the Monster Energy® Branded Drinks as "lifestyle in a can."

**C.     Ingredients in Monster Energy® Branded Drinks**

46.     The "cool factor" and the energy boost associated with energy drinks have resulted in a massive surge in their popularity in recent years. Although all age and gender groups consume energy drinks, they are especially popular among high school and college students.

47.     The most common ingredient in energy drinks, including in Monster Energy® Branded Drinks, is caffeine, which is often combined with taurine, glucuronolactone, L-carnitine, guarana, and B vitamins to form what is referred to by the Company as a "proprietary energy blend." Until recently, Monster neither listed caffeine as an official ingredient, nor was the amount of caffeine identified.[3]

48.     Energy drinks often contain additional amounts of caffeine through additives, including guarana (Brazilian cocoa), kola nut, yerba mate, and cocoa. Guarana (Paullinia cupana) is a plant that contains caffeine, theobromine (a chronotrope), and theophylline (an inotrope). Each gram of guarana can contain 40 to 80 mg of caffeine and has a potentially longer half-life because of interactions with other plant compounds. According to a February 2013 article by the American

---

[3] As detailed herein, on February 13, 2013, Monster announced that the Company was changing the labeling on its Monster Energy® Branded Drink cans so that they will no longer be considered dietary supplements, a move that changes the federal guidelines the drinks must follow. The cans will now have to list "Nutrition Facts" rather than "Supplement Facts," as well as disclose caffeine content.

AMENDED COMPLAINT

16

Academy of Pediatrics, Vol. 34, No. 2., entitled, "Energy Drinks: What Teenagers (and their Doctors) Should Know" ("February 2013 AAP Article"),

> when an energy drink lists its caffeine content, it is usually not taking into account the guarana, which has been reported to exert a more prolonged effect than an equivalent amount of caffeine. In reality, when a drink is said to contain caffeine plus guarana, it contains caffeine plus more caffeine. Guarana has not been evaluated by the FDA for safety, effectiveness, or purity."

February 2013 AAP Article at 57. Monster Energy® Branded Drinks contain guarana. Coffee does not contain guarana.

49.     Taurine is another common ingredient in Monster Energy® Branded Drinks. Taurine is one of the most abundant amino acids in the human body, which generally manufactures taurine on its own from other amino acids. Only infants and sick adults must obtain taurine from outside sources. According to the February 2013 AAP Article, "[t]he amount of taurine consumed by regular intake of energy drinks far exceeds the amount in a normal diet (40-400 mg/day) . . . . Some data from animal models suggest that taurine might minimize some of the adverse effects of alcohol consumption and could, by extension, encourage greater alcohol consumption." *Id*. at 58. Coffee does not contain taurine.

50.     Another ingredient in Monster Energy® Branded Drinks is ginseng, a root most commonly found in East Asia. According to the February 2013 AAP Article, ginseng has been linked to adverse events such as insomnia, palpitations, tachycardia, hypertension, edema, headache, vertigo, mania, and estrogen-like effects, such as breast tenderness and amenorrhea. Coffee does not generally contain ginseng.

51.     Monster Energy® Branded Drinks also contain other ingredients (e.g., B vitamins, glucuronolactone, Yohimbe, carnitine, and bitter orange) which purport to have certain positive effects, but most of the beneficial claims about

AMENDED COMPLAINT

17

these ingredients lack sufficient scientific evidence according to the recent AAP article. Coffee does not generally contain these ingredients.

52.   Moreover, unlike coffee, which offers caffeine in a relatively straightforward format, it is this combination of ingredients noted above or the so-called "proprietary energy blend" factor in Monster Energy® Branded Drinks that can be harmful if consumed frequently or even in the daily limit recommended by Monster on a regular or daily basis.

**D.   Defendants' Labeling, Advertising and Marketing of the Monster Energy® Branded Drinks Targets, Is Intended to and Does Connect Directly with Teenagers and Youth**

53.   Defendants designed the marketing, advertising and labeling of the Monster Energy® Branded Drinks for an intended audience of adolescents and youth. A 2009-2010 internal Monster marketing document acknowledges that its target consumer is "Generation Y: Born between 1985-2000." Excerpted document attached hereto as Exhibit A. Defendants essentially admit in internal documents that their marketing is geared to the 9-15 year olds, or as the Company identifies them "Trophy Kids, Mypods, Digital Generation." Defendants go on to describe Generation Y as "Non-conformists who feel entitled, very opinionated, skeptical of everything, multi-taskers with short attention spans, voracious consumers of information from sources simultaneously." *Id*. Accordingly, the Company customized its approach to associate with the Generation Y lifestyle, including "influencing the image makers who influence their peers." Monster Energy characterizes its brand as follows: "Monster represents a lifestyle. Monster is aggressive, cool, sinister, dark, mysterious and fun. Monster is about action sports, punk rock music, partying, girls, and living life on the edge."

54.   The Company eschews mainstream advertising on TV, radio, and billboards, instead sponsoring huge extreme sporting events – skateboarding, motorcycle racing, surfing, NASCAR racing, professional bull riding – and music

festivals as well as getting endorsements from music celebrities and popular sports figures. The core of Defendants' marketing strategy is prize promotions, price promotions, competitions, endorsements from selected public and extreme sports figures, personality endorsements (including from TV and other well-known sports personalities), coupons, sampling and sponsorship of selected causes, events, athletes and teams.

55.     Monster's unique marketing approach has resulted in Monster Energy® Branded Drinks becoming No. 1 in energy-drink convenience-store sales, generating over $2.2 billion and $1.8 billion in revenue in 2012, and 2011 respectively, and taking market share away from its closest competitor, Red Bull.

56.     The Company admits in its public filings that its sales and marketing strategy is to develop "brand awareness through image enhancing programs and product sampling." Monster uses branded and other promotional vehicles at events and schools where it hands out samples of Monster Energy® Branded Drinks to consumers. Similarly, the Company goes into small local towns and cities – at sports and music festivals – handing out Monster Energy® Branded Drinks to everyone – age being no bar to the freebie handout.

57.     Defendants' marketing of Monster Energy® Branded Drinks aimed to seduce this audience is channeled through extreme sports, Monster Girls and music festivals.

58.     Extreme sports or X-Games have been associated with youth since inception. X-Games and other extreme sports festivals draw a hard-to-reach demographic – males, ages 12 to 24. These games represent far more than just a sports competition – they are mass marketing and media strategies, tie-ins to music, fashion, and product endorsements. According to an audience study of on-site X-Games attendees performed by a Newport-based sponsorship market research company, the average age at the X-Games was 20 years old with over two

thirds (66%) of the attendees under 21. Recognizing this fact, major corporations, including Monster, are tapping into extreme sports because they attract a very hard to reach market: youths, ages 12 to 24 with a potential spending market estimated at several hundreds of billions of dollars a year.

59.     When Monster was getting its start, MEC President Hall and his team offered on-the-spot cash sponsorships to X-Game athletes. Now the Monster Energy® Brand is ingrained in the action sports tournament world. Recently on March 2, 2013, Monster Energy rider Ayumu Hirano took second place at the Burton U.S. Open Snowboarding Championship held in Vail Mountain, Colorado and first place at the 2013 Burton European Open Halfpipe Finals in Laax, Switzerland in February 2013. Ayumu Hirano is 14 years old.

60.     Monster's use of the Monster Girls in its marketing campaigns is an acknowledgment that the lure of sex is a quick and powerful way to convey your product message. Reproduced below are screen shots of the Monster Girls from the Company's website – beautiful, sexy and scantily clad young women. What sexually curious adolescent male (i.e. the Company's focus group) would not be drawn to Monster Energy® Branded Drinks with this kind of marketing? Moreover, women wanting to either be a part of the Monster Girls' crew or to meet guys are also getting sucked into the Monster vortex.



61.     Companies frequently use sex to sell their products, but Monster and its executives have elevated the use of women and sex to sell Monster Energy® Branded Drinks to an art form. For example, the MEC link to Monster Girls includes videos entitled, "SX ED: Episode 2" *available at*: http://www.monsterenergy.com/#!/news%3Asx-ed-episode-2.

62.     Other examples of such provocative videos include:

http://www.monsterenergy.com/monstergirls/              and

http://www.monsterenergy.com/us/en/events/#!/events%3A2013-monster-energy-ama-supercross.

63.     In addition, Monster employs a man named Ash Hodges, whose title is the Motorsports Marketing Manager and part of his responsibilities for the Company includes making, recording and maintaining a website called www.dirtshark.com. Below is an image of a recording entitled, "Dirt Shark: 2013 Monster Energy Supercross Girls" *available at* http://www.youtube.com/watch?v=jAT7ixWylV8. A portion of the video is transcribed below. The young man flanked by the scantily clad Monster Girls is a teenager.



**Monster Girl #1**:  "You want to fondle our oranges?"

**Monster Girl #2**:  "Heeeeyyy."

[Video Cut]

**Monster Girl #1**:  "ADAAAAMMM . . .. with the Monster Girls."

**Dirt Shark**: "You going to come to the [big race]?"

**Adam**:        [Laughing] "Dude, you dive bombed me. You dive bombed me. You dive bombed me."

**Dirt Shark**: "Yeah, I brought them over for you.   How're you doing?"

**Adam**:        "I'm doing really well now."

**Monster Girl #1**:  "Hey, we have a question for you. Do you want to fondle our oranges?"

**Monster Girl #2**:  "Cassie, he's not 18 yet. He can't fondle oranges."

**Monster Girl #1 (Cassie)**:        "Just kidding."

**Adam**:        "Just a couple more years and I'd love to."

[Quick video cut]

**Adam**:        "You caught me off guard.  I really don't know what to say right now. I'm speechless. I'm a [dork]."

64.     A recent video on the Dirt Shark website entitled "A Sharklet Tale" has two Monster Girls Gemma Lee Farrell and Tara Beaulieu in very skimpy bikinis, slathering sun tan lotion on their bodies while they drink a Monster Energy® Branded Drink. They are wearing Monster Energy® Branded Drink and Dirt Shark logo bikinis and Green M logo jewelry. Dirt Shark poses the question: "What is a Sharklet? One of the Monster Girls answers: "A Sharklet is an unconventional girl. Someone who likes to get naked and have a good time. We like to party."

65.     Many other similar examples are available at the following link: http://www.dirtshark.com/us/en/videos/. These videos are paid for by Monster and the messages are approved and condoned by the Company. Monster, thus, uses sex and girls to obfuscate the Company's failure to warn of the risks inherent in the consumption of its energy drinks.

66.     The Company's promotions offering "free" Monster gear are remarkably similar to the now-banned Joe Camel promotional advertising, which included among other things, merchandise such as caps, jackets, and mugs that could be "bought" with redeemed "Camel Cash." Defendants are following this exact formula here – Monster's promotions require a person to "Drink Monster," "Save Tabs," and "Trade for Gear. *See* below. The gear includes Monster-branded clothing and apparel, accessories as well as the Monster Girl 18-Month Calendar. Monster even has apparel and stickers for kids.



