©COPY

1  AZRA Z. MEHDI (220406)
   ARCELIA HURTADO (191481)
2  THE MEHDI FIRM, PC
3  One Market
   Spear Tower, Suite 3600
4  San Francisco, CA 94105
   (415) 293-8039
5  (415) 293-8001 (fax)
   azram@themehdifirm.com
6  ahurtado@themehdifirm.com
7  Attorneys for Plaintiffs and the [Proposed] Class

FILED

BY: _____
CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
RIVERSIDE

2013 JUL 26  PM 3: 01

BY FAX

8            UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10                 EASTERN DIVISION

| | |
|---|---|
| 11 ALEC FISHER, MATTHEW<br>12 TOWNSEND, and TED CROSS, on<br>Behalf of Themselves and All Others<br>13 Similarly Situated, | Case No.: EDCV12-02188 VAP (OPx)<br><br>Class Action<br><br>SECOND AMENDED COMPLAINT |
| 14              Plaintiffs,<br>15        vs. | DEMAND FOR JURY TRIAL |
| 16 MONSTER BEVERAGE<br>CORPORATION and MONSTER<br>17 ENERGY COMPANY, | |
| 18              Defendants. | |

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................1

JURISDICTION AND VENUE .........................................................................5

PARTIES .............................................................................................................7

BACKGROUND ............................................................................................... 11

A.   A Monster Was Born. ............................................................................ 11

B.   Ingredients in Monster Drinks Combine to Deliver Massive Amounts of Caffeine........................................................................................................... 12

C.   Monster's Marketing, Advertising and Labeling Was False and Misleading. ...................................................................................................... 13

D.   Reasons Why Monster's Marketing, Advertising and Labeling in False and Misleading.................................................................................................. 14

E.   Monster Markets Its Energy Drinks Primarily to Teenagers But Entirely Omits Any Warnings Directed at that Target Market.......................................... 17

F.   Monster's Strong References to Alcohol and Sex Promotes Consumption (Dependence) Among Teenagers While Obscuring Undisclosed Health Risks. ...................................................................... 19

G.   Further Evidencing Intentional Conduct, Monster Deceives Its Consumers into Believing that the Celebrities and Athletes Endorsing Monster Drinks Are Consuming Such Drinks When They Are Drinking Water............................................................................................................... 22

H.   Monster's Unfair and Deceptive Labeling, Advertising and Marketing Exposes Consumers to Serious Health Risks.......................................... 23

I.   Monster's Post-Complaint Revisions to the Company's Marketing and Labeling Confirm the Unfair and Deceptive Nature of the Practices Alleged Herein. ........................................................................... 25

CLASS ACTION ALLEGATIONS .............................................................. 26

COUNT I.................................................................................. 30

COUNT II ............................................................................... 35

COUNT III.............................................................................. 37

COUNT IV............................................................................... 39

COUNT V ............................................................................... 41

COUNT VI.............................................................................. 42

1

PRAYER FOR RELIEF ................................................................................................ 43

2

DEMAND FOR JURY TRIAL .................................................................................... 43

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Alec Fisher, Matthew Townsend and Ted Cross, by and through their undersigned counsel, bring this consumer class action on behalf of themselves and all others similarly situated, against defendants Monster Beverage Corporation ("MBC") and Monster Energy Company ("MEC") (collectively, "Monster" or the "Company").[1] Plaintiffs' allegations, except where specifically so identified as being based on personal knowledge, are based on information and belief formed after an inquiry reasonable under the circumstances and are likely to have evidentiary support after reasonable opportunity for further investigation and discovery.

## NATURE OF THE ACTION

1. This is a consumer class action seeking redress for defendants' unfair and deceptive business practices on behalf of anyone who purchased for personal consumption any of the Monster-branded energy drinks sold under the Monster Rehab® brand name and the original Monster Energy® product (hereinafter "Monster Drink(s)").[2]

2. Monster develops, markets, sells, and distributes energy drinks and other beverages in the United States and internationally. Monster is the largest energy drink maker in the United States by sales volume. In 2010, the original Monster Energy® drink became the No. 1 selling energy drink in the United States. Monster Drinks represented 95.4%, 94.4% and 93.0% of the Company's net sales for the years ended December 31, 2012, 2011 and 2010, respectively.

3. During the relevant period herein, Monster falsely or misleadingly marketed, advertised and labeled for sale highly caffeinated drinks — the Monster Drinks — alongside soft drinks, juices and sports drinks. Monster Drinks combine

---

[1] Connor Rucks is no longer a plaintiff in the instant case.

[2] The Monster Rehab® products at issue in this litigation include: Monster Rehab® Tea + Lemonade + Energy, Monster Rehab® Rojo Tea + Energy, Monster Rehab® Green Tea + Energy, Monster Rehab® Protean + Energy and Monster Rehab® Tea + Orangeade + Energy.

1    massive doses of caffeine with other ingredients that can be seriously harmful when

2    consumed by adults, youth and children alike over a period of time. Numerous

3    scientific studies have shown that the consumption of caffeine, in combination with

4    other active ingredients like guarana, taurine, carnitine, sugar, among others, can have

5    serious health consequences such as: insomnia, palpitations, tachycardia, hypertension,

6    dehydration, kidney failure, headaches and other more serious health complications.

7    Monster Drinks contain such a combination of ingredients termed as "proprietary

8    energy blend" by Monster.

9        4.    Until recently, Monster Drinks were sold as a "dietary supplement" and

10   thus, were not subjected to any kind of pre-market scrutiny prior to being introduced

11   into the stream of commerce. After the filing of the initial complaint on December

12   12, 2012, in this matter, Monster announced on February 13, 2013, that it would no

13   longer classify Monster Drinks as dietary supplements, but would begin selling them

14   as a traditional beverage. Dietary supplement manufacturers have greater leeway over

15   what types of ingredients they can include in their products, but also face more

16   stringent reporting requirements regarding possible adverse effects of their products

17   on consumers. As a dietary supplement, Monster was required to report any adverse

18   events that could be linked to the consumption of Monster Drinks, which are then

19   recorded in the Drug Abuse Warning Network ("DAWN") reports.[3] As a beverage,

20   Monster will no longer be required to report serious adverse events because foods are

21   not subject to this requirement.

22       5.    Until March 2013, Monster's marketing, advertising and labeling for its

23   Monster Rehab® brand of drinks made the following misrepresentation: "quenches

24   thirst, hydrates like a sports drink, and brings you back after a hard day's night."

25

26   _____

27   [3] DAWN is a public health surveillance system that monitors drug-related emergency
     department (ED) visits in the United States and is used as a source of information for
28   assessing the medical consequences associated with consuming energy drinks.

SECOND AMENDED COMPLAINT                                                              2

Monster reinforces the false notion of these hydrating properties adding "RE-FRESH, RE-HYDRATE, REVIVE (OR) RE-STORE" to the labeling.

6.     Monster Rehab® drinks do not hydrate like sports drinks or "bring you back." Instead, consumption of these drinks could cause severe dehydration because the combination of caffeine and guarana in energy drinks acts as a diuretic. Monster promotes the stocking of Monster Drinks with or near sports drinks to further perpetuate the deception of the similarity to sports drinks. In March 2013, months after the filing of the initial complaint in this matter, Monster changed the misrepresentations on the Monster Rehab® labels to "quenches thirst, fires you up and is the perfect choice after a hard day's night," thereby tacitly conceding that the prior label was false and misleading.

7.     The Monster Energy® drink similarly includes the misrepresentation "It's the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can." All Monster Drinks provide that consuming three cans per day is not unsafe. Monster's representations are false and misleading and omit material facts since Monster Energy® is not the ideal combo of the right ingredients in the right proportion and consuming even three Monster Drinks (or less) per day as prescribed on the label could be seriously unsafe for adults, and especially unsafe for the youth and children that Monster targets with its marketing.

8.     While the label on Monster Drinks says "Not recommended for Children," there are NO WARNINGS for the teenagers and youth that Monster specifically targets as its primary market. Internal Company marketing documents demonstrate that Monster intends to reach out not only to the youth that it fails to warn, but also children as young as nine years old, i.e., people born between 1985 and 2000 to be its primary consumers. *See* 2009 Monster International Marketing document, attached hereto as Exhibit A.

9.     Monster actively promotes consumption of Monster Drinks at high schools by passing out free samples outside schools and other events where children

SECOND AMENDED COMPLAINT

1   and youth are present, paying to have school billboards carry Monster advertisements,

2   sponsoring "Monster Player of the Game" awards, which entail the winning kid's

3   picture being taken with multi-packs of Monster Drinks in both their hands. Monster

4   also aggressively promotes extreme sports, where the participants are generally 11 to

5   17 years old.

6         10.    Monster makes strong references to alcohol and sex in its marketing and

7   advertising materials to promote the consumption of Monster Drinks by teenagers

8   while obscuring undisclosed health risks. Additionally, Monster deceives its

9   consumers into believing that the celebrities and athletes endorsing Monster Drinks

10  are consuming such drinks when they are actually drinking water in a can (Tour

11  Water) that looks identical to the Monster Energy can. In sum, Monster's conduct is

12  intentional and deceptive, and does in fact, deceive consumers.

13        11.    California courts have previously found that the Joe Camel cigarette

14  campaign constituted an unfair, unlawful, and fraudulent business practice because it

15  targeted minors: "the targeting of minors is oppressive and unscrupulous, in that it

16  exploits minors by luring them into an unhealthy and potentially life-threatening

17  addiction before they have achieved the maturity necessary to make an informed

18  decision whether to take up smoking despite its health risks." *Mangini v. R.J. Reynolds*

19  *Tobacco Co.*, 7 Cal.4th 1057, 1062 (1994). Joe Camel always seemed to be on the move,

20  riding motorcycles or joining racing tournaments, jamming with a jazz band, playing

21  pool with his cool female Camel-buddies or just hanging out with other hip young

22  camels. Just like Joe Camel, kids recognize Monster from the aggressive promotion of

23  extreme sports events and music festivals.

24        12.    Notwithstanding the high caffeine levels in Monster Drinks and the

25  scientific evidence of serious health risks these levels may pose for all consumers,

26  especially adolescents and youth (*see* attached report of adverse events related to

27  consumption of Monster Drinks attached hereto as Exhibit B), Monster's advertising,

28  marketing and promotions specifically target the 13- to 24-age group.  Monster's

efforts have been successful in capturing teenagers and other youth as intended – an estimated 30-50% of adolescents consume energy drinks.

13.    On March 19, 2013, a number of doctors, public health officials and scientific experts sent a letter to the U.S. Federal and Drug Administration ("FDA") Commissioner highlighting the serious risks energy drinks pose to children and adolescents. *See* Exhibit C, attached hereto. This was followed by a resolution on June 19, 2013 by the American Medical Association urging a ban on the sales of energy drinks to children under the age of 18.

14.    Monster's knowledge of the false and misleading nature of its marketing is evidenced by the measures the Company has taken after the filing of this action in December 2012. For example, (i) on February 13, 2013, Monster announced that it would no longer market and sell Monster Drinks as "dietary supplements" but instead would classify them as "Beverages;" (ii) Monster has removed from its five separate Monster Rehab® drink products, the false statement that Monster Rehab® "hydrates like a sports drink and brings you back after a hard day's night." Instead, the Monster Rehab® brand of drinks now states that it "fires you up and is the perfect choice after a hard day's night;" and (iii) Monster has removed references on its Monster Energy® can that in addition to "hipsters and bikers, 'milfs' dig it" — newly manufactured cans have eliminated the reference to "milfs." These measures are tacit admissions evidencing the false and misleading nature of Monster's business practices alleged herein.

15.    Monster has profited immensely and been unjustly enriched from its false and misleading marketing, advertising and labeling. Monster Drinks enjoy 35% of the market share of energy drinks and 35% of the youth market on sales of over $2 billion annually in 2011 and 2012.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over all the causes of action asserted herein. The Court has jurisdiction over the Magnuson-Moss Warranty Act ("MMWA") claim

pursuant to 28 U.S.C. §1331 because a federal question is involved and pursuant to 15 U.S.C. §2310(d) because (a) the amount in controversy of any individual claim may be less than the sum or value of $25.00; (b) the amount in controversy is greater than the sum or value of $50,000 computed on the basis of all claims in the suit; and (c) the number of plaintiffs is more than 100. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. §1367(a) as claims herein arise under the same set of facts comprising a single case or controversy.

17.     This Court also has jurisdiction over the subject matter presented by this complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332, *et seq.*, which explicitly provides for the original jurisdiction of the federal courts over any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million, exclusive of interest and costs.

18.     More than two-thirds of the members of the class are citizens of a state other than California and, as set forth below, the Company is a citizen of California. Therefore, diversity of citizenship exists under CAFA, as required by 28 U.S.C. §1332(d)(2)(A). Further, the total number of members of the proposed class is greater than 100, pursuant to 28 U.S.C. §1332(d)(5)(B).

19.     The total claims of the individual members of the class in this action are in excess of $5 million in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332(d)(2), (6).

20.     The Court has personal jurisdiction over defendants because they have purposefully availed themselves of the privilege of conducting business within the State of California by marketing, advertising and selling the Monster Drinks to plaintiffs and members of the proposed class, as well as generally maintaining systematic and continuous business contacts within the State of California.

21.     Venue is proper pursuant to 28 U.S.C. §1391(a) because the Company conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, marketing and administration of its products in this District. Venue is also proper under Cal. Civ. Code §1780(d) of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*

22.     California has numerous contacts with the conduct alleged herein and a strong interest in applying its laws to that conduct. Monster maintains its principal offices, as well as agents, in California and is licensed to do, has done, and continues to do business in California. Monster's advertising, marketing, pricing, sales and distribution operations for their Monster Drinks sold throughout the United States, which form the basis of this litigation, were coordinated at, emanate from and are developed at its California headquarters, and that all critical decisions regarding marketing and advertising were made within California. In addition, the Company directly advertised, marketed and sold its energy drinks to consumers in California as well as the other states in the country. As such, California's interest in applying California law in this litigation outweighs any interests other states or their laws may have.

**PARTIES**

23.     Plaintiff Alec Fisher ("Fisher") is, and was during the period relevant herein, a citizen of California. Fisher has been purchasing and consuming a variety of the Monster Drinks for the past six (6) years. Fisher first consumed a Monster Drink in or around 2007 at the age of sixteen (16) when he was in high school. Monster trucks were parked outside his school handing out free cans of Monster Drinks. Monster employees were not asking people their ages prior to handing out the Monster Drinks. Fisher had no reason to believe that the Monster Drinks were not safe or posed health risks and there were no warnings on the can directed at adolescents or youth. Fisher has most frequently consumed the original Monster

1   Energy® and Monster Energy® Assault®. Fisher would not have accepted Monster's

2   freebie cans or subsequently continued to buy at a premium and consume Monster

3   Drinks had he known of the health risks of consuming Monster Drinks.

4         24.    Plaintiff Matthew Townsend ("Townsend") is and was during the period

5   relevant herein, a resident of Los Angeles County, California. Townsend has been

6   purchasing and consuming a variety of the Monster Drinks for the past six (6) years.