67.     In this manner, Defendants not only encourage, but aggressively promote the consumption of Monster Energy® Branded Drinks by people of all age groups. For example, in order to get a "free" Monster Beanie (with the florescent Monster logo) or a short-sleeve T-shirt, one has to consume and send in 30 Monster Energy® Branded Drink tabs!! A hoodie demands consumption of 75 Monster Energy® Branded Drinks!! So, in effect, the gear is not actually "free." One has to pay for and consume a monstrous quantity of Monster Energy® Branded Drinks to get anything.

AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24



25     68.    The "Monster Music" and "Monster Gaming" Facebook pages are

26 most popular with persons ages 13-17. Indeed, the Monster Army website

27 sponsored by Defendants purports to be an "athlete development program that

28 currently focuses on supporting up and coming athletes ages 13-21 in moto, bike,

25

snow, skate, surf and wake," and invites "13-21" year-old action sports athletes to apply for sponsorships, and ages 13-24 is the most popular age group of those who "Like" the "Monster Army" on Facebook. Monster Army is the Company's athlete development program that supports athletes ages 13-21 in moto, bike, skate, surf, snow and wake. Athletes from all over the world are evaluated and invited into the program to represent the Monster brand. *See* http://www.monsterarmy.com/programs/, reproduced below:



69.    In keeping with a young fan-base, the Company has nurtured a strong following on social networks. It counts over 21 million enthusiasts on Facebook and has over 507,000 Twitter followers. The Company, thus, specifically targets the 13-21 age group in its marketing and advertising knowing full well that the fans of the athletes in this age group will most likely also be 13-21 or younger.

70.    Jeff Cioletti, editor of industry trade publication *Beverage World*, attributes Monster Energy® Branded Drinks' success to the Company "knowing its audience and finding a way to connect with them, in what they perceive as an authentic way, and not talking down to them." On the Company's marketing

AMENDED COMPLAINT

strategy, Mark Hall, President of MEC remarked: "There has to be some connection with the consumer – they have to feel good about what they hold in their hand and that's the elusive part of marketing."

71.    There is no question that the Company has done a remarkable job of connecting with its young audience. According to a 2011 article by the *American Academy of Pediatrics*, 30% to 50% of adolescents and young adults consume energy drinks.

72.    Ads in magazines and on billboards with slogans like "unleash the beast" and "the meanest energy supplement on the planet" ensure that consumers have brand awareness. And one certainly cannot miss Monster Energy® Branded Drinks on the shelves; with the goth-inspired logo, lurid colors, and names like Java Monster, Lo-Carb Monster, Monster Rehab, and others, they tend to stand out. And Defendants' banners adorn pretty much every big extreme sports event. The "coolness factor" i.e. sports and sex, and the caffeine in Monster Energy® Branded Drinks are what the Company is banking on to keep its consumers coming back for more.

**E.    The Labeling on Monster Energy® Branded Drinks Is Designed to Be Attractive to Adolescents and Youth**

73.    The label on a can of Monster Energy® Branded Drinks states:

Tear into a can of the meanest energy

supplement on the planet, Monster energy.

It's the ***ideal combo of the right***

***ingredients in the right proportion to***

***deliver the big bad buzz that only***

***Monster can***.

Monster packs a vicious punch but has a

smooth flavor you can really pound down.

***Athletes, musicians, anarchists, students,***

*road warriors, metal heads, nihilists,*

*geeks, hipsters, bikers, and milfs dig it.*

*You will too.*



It is commonly known that MILF is an acronym for "Mother/Mom I'd Like to F*#k." *See* en.wikipedia.org/wiki/MILF. Given the heavy focus of the Company's use of sex to sell its Monster Energy® Branded Drinks, one need not extend one's imagination too far to ascertain the message the Company is conveying with labeling like that. Yet again, Monster relies on strong sexual references to distract its consumers from the health risks of its products.

74.    In its web advertising, the Company also states: "It's a wicked mega hit that delivers *twice the buzz* of a regular energy drink." The Company's repeated reference to "buzz," a term generally used to describe the intoxicating effect one

AMENDED COMPLAINT

has from drinking alcohol, gives the impression to the consumer that Monster Energy® Branded Drinks can similarly deliver the intoxicating feeling that comes from drinking alcohol.

75.     Consumers may, thus, falsely believe that "more is better" and ingest multiple servings of the energy drinks. Moreover, since there are no restrictions on the sale of energy drinks, adolescents and children (who may be inexperienced and less tolerant to the effects of caffeine) may be at an increased risk for caffeine intoxication. Indeed, the Company's 24-oz. can of the original Monster Energy® states: "[B]igger is better . . . because you can never get too much of a good thing."



76.     Commentators who are in awe of the Company's and its executives' success nevertheless remarked that MEC President Hall "push[es] the envelope on the core Monster brand, with a gigantic, 24-oz. can called Monster BFC ("big

freakin' can"). As is typical for this cagey brand, it's hard to know whether the tagline is warning kids not to chug the full 24 ounces, or daring them to do it."

77.   Some examples of the labeling and advertising for the Company's other energy drinks that convey similar messages include:

- LO-CARB Slogan: Tear into a can of the meanest energy supplement on the planet, Lo-Carb MONSTER energy. We went down to the lab and performed major surgery on the Monster. We hacked out carbohydrates and calories, *transplanted the wicked Buzz* and dialed in the flavor. Lo-Carb MONSTER energy still *delivers twice the Buzz* of a regular Energy drink, but only has a fraction of the calories.

- Cuba Lima Monster Energy Slogan: As legend has it *a buzzed up Cuban hears his country has been liberated holds up his drink, yells "CUBA-LIBRE" and the famous cocktail is born. As big fans of the drink we decided to make our own, substituting our tried and true energy blend for the alcohol and adding a squeeze of sweet lime.* We know it sounds crazy but don`t knock it till you try it. *You`re gonna love it cause it`s a new kind buzz.* Energy Liberated!

- Übermonster Monster Energy Slogan: Über: (oo-ber) From the German meaning superior, above the norm, or the ultimate. *No regular bottle could handle this evil energy brewski.* So we designed our own with the biggest *chugger friendly* wide mouth we could make.

The big ass cap is a little hard to pry off, but it's sorta like, if you can't open it you shouldn't be able to drink it! Cheers, This energy brew's for you!

- M3 Monster Energy Slogan: This little bottle of super concentrated Monster madness packs a 16oz. punch into only 5oz. of liquid. Our unique nitrous technology mellows out the flavor. *A shot it's not . . . but then you don't have to plug your nose to drink it!*

- Super Dry Nitrous Slogan: Don't let the skinny can fool you, *Monster Extra Strength packs our biggest punch!* Call us crazy, but we supercharged our Monster Energy base then injected it with Nitrous Oxide for a unique texture, smooth drinkable flavor and *buzz that's bigger than ever. This is no "Whip-it" but it will whip you good...*

- Green Tea Rehab Slogan: *Our friends at the Rehab pool party in Vegas know all about recovering from a long night* and together we came up with Monster Rehab® Green Tea + Energy. Naturally loaded with EGCG antioxidants, infused with coconut water, quercetin, acai berry and goji berry. Monster Rehab® Green Tea + Energy delivers a triple threat that *quenches thirst, hydrates like a sports drink*, and brings you back after a hard day`s night. Monster Rehab® Green Tea + Energy: RE-FRESH, RE-HYDRATE, RE-VIVE, or in other words, Re-

habilitate with a killer mix of green tea, pineapple juice, electrolytes, and our bad-ass Monster Rehab® energy blend to fire you up. Rehab The Beast!

- Tea+Lemonade Rehab Slogan: ***While chillin' at the Vegas Rehab® pool party, contemplating a cure for cotton mouth, admiring the flesh parade***, and pondering the wisdom of doubling down when the dealer shows a face card, it HIT ME! We need a new drink. One that can do it all – a triple threat that quenches thirst, hydrates like a sports drink, and brings you back after a hard day's night. Monster Rehab: Re-Fresh, Re-hydrate, Re-store, or in other words, Re-habilitate with a killer mix of tea, lemonade, electrolytes, and ***our bad-ass Rehab® energy blend*** to fire you up. Rehab the Beast!

78. In sum, the Company's labeling conveys that Monster Energy® Branded Drinks

- have some magic formula with "the right ingredients in the right proportion;"
- deliver "a big bad buzz" like you get from drinking alcohol; and
- can make you part of the "cool" or "Über-cool" crowd.

**F.    Monster Cons Its Consumers into Believing that the Celebrities and Athletes Endorsing Monster Energy® Branded Drinks Are Consuming Such Drinks When They Are Not**

79.    Monster's conduct in connection with marketing its Monster Energy® Branded Drinks demonstrates its knowledge and awareness that Monster Energy® Branded Drinks are not as safe for consumption as Defendants represent. One example is the use of Monster Tour Water for the Company's celebrity musician and athlete endorsers instead of Monster Energy® Branded Drinks.

80.    Few, if any, of the celebrity product endorsers actually consume the Monster Energy® Branded Drinks that they endorse. The trainers for the celebrity athletes do not want their athletes consuming Monster Energy® Branded Drinks because of the high amounts of caffeine and other ingredients that could be harmful to their clients. Similarly, the managers for celebrity musician endorsers who perform at Monster's annual summer music concerts, the Warped Tours, also do not want their clients consuming large quantities of Monster Energy® Branded Drinks during the hot summer days.

81.    Defendants thus came up with the idea of Monster Tour Water, which is a way for the Company to advertise Monster Energy® Branded Drinks while the musicians and athletes are performing. Monster Tour Water looks exactly like the Monster Energy® Branded Drinks. Tour Water comes in the same black can with a green claw logo as the Monster Energy® Branded Drinks. The only difference is that instead of "Energy Drink," it says "Tour Water" in small print.



82.    While the consumers' perception is that their much admired musicians or athletes and their entire staff is thirstily consuming Monster Energy® Branded Drinks, they are in fact, drinking plain old water put in a Monster Energy® can. One needs to be up close and personal in order to determine that the can in the hands of the celebrity endorser is not a Monster Energy® Branded Drink, but in fact water. However, security at these events is often tight and fans are kept far away from the celebrities. Thus, there is very little opportunity for someone at a distance to actually discern that one's much beloved celebrity is not drinking a Monster Energy® Branded Drink.

83.    Defendants intend to, and in fact, perpetuate the perception of their consumers who attend these music and sports events that Monster Energy® Branded Drinks are safe for consumption.

84.    Defendants do not sell or give away cans of Monster Tour Water except to the celebrity endorsers, their staff or trainers or their VIP guests. Indeed, Defendants strictly monitor who has access to Monster Tour Water. If Monster employees discover the endorsers' staff or other personnel are handing out Tour

Water cans to outsiders at events, they are removed or kicked out of the event. These facts together demonstrate Defendants' intent to deceive the public into believing that (i) the celebrity endorsers are actually consuming Monster Energy® Branded Drinks when they are not; and (ii) that Monster Energy® Branded Drinks are so safe for regular consumption that the celebrity athletes and musicians consume it on a regular basis.