7   Townsend first purchased and consumed the original "green M" Monster Energy®

8   from a vitamin store in early June 2007. Townsend read the label on the 16-oz.

9   Monster Energy® drink and decided to buy it because it indicated that the Monster

10   Drink had 100% of the Daily Values of vitamins B2 (riboflavin), B3 (niacin), B6, B12

11   as well as supplements  like taurine and ginseng. The Monster Drink can label

12   recommends consumers limit daily consumption to three cans. Townsend had no

13   reason to believe that Monster Drinks posed any health risks.

14         (a)    A few days after his first purchase, Townsend bought and

15   consumed a Monster Drink instead of coffee because he believed it was better than

16   coffee due to the additional vitamins and supplements. Townsend made sure never to

17   drink more than three cans a day as prescribed on the labeling. Townsend became

18   dependent on Monster Drinks and over the next five years, continued on a steady diet

19   of Monster Drinks. Townsend has consumed every variety of energy drink created by

20   Monster, including every Monster Rehab® product and Monster Energy®. Townsend

21   frequently purchased multi-packs of Monster Drinks, which ranged in prices from

22   $19.00 to $53.00 for an 8-pack to 24-pack, respectively. Townsend read and relied on

23   Monster's affirmative representations that each of the Monster Rehab® drinks

24   "quenches thirst, hydrates like a sports drink and brings you back after a hard day's

25   night."

26         (b)    Townsend's addiction to Monster Drinks resulted in serious

27   health issues beginning in the summer of 2012. His heart frequently pounded too fast,

28   he had chest pains and trouble sleeping. He tried to cut back on the Monster Drinks,

but found that skipping Monster Drinks even one day caused him to have severe headaches from the lack of caffeine. In September 2012, Townsend had to go to the emergency room at a local hospital where his blood pressure was registered at an average of 225 over 139, which is critically high.[4] Townsend has consumed over 4,000 cans of Monster Drinks. Townsend saw nothing on the Monster Drink cans that led him to believe that drinking the Monster Drinks consistent with the limits set on the cans could lead to dangerous health conditions or a hypertensive crisis. He relied on the representations that consumed within the recommended limits, Monster Drinks were safe (or not unsafe). Had Townsend known the true facts, he would not have paid a premium to buy and consume Monster Drinks.

25.    Plaintiff Ted Cross ("Cross") is, and was during the period relevant herein, a citizen of the State of Washington. Cross began purchasing and consuming Monster Drinks in or around 2008. Until approximately 2010, Cross drank about a can of the original Monster Energy® drink per day and thereafter increased his consumption to two cans per day, a few days per week. Cross bought and consumed Monster Energy® Absolutely Zero and Java Monster® Mean Bean®. Cross frequently purchased multi-packs of Monster Drinks, which ranged in price from $7.00 to $9.00 (4-pack of Monster Energy®), $24.00 (24-pack of Monster Energy® Absolutely Zero) and $30.00 (12-pack of Java Monster® Mean Bean®). At a 2011 dental appointment, Cross' blood pressure registered at 260 mm Hg systolic. The morning of the appointment, Cross had consumed two Monster Drinks. In October 2012, Cross began to have vision problems, dizziness, nausea, and a severe headache

---

[4] The American Heart Association notes that blood pressure readings exceeding 180 mm Hg systolic and 110 mm Hg diastolic are indicative of Hypertensive Crisis putting such people in the highest risk category for heart attack, stroke, damage to the eyes and kidneys, loss of kidney function, aortic dissection, angina (unstable chest pain), pulmonary edema (fluid backup in the lungs), eclampsia and other acute life threatening problems. *Available at* mmhttp://www.heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/Hypertensive-Crisis_UCM_301782_Article.jsp

after drinking two Monster Energy® Absolutely Zero. Cross was rushed to the hospital by ambulance where his blood pressure was registered at 280 mm Hg and was operated on for a bleeding blood vessel in his brain.

      (a)    Cross had read the Monster Drink cans and saw nothing on the label or any other advertising that led him to believe that consuming Monster Drinks could lead to dangerous health conditions. Cross relied on the representation on the label indicating that Monster Drinks were safe (or not unsafe) to consume if limited to three cans per day. The label on the Monster Energy® can says: "It's the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can." Cross understood this to mean that Monster Drinks were safe (or not unsafe) for consumption and would provide energy without exposing people to health risks. Had Cross known the true facts, he would not have purchased at a premium and consumed Monster Drinks.

26.    Defendant Monster Beverage Corporation, f/k/a Hansen Natural Corporation (MBC), is a Delaware corporation with its principal place of business at 550 Monica Circle, Suite 201, Corona, California 92880. MBC is a publicly traded holding company. MBC is a holding company that carries no operating business, except through its wholly owned subsidiaries. MBC through its subsidiaries, develops, markets, sells, and distributes alternative beverages in the United States and internationally.

27.    Defendant Monster Energy Company, f/k/a Hansen Beverage Company (MEC), is a Delaware corporation with its principal place of business at 550 Monica Circle, Suite 201, Corona, California 92880. MEC is a wholly owned subsidiary of MBC (conducting all of MBC's operating business and generating substantially all of Monster's operating revenues). MEC produces and distributes a variety of energy drinks, sodas, fruit juices, teas, and waters.

28.    Prior to January 5, 2012, Monster was known as the Hansen Natural Corporation and Hansen Beverage Company. Monster's business is divided into (i)

Direct Store Delivery ("DSD"), whose principal products comprise Monster Drinks, and (ii) Warehouse, whose principal products comprise juice-based and soda beverages. During the period relevant herein, 92.3%, 91.2% and 89.9% of the Company's consolidated net sales for 2012, 2011 and 2010, respectively, were attributable to the Monster Drinks division.

29.    Monster was engaged in and continues to be engaged in and responsible for the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of Monster Drinks.

<strong>BACKGROUND</strong>

**A.    A Monster Was Born.**

30.    In the mid-90s, after narrowly escaping bankruptcy, Monster hired Mark Hall ("Hall") as President of the MEC division. Hall is credited as being the energy behind Monster Drinks. Monster CEO Rodney Sacks ("Saks") described the origin of the Monster Drinks brand as effectively going after the proper demographic or category of consumer:

> "We needed to create a brand that really spoke for, looked like and conveyed what the category really wanted, **what young, male consumers really wanted and felt like. . . . It's their lifestyle**. So when Monster was born we were able to do things such as go into extreme sports. It just never was possible before."

31.    The name "Monster" seemed most appropriate to the Company's executives because it was aggressive, sinister and cool. Monster's motto "Unleash the Beast" succinctly conveyed the desires of the Company's target audience — young, male consumers. Indeed, the Company reportedly selected the name "Monster Energy" after consulting with a focus group of teenage males.

SECOND AMENDED COMPLAINT

**B.      Ingredients in Monster Drinks Combine to Deliver Massive Amounts of Caffeine.**

32.      Monster Drinks combine caffeine, guarana, taurine, ginseng, glucuronolactone, L-carnitine, B vitamins and other ingredients to form a "proprietary energy blend."

(a)      Guarana or (Paullinia cupana): Guarana is a plant that contains caffeine, theobromine (a chronotrope), and theophylline (an inotrope). Each gram of guarana can thus add 40mg to 80mg of additional caffeine with a potentially longer half-life. According to a February 2013 article by the American Academy of Pediatrics, Vol. 34, No. 2., entitled, "Energy Drinks: What Teenagers (and Their Doctors) Should Know" ("February 2013 AAP Article"), "guarana … has been reported to exert a more prolonged effect than an equivalent amount of caffeine." February 2013 AAP Article at 57. In reality, when a drink is said to contain caffeine plus guarana, it contains caffeine plus more caffeine. "Guarana has not been evaluated by the FDA for safety, effectiveness, or purity . . . ." *Id.* Coffee does not contain guarana. Research done at the University of Alabama at Birmingham shows that "guarana, another primary ingredient in Monster Energy Drinks, has three times the concentration of caffeine."

(b)      Taurine: The human body manufactures taurine — one of the most abundant amino acids — on its own. Only infants and sick adults must obtain taurine from external sources. According to the February 2013 AAP Article,

> [t]he amount of taurine consumed by regular intake of energy drinks far exceeds the amount in a normal diet (40-400 mg/day) .
> . . . Some data from animal models suggest that taurine might minimize some of the adverse effects of alcohol consumption and could, by extension, encourage greater alcohol consumption.

*Id.* at 58. Coffee does not contain taurine.

(c)     Ginseng: Ginseng is a root most commonly found in East Asia. According to the February 2013 AAP Article, ginseng has been linked to adverse events such as insomnia, palpitations, tachycardia, hypertension, edema, headache, vertigo, mania, and estrogen-like effects, such as breast tenderness and amenorrhea. Coffee does not contain ginseng.

(d)     Other ingredients in Monster Drinks (e.g., B vitamins, glucuronolactone, Yohimbe, carnitine, and bitter orange) purport to have certain positive effects, but most of the beneficial claims of these ingredients lack sufficient scientific evidence according to the February 2013 AAP Article. Coffee does not generally contain these ingredients.

## C.     Monster's Marketing, Advertising and Labeling Was False and Misleading.[5]

33.     The marketing, advertising and labeling of the Monster Rehab® products is false and misleading on certain of the cans, the Internet as well as in other forms of advertising and promotions. For example, each of the Monster Rehab® products, including Monster Rehab® Tea + Lemonade + Energy, Monster Rehab® Rojo Tea + Energy, Monster Rehab® Green Tea + Energy, Monster Rehab® Protean + Energy and Monster Rehab® Tea + Orangeade + Energy has the following false and misleading representation:

> [A] triple threat that quenches thirst, **hydrates like a sports drink**, and **brings you back** after a hard day's night.

34.     Each of the Monster Rehab® products includes additional deceptive language designed to reinforce the false notion of significant hydrating properties of the Monster Drinks, including "RE-FRESH, RE-HYDRATE, RE-VIVE." The label

---

[5] Plaintiffs allege that Monster's marketing and labeling "was" false and misleading because Monster has, since the filing of this lawsuit, changed certain of the key statements alleged to be false and misleading herein. Plaintiffs' use of the word "was" is not an indication that Monster's labeling is in general no longer deceptive.

on a can of Monster Rehab® Tea + Lemonade + Energy states, among other things, "Monster Rehab: RE-FRESH, RE-HYDRATE, RE-STORE."

35.     The marketing, advertising and labeling for Monster Energy® includes the following misrepresentation: "It's the **ideal combo of the right ingredients in the right proportion** to deliver the big bad buzz that only Monster can," which is false and misleading in light of Monster's omission of material facts set forth below.

**D.     Reasons Why Monster's Marketing, Advertising and Labeling in False and Misleading.**

36.     Monster's representations that Monster Rehab® drinks "hydrates like a sports drink" and "brings you back" are false and misleading. Monster Drinks have significantly high amounts of caffeine. A 2009 Mayo Clinic study notes that whereas sports drinks can provide hydration and replenishment of electrolytes and carbohydrates, the elevated levels of caffeine in energy drinks (like Monster Drinks) have diuretic effects that increase urinary output and natriuresis (excretion of an excessively large amount of sodium in the urine), causing dehydration. To the extent that energy drinks, including Monster Drinks, have any hydrating qualities, they do **not** hydrate like a sports drink. Sports drinks contain water, salt and sugar, and are designed to replenish the electrolytes and energy one's body loses during exercise. Sports drinks do contain ingredients combined into a proprietary blend that directly increase one's energy levels as Monster Drinks do.

37.     Amy Peak, an assistant professor at Butler University's College of Pharmacy and Health Sciences, states that the combination of caffeine and guarana (present in Monster Drinks) can lead to dehydration. *See* Geoff Mitchell, "Dangers of Monster Energy Drinks," May 29, 2011, http://www.livestrong.com/article/306281-dangers-of-monster-energy-drinks/ (last visited July 26, 2013). Research done at Brown University and the February 2013 AAP Article note that, the caffeine in energy drinks acts as a diuretic and can leave one severely dehydrated. Monster Rehab® does not "hydrate like a sports drink."

38.     In March 2013, the National Council on Sports & Fitness issued a report, "Youth and Energy Drinks," warning that kids confuse energy drinks like Monster Drinks with the sports drinks marketed by their sports heroes. Monster's Rehab® drinks reinforce this confusion with the misrepresentation, "quenches thirst, hydrates like a sports drink, brings you back after a hard day's night."

39.     Significantly, with respect to the misrepresentations outlined in ¶¶33–35 above, Monster tacitly admits that they were false and misleading. Since the original complaint in this lawsuit was filed on December 12, 2012, Monster has changed the advertising and labeling on its Monster Rehab® brand, removing the false hydration language. The Monster Rehab® brand no longer represents that each of the Monster Drinks "quenches thirst, **hydrates like a sports drink**, and **brings you back** after a hard day's night." Instead, Monster has now replaced this representation with the following: "quenches thirst, **fires you up**, and is **the perfect choice** after a hard day's night":

**THEN**                              **NOW**

40.     Nevertheless, to induce reliance on the false analogies to sports drinks or other beverages that do not contain **de**hydrating ingredients, defendants' strategic product placement of Monster Drinks near sports drinks also suggests intent to deceive — which they did. According to the 2009 Mayo Clinic study, convenience stores display energy drinks next to the sports drinks, which can mislead the consumer into thinking that they are similar products. *See, e.g.,* product placement below:



41.     Monster's representations in ¶35 that Monster Drinks have the "ideal combination" of the "right ingredients" in the "right proportion" to deliver an energy buzz are also false and misleading because they convey the message, omit material facts regarding the potential health risks associated with the frequent consumption of Monster Drinks.

42.     The only notation on most 16-oz. Monster Drinks in fine print notes:
        Consume responsibly — Max 1 can per four hours, with limit 3
        cans per day. Not recommended for children, people sensitive to
        caffeine, pregnant women or women who are nursing."

                        *      *      *

1      Other Monster Drinks have the following notation: Consume

2      Responsibly — Limit (3) cans per day. Not recommended for

3      children, pregnant women or people sensitive to caffeine.

4      43.    Three 16-oz. Monster Drink cans contain more than 480 mg of caffeine,

5 significantly more than the 400 mg deemed safe for healthy adults to consume. The

6 safe level for adolescents according to the American Academy of Pediatrics is much

7 lower — no more than 100 mg of caffeine per day from all sources. According to the

8 University of California, teenagers who consume more than 100 mg of caffeine per

9 day are at an increased risk for high blood pressure. One study in Pediatrics, a medical

10 journal, says, "Caffeine can be lethal in doses ranging from 200 to 400 milligrams,"

11 and affects various organ systems by increasing heart rate, blood pressure, speech rate,

12 motor activity, attentiveness and body temperature. Drinking three Monster Drinks

13 per day — as stated on the label — is unsafe for adults and drinking even one

14 Monster Drink is unsafe for an adolescent.

15      44.    In addition to omitting material facts about the massive amount of

16 caffeine from three 16-oz. Monster Drinks or even just one 16-oz. can, the

17 admonition following "consume responsibly," further advances the misleading nature

18 of the label by adding yet more materially misleading content.