**G.     Defendants' Labeling, Advertising and Marketing of Their Monster Energy® Branded Drinks Is False and Misleading and Fails Adequately to Warn of Dangers of Frequent and Excessive Consumption**

85.     Monster Energy® Branded Drinks contain significantly high amounts of caffeine, in addition to other stimulants, like guarana, which contain hidden amounts of additional caffeine. The amino acid – taurine – is also found in Monster Energy® Branded Drinks. Although the Company does not identify the amount of caffeine in each can, it has disclosed through other sources that one 16-oz. can of Monster Energy® contains approximately 160 milligrams of caffeine – the equivalent of four (4) 12-oz. cans of Coca-Cola, while the 24-oz. can contains 240 milligrams of caffeine, or the equivalent of seven (7) cans of Coke.

86.     Health experts have voiced concerns about energy drinks over the past few years, saying the caffeine content can be as high as 550 mg. The maximum allowable caffeine limit set by the FDA for cola-like drinks is 0.02%, or 71 mg per 12-oz. serving. *See Journal of the American Medical Association* ("*JAMA*") article, "The "High" Risk of Energy Drinks," by Amelia M. Arria, Ph.D. and Marie Claire O'Brien, M.D., published online January 25, 2011. A December 2012 study by Consumer Reports found that Monster had more than 270 mg of caffeine in a 24-oz. can. At the time, Monster dismissed its finding claiming that the Company does not post caffeine amounts because "there is no legal or commercial business requirement to do so, and also because our products are completely safe, and *the actual numbers are not meaningful to most consumers*."

AMENDED COMPLAINT

87.    Defendants have proven that they have marketing genius and this genius has been resoundingly rewarded by the market – both its shareholders and its consumers. Notwithstanding the high caffeine levels in Monster Energy® Branded Drinks and scientific evidence of the serious health risks that they pose, especially for the teenagers and youth that the Company specifically targets Monster Energy® Branded Drinks fail miserably in providing any warnings on its products as to the effects of frequent or excessive caffeine consumption to the teenagers and youth it targets.

88.    The only notation that the Company has on a Monster Energy® can is hidden in fine print: "Consume responsibly – Max 1 can per four hours, with limit 3 cans per day. Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing."



89.   Monster Energy® Branded Drinks can labels have **<u>NO WARNING</u>** for the teenagers and adolescents the Company targets. Children are deemed to be persons under the age of 12. In a recent article, Monster claimed that its target market is 18 to 34 years old but that its drinks are nevertheless safe for children as well. In light of internal Company documents demonstrating that Monster's marketing is intended for children and youth, this hardly is a credible safety endorsement. Moreover, Monster's CEO Sacks and MEC President Hall consider energy drinks to be "the new soft drinks."

90.   Three 16-oz. cans contain, even by Defendants' standards, more than 480 mg of caffeine, significantly more than the 400 mg that that the FDA has stated is safe for healthy adults to consume. The safe level for adolescents according to the American Academy of Pediatrics is much lower – no more than 100 mg of caffeine per day from all sources. According to the University of California, teenagers who consume more than 100 mg of caffeine per day are at an increased risk for high blood pressure. One study in *Pediatrics*, a medical journal, says, "Caffeine can be lethal in doses ranging from 200 to 400 milligrams," and affects various organ systems by increasing heart rate, blood pressure, speech rate, motor activity, attentiveness and body temperature. Thus, drinking even one can of a Monster Energy® Branded Drink is unhealthy for an adolescent.

91.   Remarkably, in a recent press release as well as during the Company's recent earnings conference call, Monster executives continue to "reiterate that our products are safe based on both our and the industry's long track record and the scientific evidence supporting the safety of our ingredients. We estimate that about 50 billion cans of energy drinks have been sold and ***safely consumed*** worldwide over the past 25 years, including more than 8 billion Monster Energy drinks over the past 11 years." This is simply untrue.

92.   Monster Energy® Branded Drinks have been cited in the deaths of five people in the past year, according to incident reports that doctors and

companies submit to the FDA. According to Shelly Burgess, an FDA spokeswoman, the reports said the victims consumed Monster Energy® Branded Drinks prior to their deaths. The five death reports, and a sixth in 2009, were among 37 adverse reaction reports since 2004 that mentioned Monster Energy® Branded Drinks, according to a log of incidents that health professionals, companies and the public voluntarily recorded with the FDA. *See* excerpt attached hereto as Exhibit B. The event reports linked to the Company claimed that some of the life-threatening illnesses were characterized by heart attack, chest pain and vomiting.

93.    A November 2011 report by DAWN, produced under the auspices of the Department of Health and Human Services, showed a tenfold increase in ER visits linked to energy drinks from 2005 (1,128 visits) and 2008 and 2009 (16,053 and 13,114 visits, respectively), representing about a tenfold increase, with about half those trips made by patients 18 to 25 years old. Meanwhile, sales of energy drinks have increased 240% in the same period. "Consumption of energy drinks is a rising public health problem because medical and behavioral consequences can result from excessive caffeine intake," the report concluded. "A growing body of scientific evidence documents harmful effects, particularly for children, adolescents and young adults."

94.    A January 10, 2013 update to The DAWN Report ("DAWN Update") reiterated its original conclusion that "energy drinks can be dangerous when used alone or in combination with other drugs or alcohol" and that "consumption of energy drinks is a rising public health problem because medical and behavioral consequences can result from excessive caffeine intake." Further, it found that the number of emergency department (ED) visits involving energy drinks doubled from 10,068 visits in 2007 to 20,783 visits in 2011. In 2011, more than half of energy drink-related ED visits involved energy drinks only (58%), and the remaining 42% involved other drugs. The DAWN Update also noted that "In each

AMENDED COMPLAINT

38

year from 2007 to 2011, there were more patients aged 18 to 39 than patients in other age groups involved in energy drink-related visits; however, the largest increase was seen among patients aged 40 or older, for whom visits increased 279 percent from 1,382 visits in 2007 to 5,233 visits in 2011."



Figure 4. Energy Drink-Related Emergency Department (ED) Visits, by Age Group: 2007 and 2011

* The difference between the number of visits in 2007 and 2011 was statistically significant at the .05 level among patients aged 40 or older.
Source: 2011 SAMHSA Drug Abuse Warning Network (DAWN).

95.     Although the dominant audience for Monster Energy® Branded Drinks is made up of teens and people in their early 20s, the Dawn Update's research and findings suggest that older adults may also be vulnerable to the effects of energy drinks, even though the drinks are marketed with claims of having a positive impact on energy and concentration. Frequent consumption of Monster Energy® Branded Drinks is harmful to people of all ages, as is apparent from the

health issues that plaintiff Townsend had and continues to have from over five years of regular consumption of Monster Energy® Branded Drinks.

96.     Health advocates and experts have been concerned about the use of energy drinks among adolescents and trying for some time now to draw attention to the issue of energy drink consumption by kids. In 2011, the *Journal of Pediatrics* published a report titled, "Health Effects of Energy Drinks on Children, Adolescents, and Young Adults" warning that the consequences of energy drink consumption included "palpitations, seizures, strokes, and even sudden death." The authors also specifically warned parents that the drinks could be dangerous for kids with heart problems, diabetes, or ADHD (attention deficit hyperactivity disorder).

97.     Recently, the parents in Maryland sued MBC claiming the drinks led to caffeine toxicity that killed their daughter. Fourteen year-old Anais Fournier, who had a pre-existing heart condition, went into cardiac arrest after drinking two 24-oz. cans of the Monster Energy® Branded Drinks two days in a row in December 2011. She was pronounced brain dead six days later.

98.     Earlier this year, the National Council of Sports and Fitness issued a report, "Youth and Energy Drinks," warning that kids confuse energy drinks like Monster Energy® Branded Drinks with the sports drinks marketed by their sports heroes. Monster's Rehab™ + Energy and Monster's Rehab™ Tea + Lemonade + Energy energy drinks reinforce this confusion with the misrepresentation, "quenches thirst, hydrates like a sports drink."

99.     Sports drinks contain water, salt and sugar, and are designed to replenish the electrolytes and energy one's body loses during exercise. Sports drinks do not contain chemicals that directly increase one's energy levels as energy drinks do. Defendants' product placement in the vicinity of sports drinks is also by design. *See* product placement below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20   100.   According to the 2009 Mayo Clinic study, convenience stores display

21   energy drinks next to the sports drinks, which can mislead the consumer into

22   thinking that they are similar products. The study notes that whereas sports drinks

23   can indeed provide hydration and replenishment of electrolytes and carbohydrates,

24   the elevated levels of caffeine in energy drinks have diuretic effects that increase

25   urinary output and natriuresis (excretion of an excessively large amount of sodium

26   in the urine). Additionally, according to the National Federation of High School

27   Associations (NFHS), energy drinks supply an amount of carbohydrate far beyond

28

that is recommended for physically active people, which can slow the rate at which fluid is absorbed into the bloodstream or lead to gastrointestinal distress.

101.  Amelia M. Arria, Ph.D., an epidemiologist who serves as director of the Center on Young Adult Health and Development at the University of Maryland School of Public Health stated: "In my opinion, some of the marketing messages go overboard about the health benefits of these drinks. The term 'energy drink' is misleading. Energy should come from calories – this is more about stimulation." Studies have shown almost 30% of college students consume energy drinks regularly, Dr. Arria said. The high concentrations of caffeine they contain can produce cardiovascular complications, especially in young people or those who are sensitive to caffeine, she said.

102.  According to a 2011 article by the American Academy of Pediatrics, of the 5,448 U.S. caffeine overdoses reported in 2007, 46% occurred in those younger than 19 years. The researchers of the 2011 study concluded, among other things that:

- **energy drinks have no therapeutic benefit**, and both the known and unknown pharmacology of various ingredients, combined with reports of toxicity, suggest that these drinks may put some children at risk for serious adverse health effects;

- typically, energy drinks contain high levels of caffeine, taurine, and guarana, which have stimulant properties and cardiac and hematologic activity, but manufacturers claim that energy drinks are nutritional supplements, which shields them from the caffeine limits imposed on sodas and the safety testing and labeling required of pharmaceuticals; and

AMENDED COMPLAINT

42

- youth-aimed marketing and risk taking adolescent developmental tendencies combine to increase over-dose potential.

103.   Most of these findings were reinforced in the February 2013 AAP Article, which was an evaluation by the Navy, Army and Air Force doctors of the current information about the content, benefits, and risks of the use of energy drinks by teens. These doctors expressed "great concern" over the safety and negative effects of energy drinks, given their high caffeine content and the common practice on college campuses (and most likely at the high school level as well) of mixing energy drinks with alcohol.