19      45.    The Company's statement on the can that the drinks are not

20 recommended for children, pregnant women or ***people sensitive to caffeine***, falsely

21 suggests that if consumers do not have a specific sensitivity to caffeine, that Monster

22 Drinks are safe (or not unsafe) for consumption. Neither Fisher, Townsend, nor

23 Cross have any sensitivity to caffeine.

24 **E.    Monster Markets Its Energy Drinks Primarily to Teenagers But Entirely**

25 **Omits Any Warnings Directed at that Target Market.**

26      46.    Despite known risks, there are **<u>NO WARNINGS</u>** at all for the teenagers

27 and youth Monster specifically targets. An internal marketing document created by

28 Monster in 2009 to 2010 evidences Monster's intent to target children and youth in

sales of Monster Drinks. Monster's marketing documents identify children as young as nine (9) years old as the target consumer for Monster Drinks. Monster's failure to include material facts consequences that may result from consumption of Monster Drinks even under the conditions of use prescribed, render Monster's warnings false and misleading. Given that Monster's marketing strategy as evidenced by internal marketing documents targeting children and youth, this material omission is strongly suggestive of intent.

47.     Monster publicly (and misleadingly) asserts that its target market is 18 to 34 years old. Monster's assertion is further belied by internal Monster marketing documents that target children as young as nine (9) years old. *See* excerpt below, full document attached as Exhibit A and incorporated by reference herein:[6]



48.     Monster eschews mainstream advertising on TV, radio, and billboards, instead sponsoring huge extreme sporting events and music festivals. X-Games and other extreme sports festivals draw a hard-to-reach demographic — males, ages 12 to 24. According to an audience study of on-site X-Games attendees performed by a Newport-based sponsorship market research company, over two thirds (66%) of the X-Games attendees are under 21.[7]

---

[6] Monster also publicly asserts that Monster Drinks are safe for children as well. This is patently false. Even Monster's paid medical advisor Bob Arnot conceded that he would not give Monster Drinks to his kids.

[7] Recently on March 2, 2013, **Monster Energy® rider** Ayumu Hirano took second place at the Burton U.S. Open Snowboarding Championship held in Vail Mountain,

49.     Monster also advertises on scoreboards at high school events and sponsors "Monster Energy Drink Player of the Game" where photographs are taken of the high school athletes holding a pack of Monster Drinks in each hand:



50.     Monster's targeted marketing of young people and simultaneous failure to include any warnings directed at the teenagers and youth it targets, is deceptive. An estimated 30% to 50% of adolescents reportedly consume energy drinks.

**F.      Monster's Strong References to Alcohol and Sex Promotes Consumption (Dependence) Among Teenagers While Obscuring Undisclosed Health Risks.**

51.     In addition to centralizing its marketing toward youth and even children and simultaneously failing to disclose and or intentionally obscuring the health risks associated with the ingestion of massive amounts of caffeine delivered by its energy drinks, the Company promises youths an alcohol like "buzz" through the ingestion of even more of its highly caffeinated products. For example, the Monster Cuba-Lima® can states: "***We … substitute[ed] our tried and true energy blend for the alcohol and adding a squeeze of lime. You're gonna love it cause it's a new kind of buzz***."; *see also* ÜberMonster (energy "brewski" using proprietary German brewing technology) and Irish Blend ("Take our favorite spirit, remove the alcohol add the flavor to Java Monster — Success!").

---

Colorado and first place at the 2013 Burton European Open Halfpipe Finals in Laax, Switzerland in February 2013. **Ayumu Hirano is 14 years old**.

SECOND AMENDED COMPLAINT

19

52.     Monster also aggressively uses Monster Girls as a marketing tool targeted at teenagers to convey strong sexually charged images and suggestions, inevitably connecting Monster Drinks with sex. Reproduced below are screen shots of the Monster Girls from the Company's website — sexy and scantily clad women:



53.     In addition, Ash Hodges, Monster's Motorsports Marketing Manager's responsibilities include, in part, making, recording and maintaining a website called www.dirtshark.com. Below is an image of a recording entitled, "Dirt Shark: 2013 Monster Energy Supercross Girls" *available at* http://www.youtube.com/watch?v=jAT7ixWylV8. A portion of the video is transcribed below. The young man flanked by the scantily clad Monster Girls is a teenager who is being encouraged to fondle the Monster Girls' "oranges":[8]



| Monster Girl #1:     ***"You want to fondle our oranges?"*** |
| *       *       * |
| Monster Girl #1:     ***"Hey, we have a question for you. Do you want to fondle our oranges?"*** |
| Monster Girl #2:     ***"Cassie, he's not 18 yet. He can't fondle oranges."*** |

[8] *See also* "SX ED with Miss Supercross," Episode 2, *available at*: http://www.monsterenergy.com/#!/news%3Asx-ed-episode-2; http://www.monsterenergy.com/monstergirls/; http://www.monsterenergy.com/us/en/events/#!/events%3A2013-monster-energy-ama-supercross.

SECOND AMENDED COMPLAINT

54.     Another video entitled, "A Sharklet Tale" has two Monster Girls in skimpy bikinis, slathering sun tan lotion on their bodies while they drink a Monster Drink. Dirt Shark asks: "What is a Sharklet? One of the Monster Girls answers: "A Sharklet is an unconventional girl. Someone who likes to get naked and have a good time." These videos are paid for by Monster and the messages are approved and condoned by the Company. Until recently, the Monster Energy® label stated: "Athletes, musicians, and **_milfs_** dig it. You will too."[9]

55.     Monster not only encourages, but aggressively promotes the consumption of Monster Drinks by people of all age groups. Monster's promotions require a person to "Drink Monster," "Save Tabs," and "Trade for Gear." The gear includes Monster-branded clothing and apparel (including apparel and stickers for kids). Monster's "free" Monster gear promotion is remarkably similar to the now-banned Joe Camel promotional advertising, which included among other things, merchandise such as caps, jackets, and mugs that could be "bought" with "Camel Cash." For example, to get a "free" Monster Beanie or a short-sleeve T-shirt, one has to consume and send in 30 Monster Drink tabs. A hoodie demands consumption of 75 Monster Drinks. So, in effect, the gear is not actually "free."

56.     The "Monster Music" and "Monster Gaming" Facebook pages are most popular with persons ages 13 to 17. The Monster Army website purports to be an "athlete development program" that supports athletes ages 13 to 21 in "moto, bike, skate, surf, snow and wake" and invites "13-21" year-old action sports athletes to apply for sponsorships to represent the Monster brand. _See_

---

[9] It is commonly known that MILF is an acronym for "Mother/Mom I'd Like to F*#k." _See_ en.wikipedia.org/wiki/MILF. This is another example of the Company's use of sex to sell its Monster Drinks to youth and kids and obfuscate the Company's failure to warn of the health risks inherent in the consumption of its energy drinks. After the filing of this lawsuit, Monster has revised its label, website and other marketing to remove the term "MILF" from the Monster Energy® can.

1  http://www.monsterarmy.com/programs/. Ages 13 to 24 is the most popular age

2  group of those who "Like" the "Monster Army" on Facebook.

3  **G.    Further Evidencing Intentional Conduct, Monster Deceives Its**

4  **Consumers into Believing that the Celebrities and Athletes Endorsing**

5  **Monster Drinks Are Consuming Such Drinks When They Are Drinking**

6  **Water.**

7  57.    Monster intends to mislead consumers into believing that its celebrity

8  endorsers actually consume the Monster Drinks that they endorse. In truth, trainers

9  for the celebrity athletes do not want their athletes consuming Monster Drinks

10 because of the high caffeine content and other potentially harmful ingredients.

11 Similarly, the managers for celebrity musician endorsers who perform at Monster's

12 annual summer music concerts, the Warped Tours, also do not want their clients

13 consuming large quantities of Monster Drinks during the hot summer days due to

14 health concerns.

15 58.    In order to address this known marketing obstacle, the Company

16 designed Monster Tour Water, a can that looks nearly identical to the Monster

17 Energy® can, except it contained water. Monster's sole intent in creating Tour Water

18 was to deceive the public into believing that the celebrity endorsers are drinking

19 Monster Drinks when in fact they are actually drinking water.

20 59.    One needs to be up very close in order to determine that the can in the

21 hands of the celebrity endorser is not a Monster Drink. However, security at these

22 events is often tight and fans are kept far away from the celebrities. Thus, there is very

23 little opportunity for someone at a distance to actually discern that the celebrity or

24 athlete is not drinking a Monster Drink.

25 60.    Of course Monster does not make Monster Tour Water available to the

26 general public. Indeed, defendants strictly monitor who has access to Monster Tour

27 Water. These facts together demonstrate Monster's intent to deceive the public into

28 believing that (i) the celebrity endorsers are actually consuming Monster Drinks when

they are not; and (ii) that Monster Drinks are so safe for regular consumption that the celebrity athletes and musicians consume it on a regular basis.

**H.     Monster's Unfair and Deceptive Labeling, Advertising and Marketing Exposes Consumers to Serious Health Risks.**

61.     Monster publicly states that Monster Drinks are safe and that more than 8 billion Monster Drinks have been sold and *safely consumed* over the past 11 years.[10] Yet, Monster Drinks have been cited in the deaths of at least five people in the past year, a sixth in 2009, and at least 37 adverse reaction reports (including heart attacks, chest pains, and vomiting) since 2004, according to incident reports submitted to the FDA. *See* excerpt detailing adverse reports of Monster Drinks, attached hereto as Exhibit B.

62.     A November 2011 report by DAWN showed a tenfold increase in ER visits linked to energy drinks including from 2005 (1,128 visits) and 2008 and 2009 (16,053 and 13,114 visits, respectively), representing about a tenfold increase, with about half those trips made by patients 18 to 25 years old. A January 10, 2013 update to the DAWN Report ("DAWN Update") reiterated its original conclusion that "energy drinks can be dangerous when used alone or in combination with other drugs or alcohol." Further, it found that the number of emergency department (ED) visits involved the consumption of energy drinks doubled from 10,068 visits in 2007 to 20,783 visits in 2011. In 2011, 58% of the energy drink-related ED visits involved energy drinks alone. The remaining 42% involved other drugs.

63.     The DAWN Update also noted that "[i]n each year from 2007 to 2011, there were more patients aged 18 to 39 than patients in other age groups involved in energy drink-related visits; however, the largest increase was seen among patients aged

---

[10] That Monster CEO Sacks and MEC President Hall consider energy drinks to be the "the new soft drinks" explains the Company's failure to include material facts in the marketing and labeling of Monster Drinks.

40 or older, for whom visits increased 279 percent from 1,382 visits in 2007 to 5,233 visits in 2011." The Dawn Update's research and findings suggest that older adults may also be vulnerable to the hazardous health effects of energy drinks.

64.   A 2011 article by the American Academy of Pediatrics noted that of the 5,448 U.S. caffeine overdoses reported in 2007, 46% occurred in those younger than 19 years. The researchers of the 2011 study concluded, among other things that "**energy drinks have no therapeutic benefit**, and . . . may put some children at risk for serious adverse health effects." Most of these findings were reinforced in the February 2013 AAP Article, which was an evaluation by the Navy, Army and Air Force doctors of the current information about the content, benefits, and risks of the use of energy drinks by teens.[11]

65.   Monster Drinks can raise one's heart rate — "Caffeine can increase the heart rate tremendously and drive blood pressure up," says Dr. Suzanne Steinbaum, a preventive cardiologist at Lenox Hill Hospital in New York City. "People may think that these energy drinks are healthy by the way they're marketed. There are, however, 240 milligrams of caffeine in some of these drinks. That's seven times the amount of caffeine in a can of soda," she added. A survey of 496 students completed by The Johns Hopkins University corroborates this finding that 19% of students indicated that they experienced heart palpitations from energy drinks. The American Heart Association also confirms this, noting that people consuming two energy drinks everyday experienced blood pressure and heart rate increases. As described in ¶¶36–39, *supra*, another significant side effect of Monster Drinks is dehydration.

66.   On March 19, 2013, 18 doctors, public health professionals and other science experts from around the country summarized the scientific evidence on the

---

[11] In the February 2013 AAP Article, doctors expressed "great concern" over the safety and negative effects of energy drinks, given their high caffeine content and the common practice on college campuses (and most likely at the high school level as well) of mixing energy drinks with alcohol.

safety of caffeine levels in energy drinks, particularly given the heavy marketing of such drinks to youth, and concluded that

> there is no general consensus among qualified experts that the addition of caffeine . . . in energy drinks is safe under its conditions of intended . . . particularly for vulnerable populations such as adolescents. On the contrary, there is evidence in the published scientific literature that the caffeine levels in energy drinks pose serious potential health risks, including increased risk of serious injury or even death.

*See* attached Exhibit C, incorporated by reference herein (highlighting elevated blood pressure, altered heart rates, severe cardiac events and other significant health risks in children and young adults).

67.     On June 18, 2013, the American Medical Association comprising about 225,000 U.S. doctors voted at its annual policy meeting to endorse a policy that called for a ban on marketing energy drinks, including Monster Drinks, sold to those younger than 18. The group cited studies that link the drinks to heart problems and reports about emergency room visits by children after consuming the drinks.

68.     While touting the questionably positive qualities of Monster Drinks, the Company fails to provide any warnings of the dangers of frequent excessive consumption of its Monster Drinks. Thus, the Company's labeling of its Monster Drinks is false and misleading.

**I.      Monster's Post-Complaint Revisions to the Company's Marketing and Labeling Confirm the Unfair and Deceptive Nature of the Practices Alleged Herein.**

69.     Shortly after the filing of this action in December 2012, Monster appears to have taken business measures properly characterized as tacit admissions evidencing the false and misleading nature of its business practices alleged herein. For example:

(a)     On February 13, 2013, the Company announced that it would no longer market and sell its energy drinks as "dietary supplements" but instead would classify them as "Beverages," requiring additional disclosures or Monster Drinks' ingredients.

(b)     After the filing of this suit, Monster has removed from its five separate Monster Rehab Drink products, the false statement that Monster Rehab "hydrates like a sports drink and brings you back after a hard day's night." Instead, the Monster Rehab brand of drinks now states that it "fires you up and is the perfect choice after a hard day's night."

(c)     After the filing of this action, Monster has removed references on its Monster Energy® can that in addition to "hipsters and bikers, 'milfs' dig it." Newly manufactured cans have eliminated the reference to "milfs."

## CLASS ACTION ALLEGATIONS

70.    Pursuant to Federal Rule of Civil Procedure 23, plaintiffs bring this class action and seeks certification of a class comprised of:

> All persons who, during the Class Period (December 12, 2008 to
> the present) purchased Monster Energy®, or any Monster
> Rehab® brand of energy drinks (including Monster Rehab® Tea
> + Lemonade + Energy, Monster Rehab® Rojo Tea + Energy,
> Monster Rehab® Green Tea + Energy, Monster Rehab® Protean
> + Energy, and Monster Rehab® Tea + Orangeade + Energy) for
> personal use and not for purposes of further retail sale or
> distribution (referred hereinafter as the "Class").