104.   The February 2013 AAP Article also noted:

Caffeine use and withdrawal have been linked to a variety of health effects, including irritability, anxiety, mental confusion, hand and limb tremor, osteoporosis, digestive problems, nausea, insomnia and sleepiness, urinary frequency, headache, palpitations, arrhythmias, and elevated blood pressure. Cardiovascular effects as a result of heavy caffeine use can be a significant source of morbidity in athletes. Hypertension and palpitations in the adolescent athlete often lead to extensive medical evaluations. The diuretic effect of high levels of caffeine could lead to dehydration in athletes who do not drink enough fluids to compensate.

105.   The February 2013 AAP Article also noted that caffeine remains on the World Anti-Doping Agency's (WADA) closely monitored drug list even after being removed from its list of banned substances in 2004. WADA is reconsidering its ban on caffeine given a recent adverse outcome in an Australian football league athlete. Athletes in the league routinely take as many as six caffeine tablets as a game-day stimulant, and then take a sleeping pill to "come down." A star player in

AMENDED COMPLAINT

43

the league was rushed to the hospital with complications following ingestion of this pill cocktail.

106.   The February 2013 AAP Article remarked that the National Collegiate Athletic Association (NCAA) also considers caffeine illegal if found in quantities in the urine that approximate five to eight cups of coffee consumed in one hour. Depending on the brand, that is the equivalent of as few as one to three energy drinks.

107.   In late February 2013, U.S. Senator Dick Durbin (D-IL), U.S. Senator Richard Blumenthal (D-CT) and U.S. Representative Ed Markey (D-MA) sent letters to the President of the National Collegiate Athletic Association (NCAA) and the Executive Director of the NFHS raising concerns about the marketing of energy drinks at high school and collegiate athletic events and asking for more information on what the organizations are doing to ensure student-athletes and schools are educated about possible health risks of energy drinks and what steps they are taking to limit the presence of marketing for these products at athletic events.

108.   The Congressmen pointed out that "Energy drinks with names like Monster Energy, Red Bull, Rockstar, Full Throttle, and AMP frequently target young people with claims to increase energy, attention, stamina, and physical performance." The letters noted that at some high school sporting events energy drinks are featured on scoreboards. They highlighted that "the practice of outstanding student-athletes at some high schools being awarded the 'Monster Energy Drink Player of the Game' often resulted in photos of these athletes being taken with a pack of Monster Energy in each hand." The Congressmen also noted that this "targeted marketing of young people appears to be working, with estimates of 30 to 50 percent of adolescents reporting consumption of energy drinks."

109.   Citing the February 2013 AAP Article, the Congressmen remarked that the "cardiovascular effects as a result of heavy caffeine use can be a significant source of morbidity in athletes," and, "given the unknown levels of caffeine and other poorly studied additives, there is significant risk associated with energy drink consumption that may outweigh the benefits in the adolescent consumer. . . . Other reports have pointed out that the ingredients found in these drinks can cause dehydration, irregular heartbeat, nausea, arrhythmia, and in some cases even death."

110.   The Congressmen urged both NFHS and the NCAA to educate students, schools, and athletic departments about the potential health risks posed to young people by consuming energy drinks and to play a meaningful role in limiting the marketing of energy drinks to student athletes at school-sponsored events.

111.   According to medical experts at the Department of Psychiatry and Behavioral Sciences at The Johns Hopkins University School of Medicine, the consumption of energy drinks may increase the risk for caffeine overdose in caffeine abstainers as well as habitual consumers of caffeine from coffee, soft drinks, and tea due to the lack of adequate labeling. Many energy drinks do not label their product with the amount of caffeine or display warning labels advising proper use. Consequently, consumers may be completely unaware of the amount of caffeine they are ingesting.

112.   Additionally, the potential for acute caffeine toxicity due to consumption of energy drinks may be greater than other dietary sources of caffeine since many energy drinks are marketed with claims of performance enhancing effects although the existence and extent of such effects has not been conclusively established.

113.   The Federal Food, Drug and Cosmetics Act provides in section 201(n) (21 U.S.C. §321(n)) that affirmative representations are not the only factor relevant to whether labeling is misleading. Rather,

> in determining whether the labeling of an article is misleading there shall be taken into account (among other things), . . . the extent to which the labeling fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.

21 U.S.C. §321(n).

114.   While touting the questionably positive qualities of Monster Energy® Branded Drinks, the Company fails to adequately warn of the dangers of frequent excessive consumption. Thus, the Company's labeling of its Monster Energy® Branded Drinks is false and misleading.

**H.   Defendants' Failure to Properly Label Monster Energy® Branded Drinks Has Caused Serious Bodily Injury to Consumers and Continues to Pose a Danger**

115.   Monster Energy® Branded Drinks are targeted towards people with active lifestyles. They can, however, cause adverse health conditions, especially in teenagers and adolescents who are still in the process of developing.

116.   Monster Energy® Branded Drinks can raise one's heart rate. The University of Washington reports that caffeine is a central nervous system stimulant and can increase one's heart rate. According to the University of Alabama at Birmingham, guarana has three times the caffeine content as caffeine in coffee. According to The Johns Hopkins University, in a survey of 496 college undergraduate students, 19% of students indicated that they experienced heart palpitations from energy drinks. The American Heart Association confirms this,

noting that people consuming two energy drinks everyday experienced blood pressure and heart rate increases. The American Heart Association states that energy drinks can pose an increased risk of heart problems during exercise, as one's heart rate naturally increases on its own during physical activity. High blood pressure, also known as hypertension, puts one's body at risk for numerous additional illnesses. Having high blood pressure can harden one's arteries, strain one's kidneys and cause permanent damage to one's heart.

117.   In 2007, Wayne State University in Michigan conducted a study on how energy drinks might affect blood pressure and the heart. Participants, who were in their 20s, drank two energy drinks a day for seven days straight. The participants did not consume caffeine for two days prior to the study. Heart rates were measured each day within two hours of consuming the energy drinks, while the participants were sitting down and not engaged in any strenuous activity. The results showed that there was an average heart rate increase of 11% on the seventh day, an increase of up to seven beats per minute. Blood pressure also increased by over 7%, which signified the added pressure to the heart.

118.   James Kalus, Pharm.D., senior manager of Patient Care Services at Henry Ford Hospital in Detroit, Michigan, and a former Wayne State University researcher who led the study, feels that the increases in blood pressure and heart rate may be due to the caffeine and taurine in the drinks. "Thousands of young adults are using these drinks," Dr. Kalus said. "Some are mixing the energy drinks with alcohol. We don't necessarily know how much they are drinking at a time or whether they are drinking before exerting themselves playing basketball or dancing." This is especially so since the marketing for energy drinks is combined with extreme sports, he said.

119.   Dr. Suzanne Steinbaum, a preventive cardiologist at Lenox Hill Hospital in New York City. "People may think that these energy drinks are healthy by the way they're marketed," she said. There are, however, 240 milligrams of

caffeine in some of these drinks, Dr. Steinbaum said. "That's seven times the amount of caffeine in a can of soda," she added. Caffeine can increase the heart rate tremendously and drive blood pressure up, Dr. Steinbaum explained.

120. Energy drinks cause drastic changes in energy levels. Caffeine's primary effect on the body is to stimulate the nervous system, producing a burst of energy, but this is followed by a period of diminished energy. These episodes were referred to as jolts and crashes, respectively, in a study published by *Nutrition Journal* in October 2007. Results of this study, which included almost 500 college students, indicated that jolts and crashes were experienced by 29% of subjects who drank energy drinks. In addition, 22% experienced headaches and 19% experienced heart palpitations.

121. The high sugar and caffeine content in Monster Energy® Branded Drinks can keep one wired for hours and cause sleep deprivation. Medline Plus reports that caffeine is absorbed by one's body quickly and distributed through the bloodstream. From this point, it quickly accesses one's brain. This can cause the caffeine to have an effect for hours after one drinks it. Monster Energy® Branded Drinks also contain additional ingredients such as carnitine, guarana, ginseng and taurine, each of which is believed to increase one's energy which may be disruptive to sleep.

122. Another side effect of Monster Energy® Branded Drinks is dehydration. Amy Peak, an assistant professor at Butler University's College of Pharmacy and Health Sciences, reports that the combination of caffeine and guarana in energy drinks can lead to dehydration. According to Brown University, the caffeine in energy drinks acts as a diuretic and can leave one severely dehydrated. This is particularly concerning where one uses Monster Energy® Branded Drinks as a pre-workout dietary supplement.

123. According to a 2009 study by the Mayo Clinic, regulation of energy drinks, including content labeling and health warnings are the laxest in the United

States.[4] According to the study, this absence of oversight has resulted in aggressive marketing of energy drinks, targeted primarily toward young men and openly promoting psychoactive, performance-enhancing, and stimulatory effects. Alarmingly, energy drink consumption has been shown to be positively associated with high-risk behavior, including marijuana use, sexual risk taking, fighting, failure to use seat belts, and taking risks on a dare, as well as with smoking, drinking, problems stemming from alcohol abuse, and illicit drug use.

124.   There appears to be no alcohol in Monster Energy® Branded Drinks. However, Monster's internal marketing documents demonstrate that the Company actively promotes the mixing of Monster Energy® Branded Drinks with alcohol under the heading "Mix it UP." *See* Ex. A. Monster has special names for its mixed drinks, including: The Monster Rail, Jager Monster, Montini, Monster Screw, and others. *Id.* Monster even provides recipes on its website under the link Events & Nightlife. *Id.* Additionally, Monster has been working with Anheuser-Busch under its 2006 distribution agreement to ensure and expand the on-site availability of Monster Energy® Branded Drinks in restaurants, bars and nightclubs. Significantly, some clinical studies have demonstrated a relationship between energy drink consumption and alcohol abuse. According to a study published in the

---

[4] This is underscored by the FDA's response to certain senators' requests on the FDA to investigate health risks associated with mixing caffeine and other stimulants. The FDA said it had not found any safety studies that showed the mix of ingredients in energy drinks to be dangerous, but conceded that its preliminary review may be greatly enhanced by engaging specialized expertise outside the FDA, focusing particularly on the *vulnerability of certain populations to stimulants and the incidence and consequence of excessive consumption of energy drinks, especially by young people*. The FDA assured the senators that it was continuing its investigation and that if it did find such risks in its ongoing research into the products, it would consider taking regulatory action. Most importantly, the FDA acknowledged that resource and capacity constraints preclude the government or government-funded toxicity testing of all possible combinations.

February 2011 issue of *Alcoholism, Clinical and Experimental Research*, energy drink consumption appears to be a risk factor for alcohol dependence. Specifically, college students who reportedly drank energy drinks daily or weekly, were more likely to report consuming alcohol more frequently and in greater amounts, than students who drank energy drinks less than once a week or not at all.