71.    Excluded from the definition of the Class are: defendants, defendants' employees, any entity in which defendants have a controlling interest or which holds a controlling interest in defendants, including, but not limited to, any warehouses or distributors in which defendants have a controlling interest during the Class Period and defendants' legal representatives, assigns and successors; all persons who make a

timely election to opt out of the proposed Class, and governmental entities, including the Judge and the judicial staff assigned to this case.

72.     Subject to additional information obtained through further investigation and discovery, plaintiffs may expand or narrow the foregoing definition by amendment or amended complaint, as permitted by the Court.

73.     Monster's marketing, advertising and labeling practices and related misrepresentations and material omissions of the risks associated with the consumption of Monster Drinks apply uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class.

74.     All Class members were and are similarly affected by purchasing Monster Drinks at a premium for their intended and foreseeable purpose as marketed, advertised, and labeled.

75.     The proposed Class is so numerous that joinder of all members would be impracticable.

76.     Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including, *inter alia*:

(a)     Whether Monster's business practices, representations or omissions in connection with the advertising, marketing, labeling, promotion and sale of Monster Drinks were false, misleading or likely to deceive or confuse consumers;

(b)     Whether Monster's conduct violated the MMWA, 15 U.S.C. §2301, *et seq.*;

(c)     Whether Monster's conduct violated California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §17200*, et seq.*;

(d)     Whether Monster's conduct violated California's UCL, Bus. & Prof. Code §17500, *et seq.*;

(e)     Whether Monster's conduct violated the CLRA, Cal. Civ. Code §1750, *et seq.*;

SECOND AMENDED COMPLAINT

1

(f)      Whether Monster failed to disclose, withheld or misrepresented

2      material information regarding the health risks of Monster Drinks;

3

(g)      Whether Monster acted intentionally, knew or should have known

4      of the false and misleading nature of its marketing, advertising and labeling

5      before putting the Monster Drinks subject to such advertising and labeling into

6      the stream of commerce for purchase and consumption by plaintiffs and the

7      Class;

8

(h)      Whether Monster breached express and implied warranties in

9      connection with the labeling, advertising, marketing, promotion and sale of

10      Monster Drinks;

11

(i)      Whether Monster's conduct resulted in ill-gotten gains and, if so,

12      the extent of the ill-gotten gains;

13

(j)      Whether Monster's conduct injured consumers and, if so, the

14      nature and extent of the injury; and

15

(k)      Whether, and to what extent, injunctive relief should be imposed

16      on Monster to prevent such conduct in the future.

17      77.      The claims asserted by plaintiffs in this action are typical of the claims of

18      the members of the Class, as the claims arise from the same course of conduct by

19      defendants, and the relief sought is common. The misrepresentations and omissions

20      as to plaintiffs when they purchased Monster Drinks are similar to the

21      misrepresentations and omissions made to other Class members across the country.

22      Plaintiffs and all Class members have suffered economic injury as a result of

23      defendants' misrepresentations and omissions, and the Company has realized massive

24      ill-gotten gains associated with the sale of its Monster Drinks. Absent this class action,

25      the members of the Class will continue to suffer losses and the violations of law

26      described herein will continue without a practical remedy, and defendants would

27      unjustly retain the proceeds of their ill-gotten gains. Defendants continue to engage in

28

SECOND AMENDED COMPLAINT

the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

78.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiffs and their counsel do not foresee any circumstances where the interests of plaintiffs would be adverse to the interests of the Class.

79.     Certification of this class action is appropriate under Fed. R. Civ. P. 23, because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes a class action superior to other available methods for the fair and efficient adjudication of this controversy. It would be economically impractical for plaintiffs and Class members to pursue individual actions against defendants as the costs of prosecution would likely surpass their individual damages. Thus, plaintiffs and Class members would be left with no effective remedy for the damages they suffered and continue to suffer. Class treatment of plaintiffs' claims will permit plaintiffs and the Class to vindicate their rights against defendants and conserve the resources of the Court and the Parties. Class treatment will also avoid the possibility of inconsistent outcomes that could result from a multitude of individual actions in varying jurisdictions nationwide.

80.     Certification also is appropriate because defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of consumers of Monster Drinks, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

81.     A class action is a manageable, fair and appropriate method for the group-wide adjudication of this controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the

SECOND AMENDED COMPLAINT

1  unnecessary hardship that would result from the prosecution of numerous individual

2  actions and the duplication of discovery, effort, expense and burden on the courts

3  that individual actions would engender.

4      82.    Plaintiffs know of no difficulty that will be encountered in the

5  management of this litigation that would preclude maintenance as a class action.

6  Moreover, the benefits of proceeding as a class action, including providing a method

7  for obtaining redress for claims that would not be practical to pursue individually,

8  outweigh any difficulties that might be argued with regard to the management of this

9  class action.

10                          **COUNT I**

11  **For Violations of the UCL, Cal. Bus. & Prof. Code Section 17200, *et seq.***

12      83.    Plaintiffs repeat each and every allegation contained in the paragraphs

13  above and incorporate by reference each preceding paragraph as though fully set forth

14  at length herein.

15      84.    This cause of action is brought pursuant to California Business &

16  Professions Code §17200, *et seq.*, which provides that "unfair competition shall mean

17  and include any unlawful, unfair or fraudulent business act or practice and unfair,

18  deceptive, untrue or misleading advertising and any act prohibited by Chapter I

19  (commencing with Section 17500) of the Business and Professions Code."

20      85.    Monster's misrepresentations and omissions in connection with its

21  marketing, advertising and labeling practices, as set forth above, were intended to

22  promote the sale of Monster Drinks and constitute unlawful, deceptive and/or unfair

23  business practices within the meaning of California Business & Professions Code

24  §17200, *et seq.*

25      86.    Monster misrepresented that its Monster Rehab® brand of drinks

26  "quenches thirst, hydrates like a sports drink, and brings you back after a hard day's

27  night." The Company also states that this brand of Monster Drinks "RE-FRESH,

28  RE-HYDRATE, REVIVE (OR) RE-STORE."

87.     These representations are false and misleading because Monster Rehab®
Drinks do not hydrate like sports drinks or "bring you back." Instead, consumption
of these drinks as prescribed on the label could cause severe dehydration because the
combination of caffeine and guarana in energy drinks acts as a diuretic. Plaintiffs
relied on these statements in purchasing at a premium and consuming Monster
Rehab® Drinks.

88.     Monster even tacitly concedes that its marketing and labeling on
Monster Rehab® Drinks is false and misleading because after the filing of the initial
complaint in this matter, Monster changed the misrepresentations to "quenches thirst,
fires you up and is the perfect choice after a hard day's night."

89.     The marketing, advertising and labeling for Monster Energy® includes
the misrepresentation "It's the ideal combo of the right ingredients in the right
proportion to deliver the big bad buzz that only Monster can" and that consuming 3
Monster Drinks per day is not unsafe. Plaintiffs relied on these statements in
purchasing at a premium and consuming Monster Energy®.

90.     Monster's representations are false and misleading and omit material
facts regarding the health risks associated with the frequent consumption of caffeine
present in the Monster Drinks. Indeed, Monster Energy® is not the ideal combo of
the right ingredients in the right proportion and consuming even three Monster
Drinks (or less) per day as prescribed on the label can be unsafe for adults, and
especially unsafe for the youth and children that Monster target with its marketing.

91.     The California Sherman Food, Drug, and Cosmetic Law (the "Sherman
Law"), Cal. Health & Safety Code §109875, et seq., broadly prohibits the misbranding
of food. See Sherman Law, §110660. The Sherman Law provides that food is
misbranded "if its labeling is false or misleading in any particular." The Sherman Law
incorporates "[a]ll food labeling regulations and any amendments to those regulations
adopted pursuant to the [Federal Food, Drug, and Cosmetic Act] as "the food
labeling regulations of this state." Cal. Health & Safety Code §110100(a). The Federal

Food, Drug, and Cosmetic Act provision prohibiting the misbranding of food uses language identical to that of the Sherman Law. See 21 U.S.C. §343 a-1 ("A food shall be deemed misbranded if its labeling is false or misleading in any particular.").

92.     Monster's business practices alleged above are unlawful under Cal. Bus. & Prof. Code §17200, et seq., because they violate the Sherman Law which forbids the misbranding of food. Monster's business practices alleged above are also unlawful under Cal. Bus. & Prof. Code §17500, et seq., which forbids untrue and misleading advertising, and the CLRA, Cal. Civ. Code §1750, et seq., which prohibits methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of goods or services to any consumer."

93.     Monster's conduct, as detailed above, constitutes fraudulent business practices under Cal. Bus. & Prof. Code § 17200, et seq. Monster's misleading marketing, advertising and labeling of Monster Drinks is likely to, and does in fact, deceive reasonable consumers.

94.     Monster likens the hydrating effect of consuming Monster Rehab® Drinks to drinking sports drinks, when that is in fact, not true. Scientific studies demonstrate that indeed consumption of Monster Rehab® Drinks may actually cause dehydration.

95.     Monster's conduct constitutes fraudulent and deceptive business practices because the Company promotes the stocking of Monster Drinks with sports drinks to further advance the similarity to sports drinks.

96.     Further all Monster Drinks indicate that consumers can safely consume up to three Monster Drinks a day, when in fact consumption of Monster Drinks as prescribed on the label could be unsafe for adults, and especially unsafe for the youth and children that Monster targets.

SECOND AMENDED COMPLAINT

97.     Monster's conduct also constitutes fraudulent and deceptive business practices because the Company fails to provide any warning to teenagers - its primary target market – with knowledge that this group is especially vulnerable.

98.     Monster's conduct also constitutes fraudulent and deceptive business practices because the Company actively promotes consumption of Monster Drinks at high schools and other events where children and youth are present through sponsorships and prize promotions.

99.     Monster's conduct also constitutes fraudulent and deceptive business practices because the Company's strong references to alcohol and sex in its marketing and advertising materials promotes the consumption of Monster Drinks by teenagers while obscuring undisclosed health risks.

100.    Monster's conduct also constitutes fraudulent and deceptive business practices because the Company deceives its consumers into believing that the celebrities and athletes endorsing Monster Drinks are consuming such drinks when they are actually drinking water in a can (Tour Water) that looks identical to the Monster Energy can.

101.    Plaintiffs and the other members of the Class who purchased Monster Drinks were unquestionably deceived by defendants' conduct regarding the benefits of Monster Drinks. Monster's deceptive conduct caused plaintiffs and the other members of the Class to purchase Monster Drinks or pay more than they would have for Monster Drinks had they known the nature of the products.

102.    Monster's conduct, as set forth above, also constitutes unfair business practices. Plaintiffs and the other members of the Class who purchased Monster Drinks suffered a substantial injury by virtue of buying Monster Drinks that they would not have purchased absent defendants' unfair marketing, advertising, and labeling or by paying an excessive premium price for the unfairly marketed, advertised and labeled Monster Drinks.

103.    There is no benefit to consumers or competition by deceptively marketing, advertising, and labeling Monster Drinks. The harm to consumers and competition is substantial. Monster had an improper motive (profit before accurate marketing) by implementing marketing strategies designed to attract children and youth. The use of such unfair business acts and practices was and is under the sole control of Monster, and was deceptively hidden from members of the Class and the general public.

104.    Plaintiffs and the other members of the Class who purchased Monster Drinks had no way of reasonably knowing that the Monster Drinks they bought were not as marketed, advertised and labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

105.    The gravity of the consequences of Monster's conduct as described above outweighs any justification, motive or reason therefore, particularly considering the available legal alternatives which exist in the marketplace and is immoral, unethical, unscrupulous, offends established public policy or is substantially injurious to plaintiffs and the other members of the Class.

106.    As members of the general public who purchased and consumed Monster Drinks, plaintiffs have standing and are entitled to and do bring this class action seeking all available remedies under the UCL. As a result of Monster's violations of the UCL, plaintiffs and members of the Class are entitled to restitution for out-of-pocket expenses and for economic harm in terms of the price they paid for Monster Drinks. Monster Drinks retail for prices higher than sports drinks and many other energy drinks.

107.    Pursuant to California Business & Professions Code §17203, plaintiffs seek an order of this Court for injunctive relief and disgorging from Monster and restoring to plaintiffs and members of the Class all monies that may have been acquired by Monster as a result of such unfair, deceptive and/or unlawful business acts or practices. Plaintiffs, members of the Class and the general public may be

1   irreparably harmed and/or denied an effective and complete remedy if such relief is

2   not granted.

3                                    **COUNT II**

4          **For Violations of the FAL, Bus. & Prof. Code Section 17500, *et seq.***

5          108.   Plaintiffs repeat each and every allegation contained in the paragraphs

6   above and incorporate by reference each preceding paragraph as though fully set forth

7   at length herein.

8          109.   In violation of California Business & Professions Code §17500,

9   defendants have disseminated, or caused to be disseminated advertising, labeling, and

10  marketing of Monster Drinks that is untrue or misleading or which by the exercise of

11  reasonable care should be known, to be untrue or misleading.

12         110.   Monster was engaged in a scheme to offer Monster Drinks for sale by

13  way of, *inter alia*, marketing, advertising, Internet, packaging, labeling and other

14  promotional materials. These materials misrepresented or materially omitted the true

15  nature of Monster Drinks.

16         111.   Monster misrepresented that its Monster Rehab® brand of drinks

17  "quenches thirst, hydrates like a sports drink, and brings you back after a hard day's

18  night," and that they "RE-FRESH, RE-HYDRATE, REVIVE (OR) RE-STORE."

19  These representations are false and misleading because Monster Rehab® drinks do

20  not hydrate like sports drinks or "bring you back." Instead, consumption of these

21  drinks as prescribed on the label could cause severe dehydration because the

22  combination of caffeine and guarana in energy drinks acts as a diuretic. Plaintiffs

23  relied on these statements in purchasing at a premium and consuming Monster

24  Rehab® drinks.

25         112.   Monster concedes that its marketing and labeling on Monster Rehab®

26  drinks is false and misleading because after the filing of the initial complaint in this

27  matter, Monster changed the misrepresentations to "quenches thirst, fires you up and

28  is the perfect choice after a hard day's night."

SECOND AMENDED COMPLAINT

35

113.    The marketing, advertising and labeling for Monster Energy® also includes the misrepresentation "It's the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can" and that consuming three Monster Drinks per day is not unsafe. Plaintiffs relied on these statements in purchasing at a premium and consuming Monster Energy®.

114.    Monster's representations are false and misleading and omit material facts regarding the health risks associated with the frequent consumption of caffeine present in the Monster Drinks. Indeed, Monster Energy® is not the ideal combo of the right ingredients in the right proportion and consuming even three Monster Drinks (or less) per day as prescribed on the label can be unsafe for adults, and especially unsafe for the youth and children that Monster target with its marketing.