125.   According to a *JAMA* article entitled "The 'High' Risk of Energy Drinks" by Amelia M. Arria, Ph.D. and Marie Claire O'Brien, M.D., published online January 25, 2011,

> the practice of mixing energy drinks with alcohol – which is more widespread than generally recognized – has been linked consistently to drinking high volumes of alcohol per drinking session and subsequent serious alcohol-related consequences such as sexual assault and driving while intoxicated. Although consumers might be under the impression that caffeine counteracts the adverse effects of alcohol, research has demonstrated that individuals who combine energy drinks with alcohol underestimate their true level of impairment. Although any type of caffeine consumption after a drinking session might reduce sleepiness, it does not alleviate alcohol-related impairment. The state of being less likely to accurately appraise the true level of impairment has been labeled "wide-awake drunkenness" and can lead to engaging in risky behavior. Recent regulatory actions to encourage removal of caffeine from some premixed alcoholic energy drinks should alert consumers that mixing alcohol with highly caffeinated energy drinks carries similar health risks and that this practice is not comparable to consuming mixed drinks such as rum and Coke, which have much lower caffeine concentrations. A second major concern is that simultaneously consuming alcohol and energy drinks can prolong the drinking session

AMENDED COMPLAINT

by keeping the individual awake longer and therefore may lead to drinking much more alcohol than intended.

126.   The February 2013 AAP Article also pointed to a study of energy drink consumption among college students, which concluded that those who mixed energy drinks with alcohol often consumed three or more energy drinks.

127.   Adolescents who combine energy drinks with alcohol perceive less of an effect from alcohol. For example, one study noted that young adults who consumed energy drinks with alcohol felt fewer symptoms such as headache, weakness, and impaired muscular coordination. But these participants still were impaired in terms of motor coordination and visual reaction time. The study by Dr. O'Brien reported that 15% of adolescents mixed energy drinks with alcohol "to drink more and not feel as drunk," and 5% of teens "did not want to look as drunk."

128.   Drs. Arria and O'Brien suggest that regardless of whether energy drinks are mixed with alcohol, recent research suggests that, even after adjustment for potential confounders such as heavier drinking patterns, energy drink use might confer a risk for alcohol dependence and perhaps nonmedical prescription drug use. Based on their research, Drs. Arria and O'Brien find "[p]robably most concerning is the possibility that caffeine's neuropharmacologic effects might play a role in the propensity for addiction. . . . [T]he message to health professionals, consumers, and the energy drink and alcohol industries should be clear: the consumption of energy drinks mixed with alcohol may have adverse health and safety consequences."

I.   **Defendants Have Profited Immensely from Their False and Misleading Labeling and Advertising and Failure to Warn**

129. Defendants' unique approach to labeling, print and internet advertising, promotion and general marketing of the Monster Energy® Branded

AMENDED COMPLAINT

51

Drinks has been immensely profitable. MBC is one of the fastest growing public companies.

130.   Defendants boast that more than eight billion cans of Monster Energy® Branded Drinks have been sold and safely consumed in the United States and around the world since 2002; including more than two billion cans just in the year 2012.

131.   Indeed, of the Company's two reportable segments – DSD, whose principal products comprise Monster Energy® Branded Drinks, and Warehouse, whose principal products comprise juice based and soda beverages – the Company's DSD segment represented 95.4%, 94.4%, 93% and 91.4% of the Company's consolidated net sales for the years ended December 31, 2012, 2011, 2010 and 2009, respectively. Monster Energy Branded Drinks represented 92.1%, 91.2%, 89.9% and 90% of the Company's net sales for the years ended December 31, 2012, 2011, 2010 and 2009, respectively. These figures demonstrate that Monster Energy® Branded Drinks are materially significant to the very existence of the Company.

132.   Further, in filings with the Securities and Exchange Commission, the Company stated that its gross profit for the year ended ending December 31, 2012 was $1.066 billion, an increase of approximately $171.3 million, or 19.2% higher than 2011 gross profit of $894.3 million, which was 31.5% higher than in 2010. Monster admits that the increase in gross profit dollars for all these years was primarily the result of the increases in gross sales of Monster Energy® Branded Drinks.

133.   The Company's public filings acknowledge the risk that because Monster Energy® Branded Drinks currently generate the vast majority of its sales (over 95% in 2012, over 94% in 2011, and over 93% in 2010), any criticism of the Monster Energy® Branded Drinks of the nutritional benefits the Monster Energy®

Branded Drinks, could result in decreased demand, which in turn could have a significant adverse effect on Monster's future business and financial results.

134.   The Company also acknowledges that there are currently pending proposals to enact legislation to limit or restrict the sale of energy drinks generally to minors and/or persons below a specified age and/or restrict the venues in which energy drinks can be sold and/or restrict the use of food stamps and the like to purchase energy drinks. For example, in January 2013, Chicago Alderman Ed Burke proposed a ban on the sale and distribution of energy drinks (defined as "a canned or bottled beverage which has 180 milligrams or more of caffeine per single-serve container and contains Taurine or Guarana") to all consumers, not just minors, in Chicago.

135.   In February 2013, Suffolk County, New York Legislator William Spencer proposed two local laws; one would ban the distribution of free samples of energy drinks (which the law would characterize as "stimulant drinks") to individuals under the age of eighteen in that county, and the second would ban the sale or distribution of such drinks in Suffolk County parks.

136.   Defendants concede that should these proposals succeed, any such legislation would result in a reduction in demand for Monster Energy® Branded Drinks and adversely affect the Company's profit margin. Thus, by its own admission, Monster Energy® Branded Drinks and their continued availability to all – even minors, teens, and youth – are vital to the Company's continued success, and even to its very existence.

## J.   The Company's Energy Drink Labeling Continues to Be Under Investigation

137.   For many years, Monster had evaded any meaningful regulation of its energy drinks by the FDA primarily by classifying Monster Energy® Branded Drinks as a "dietary supplement," i.e., not a conventional "food" or "beverage." Ordinarily the FDA evaluates the safety of ingredients for beverages or other

conventional foods (including "energy drinks" represented as beverages, which are conventional foods) through food additive pre-market programs that generally focus on individual ingredients that may be used in a range of food, rather than on a product-specific basis. The FDA concedes that it does not have authority to require a manufacturer to submit each formulated product for pre-market review.

138.   Defendants have relied on this gray area to circumvent applicable standards by marketing the Monster Energy® Branded Drinks akin to a beverage or sports drink, but not being subject to regulation by classifying them as a "dietary supplement." While competitors like Red Bull, NOS, Full Throttle and Amp marketed their energy drinks as beverages, until recently the Company marketed Monster Energy® Branded Drinks as dietary supplements.

139.   Two months after plaintiff Fisher filed the initial complaint in this matter, Monster announced on February 13, 2013, that it was changing the labeling on its Monster Energy® Branded Drink cans so that its energy drinks will no longer be considered dietary supplements, but a traditional beverage. Monster's CEO Sacks stated that the Monster Energy® Branded Drink cans will now list "Nutrition Facts" rather than "Supplement Facts," and disclose caffeine content.

140.   Monster's senior executives claim that the change has not been implemented yet and will be put into effect as and when new packaging is manufactured and new products are introduced. They also stated that the ingredients currently in Monster Energy® Branded Drinks will remain the same. Monster defensively contends that the criticism leveled against the Company that it was evading FDA regulation is untrue because Monster Energy® Branded Drinks "could equally satisfy the regulatory requirements applicable to both regulatory categories [dietary supplement as well as traditional food]."

141.   Whether Monster's claims are accurate remains to be seen. Dietary supplement manufacturers have greater leeway over what types of ingredients they

can include in their products, but also face more stringent reporting requirements when it comes to possible adverse effects on consumers. Monster will no longer be required to report serious adverse events to the FDA because foods are not subject to this requirement.

142. Although companies generally have more leeway in the ingredients they can add to dietary supplements, with products considered to be food or drinks, companies can only use ingredients that are approved food additives or that are "generally recognized as safe" or GRAS. Although Monster claims that it plans to keep its ingredients the same, it will be interesting to see how it plans to do so under the new regulations. For instance, the FDA established a safe limit for caffeine in cola-like beverages in 1959 at 200 parts per million (or 71 mg for a 12-oz. can of soda, though an average can of Coke has only 35 mg of caffeine). Since Monster Energy® Branded Drinks are currently classified as a dietary supplement, they are not limited to the FDA's 200 parts per million caffeine limit on sodas. Coca Cola Classic has 30 to 35 mg of caffeine per 12-oz. can, but 12 oz. of the Monster Energy® Branded Drinks contain four times that amount.

143. In July 2012, the Company was subpoenaed by the New York Attorney General ("NYAG") in connection with an investigation into its advertising, marketing, promotion, ingredients, usage and sale of its Monster Energy® Branded Drinks, specifically whether the Company was misleading consumers about how much caffeine the drinks contain and the health risks they could pose. The NYAG investigation focuses, among other things, on whether Monster (and other companies) violated federal law in promoting the drinks as dietary supplements rather than as foods, which are regulated more strictly.

144. State investigators are also examining whether all of the ingredients that go into the beverages are properly disclosed particularly since some additives,

AMENDED COMPLAINT

like black tea extract and guarana, may contain additional caffeine that is not reflected when the drinks are labeled.

145. In an October 31, 2012 letter, the City Attorney of San Francisco, Dennis J. Herrera, sent a letter to MBC demanding that the Company provide evidence that supports the advertising and marketing claims it makes to adolescents for its energy drinks and to substantiate its claim that large daily quantities of Monster Energy® Branded Drinks were safe for adolescents and adults, including claims that consumers of Monster Energy® Branded Drinks:

- "[C]an never get too much of a good thing!"
- "3 cans per day" of 16-oz. Monster is "responsible" or safe consumption by adolescents and adults.
- "[B]igger is better."
- "2 cans per day" of 24-oz. Monster is "responsible" or safe consumption by adolescents and adults.
- Monster and Monster Mega are safe for consumption except for "children, pregnant women or people sensitive to caffeine."

146. Mr. Herrera also echoed concerns that MBC seems to have chosen to label its Monster Energy® Branded Drinks as a "dietary supplement" rather than as a conventional food or beverage in an attempt to circumvent the safety standards required for food and beverage additives. Mr. Herrera's letter noted that Monster Energy® Branded Drinks did not meet the definition of a "dietary supplement."

147. As the FDA has explained, "the packaging of liquid products in bottles or cans similar to those in which single or multiple servings or beverages like soda, bottled water, fruit juices, and iced tea are sold, suggests that the liquid product is intended for use as a conventional food." Monster is marketed in a single serving can similar in size, shape and appearance to conventional beverages.

148.   Mr. Herrera also pointed out that the fact that MBC refers to its products as "Monster Energy® Branded Energy Drinks," and states that "Monster Energy delivers 'twice the buzz of a regular energy drink,'" belied any notion that "[MBC's] products are not beverages." Indeed, the Company's public filings reinforce this – nowhere in its public filings does the Company refer to Monster Energy® Branded Drinks as a "dietary supplement." In describing its signature Monster Energy® Branded Drink, the Company states: "In 2002, we launched a new carbonated energy drink under the Monster Energy® brand name in 16-ounce cans . . . . Our Monster Energy® drinks contain vitamins, minerals, nutrients, herbs and supplements (collectively, 'supplement') and are marketed through our full service distributor network."