115.    Monster's advertisement and inducements come within the definition of advertising as contained in Cal. Bus. & Prof. Code § 17500, *et seq.* in that such advertisements, labels and promotional materials were disseminated by Monster to plaintiffs and the other members of the Class, and were intended to reach such consumers to induce them to purchase Monster Drinks. Plaintiffs reasonably relied on Monster's statements in purchasing Monster Drinks at a premium.

116.    Defendants knew, or by the exercise of reasonable care, should have known that these statements were misleading and untrue in violation of Cal. Bus & Prof. Code §17500.

117.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the Class members have suffered substantial harm while Monster has been unjustly enriched at the expense of plaintiffs and the Class. Pursuant to California Business & Professions Code §17535, plaintiffs and the Class are entitled to restitution for out-of-pocket expenses and economic harm as a result of their unfair and deceptive acts and practices, and for an order enjoining such future conduct by Monster.

## COUNT III

### For Violations of the CLRA, Cal. Civ. Code Section 1750, *et seq.*

118.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

119.    This cause of action is brought pursuant to the CLRA.

120.    Plaintiffs and each member of the Class are "consumers" within the meaning of California Civil Code §1761(d).

121.    The Monster Drinks plaintiffs and other members of the Class purchased from Monster were "goods" within the meaning of Cal. Civ. Code §1761(a).

122.    The purchases of Monster Drinks by plaintiffs and each member of the Class were and are "transactions" within the meaning of California Civil Code §1761(e).

123.    Defendants have violated the CLRA by, among other things, their representations and material omissions in the labeling, advertising, marketing, promotion and sales of Monster Drinks that hydrate like sports drinks, are the ideal combo of the right ingredients in the right proportion, and not unsafe if consumed as prescribed on the can, when they knew of had access to information that indicated that defendants' representations were false and misleading.

124.    Defendants' labeling, advertising, marketing, promotion and sales of Monster Drinks as alleged herein, violated §1770(a) of the CLRA in at least the following respects for the reasons set forth in detail above:

(a)    Misrepresenting the source, sponsorship, approval, or certification of goods or services (Cal. Civ. Code §1770(a)(2));

(b)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have (Cal. Civ. Code §1770(a)(5));

(c)     Representing that goods or services are of a particular standard, quality, grade, or that goods are of a particular style or model, if they are of another (Cal. Civ. Code §1770(a)(7));

(d)     Advertising goods or services with intent not to sell them as advertised (Cal. Civ. Code §1770(a)(9)); and

(e)     Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code §1770(a)(16)).

125.    As a result of the use or employment by defendants of methods, acts or practices declared unlawful by the above provisions of Cal. Civ. Code §1770, plaintiffs suffered damage in that they bought the Monster Drinks and thus paid monies that they would not have expended had the true facts been accurately disclosed to them and had Monster Drinks not been promoted as they were in light of the material adverse facts set forth above, or spent more money on Monster Drinks than they otherwise would have. Plaintiffs therefore seek and are entitled to, on behalf of themselves and members of the Class, equitable relief in the form of an order for injunctive relief and requiring Monster to make full restitution of all monies wrongfully obtained as a result of the conduct described above.

126.    Pursuant to California Civil Code §1780(d), plaintiffs request that this Court enjoin defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. If defendants are not restrained from engaging in these types of practices in the future, plaintiffs and other members of the Class will continue to suffer harm.

127.    Pursuant to California Civil Code §1782(a), plaintiffs notified the Company, by certified letter dated December 12, 2012, received by defendants on or about December 17, 2012, i.e., more than 30 days from the filing of this Complaint, of the above-outlined violations of California Civil Code §1750, *et seq.*, and demanded that defendants provide an appropriate remedy. After 30 days, defendants provided

1  no response and have failed to adequately address or remedy the violations and other

2  wrongful conduct alleged herein.

3       128.    As a direct and proximate result of defendants' violations of the CLRA

4  as alleged herein, plaintiffs and the members of the Class have been injured by,

5  including, but not limited to, the infringement of their legal rights as a result of being

6  subjected to the common course of unlawful conduct alleged herein; and being

7  induced to purchase the Monster Drinks that provided no benefit to them.

8       129.    Pursuant to Cal. Civ. Code §1780(a)(3), plaintiffs, on behalf of

9  themselves and all other members of the Class, seek compensatory damages, punitive

10 damages and restitution of any ill-gotten gains due to defendant' unfair and deceptive

11 acts and practices.

12       130.    Plaintiffs also request on their and the rest of the Class' behalf that this

13 Court award them and reasonable attorneys' fees pursuant to Cal. Civ. Code §1780(d).

**COUNT IV**

**Breach of Express and Implied Warranty**

16       131.    Plaintiffs repeat each and every allegation contained in the paragraphs

17 above and incorporate by reference each preceding paragraph as though fully set forth

18 at length herein.

19       132.    Monster provided plaintiffs and the other members of the Class with

20 express warranties, including warranties that Monster Drinks are the "ideal combo of

21 the right ingredients in the right proportion," and "hydrates like a sports drink," and is

22 not unsafe if consumption is limited to three cans per day. These warranties became

23 part of the bargain between plaintiffs and the Class on the one hand and Monster on

24 the other.

25       133.    Plaintiffs and the members of the Class relied upon Monster's warranties

26 in purchasing and consuming Monster Drinks.

27       134.    Defendants breached these warranties which resulted in damages to

28 plaintiffs and other members of the Class, who purchased and overpaid for Monster

Drinks, which do not hydrate like sports drinks, are not the ideal combo of the right ingredients in the right proportion, could result in serious health risks if consumed as prescribed on the can and did not otherwise conform to Monster's warranties.

135.   As a proximate result of the breach of warranties by Monster, plaintiffs and Class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised as promoted, marketed, advertised, packaged and labeled by Monster, and they were deprived of the benefit of their bargain and spent money on products that did not have any value, had less value than warranted or that they would not have purchased and consumed had they known the true facts about them.

136.   Whether or not expressly made, such warranties that the Monster Drinks would be merchantable and fit for the ordinary purposes for which such goods are used and conform to the promises or affirmations of fact made in the products' promotions, marketing, advertising and labels, are implied by law in all consumer transactions. In doing so, plaintiffs and other Class members relied on Monster's representations that the Monster Drinks hydrate like sports drinks, are the ideal combo of the right ingredients in the right proportion, and not unsafe if consumed as prescribed on the can as set forth above and at or about the time, defendants sold Monster Drinks to plaintiffs and other Class members.

137.   Plaintiffs and Class members bought Monster Drinks, relying on Monster's representations and material omissions when, in fact, Monster Drinks do not hydrate like sports drinks, are not the ideal combo of the right ingredients in the right proportion, could result in serious health risks if consumed as prescribed on the can and did not otherwise conform to Monster's warranties.

138.   Monster breached the warranties implied at the time of sale in that plaintiffs and Class members did not receive goods that were beneficial or that had the beneficial characteristics represented and thus, the goods were not merchantable

1  as fit for the ordinary purposes for which such goods are used or as promoted,

2  marketed, advertised, labeled or sold.

3       139.   As a direct and proximate result of these breaches of warranty by

4  Monster, plaintiffs and Class members have suffered damages in an amount to be

5  determined at trial in that, among other things, they purchased and paid for products

6  that did not conform to what was promised as promoted, marketed, advertised,

7  packaged and labeled by Monster, they were deprived of the benefit of their bargain

8  and spent money on products that did not have any value, had less value than

9  warranted or that they would not have purchased and consumed had they known the

10  true facts about them.

**COUNT V**

11
12  **For Violations of the MMWA, 15 U.S.C. Section 2301, *et seq.***

13       140.   Plaintiffs repeat each and every allegation contained in the paragraphs

14  above and incorporate by reference each preceding paragraph as though fully set forth

15  at length herein.

16       141.   Plaintiffs and Class members are "consumers" within the meaning of the

17  MMWA.

18       142.   The Company is a "supplier" and "warrantor" within the meaning of the

19  MMWA.

20       143.   Monster Drinks are "consumer products" within the meaning of the

21  MMWA.

22       144.   Defendants' written affirmations of fact, promises and/or descriptions,

23  as alleged herein, are each a "written warranty" and/or there exists an implied

24  warranty for the sale of Monster Drinks within the meaning of the MMWA. Plaintiffs

25  and other Class members relied on these warranties in purchasing Monster Drinks at

26  prices ranging from $7.00 to $53.00 (¶¶ 19(a), 20).

27       145.   As set forth above, defendants breached their warranties as Monster

28  Drinks were not fit for their intended use, and thereafter the Company has refused to

1    honor any applicable warranties by refunding the price paid for such products despite

2    demand therefor. Defendants' conduct thereby caused damages to plaintiffs and

3    members of the Class.

4         146.    As a result of the Company's breach of warranties, plaintiffs and Class

5    members have sustained damages and other losses in an amount to be determined at

6    trial, as well as attorneys' fees, rescission, and/or other relief as is deemed appropriate.

7                                    **COUNT VI**

8                                **Unjust Enrichment**

9         147.    Plaintiffs repeat each and every allegation contained in the paragraphs

10   above and incorporate by reference each preceding paragraph as though fully set forth

11   at length herein.

12        148.    By means of their misrepresentations and material omissions, as set forth

13   above, Monster induced plaintiffs and the Class to purchase Monster Drinks that

14   provided no substantial benefit to consumers, and actually may have caused

15   significant detriment to their health and mental well-being. As a consequence of such

16   misrepresentations and misconduct, plaintiffs and the members of the Class paid

17   monies to obtain the Monster Drinks.

18        149.    Defendants voluntarily accepted and retained the benefit of the monies

19   paid by plaintiffs and the Class with full knowledge of the health risks of the Monster

20   Drinks and without adequately disclosing those risks.

21        150.    Defendants have been enriched, at the expense of plaintiffs and the

22   Class, by retaining monies for benefits, which they did not provide.

23        151.    Plaintiffs and the Class have no adequate remedy at law.

24        152.    It would be unjust and inequitable for defendants to retain the profits,

25   benefits, and other compensation obtained from its wrongful conduct as alleged

26   herein.

27

28

SECOND AMENDED COMPLAINT

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against defendants as follows:

A.     Certifying a nationwide Class as requested for all claims asserted herein;

B.     Awarding plaintiffs and the proposed Class members actual, statutory and punitive damages;

C.     Awarding declaratory and injunctive relief as permitted by law or equity, including corrective labeling, advertising and marketing;

D.     Ordering that defendants be required to make full restitution of all monies wrongfully obtained as a result of the conduct described above and disgorge all ill-gotten gains flowing from the conduct described above;

E.     For payment of reasonable costs of suit and attorneys' fees pursuant to, *inter alia*, Cal. Civ. Proc. Code §1021.5, Cal. Civ. Code §1780(d), and the MMWA, 15 U.S.C. §2310(d);

F.     Ordering that defendants be required to pay pre- and post-judgment interest on all such sums;

G.     Providing such further relief as may be just and proper;

H.     Other legal and equitable relief permitted with respect to the causes of action stated herein;

I.     A trial by jury on all issues so triable; and

J.     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury with respect to any claims so triable.

DATED: July 26, 2013

_____
AZRA Z. MEHDI

THE MEHDI FIRM, PC
AZRA Z. MEHDI (220406)
ARCELIA HURTADO (191481)
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105

43

1

(415) 293-8039
(415) 293-8001(fax)

2

–

3

9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
(310) 853-8010
(310) 853-8011(fax)
azram@themehdifirm.com
ahurtado@themehdifirm.com

4

5

6

Attorneys for Plaintiffs and the [Proposed]
Class

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT

# EXHIBIT A



# Today's Consumer

- **Generation Y: Born between 1985 – 2000**
- **70 million strong**
  - Trophy kids
  - Mypods
  - Digital Generation







# Generation Y



- Non-conformists

- They expect to be heard and not seen, very opinionated

- Multi-taskers with short attention spans

- They consume many information sources simultaneously

- They feel entitled

- Skeptical of everything

# Marketing To Generation Y

- They expect companies to conform to their lifestyle

- Looking for a release from their over-scheduled, authority dominated world

- They are skeptical and don't believe in big company advertising

- They rely on their network of friends and peers for their recommendations "Peer-to-Peer Marketing"

# Monster's Approach

## Associate with their lifestyle

















# Monster's Approach

## Must always be credible and authentic



# Monster Energy Positioning

Monster represents a lifestyle.  Monster is aggressive, cool, sinister, dark, mysterious and fun.  Monster is about action sports, punk rock music, partying, girls, and living life on the edge.











# Building The Image

## Girls



## Music



## Action Sports





# Brand Building

## Awareness

### Media



### Events



### Athletes



## Image

### Grass Roots










# Kawasaki Fantasy Camp



## National Promotion

- 2nd Trimester: 5/1/09 – 8/31/09

- **12** Win a Trip to Monster Energy Kawasaki Fantasy Camp

- **75** First Place Winners receive a Monster Energy Edition Kawasaki KLX 140 Dirt Bike.

- Monster Energy Kawasaki Pro Circuit Jersey Dealer Loaders.





MONSTER.COM:

1. REPRESENTS THE MONSTER LIFESTYLE.

2. IS A BRAND LOYALTY PLATFORM.

3. ALLOWS USERS TO SHARE, VOTE, RATE & INTERACT.

4. PROMOTES OUR GIRLS, ATHLETES & BANDS.

5. IS A CENTRAL HUB FOR ALL EVENTS.

6. IS TECHNOLOGICALLY AHEAD OF THE COMPETITION.

7. WILL PROMOTE OUR WORLDWIDE PRODUCTIZATION EFFORTS.













# EXHIBIT B

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Food Safety and Applied Nutrition

CFSAN Adverse Event Reporting System
Voluntary and Mandatory Reports on 5-Hour Energy, Monster Energy, and Rockstar
Energy Drink
January 1, 2004, through October 23, 2012


## Introduction

FDA's Center for Food Safety and Applied Nutrition (CFSAN) Adverse Event Reporting
System (CAERS) collects reports about adverse health events and product complaints
related to CFSAN-regulated products, including conventional foods, dietary supplements,
and cosmetics. Based on a search of CAERS, this document summarizes the adverse
events reported to FDA in connection with products under the labels 5-Hour Energy,
Monster, and Rockstar between January 1, 2004 and October 23, 2012. These products
are currently marketed as dietary supplements.

CAERS includes voluntary reports for cosmetics and conventional foods, and both
voluntary and mandatory reports for dietary supplements. Mandatory reports are those
required by the Dietary Supplement and Nonprescription Drug Consumer Protection Act.
Specifically, dietary supplement manufacturers, packers, and distributors must notify
FDA if they receive reports about serious adverse events in connection with the use of
their products. This law defines a serious adverse event as an adverse health-related event
that is associated with the use of a dietary supplement and that results in death, a life-
threatening experience, inpatient hospitalization, a persistent or significant disability or
incapacity, a congenital anomaly or birth defect, or that requires, based on reasonable
medical judgment, a medical or surgical intervention to prevent one of those outcomes.
The requirement to report serious adverse events to FDA applies only to dietary
supplements and not to beverages, other conventional foods, or cosmetics.