149.   In his letter, Mr. Herrera also noted that

> [d]espite exceedingly high caffeine levels, Monster Beverage Corporation encourages unsafe and irresponsible consumption of Monster Energy products. Monster's labeling recommends that individuals consume no more than three 16 oz. cans or two 24 oz. cans per day, which amounts to a total of 48 oz. of Monster per day. But 48 oz. of Monster contains 480 mg of caffeine, nearly five times the caffeine that is safe for adolescents to consume in an entire day, and more than the 400 mg per day the FDA has indicated is safe for healthy adults.

150.   Mr. Herrera further noted that "[r]ather than warning consumers to exercise constraint or caution, Monster's marketing states that 'bigger is always better' and 'you can never get too much of a good thing.'" The Company urges consumers to "chug it down," or "throw [it] back." The Company states that its product has a "smooth flavor you can really pound down," and that one of its products has "the biggest chugger friendly wide-mouth we could make."

AMENDED COMPLAINT

57

151.   Many countries ban or restrict energy drink sales. Germany, Norway, France and Denmark among some of the countries that have banned the sale of energy drinks in their countries (only permitting sales in pharmacies classifying them as medicine for their high caffeine content). Germany has been tracking energy drink related health problems since 2002. Reported outcomes include: liver damage, kidney failure, respiratory disorders, agitation, seizures, psychotic conditions, heart failure, and death. Other countries with bans on energy drinks include: Australia, Denmark, Turkey, and Uruguay. In addition, Sweden, Norway and Canada have placed some sales restrictions on the drinks. Many more countries, including Nigeria, are reviewing possible restrictions/bans on energy drinks.

152.   Many countries require the Company to sell Monster Energy® Branded Drinks as food. In Canada, Monster Energy® Branded Drinks were recently reclassified as food, and thus are subject to regulation by Health Canada. On January 1, 2013, regulations took effect in Canada that limit the amount of caffeine contained in any beverage in a single-serving can or bottle to less than 180 milligrams. Some countries levy a tax based on caffeine content. On January 1, 2011, the Mexican legislature imposed a 25% excise tax on energy drinks based on caffeine content. In response Defendants adjusted the caffeine levels in Monster Energy® Branded Drinks that are sold in Mexico to address this legislation. In 2011, Hungary implemented a tax on energy drinks and the Company's Monster Energy® Branded Drinks sold in Hungary are subject to this tax.

## CLASS ACTION ALLEGATIONS

153.   Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this class action and seeks certification of a class comprised of:

All persons who, during the Class Period (December 12, 2008 to the present) purchased any Monster Energy® Branded Drinks for

AMENDED COMPLAINT

1       personal use and not for purposes of further retail sale or distribution

2       (referred hereinafter as the "Class").

3 For purposes of this class definition, the term "Monster Energy® Branded Drinks"

4 includes Monster Energy®, Lo-Carb Monster Energy®, Monster Energy®

5 Assault®, Monster Khaos®, Monster M-80®, Monster MIXXD®, Monster

6 Energy® Absolutely Zero, Monster Energy® Import Light, Monster Energy® Dub

7 Edition Baller's Blend, Monster Energy® Dub Edition Mad Dog, Monster

8 Rehab™ Tea + Lemonade + Energy, Monster Rehab™ Rojo Tea + Energy,

9 Monster Rehab™ Green Tea + Energy, Monster Rehab™ Protean + Energy,

10 Monster Energy® M3™ Super Concentrate, Java Monster® Kona Blend, Java

11 Monster® Loca Moca®, Java Monster® Mean Bean®, Java Monster® Vanilla

12 Light, Java Monster® Irish Blend®, Java Monster® Toffee, Monster Energy®

13 Import, Monster Energy Extra Strength Nitrous Technology® Super Dry™,

14 Monster Energy Extra Strength Nitrous Technology® Anti-Gravity®, Monster

15 Energy Extra Strength Nitrous Technology® Killer B®, Monster Energy Extra

16 Strength Nitrous Technology® Black Ice™, X-Presso Monster® Hammer, X-

17 Presso Monster® Midnite, Übermonster® Energy Brew.

18     154. Excluded from the definition of the Class are: Defendants,

19 Defendants' employees, any entity in which Defendants have a controlling interest

20 or which holds a controlling interest in Defendants, including, but not limited to,

21 any warehouses or distributors in which Defendants have a controlling interest

22 during the Class Period and Defendants' legal representatives, assigns and

23 successors; all persons who make a timely election to opt out of the proposed

24 Class, and governmental entities, including the Judge and the judicial staff

25 assigned to this case.

26     155. Subject to additional information obtained through further

27 investigation and discovery, Plaintiffs may expand or narrow the foregoing

28 definition by amendment or amended complaint, as permitted by the Court.

156.   Monster's policies, practices, misrepresentations and omissions apply uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the Class were and continue to be similarly affected by being subjected to the same labeling, advertising and marketing and by not receiving disclosure of the risks associated with consuming Monster Energy® Branded Drinks. The relief sought herein is for the benefit of Plaintiffs and members of the Class. Defendants' marketing, advertising and promotional practices as detailed above applied uniformly to all members of the Class throughout the Class Period, so that the questions of law and fact detailed herein are common to all members of the Class.

157.   All Class members were and are similarly affected by purchasing Monster Energy® Branded Drinks for their intended and foreseeable purpose as promoted, advertised, packaged, and labeled by Defendants' and as set forth in detail above.

158.   The proposed Class is so numerous that joinder of all members would be impracticable. Based on the annual sales of Monster Energy® Branded Drinks and their popularity, it is apparent that the number of consumers of Monster Energy® Branded Drinks would be so large as to make joinder impossible. Moreover, the Company concedes that it had sold over 8 billion cans of Monster Energy® Branded Drinks since 2002, and over two billion cans in 2012 alone.

159.   Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including, *inter alia*:

>    (a)   Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks were false, misleading or likely to deceive or confuse consumers;

(b)     Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks violated the MMWA, 15 U.S.C. §2301, *et seq.*;

(c)     Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks was unfair, deceptive or unlawful or in any respect, thereby violating California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §17200*, et seq.*;

(d)     Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks was unfair, deceptive or unlawful or in any respect, thereby violating California's UCL, Bus. & Prof. Code §17500, *et seq.*;

(e)     Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks violated the CLRA, Cal. Civ. Code §1750, *et seq.*;

(f)     Whether Defendants failed to disclose, or adequately disclose, the amount of caffeine in Monster Energy® Branded Drinks or the risks associated with caffeine as used in Monster Energy® Branded Drinks;

(g)     Whether Defendants failed to disclose, withheld or misrepresented material information regarding the health effects on Monster Energy® Branded Drinks is an effort to deceive consumers;

AMENDED COMPLAINT

61

(h)   Whether Defendants' Monster Energy® Branded Drink labels were false and misleading because they failed to warn consumers of the risks of frequent or excessive consumption of Monster Energy® Branded Drinks, including specifically the teenagers and youth the Company targets;

(i)   Whether Defendants acted intentionally in their deceptive and false advertising, marketing, promotion and sale of Monster Energy® Branded Drinks;

(j)   Whether Defendants' practices, representations or omissions deceived or have the capacity to deceive;

(k)   Whether Defendants breached express and implied warranties in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks;

(l)   Whether Defendants knew or should have known of the false and misleading nature of its advertising and labeling before putting the Monster Energy® Branded Drinks subject to such advertising and labeling into the stream of commerce for purchase and use by Plaintiffs and the Class;

(m)   Whether Defendants' conduct described above resulted in ill-gotten gains and, if so, the extent of the ill-gotten gains; and

(n)   Whether Defendants' conduct as set forth above injured consumers and, if so, the nature and extent of the injury; and

(o)   Whether, and to what extent, injunctive relief should be imposed on Defendants to prevent such conduct in the future.

160.   The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, and the relief sought is common. The misrepresentations

and omissions as to Plaintiffs when they purchased Monster Energy® Branded Drinks are similar to the misrepresentations and omissions made to other Class members across the country. Plaintiffs and all Class members have suffered economic injury as a result of Defendants' misrepresentations and omissions, and the Company has realized massive ill-gotten gains associated with the sale of its Monster Energy® Branded Drinks. Absent this class action, the members of the Class will continue to suffer losses and the violations of law described herein will continue without a practical remedy, and Defendants would unjustly retain the proceeds of their ill-gotten gains. Defendants continue to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

161.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiffs and their counsel do not foresee any circumstances where the interests of Plaintiffs would be adverse to the interests of the Class.

162.   Certification of this class action is appropriate under Fed. R. Civ. P. 23, because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes a class action superior to other available methods for the fair and efficient adjudication of this controversy. It would be economically impractical for Plaintiffs and Class members to pursue individual actions against Defendants as the costs of prosecution would likely surpass their individual damages. Thus, Plaintiffs and Class members would be left with no effective remedy for the damages they suffered and continue to suffer. Class treatment of Plaintiffs' claims will permit Plaintiffs and the Class to vindicate their rights against Defendants and conserve the resources of the Court and the Parties. Class treatment will also avoid the possibility of inconsistent outcomes that could result from a multitude of individual actions in varying jurisdictions nationwide.

163.   Certification also is appropriate because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of consumers of Monster Energy® Branded Drinks, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

164.   A class action is a manageable, fair and appropriate method for the group-wide adjudication of this controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the Courts that individual actions would engender.

165.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude maintenance as a class action. Moreover, the benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## COUNT I

### For Violations of the UCL, Cal. Bus. & Prof. Code Section 17200, *et seq.*

166.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

167.   This cause of action is brought pursuant to California Business & Professions Code §17200, *et seq.*, which provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by

AMENDED COMPLAINT

Chapter I (commencing with Section 17500) of the Business and Professions Code."

168. Defendants' practices, representations and omissions, as set forth above, were intended to promote the sale of Monster Energy® Branded Drinks and constitute unfair, deceptive and/or unlawful business practices within the meaning of California Business & Professions Code §17200, *et seq*.

169. Defendants committed unfair business acts and/or practices. Nothing in Monster's packaging, labeling, advertising, marketing, promotion or sale of Monster Energy® Branded Drinks disclosed, or adequately disclosed, the amount of caffeine in Monster Energy® Branded Drinks or the risks associated with caffeine as used in Monster Energy® Branded Drinks, as set forth in detail above.

170. Statements on Defendants' Monster Energy® Branded Drinks labels lack proper warnings, and are thus considered false, misleading and/or deceptive representations, practices or omissions. Defendants have consistently failed to disclose or warn consumers that Monster Energy® Branded Drinks may increase blood pressure and/or heart rate of consumers who ingest Monster Energy® Branded Drinks or that such drinks may cause nervousness, irritability, and/or sleeplessness, and that this failure to disclose or warn deceives or tends to deceive consumers. Consequently, consumers who purchase Defendants' Monster Energy® Branded Drinks may experience an increase in blood pressure and/or an increase in their heart rate without having knowledge of such adverse reactions associated with drinking Monster Energy® Branded Drinks.