Medical officers with the agency's Dietary Supplement Program staff  review all serious
adverse events reported to FDA about dietary supplements as part of the normal process
of assessment and categorization. In addition to these mandatory reports, the CAERS
system also contains adverse events (both serious and non-serious) that are voluntarily
reported to FDA by consumers and health care providers.

FDA encourages consumers and health care providers to report adverse events they
believe may be related to FDA-regulated products to FDA's MedWatch Adverse Event
Reporting Program (http://www.fda.gov/Safety/MedWatch/default.htm). FDA advises
consumers to talk with their health care providers before using any product marketed as
an "energy shot" or "energy drink."

**Things You Should Know About Adverse Event Report Data**

Individual adverse event reports about a particular product and the total number of adverse event reports for that product in CAERS only reflect information **AS REPORTED** and do not represent any conclusion by FDA about whether the product actually caused the adverse events. Because CAERS is constantly updated with new information, the number of reports for a given product and the content of individual reports may change over time.

Even with mandatory reporting of serious adverse events for dietary supplements, generally only a small fraction of adverse events associated with any product is reported. On the other hand, there may be duplicate reports in CAERS for the same adverse event because multiple people (such as an injured consumer and a health care provider who treated him or her) may have submitted reports.

There are important limitations to making inferences based on data from adverse event reports, such as those in CAERS.

- Reports to FDA do not necessarily include all relevant data, such as whether an individual also suffered from other medical conditions (such as cardiac disease) or took other supplements or medication at the same time.

- Reports may not include accurate or complete contact information for FDA to seek further information about the event, or complainants may choose not to participate in the follow-up investigation.

When important information is missing from a report, it is difficult for FDA to fully evaluate whether the product caused the adverse event or simply coincided with it. The fact that an adverse event happened after a person took a dietary supplement does not necessarily mean that the dietary supplement caused the adverse event.

# CAERS Adverse Events Reports Allegedly Related to Monster

## Search Terms: Monster

The Center for Food Safety Adverse Event Reporting System (CAERS) is a post-market surveillance system that collects reports about events or problems that are allegedly related to CFSAN regulated products. In some reports, information in the reports cannot be verified for accuracy. Furthermore, in many reports, individuals may have used other products, and many products contain multiple ingredients which further complicates the evaluation of adverse event reports.

There is no certainty that a reported adverse event can be attributed to a particular product or ingredient. The number of adverse event reports in CAERS received by FDA and the adverse event report itself about a particular product only reflects information **AS REPORTED** and does not represent any conclusion by FDA regarding a causal relationship or association with the product or ingredient. Due to the continuous inclusion of new or updated information into the CAERS system, reports released from CAERS containing adverse event data may change over time.

Each report received by CAERS regarding an individual that experiences an adverse event is assigned a unique report number (Report #).

*Previous versions of this document may include CAERS reports 150942 and 150496. Since we received two CAERS reports for the same individual, we have merged them into a single CAERS report (150942).

^ Additional dates indicate receipt of additional materials on report.

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 66354 | 2/4/04 | MONSTER ENERGY, ENERGY SUPPLEMENT DRINK | ABDOMINAL PAIN UPPER, RETCHING, VOMITING, DIARRHOEA, WEIGHT DECREASED, DIZZINESS, HOSPITALISATION | LIFE THREATENING, HOSPITALIZATION |
| 71234 | 8/11/04 | MONSTER ENERGY DRINK | MYOCARDIAL INFARCTION, ELECTROCARDIOGRAM ST SEGMENT ELEVATION, HOSPITALISATION | HOSPITALIZATION, LIFE THREATENING |
| 75388 | 1/10/05 | MONSTER BEVERAGE CO MONSTER ENERGY | FATIGUE | VISITED A HEALTH CARE PROVIDER |
| 78111 | 4/6/05 | HANSENS MONSTER ENERGY DRINK | PHARYNGITIS, DIZZINESS | NON-SERIOUS INJURIES/ ILLNESS |
| 86237 | 3/22/06 | MONSTER ENERGY DRINK | TREMOR, DYSPNOEA, VOMITING, CHEST PAIN, TREMOR, RHABDOMYOLYSIS, MYOCLONUS | HOSPITALIZATION, VISITED AN ER, LIFE THREATENING |
| 111857 | 4/7/09 | MONSTER ENERGY DRINK | DEATH | DEATH |
| 112784 | 4/7/09 | MONSTER BLUE LOW CARB ENERGY DRINK | NAUSEA, THROAT IRRITATION | NON-SERIOUS INJURIES/ ILLNESS |

Page 1

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 113068 | 5/7/09 | MONSTER ENERGY DRINK | BIPOLAR DISORDER, PSYCHOTIC DISORDER, PERSONALITY DISORDER, SUICIDAL IDEATION | HOSPITALIZATION |
| 116885 | 6/2/09 | JAVA MONSTER PLUS ENERGY ENERGY DRINK RUSSIAN FLAVOR | GASTROENTERITIS SALMONELLA, MALAISE, VOMITING, BACK PAIN, HEADACHE, ABDOMINAL PAIN, COUGH, DIARRHOEA | NON-SERIOUS INJURIES/ ILLNESS |
| 128536 | 7/28/10 | MONSTER ENERGY DRINK | FATIGUE, INFLUENZA LIKE ILLNESS, MEMORY IMPAIRMENT, MIGRAINE, ANGINA PECTORIS, PALPITATIONS, EYE PAIN, MALAISE, DYSURIA, NEUROPATHY PERIPHERAL, NIGHT SWEATS, DECREASED APPETITE, ASTHENIA, PAIN, INSOMNIA, HEADACHE, FLUSHING, VISUAL ACUITY REDUCED | LIFE THREATENING, HOSPITALIZATION |
| 130690 | 10/5/10 | MONSTER ENERGY DRINK | DYSPNOEA, POLLAKIURIA, BLOOD POTASSIUM DECREASED | VISITED AN ER, HOSPITALIZATION |
| 132041^ | 11/12/10 6/21/12 | MONSTER NITROUS | DEATH | DEATH |
| 133771 | 12/8/10 | JAVA MONSTER MEAN BEAN COFFEE FLAVORED ENERGY DRINK | VOMITING, ABDOMINAL PAIN | NON-SERIOUS INJURIES/ ILLNESS |
| 142050 | 8/1/11 | MONSTER ENERGY DRINK | LETHARGY, ABDOMINAL PAIN, HEART RATE ABNORMAL | NON-SERIOUS INJURIES/ ILLNESS |
| 143117 | 8/1/11 | MONSTER/LOW CARB ENERGY DRINK | CONJUNCTIVITIS | VISITED A HEALTH CARE PROVIDER, NON-SERIOUS INJURIES/ ILLNESS |
| 144780 | 4/14/11 | MONSTER HIT MAN ENERGY DRINK | NAUSEA, DIZZINESS, VOMITING, HEART RATE ABNORMAL, BLOOD PRESSURE FLUCTUATION | NON-SERIOUS INJURIES/ ILLNESS |

Page 2

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 145133 | 10/26/11 | MONSTER DRINK | MUSCLE SPASMS, ABASIA, DIZZINESS, MUSCULOSKELETAL STIFFNESS, DYSPNOEA, PAIN IN EXTREMITY | OTHER SERIOUS (IMPORTANT MEDICAL EVENTS) |
| 145546 | 11/10/11 | MONSTER ENERGY DRINK | HEART RATE ABNORMAL, SKIN DISCOLOURATION, BLOOD PRESSURE INCREASED | VISITED AN ER |
| 146476^ | 12/7/11 3/27/12 4/4/12 | MONSTER DRINKS | LOSS OF CONSCIOUSNESS | DEATH |
| 146479 | 12/6/11 | MONSTER ENERGY DRINK | HEART RATE IRREGULAR, DYSPNOEA, ATRIAL FIBRILLATION | HOSPITALIZATION |
| 147297 | 12/30/11 | MONSTER | DEATH | DEATH |
| 147873 | 12/5/11 | MONSTER ENERGY DRINK | ABDOMINAL PAIN | NON-SERIOUS INJURIES/ ILLNESS |
| 150719 | 4/3/12 | MONSTER ENERGY DRINK | FATIGUE, IRRITABILITY, DEPENDENCE | NON-SERIOUS INJURIES/ ILLNESS |
| 150941 | 4/6/12 | MONSTER | TREMOR, RESPIRATORY RATE INCREASED | VISITED A HEALTH CARE PROVIDER, HOSPITALIZATION |
| * 150942^ | 3/27/12 4/9/12 | MONSTER ENERGY DRINK | CARDIAC ARREST, ARRHYTHMIA, DRUG TOXICITY | DEATH |
| 151016 | 4/9/12 | MONSTER ENERGY DRINKS | DYSPNOEA, CHEST PAIN | VISITED AN ER, OTHER SERIOUS (IMPORTANT MEDICAL EVENTS) |
| 151782 | 4/27/12 | MONSTER ENERGY REHAB PROTEAN + ENERGY 15.5 OZ | THROAT TIGHTNESS, HYPERSENSITIVITY | HOSPITALIZATION |
| 152471 | 5/15/12 | MONSTER ENERGY | DIARRHOEA, VOMITING, CHROMATURIA, JAUNDICE, PRURITUS, ANOREXIA, BILIARY SPHINCTEROTOMY, CHOLESTASIS, GALLBLADDER DISORDER, PANCREATIC DISORDER | OTHER SERIOUS (IMPORTANT MEDICAL EVENTS), HOSPITALIZATION |

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 153012 | 5/31/12 | MONSTER ENERGY REHAB PROTEAN | RESPIRATORY ARREST, CARDIAC ARREST | HOSPITALIZATION |
| 153279 | 6/11/12 | MONSTER ENERGY 16 OZ | DIZZINESS, TREMOR, ANXIETY | HOSPITALIZATION |
| 153974 | 6/29/12 | MONSTER ENERGY IMPORT DUB EDITION | OROPHARYNGEAL SWELLING | VISITED AN ER, HOSPITALIZATION |
| 154641 | 7/20/12 | MONSTER ENERGY IMPORT | CONFUSIONAL STATE, CHEST PAIN, PAIN, HEADACHE, CHILLS, DIZZINESS | VISITED AN ER, HOSPITALIZATION |
| 155221 | 8/7/12 | MONSTER ENERGY 16 OZ | DYSPNOEA, FEELING JITTERY, HYPOAESTHESIA | HOSPITALIZATION |
| 155267 | 8/8/12 | MONSTER ENERGY | HYPERSENSITIVITY, EMOTIONAL DISTRESS, URTICARIA | VISITED AN ER, HOSPITALIZATION |
| 155411 | 8/10/12 | MONSTER ENERGY DRINK | HYPERSENSITIVITY, MALAISE | CONGENITAL ANOMALY, REQ. INTERVENTION TO PRVNT PERM. IMPRMNT., LIFE THREATENING, DISABILITY |
| 155735 | 8/22/12 | MONSTER ENERGY | HEART RATE INCREASED, PALPITATIONS, FALL | HOSPITALIZATION |
| 155835 | 8/27/12 | MONSTER ENERGY ANTI-GRAVITY 12 FL. OZ | ORAL HERPES, HYPERSENSITIVITY, RASH, PRURITUS | HOSPITALIZATION |
| 156002 | 8/30/12 | MONSTER ENERGY ABSOLUTELY ZERO | ABDOMINAL PAIN UPPER, VOMITING, SYNCOPE, DIARRHOEA, DEHYDRATION | HOSPITALIZATION |
| 156830 | 9/20/12 | MONSTER ENERGY | CHOKING, HAEMORRHAGE, FOREIGN BODY TRAUMA, RETCHING | VISITED AN ER, HOSPITALIZATION |
| 157791 | 10/11/12 | MONSTER ENERGY REHAB GREEN TEA 15.5OZ | SYNCOPE, MYOCARDIAL INFARCTION, FOOD POISONING, DIZZINESS, FEELING ABNORMAL | VISITED A HEALTH CARE PROVIDER |
| 40 | | | | |

Page 4

EXHIBIT C

March 19, 2013

The Honorable Margaret A. Hamburg, M.D.
Commissioner
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

Re: The Use of Caffeine In Energy Drinks

Dear Commissioner Hamburg:

Recent reports of health complications, emergency department visits, injuries, and deaths related to energy drink consumption have spawned widespread concern among scientists, health professionals, legislators, state and local law enforcement officials, and consumers regarding the safety of highly caffeinated energy drinks.  As researchers, scientists, clinicians, and public health professionals who have studied and conducted research on energy drinks, we are writing this letter to summarize the scientific evidence on this issue and encourage action.

Given the evidence summarized below, we conclude that there is neither sufficient evidence of safety nor a consensus of scientific opinion to conclude that the high levels of added caffeine in energy drinks are safe under the conditions of their intended use, as required by the FDA's Generally Recognized as Safe (GRAS) standards for food additives.  To the contrary, the best available scientific evidence demonstrates a robust correlation between the caffeine levels in energy drinks and adverse health and safety consequences, particularly among children, adolescents, and young adults.