171. Plaintiffs relied on the truth and accuracy of the labeling and marketing of Monster Energy® Branded Drinks, but based on the label's failure to disclose, or adequately disclose, the amount of caffeine in the energy drinks or the risks associated with caffeine and other ingredients as used in Monster Energy® Branded Drinks, material facts that would have been substantial factors in Plaintiffs' decision to purchase and consume Monster Energy® Branded Drinks for

the reasons set forth above, Plaintiffs were deceived by Defendants into purchasing and paying for the Monster Energy® Branded Drinks as set forth above.

172.   The utility of Defendants' practices, representations and omissions related to the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks without disclosing, or adequately disclosing, that the amount of caffeine in Monster Energy® Branded Drinks or the risks associated with the proprietary energy blend as used in Monster Energy® Branded Drinks, is negligible, if there is any utility at all, when weighed against the harm to the general public, Plaintiffs and members of the Class.

173.   The harmful impact upon members of the general public and the Class – particularly the teenagers and youth the Company targets in its advertising, marketing and promotion campaign – who purchased and used Monster Energy® Branded Drinks outweighs any reasons or justifications by Defendants for the unfair business practices they employed to sell Monster Energy® Branded Drinks described herein, particularly considering the reasonably available alternatives.

174.   Defendants had an improper motive (profit before accurate marketing) at their intended audience in their practices, representations and omissions related to the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks, specifically by implementing promotions and other marketing strategies designed to attract adolescents and youth, as set forth above.

175.   The use of such unfair business acts and practices was and is under the sole control of Defendants, and was deceptively hidden from members of the Class and the general public in their packaging, labeling, advertising, marketing, promotion and sale of Monster Energy® Branded Drinks.

176.   Defendants engaged in deceptive acts or practices by failing to disclose, or adequately disclose, to the consumers targeted by Defendants' advertising and promotional campaign, the amount of caffeine in Monster Energy® Branded Drinks or the risks associated with the frequent or excessive

consumption of the proprietary energy blend as used in Monster Energy® Branded Drinks, and set forth in detail above.

177.   Defendants also engaged in deceptive acts or practices in labeling and describing Monster Energy® Branded Drinks in a manner as to appeal to pre-teens and teens, and by comparing favorably the "buzz" one gets from drinking Monster Energy® Branded Drinks to that obtained by drinking alcohol.

178.   Defendants engaged in deceptive acts or practices by promoting the stocking of Monster Energy® Branded Drinks near sports drinks and comparing the hydration benefits to sports drinks.

179.   These deceptive acts and practices had a capacity, tendency, and/or likelihood to deceive or confuse reasonable consumers into believing that Monster Energy® Branded Drinks posed no greater risk to the health of those who drank it than did other sports drinks, particularly given the existence of peer-reviewed scientific studies indicating the dangers of caffeinated energy beverages.

180.   Defendants also engaged in unlawful business practices by violating California's False Advertising Law ("FAL"), the CLRA, the MMWA as well as state warranty laws, as set forth in detail below. The violations of these laws serve as predicate violations of this prong of the UCL.

181.   As a purchaser and consumer of Monster Energy® Branded Drinks, and as a member of the general public who purchased and used Monster Energy® Branded Drinks, Plaintiffs have standing and are entitled to and do bring this class action seeking all available remedies under the UCL.

182.   Pursuant to California Business & Professions Code §17203, Plaintiffs seek an order of this Court for injunctive relief and disgorging from Defendants and restoring to Plaintiffs and members of the Class all monies that may have been acquired by Defendants as a result of such unfair, deceptive and/or unlawful business acts or practices.

183.   Plaintiffs, members of the Class and the general public may be irreparably harmed and/or denied an effective and complete remedy if such relief is not granted.

184.   As a result of Defendants' violations of the UCL, Plaintiffs and members of the Class are entitled to restitution for out-of-pocket expenses and economic harm in terms of the price they paid for Monster Energy® Branded Drinks. Monster Energy® Branded Drinks retail for prices higher than sports drinks or other energy drinks.

185.   Pursuant to California Civil Code §3287(a), Plaintiffs and members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct. The amount on which interest is to be applied is a sum certain and capable of calculation, and Plaintiffs and members of the Class are entitled to interest in an amount according to proof.

## COUNT II

### For Violations of the FAL, Bus. & Prof. Code Section 17500, *et seq.*

186.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

187.   In violation of California Business & Professions Code Section 17500, Defendants have disseminated, or caused to be disseminated advertising, labeling, packaging, marketing, and promotion of Monster Energy® Branded Drinks that is deceptive because of its failure to warn of the particular dangers inherent in consuming a highly caffeinated beverage containing other additives to form a proprietary energy blend.

188.   Defendants compounded this deception by likening the effect of drinking Monster Energy® Branded Drinks to consuming alcohol in the advertising, packaging and labeling of Monster Energy® Branded Drinks, and by promoting the stocking of Monster Energy® Branded Drinks near sports drinks.

AMENDED COMPLAINT

68

189.   These acts deceptively represented Monster Energy® Branded Drinks as posing no greater risk to the health of those who drank it than did sports drinks.

190.   Defendants' representations and omissions for Monster Energy® Branded Drinks are by their very nature unfair, deceptive and/or unlawful within the meaning of California Business & Professions Code §17500, *et seq.*, and were likely to deceive reasonable consumers.

191.   In making and disseminating the representation and omissions alleged herein, Defendants knew or should have known they were misleading, particularly given the existence of peer-reviewed scientific studies indicating the dangers of caffeinated energy drinks. Accordingly, Defendants acted in violation of California Business & Professions Code §17500, *et seq.*

192.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class members have suffered substantial harm.

193.   Pursuant to California Business & Professions Code §17535, Plaintiffs, on behalf of themselves and all others similarly situated, seek an order of this Court restoring all monies that may have been acquired by Defendants as a result of such deceptive acts and/or practices.

194.   As a result of Defendants' violations of the FAL, Plaintiffs and the Class are entitled to restitution for out-of-pocket expenses and economic harm.

195.   Pursuant to California Civil Code §3287(a), Plaintiffs and members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct. The amount on which interest is to be applied is a sum certain and capable of calculation, and Plaintiffs and members of the Class are entitled to interest in an amount according to proof.

AMENDED COMPLAINT

69

**COUNT III**

**For Violations of the CLRA, Cal. Civ. Code Section 1750,** *et seq.*

196.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

197.   This cause of action is brought pursuant to the CLRA.

198.   Plaintiffs and each member of the Class are "consumers" within the meaning of California Civil Code §1761(d).

199.   The purchases of Monster Energy® Branded Drinks by Plaintiffs and each member of the Class were and are "transactions" within the meaning of California Civil Code §1761(e).

200.   Defendants have violated the CLRA by, among other things, their representations, practices and omissions in the labeling, advertising, marketing, promotion and sales of Monster Energy® Branded Drinks that Monster Energy® Branded Drinks were safe for consumption when they knew or had access to information that indicated that Defendants' representations were false and misleading.

201.   Defendants' labeling, advertising, marketing, promotion and sales of Monster Energy® Branded Drinks as alleged herein, violated Section 1770(a) of the CLRA in at least the following respects for the reasons set forth in detail above:

      (a)   Misrepresenting the source, sponsorship, approval, or certification of goods or services (Cal. Civ. Code §1770(a)(2));

      (b)   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have (Cal. Civ. Code §1770(a)(5));

      (c)   Representing that goods or services are of a particular standard, quality, grade, or that goods are of a particular style or model, if they are of another (Cal. Civ. Code §1770(a)(7));

(d)    Advertising goods or services with intent not to sell them as advertised (Cal. Civ. Code §1770(a)(9));

(e)    Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law (Cal. Civ. Code §1770(a)(14)); and

(f)    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code §1770(a)(16)).

202.   As a result of the use or employment by Defendants of methods, acts or practices declared unlawful by the above provisions of Cal. Civ. Code §1770, Plaintiffs suffered damage in that they bought the Monster Energy® Branded Drinks and thus paid monies that they would not have expended had the true facts been accurately disclosed to them and had Monster Energy® Branded Drinks not been promoted as they were in light of the material adverse facts set forth above, or spent more money on Monster Energy® Branded Drinks than they otherwise would have. Plaintiffs therefore seek and are entitled to, on behalf of themselves and members of the Class, equitable relief in the form of an order for injunctive relief and requiring Monster to make full restitution of all monies wrongfully obtained as a result of the conduct described above.

203.   Pursuant to California Civil Code §1780(d), Plaintiffs request that this Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. If Defendants are not restrained from engaging in these types of practices in the future, Plaintiffs and other members of the Class will continue to suffer harm.

204.   Pursuant to California Civil Code §1782(a), Plaintiffs notified the Company, by certified letter dated December 12, 2012, received by Defendants on or about December 17, 2012, i.e., more than 30 days from the filing of this Amended Complaint, of the above-outlined violations of California Civil Code

§1750, *et seq*., and demanded that Defendants provide an appropriate remedy. After 30 days, Defendants provided no response and have failed to adequately address or remedy the violations and other wrongful conduct alleged herein.

205.   As a direct and proximate result of Defendants' violations of the CLRA as alleged herein, Plaintiffs and the members of the Class have been injured by, including, but not limited to, the infringement of their legal rights as a result of being subjected to the common course of unlawful conduct alleged herein; and being induced to purchase the Monster Energy® Branded Drinks that provided no benefit to them.

206.   Plaintiffs have also suffered injury in fact as a result of Defendants' conduct and have lost money in the form of payments made for the purchase of a product that, among other things, had uses or benefits which the Monster Energy® Branded Drinks did not have.

207.   In addition to restitution, Plaintiffs also separately seeks and are entitled to, pursuant to §1780(d) of the CLRA, an order for the equitable relief described above, as well as costs, attorneys' fees and any other relief which the Court deems proper.

## COUNT IV

### Breach of Express and Implied Warranty

208.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

209.   Plaintiffs and the Class purchased Monster Energy® Branded Drinks. By virtue of their purchases and the payment of monies, they formed a contract that included promises and affirmations made by Defendants through the labeling, packaging and accompanying advertising and marketing of the Monster Energy® Branded Drinks.

210.   The labeling and packaging of Monster Energy® Branded Drinks constitutes express warranties that Monster Energy® Branded Drinks are the "ideal combo of the right ingredients in the right proportion," "bigger is better . . . because you can never get too much of a good thing," and "hydrates like a sports drink". These warranties became part of the bargain between Plaintiffs and the Class on the one hand and Defendants on the other.

211.   Plaintiffs and the members of the Class relied upon Defendants' statements and Defendants' research and investigation regarding the safety of the Monster Energy® Branded Drinks in purchasing and consuming them.

212.   Defendants intended to and did in fact, and continue to the present, target their marketing to teenagers and adolescents by handing out free samples of Monster Energy® Branded Drinks outside high schools, sports and music events without regard to the age of the recipient.

213.   Monster Energy® Branded Drinks were not fit for the purposes for which they were intended. The Monster Energy® Branded Drinks Plaintiffs consumed were neither safe for their intended use, nor of merchantable quality, in that they do not contain "the right ingredients in the right proportions," bigger is not better and they do not hydrate like a sports drink. Defendants, thus, breached their express warranties with Plaintiffs and the Class, and they have been injured as a result.