### DESCRIPTION OF ENERGY DRINKS AND RELATED PRODUCTS

Energy drinks are a relative newcomer to the U.S. marketplace and have surged in popularity in recent years, particularly among adolescents.  Energy drinks are flavored beverages that contain added amounts of caffeine as well as other additives such as taurine, guarana (a natural source of caffeine), and ginseng.[1-3]

The U.S. energy drink industry has grown rapidly since the drinks were first introduced,[3,4] and is projected to reach $19.7 billion in sales by 2013.[2]  Between 2006 and 2012, Monster Energy®, the largest U.S. energy drink manufacturer, tripled its sales.[5]  As a result of aggressive marketing, energy drinks are particularly popular among adolescents.[4,6,7]  As noted in a 2010 study commissioned by the FDA,[a] "[e]nergy drinks are typically attractive to young people," and 65% of energy drink consumers are 13- to 35-year-olds.[8]  More recent reports show that 30 to 50% of

---

[a] This report discusses the mean per capita daily caffeine intake from energy drinks as calculated by estimates from data provided by the Beverage Marketing Corporation.  The mean per capita daily intake tells us nothing about the number of individuals who are ingesting large quantities of these products.  The report relied on data that is now out of date and made assumptions based on caffeine levels in 16 oz serving sizes, rather than the new 24 oz sizes.  Further, the report also acknowledged that "very limited reliable information is available of the number and age distribution of regular energy drink consumers" and "there may be underreporting for young person[s]".[8]

adolescents and young adults consume energy drinks.[7,9-11]  According to *Monitoring the Future*, the federally funded national annual survey of students in grades eight through twelve, 35% of eighth graders and 29% of both tenth and twelfth graders consumed an energy drink during the past year, and 18% of eighth graders reported using one or more energy drinks every day.[12]

Energy drinks vary with respect to caffeine content and concentration.[1,13]  The caffeine content of many energy drinks is not disclosed on the product label,[2] and in these cases, information about caffeine content must be derived from Internet sources of unknown validity.  In general, the caffeine concentration of energy drinks is much higher than that of sodas, for which the FDA has recognized 200 parts per million of caffeine (approximately 71 mg per 12 fl oz serving) as GRAS.[14]  By contrast, the most popular energy drinks, like Monster Energy®, contain between 160 and 240 milligrams of caffeine per can.  Many energy drinks contain as much as 100 mg of caffeine per 8 fl oz serving[2] with some containing as much as 300 mg per 8 fl oz serving.[13]  In addition, many energy drink brands are sold in larger, containers that hold multiple servings (16 to 24 fl oz/473 to 710 mL).[1]  While some energy drink manufacturers properly classify their drinks as beverages, others label their beverages as dietary supplements.[b]

Although some brands of coffee contain amounts of caffeine that exceed the FDA's established GRAS levels for soda, energy drinks differ from coffee in three important ways.  First, the caffeine in coffee is naturally occurring, while the caffeine in energy drinks is added by the manufacturer and is thus subject to regulation by the FDA as a food additive.  Second, many energy drinks and related products containing added caffeine exceed the caffeine concentration of even the most highly caffeinated coffee.[13,15]  Third, coffee is typically served hot, tastes bitter, and is consumed slowly by sipping.  By contrast, energy drinks are typically carbonated, sweetened drinks that are served cold and consumed more rapidly.  Indeed, energy drinks are often marketed in a manner that encourages consumers to ingest large quantities quickly (*e.g.*, "pound down," "chug it down"[c]). Unlike coffee, energy drinks are marketed in a manner designed to appeal to youth and are highly popular with youth.  A scientific review funded by the National Institutes of Health has concluded that the risk for energy drink overdose is increased by the combination of marketing that specifically targets youth and the developmental risk-taking tendencies of adolescents.[7]

---

[b]Energy "shots" are a subset of energy drinks that come in smaller containers (usually 1.4 to 3 oz) and have even higher caffeine concentration than regularly-sized energy drinks. Many contain B vitamins, taurine, flavoring, and sweeteners.  Other "energy products" available for purchase include gel packs, candies, gum, snacks, energy powders, inhalers, and strips, all containing various amounts of added caffeine.

[c]Labels of Monster Energy® products.

HEALTH COMPLICATIONS ASSOCIATED WITH THE CONSUMPTION OF ENERGY DRINKS

We are particularly concerned about the health effects of energy drink consumption by children and adolescents.  Younger individuals tend to have greater sensitivity to a given serving of caffeine than adults because they are more likely to have a lower body mass and are less likely have already developed a pharmacological tolerance from regular caffeine consumption.  The American Academy of Pediatrics' Committee on Nutrition and the Council on Sports Medicine and Fitness recently concluded that "rigorous review and analysis of the literature reveal that caffeine and other stimulant substances contained in energy drinks have no place in the diet of children and adolescents."[16]

The Institute of Medicine has similarly recommended that any drinks containing caffeine should not be sold to children at school.[17]  Pediatric professionals concur and further state that energy drinks "are not appropriate for children and adolescents and should never be consumed."[16]  Other experts have concluded that children and adolescents should not consume more than 100 mg of caffeine per day,[7] less than the amount in a single can of most energy drinks.

With respect to adults, the FDA has noted that consumption of 400 mg of caffeine by healthy adults in the course of a day is not associated with adverse health effects.[18]  That standard for "healthy adults" does not take into consideration that individuals have varying sensitivities to caffeine.[19-24]  Moreover, consumption of 400 mg "in the course of the day" is an important qualification because consumers can ingest 400 mg of caffeine from energy drinks very quickly.  Metabolism of caffeine appears to be non-linear at high doses.  In one study using caffeine-experienced human subjects, an increase in caffeine dose from 250 to 500 mg was associated with significant increases in the half-life as well as a decrease in the clearance of caffeine from the blood, resulting in higher caffeine levels that were sustained much longer compared with the lower dose.[25]  An additional consideration is that the negative effects of caffeine at high blood levels could be compounded by the accumulation of its metabolites (e.g., paraxanthine, theophylline, theobromine), which are active stimulants themselves.[25,26]

Our work as public health professionals has included examination of the surveillance methods used to track adverse health effects associated with energy drink consumption (e.g., emergency department visits for caffeine-related cardiac events).  Despite widespread use of energy drinks, there are no systematic data collection methods to ascertain the prevalence of possible adverse health complications related to energy drinks and related products.  Therefore, the following information likely underestimates the actual prevalence of adverse health effects associated with these beverages.

**Fatalities and Injuries**:  According to information submitted to the FDA through its voluntary Adverse Event Reporting System, consumption of Monster Energy® was implicated in the deaths of five individuals, and reports of 13 deaths have cited the possible involvement of 5-Hour Energy®.[27]  The FDA has not disclosed the ages of the deceased individuals in these cases.  However, details reported elsewhere indicate that in one case, a 14-year-old girl reportedly died of a cardiac arrhythmia induced by caffeine after consuming two 24 oz Monster Energy®

beverages over two consecutive days.[28]  Also reported to the FDA were 21 claims of adverse reactions, some requiring hospitalization, which were reportedly associated with the consumption of Red Bull®.[29]  These reports only refer to three of the energy products on the market, and of course do not include injuries and deaths that were not voluntarily reported to the FDA.  Also, between October 2010 and September 2011, about half of all calls to the National Poison Data System for energy-drink-related caffeine toxicity concerned children under 6 years old. This incidence is far greater than for accidental ingestion of other forms of caffeine.[30]

**Emergency Department Visits**:  The Drug Abuse Warning Network (DAWN) reports U.S. emergency department (ED) visits using a probability sampling strategy.  DAWN conducted a special analysis of the data related to energy drink consumption, which revealed a ten-fold increase in ED visits from 2005 to 2009 (1,128 to 13,114).[31]  DAWN recently issued an update to that report which showed that the number of energy-drink-related ED visits doubled between 2007 and 2011, from 10,068 to 20,783.[32]

**Cardiovascular Complications**:  Caffeine produces a number of cardiac effects, which appear in a more pronounced manner in caffeine-naïve subjects and in those consuming higher doses of caffeine.  The consumption of highly caffeinated energy drinks has been associated with elevated blood pressure, altered heart rates, and severe cardiac events in children and young adults, especially those with underlying cardiovascular diseases.  A few studies have examined the effects of caffeine consumption on heart rate and blood pressure in children and adolescents.[33,34]

Higher doses of caffeine have been associated with caffeine intoxication, resulting in tachycardia, elevated blood pressure, vomiting, hypokalemia (from beta-adrenergic stimulation), and cardiac arrhythmias (atrial flutter, atrial fibrillation, atrioventricular nodal reentrant tachycardia, and ventricular fibrillation).[1,3]

 A study of young adults found that the consumption of a sugar-free energy drink containing 80 mg of caffeine was associated with changes in platelet and endothelial function great enough to increase the risk for severe cardiac events in susceptible individuals.[35]  These findings show how acute effects of caffeine administration on heart rate might result in cardiovascular events requiring hospitalization, especially in at-risk youth. Caffeine's effects on blood pressure have been found to be more pronounced among African American children than White children.[36,37]

The consumption of energy drinks before or during exercise might be linked to an increased risk for myocardial ischemia.  In healthy individuals who consume caffeine and then exercise afterwards, significant reductions in myocardial blood flow have been noted by indirect laboratory measures.[38]  Several mechanisms have been postulated to explain this effect, including the ability of caffeine to block adenosine receptors that modulate coronary vasomotor tone.[38]  This vasoconstrictive effect might be more pronounced among caffeine-naïve individuals or those who acutely ingest higher doses of caffeine, such as are present in energy drinks.

4

**Seizures**:  In addition to cardiac events, cases have been reported of new-onset seizures attributed to energy drink consumption among 15- to 28-year-olds.[39-42]  In all of these cases, seizures ceased after the individuals abstained from consuming energy drinks.

**Childhood Obesity**:  Energy drinks have also been shown to contribute to youth obesity due to their high calorie and sugar content.[7,43]  One 24-oz can of Monster Energy® contains 81 grams of sugar, which is equivalent to 6.75 tablespoons.[2]  The American Academy of Pediatrics' Committee on Nutrition reports findings that the consumption of excessive carbohydrate calories from energy drinks increases risk for pediatric overweight and that "energy drinks have no place in the diet of children and adolescents."[16]  In addition, adolescents are at risk for increased consumption of high-calorie energy beverages due to marketing claims that they enhance physical and mental performance and increase energy.[13]

**Other Health Issues**:  Youth with higher caffeine intake commonly report troubling neurological symptoms, including nervousness, anxiety, jitteriness, and headache.[44-46]  In one review, youth consuming 100 to 400 mg of caffeine daily from dietary sources report jitteriness and nervousness.[44]  Studies have also linked high caffeine intake to reduced sleep, poor academic performance, daytime sleepiness (falling asleep at school), aggressive behavior, and social and attention problems among youth.[47-53]  With regard to energy drinks in particular, studies have shown negative behavioral effects among youth including jitteriness, anxiety, and dizziness, which might undermine students' ability to stay on task, focus, and perform well.[6]  Although many energy drink manufacturers assert that additives such as taurine and B-vitamins improve physical or cognitive performance, current evidence does not support these claims.[54]  Finally, energy drinks that have higher titratable acidity levels than sports drinks have been associated with comparatively more tooth enamel loss.[55]

**Health and Safety Effects of Combining Energy Drinks with Alcohol**:  Energy drinks also pose unique dangers when combined with alcohol.  Although the FDA and CDC have concluded that the combination of alcohol and energy drinks is unsafe and poses serious health risks,[18,56] the latest available national data from *Monitoring the Future* indicated that 26% of high school seniors consumed an alcoholic beverage containing caffeine during the past year.[12]  Because individuals who consume energy drinks with alcohol underestimate their true level of alcohol-related impairment (*i.e.*, a "wide-awake drunk")[57-59] the bulk of scientific evidence suggests that individuals who combine energy drinks with alcohol are more likely to engage in risky behavior than if they were only consuming alcohol.[60-64]  Accordingly, consuming energy drinks mixed with alcohol is associated with serious alcohol-related consequences such as sexual assault and driving while intoxicated.[60]  One study found that individuals who mix alcohol and energy drinks are more likely to report heavy drinking,[65] while another study documented a link between frequent consumption of energy drinks and increased risk for alcohol dependence among college students.[66]

CONCLUSION

Based on our own research and our review of the published literature cited herein, we conclude that there is no general consensus among qualified experts that the addition of caffeine in the amounts used in energy drinks is safe under its conditions of intended use as required by the GRAS standard, particularly for vulnerable populations such as children and adolescents.  On the contrary, there is evidence in the published scientific literature that the caffeine levels in energy drinks pose serious potential health risks, including increased risk for serious injury or even death.  We therefore urge the FDA to take prompt action to protect children and adolescents from the dangers of highly caffeinated energy drinks, including applying the existing GRAS standard for sodas to energy drinks and other beverages that contain caffeine as an additive.  We also urge the FDA to require that manufacturers include caffeine content on product labels.

Sincerely,

**Amelia M. Arria, Ph.D.**
Director
Center on Young Adult Health and Development
University of Maryland School of Public Health
8400 Baltimore Avenue, Suite 100
College Park, MD 20740
aarria@umd.edu

**Mary Claire O'Brien, M.D.**
Associate Professor
Department of Emergency Medicine
Department of Social Science and Health Policy
Wake Forest School of Medicine
One Medical Center Boulevard
Winston-Salem, NC 27157
mobrien@wakehealth.edu

**Roland R. Griffiths, Ph.D.**
Professor
Departments of Psychiatry and Neuroscience
Johns Hopkins University School of Medicine
5510 Nathan Shock Drive
Baltimore, MD 21224
rgriff@jhmi.edu

**Patricia B. Crawford, Dr.P.H., R.D.**
Adjunct Professor and Director
Atkins Center for Weight and Health
CE Nutrition Specialist
119 Morgan Hall
University of California
Berkeley, CA 94720
pbcraw@berkeley.edu

**Additional Signatories**

**Kavita Babu, M.D., FACEP, FACMT**
Fellowship Director
Division of Medical Toxicology
Assistant Professor
Department of Emergency Medicine
UMass Memorial Medical Center
55 Lake Avenue North
Worcester, MA  01655
kavitambabu@gmail.com

**Bruce A. Goldberger, Ph.D.**
Professor and Director of Toxicology
Departments of Pathology and Psychiatry
University of Florida College of Medicine
4800 S.W. 35th Drive
Gainesville, FL 32608
bruce-goldberger@ufl.edu

**William C. Griffin III, Ph.D., R.Ph.**
Research Assistant Professor
Center for Drug and Alcohol Programs
Department of Psychiatry and Behavioral Sciences
Medical University of South Carolina
MSC 861
67 Presidential Street
Charleston, SC 29425
griffinw@musc.edu

**John P. Higgins, M.D., M.B.A. (Hons), M.Phil., FACC, FACP, FAHA, FACSM, FASNC, FSGC**
Associate Professor of Medicine, The University of Texas Health Science Center at Houston
Director of Exercise Physiology, Memorial Hermann Ironman Sports Medicine Institute
Chief of Cardiology, Lyndon B. Johnson General Hospital
Principal Investigator HEARTS (Houston Early Age Risk Testing & Screening Study)
Division of Cardiology
6431 Fannin Street, MSB 4.262
Houston, TX 77030
john.p.higgins@uth.tmc.edu

**C. Tissa Kappagoda, M.D.**
Professor Emeritus
Heart and Vascular Services
Lawrence J. Ellison Ambulatory Care Center
University of California Davis Health System
4860 Y Street, Suite 0200
Sacramento, CA 95817
ctkappagoda@ucdavis.edu

**Steven E. Lipshultz, M.D., FAAP, FAHA**
George E. Batchelor Professor of Pediatrics and Endowed Chair in Pediatric Cardiology
Professor of Epidemiology and Public Health
Professor of Medicine (Oncology)
Leonard M. Miller School of Medicine, University of Miami
Chief-of-Staff, Holtz Children's Hospital of the University of Miami-Jackson Memorial Medical Center
Director, Batchelor Children's Research Institute
Member, Sylvester Comprehensive Cancer Center, Miami, Florida
Department of Pediatrics (D820)
University of Miami, Leonard M. Miller School of Medicine
P.O. Box 016820
Miami, Florida 33101
slipshultz@med.miami.edu

**Kristine Madsen, M.D., M.P.H., FAAP**
Fellow, American Academy of Pediatrics
Assistant Professor
School of Public Health, University of California Berkeley
Department of Pediatrics, University of California San Francisco
King Sweesy and Robert Womack Endowed Chair in Medical Research and Public Health
219 University Hall
Berkeley, CA 94720
madsenk@berkeley.edu

**Cecile A. Marczinski, Ph.D.**
Assistant Professor
Department of Psychological Science
Northern Kentucky University
349 BEP, 1 Nunn Drive
Highland Heights, KY 41099
marczinskc1@nku.edu

**Kathleen E. Miller, Ph.D.**
Senior Research Scientist
Research Institute on Addictions
University at Buffalo
1021 Main Street
Buffalo, NY  14203
kmiller@ria.buffalo.edu

**Jeffrey Olgin, M.D., FACC**
Gallo-Chatterjee Distinguished Professor of Medicine
Professor of Medicine & Chief, Division of Cardiology
University of California San Francisco
505 Parnassus Avenue
Room M-1182A, Box 0124
San Francisco, CA  94143
olgin@medicine.ucsf.edu

**Kent A. Sepkowitz, M.D.**
Physician
Infectious Disease Service
Department of Medicine, Infection Control
Memorial Sloan-Kettering Cancer Center
1275 York Avenue
New York, NY 10065
sepkowik@mskcc.org

**Jennifer L. Temple, Ph.D.**
Assistant Professor
University at Buffalo
Departments of Exercise and Nutrition Sciences and Community Health and Behavior
3435 Main Street
1 Farber Hall
Buffalo, NY 14214
jltemple@buffalo.edu

**Dennis L. Thombs, Ph.D., FAAHB**
Professor and Chair
Department of Behavioral & Community Health
EAD 709N School of Public Health
3500 Camp Bowie Boulevard
University of North Texas Health Science Center
Fort Worth, TX 76107
dennis.thombs@unthsc.edu

**Charles J. Wibbelsman, M.D.**
President
California Chapter 1, District IX
American Academy of Pediatrics
Kaiser Permanente
2200 O'Farrell Street, Teen Clinic
San Francisco, California 94115
charles.wibbelsman@kp.org

**Acknowledgements:**
Special thanks are extended to Brittany A. Bugbee, Kimberly M. Caldeira, Kaitlin A. Hippen, and Kathryn B. Vincent.