214.   Defendants breached the following state warranty laws:

      1.     Alaska Stat. §45.02.313;

      2.     A.R.S. §47-2313;

      3.     A.C.A. §4-2-313;

      4.     Cal. Comm. Code §2313;

      5.     Colo. Rev. Stat. §4-2-313;

      6.     Conn. Gen. Stat. §42a-2-313;

      7.     6 Del. C. §2-313;

AMENDED COMPLAINT

8.      D.C. Code §28:2-313;

9.      O.C.G.A. §11-2-313;

10.     HRS §490:2-313;

11.     Idaho Code §28-2-313;

12.     810 ILCS 5/2-313;

13.     Ind. Code §26-1-2-313;

14.     K.S.A. §84-2-313;

15.     KRS §355.2-313;

16.     11 M.R.S. §2-313;

17.     Mass. Gen. Laws Ann. ch. 106 §2-313;

18.     Minn. Stat. §336.2-313;

19.     Miss. Code Ann. §75-2-313;

20.     R.S. Mo. §400.2-313;

21.     Mont. Code Anno. §30-2-313;

22.     Neb. Rev. Stat. §2-313;

23.     Nev. Rev. Stat. Ann. §104.2313;

24.     RSA 382-A:2-313;

25.     N.J. Stat. Ann. §12A:2-313;

26.     N.M. Stat. Ann. §55-2-313;

27.     N.Y. U.C.C. Law §2-313;

28.     N.C. Gen. Stat. §25-2-313;

29.     N.D. Cent. Code §41-02-30;

30.     ORC Ann. §1302.26;

31.     12A Okl. St. §2-313;

32.     Or. Rev. Stat. §72-3130;

33.     13 Pa.C.S. §2313;

34.     R.I. Gen. Laws §6A-2-313;

35.     S.C. Code Ann. §36-2-313;

AMENDED COMPLAINT

36.   S.D. Codified Laws, §57A-2-313;

37.   Tenn. Code Ann. §47-2-313;

38.   Tex. Bus. & Com. Code §2.313;

39.   Utah Code Ann. §70A-2-313;

40.   9A V.S.A. §2-313;

41.   Va. Code Ann. §59.1-504.2;

42.   Wash. Rev. Code Ann. §62A.2-313;

43.   W. Va. Code §46-2-313; and

44.   Wyo. Stat. §34.1-2-313.

215.   As a result of Defendants' breaches of express warranty, Plaintiffs and the other members of the Class were damaged in the amount of the purchase price they paid for the Monster Energy® Branded Drinks, in amounts to be proved at trial.

216.   Within a reasonable time after they knew or should have known of such breach, Plaintiffs placed Defendants on notice thereof.

217.   Whether or not expressly made, such warranties that the Monster Energy® Branded Drinks are fit for the purposes intended and are safe is implied by law in all consumer transactions.

218.   Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. *See* U.C.C. §2-314; Cal. Com. Code §2314.

219.   Monster Energy® Branded Drinks are "goods," as defined in the Uniform and California Commercial Code. U.C.C. §2-105(1).

220.   Plaintiffs and members of the Class are each a "Consumer" meaning an individual who buys or contracts to buy goods that, at the time of contracting, are intended by the individual to be used primarily for personal, family, or household purposes. U.C.C. §2-314.

221. As designers, manufacturers, licensors, producers, marketers, and sellers of the Monster Energy® Branded Drinks, the Company is a "merchant" within the meaning of the U.C.C. and California Commercial Code. U.C.C. §2-104(1); Cal. Com. Code §2104(1).

222. By placing the Monster Energy® Branded Drinks in the stream of commerce, Defendants impliedly warranted that the Monster Energy® Branded Drinks are reasonably safe, effective and adequately tested for its intended use, i.e., are fit for the ordinary purposes for which goods of that description are used and are adequately contained, packaged, and labeled.

223. Defendants marketed and sold Monster Energy® Branded Drinks using misleading marketing materials emphasizing the positive aspects of the Energy Drinks while neglecting to inform the consumer of the risks associated with its consumption, including increased heart rate, high blood pressure, arrhythmia, dehydration, sleep deprivation and diarrhea.

224. As merchants of the Monster Energy® Branded Drinks, Defendants knew that purchasers relied upon them to design, manufacture, license and sell products that were reasonably safe and effective. Defendants impliedly warranted to Plaintiffs and members of the Class that Monster Energy® Branded Drinks were of merchantable quality and safe and fit for the use for which they was intended. Plaintiffs and the Class reasonably relied entirely on Defendants' expertise, knowledge, skill, judgment, and implied warranty in choosing to purchase and consume Monster Energy® Branded Drinks.

225. Plaintiffs and the Class members purchased the Monster Energy® Branded Drinks for their intended purpose, i.e. for consumption.

226. In breach of Defendants' implied warranties, the Monster Energy® Branded Drinks are unsafe, ineffective and not merchantable for ways which include, but are not limited to the fact, that it can cause serious and even fatal health problems, that the caffeine content in the Monster Energy® Branded Drinks

76

is dangerously high for consumption that frequent and excessive consumption may result in increasing heart rate, blood pressure, other cardiovascular complications, sleep deprivation and diarrhea, among others.

227.   Monster Energy® Branded Drinks are not reasonably safe for their intended use and the labels do not adequately warn of such dangers or disclose the caffeine content.

228.   Plaintiffs and the Class, who could not have known about the nature of the risks and side effects associated with Monster Energy® Branded Drinks until after they purchased or consumed them. Plaintiffs and members of the Class were repeat purchasers of Monster Energy® Branded Drinks since the high caffeine content is addictive. Moreover, the risks associated with consuming Monster Energy® Branded Drinks far outweigh any perceived benefits.

229.   By selling, delivering and/or distributing the defective Monster Energy® Branded Drinks to Plaintiffs and the Class, Defendants breached the implied warranty of merchantability and the implied warranty of fitness.

230.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs and Class members have sustained injuries by purchasing the Monster Energy® Branded Drinks which were not safe or effective as represented, thus entitling Plaintiffs to judgment and equitable relief against Defendants, as well as restitution, including all monies paid for the Monster Energy® Branded Drinks.

## COUNT V

### For Violations of the MMWA, 15 U.S.C. Section 2301, *et seq.*

231.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

232.   Plaintiffs and Class members are "consumers" within the meaning of the MMWA.

233.   The Company is a "supplier" and "warrantor" within the meaning of the MMWA.

234.   Monster Energy® Branded Drinks are "consumer products" within the meaning of the MMWA.

235.   Defendants' written affirmations of fact, promises and/or descriptions, as alleged herein, are each a "written warranty" and/or there exists an implied warranty for the sale of Monster Energy® Branded Drinks within the meaning of the MMWA, i.e., that they are safe for consumption.

236.   The Company breached its warranties as Monster Energy® Branded Drinks were not fit for their intended use, and thereafter the Company has refused to honor any applicable warranties by refunding the price paid for such products despite demand therefor. Defendants' conduct thereby caused damages to Plaintiffs and members of the Class.

237.   As a result of the Company's breach of warranties, Plaintiffs and Class members have sustained damages and other losses in an amount to be determined at trial, as well as attorneys' fees, rescission, and/or other relief as is deemed appropriate.

## COUNT VI

### Unjust Enrichment

238.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

239.   At all times relevant hereto, Defendants designed, manufactured, licensed, produced, promoted, marketed and/or sold the ineffective, dangerous and improperly labeled Monster Energy® Branded Drinks.

240.   Plaintiffs and members of the Class conferred a benefit upon Defendants by paying for a product with benefits that could not be provided or delivered and were not safe and effective as advertised. By means of their material

misrepresentations and omissions, as set forth above, Defendants induced Plaintiffs and the Class to purchase Monster Energy® Branded Drinks that provided no substantial benefit to consumers, and actually may have caused significant detriment to their health and mental well-being. As a consequence of such misrepresentations and misconduct, Plaintiffs and the members of the Class paid monies to obtain the Monster Energy® Branded Drinks.

241.   Defendants voluntarily accepted and retained the benefit of the monies paid by Plaintiffs and the Class with full knowledge of the dangers of the Monster Energy® Branded Drinks and without adequately disclosing those risks.

242.   Defendants have been enriched, at the expense of Plaintiffs and the Class, by retaining monies for benefits, which they did not provide.

243.   Plaintiffs and the Class have no adequate remedy at law.

244.   It would be unjust and inequitable for Defendants to retain the profits, benefits, and other compensation obtained from its wrongful conduct as alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

A.   Certifying the Class as requested for all claims asserted herein;

B.   Awarding Plaintiffs and the proposed Class members actual, statutory and punitive damages;

C.   Awarding declaratory and injunctive relief as permitted by law or equity, including corrective labeling, advertising and marketing;

D.   Ordering that Defendants be required to make full restitution of all monies wrongfully obtained as a result of the conduct described above and disgorge all ill-gotten gains flowing from the conduct described above;

AMENDED COMPLAINT

79

1  E. For payment of reasonable costs of suit and attorneys' fees pursuant

2  to, *inter alia*, Cal. Civ. Proc. Code §1021.5, Cal. Civ. Code §1780(d), and the

3  MMWA, 15 U.S.C. §2310(d);

4  F. Ordering that Defendants be required to pay pre- and post-judgment

5  interest on all such sums;

6  G. Providing such further relief as may be just and proper;

7  H. Other legal and equitable relief permitted with respect to the causes of

8  action stated herein;

9  I. A trial by jury on all issues so triable; and

10  J. Such other and further relief as the Court may deem just and proper.

11  **DEMAND FOR JURY TRIAL**

12  Plaintiffs hereby demand a trial by jury with respect to any claims so triable.

13  DATED: March 7, 2013                THE MEHDI FIRM

14

15                                                     AZRA Z. MEHDI

16                                                     One Market
                                                       Spear Tower, Suite 3600
17                                                     San Francisco, CA 94105
                                                       Telephone: (415) 293-8039
18                                                     Facsimile: (415) 293-8001

19                                                     9107 Wilshire Blvd., Suite 450
                                                       Beverly Hills, CA 90210
20                                                     Telephone: (310) 853-8010
                                                       Facsimile: (310) 853-8011
21                                                     azram@themehdifirm.com

22                                                     HALUNEN & ASSOCIATES
                                                       CLAYTON D. HALUNEN
23                                                     SUSAN M. COLER
                                                       MELISSA W. WOLCHANSKY
24                                                     1650 IDS Center
                                                       80 South Eighth Street
25                                                     Minneapolis, MN 55402
                                                       Telephone: (612) 605-4098
26                                                     Facsimile: (612) 605-4099

27

28

80

AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

halunen@halunenlaw.com
coler@halunenlaw.com
wolchansky@halunenlaw.com

Attorneys for Plaintiffs and the [Proposed]
Class

AMENDED COMPLAINT

81