## References

1. Wolk BJ, Ganetsky M, Babu KM. Toxicity of energy drinks. *Curr Opin Pediatr.* 2012;24(2):243-251.
2. Heckman MA, Sherry K, Gonzalez de Mejia E. Energy drinks: An assessment of their market size, consumer demographics, ingredient profile, functionality, and regulations in the United States. *Compr Rev Food Sci Food Saf.* 2010;9(3):303-317.
3. Higgins JP, Tuttle TD, Higgins CL. Energy beverages: Content and safety. *Mayo Clin Proc.* 2010;85(11):1033-1041.
4. Blankson KL, Thompson AM, Ahrendt DM, Vijayalakshmy P. Energy drinks: What teenagers (and their doctors) should know. *Pediatr Rev.* 2013;34(2):55-62.
5. Edney A. Monster energy drinks cited in death reports, FDA says. *Bloomberg News: Businessweek.* 2012; http://www.businessweek.com/news/2012-10-22/monster-energy-drinks-cited-in-death-reports-fda-says. Accessed February 12, 2013.
6. Pennington N, Johnson M, Delaney E, Blankenship MB. Energy drinks: A new health hazard for adolescents. *J Sch Nurs.* 2010;26(5):352-359.
7. Seifert SM, Schaechter JL, Hershorin ER, Lipshultz SE. Health effects of energy drinks on children, adolescents, and young adults. *Pediatrics.* 2011;127(3):511-528.
8. Somogyi LP. *Caffeine intake by the US population.* Silver Spring, MD: Food and Drug Administration; 2010.
9. Malinauskas BM, Aeby VG, Overton RF, Carpenter-Aeby T, Barber-Heidal K. A survey of energy drink consumption patterns among college students. *Nutr J.* 2007;6(1):35-41.
10. Simon M, Mosher J. *Alcohol, energy drinks, and youth: A dangerous mix.* San Rafael, CA: Marin Institute; 2007.
11. Miller KE. Wired: Energy drinks, jock identity, masculine norms, and risk taking. *J Am Coll Health.* 2008;56(5):481-490.
12. Wadley J. *Marijuana use continues to rise among U.S. teens, while alcohol use hits historic lows.* Ann Arbor, MI: University of Michigan; 2011.
13. Reissig CJ, Strain EC, Griffiths RR. Caffeinated energy drinks-A growing problem. *Drug Alcohol Depend.* 2009;99(1-3):1-10.
14. U.S. Code of Federal Regulations, nr 21CFR-182.1180. Food and Drug Administration. 2012.
15. McCusker RR, Goldberger BA, Cone EJ. Caffeine content of specialty coffees. *J Anal Toxicol.* 2003;27(7):520-522.
16. Committee on Nutrition and the Council on Sports Medicine and Fitness. Sports drinks and energy drinks for children and adolescents: Are they appropriate? *Pediatrics.* 2011;127(6):1182-1189.
17. Institute of Medicine. *Nutrition standards for foods in schools : Leading the way toward healthier youth.* Washington, DC: National Academies Press; 2007.
18. Food and Drug Administration. *Warning letter to Phusion Projects Inc.* College Park, MD: Food and Drug Administration; 2010.
19. Adan A, Prat G, Fabbri M, Sànchez-Turet M. Early effects of caffeinated and decaffeinated coffee on subjective state and gender differences. *Prog Neuropsychopharmacol Biol Psychiatry.* 2008;32(7):1698-1703.
20. Alsene K, Deckert J, Sand P, de Wit H. Association between A2A receptor gene polymorphisms and caffeine-induced anxiety. *Neuropsychopharmacology.* 2003;28(9):1694-1702.
21. Yang A, Palmer A, de Wit H. Genetics of caffeine consumption and responses to caffeine. *Psychopharmacology.* 2010;211(3):245-257.

22. Temple JL, Ziegler AM. Gender differences in subjective and physiological responses to caffeine and the role of steroid hormones. *J Caffeine Res.* 2011;1(1):41-48.

23. Cornelis MC, El-Sohemy A, Campos H. Genetic polymorphism of the adenosine A2A receptor is associated with habitual caffeine consumption. *Am J Clin Nutr.* 2007;86(1):240-244.

24. Sepkowitz KA. Energy drinks and caffeine-related adverse effects. *JAMA.* 2013;309(3):243-244.

25. Kaplan GB, Greenblatt DJ, Ehrenberg BL, Goddard JE, Cotreau MM, Harmatz JS, Shader RI. Dose-dependent pharmacokinetics and psychomotor effects of caffeine in humans. *J Clin Pharmacol.* 1997;37(8):693-703.

26. Denaro CP, Brown CR, Wilson M, Jacob P, Benowitz NL. Dose-dependency of caffeine metabolism with repeated dosing. *Clin Pharmacol Ther.* 1990;48(3):277-285.

27. Center for Food Safety and Applied Nutrition. *Voluntary and mandatory reports on 5-Hour Energy, Monster Energy, and Rockstar energy drink.* Washington, DC: Food and Drug Administration; 2012.

28. Kilar S, Dance S. Family sues energy drink maker over girl's death. *The Baltimore Sun.* 2012; http://articles.baltimoresun.com/2012-10-19/health/bs-hs-monster-energy-drink-death-20121019_1_energy-drink-monster-energy-monster-beverage-corp. Accessed February 12, 2013.

29. Center for Food Safety and Applied Nutrition. *Voluntary reports on Red Bull energy drink.* Washington, DC: Food and Drug Administration; 2012.

30. Seifert SM, Seifert SA, Schaechter J, Arheart K, Benson BE, Hershorin ER, Bronstein AC, Lipshultz SE. Energy drink exposures in the American Association of Poison Control Centers (AAPCC) National Poison Data System (NPDS) database. Paper presented at: Annual Meeting of the North American Congress of Clinical Toxicology; 2012; Las Vegas, NV.

31. Drug Abuse Warning Network. *Emergency department visits involving energy drinks.* Rockville, MD: Substance Abuse and Mental Health Services Administration, Center for Behavioral Health Statistics and Quality; 2011.

32. Drug Abuse Warning Network. *Update on emergency department visits involving energy drinks: A continuing public health concern.* Rockville, MD: Substance Abuse and Mental Health Services Administration, Center for Behavioral Health Statistics and Quality; 2013.

33. Temple JL, Dewey AM, Briatico LN. Effects of acute caffeine administration on adolescents. *Exp Clin Psychopharmacol.* 2010;18(6):510-520.

34. Turley KR, Gerst JW. Effects of caffeine on physiological responses to exercise in young boys and girls. *Med Sci Sports Exerc.* 2006;38(3):520-526.

35. Worthley MI, Anisha P, Sciscio Pd, Schultz C, Prashanthan S, Willoughby SR. Detrimental effects of energy drink consumption on platelet and endothelial function. *Am J Med.* 2010;123(2):184-187.

36. Savoca MR, MacKey L, Evans CD, Wilson M, Ludwig DA, Harshfield GA. Association of ambulatory blood pressure and dietary caffeine in adolescents. *Am J Hypertens.* 2005;18(1):116-120.

37. Savoca MR, Evans CD, Wilson ME, Harshfield GA, Ludwig DA. The association of caffeinated beverages with blood pressure in adolescents. *Arch Pediatr Adolesc Med.* 2004;158(5):473-477.

38. Higgins JP, Babu KM. Caffeine reduces myocardial blood flow during exercise. *Am J Med.* in press.

39. Calabrò RS, Italiano D, Gervasi G, Bramanti P. Single tonic–clonic seizure after energy drink abuse. *Epilepsy Behav.* 2012;23(3):384-385.

40. Iyadurai SJP, Chung SS. New-onset seizures in adults: Possible association with consumption of popular energy drinks. *Epilepsy Behav.* 2007;10(3):504-508.

41. Babu KM, Zuckerman MD, Cherkes JK, Hack JB. First-onset seizure after use of an energy drink. *Pediatr Emerg Care.* 2011;27(6):539-540.
42. Trabulo D, Marques S, Pedroso E. Caffeinated energy drink intoxication. *BMJ Case Rep.* 2011;28(8):712-714.
43. Clauson KA, Shields KM, McQueen CE, Persad N. Safety issues associated with commercially available energy drinks. *J Am Pharm Assoc.* 2008;48(3):e55-e63.
44. Temple JL. Caffeine use in children: What we know, what we have left to learn, and why we should worry. *Neurosci Biobehav Rev.* 2009;33(6):793-806.
45. Bernstein GA, Carroll ME, Crosby RD, Perwien AR, Go FS, Benowitz NL. Caffeine effects on learning, performance, and anxiety in normal school-age children. *J Am Acad Child Adolesc Psychiatry.* 1994;33(3):407-415.
46. Heatherley SV, Hancock KMF, Rogers PJ. Psychostimulant and other effects of caffeine in 9- to 11-year-old children. *J Child Psychol Psychiatry.* 2006;47(2):135-142.
47. Calamaro CJ, Mason TBA, Ratcliffe SJ. Adolescents living the 24/7 lifestyle: Effects of caffeine and technology on sleep duration and daytime functioning. *Pediatrics.* 2009;123(6):e1005-e1010.
48. James JE, Kristjansson AL, Sigfusdottir ID. Adolescent substance use, sleep, and academic achievement: Evidence of harm due to caffeine. *J Adolesc.* 2011;34(4):665-673.
49. Pettit ML, DeBarr KA. Perceived stress, energy drink consumption, and academic performance among college students. *J Am Coll Health.* 2011;59(5):335-341.
50. Martin CA, Cook C, Woodring JH, Burkhardt G, Guenthner G, Omar HA, Kelly TH. Caffeine use: Association with nicotine use, aggression, and other psychopathology in psychiatric and pediatric outpatient adolescents. *ScientificWorldJournal.* 2008;8:512-516.
51. Warzak WJ, Evans S, Floress MT, Gross AC, Stoolman S. Caffeine consumption in young children. *J Pediatr.* 2011;158(3):508-509.
52. Anderson BL, Juliano LM. Behavior, sleep, and problematic caffeine consumption in a college-aged sample. *J Caffeine Res.* 2012;2(1):38-44.
53. Drescher AA, Goodwin JL, Silva GE, Quan SF. Caffeine and screen time in adolescence: Associations with short sleep and obesity. *J Clin Sleep Med.* 2011;7(4):337-342.
54. McLellan TM, Lieberman HR. Do energy drinks contain active components other than caffeine? *Nutr Rev.* 2012;70(12):730-744.
55. Jain P, Hall-May E, Golabek K, Zenia Agustin M. A comparison of sports and energy drinks-Physiochemical properties and enamel dissolution. *Gen Dent.* 2012;60(3):190-199.
56. Centers for Disease Control and Prevention. *Fact sheets: Caffeinated alcoholic beverages.* Atlanta, GA: Centers for Disease Control and Prevention; 2010.
57. Ferreira SE, de Mello MT, Pompeia S, de Souza-Formigoni ML. Effects of energy drink ingestion on alcohol intoxication. *Alcohol Clin Exp Res.* 2006;30(4):598-605.
58. Marczinski CA, Fillmore MT, Henges AL, Ramsey MA, Young CR. Effects of energy drinks mixed with alcohol on information processing, motor coordination and subjective reports of intoxication. *Exp Clin Psychopharmacol.* 2012;20(2):129-138.
59. Arria AM, O'Brien MC. The "high" risk of energy drinks. *JAMA.* 2011;305(6):600-601.
60. O'Brien MC, McCoy TP, Rhodes SD, Wagoner A, Wolfson M. Caffeinated cocktails: Energy drink consumption, high-risk drinking, and alcohol-related consequences among college students. *Acad Emerg Med.* 2008;15(5):453-460.
61. Arria AM, Caldeira KM, Kasperski SJ, O'Grady KE, Vincent KB, Griffiths RR, Wish ED. Increased alcohol consumption, nonmedical prescription drug use, and illicit drug use are associated with energy drink consumption among college students. *J Addict Med.* 2010;4(2):74-80.

**62.**    Miller KE. Alcohol mixed with energy drink use and sexual risk-taking: Casual, intoxicated, and unprotected sex. *J Caffeine Res.* 2012;2(2):62-69.

**63.**    Thombs DL, O'Mara RJ, Tsukamoto M, Rossheim ME, Weiler RM, Merves ML, Goldberger BA. Event-level analyses of energy drink consumption and alcohol intoxication in bar patrons. *Addict Behav.* 2010;35(4):325-330.

**64.**    Howland J, Rohsenow DJ. Risks of energy drinks mixed with alcohol. *JAMA.* 2013;309(3):245-246.

**65.**    Berger LK, Fendrich M, Chen H-Y, Arria AM, Cisler RA. Sociodemographic correlates of energy drink consumption with and without alcohol: Results of a community survey. *Addict Behav.* 2011;36(5):516-519.

**66.**    Arria AM, Caldeira KM, Kasperski SJ, Vincent KB, Griffiths RR, O'Grady KE. Energy drink consumption and increased risk for alcohol dependence. *Alcohol Clin Exp Res.* 2011;35(2):365-375.