1

2

3                                                          O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   ALEC FISHER,              )   Case No. EDCV 12-02188-VAP
     INDIVIDUALLY AND ON       )   (OPX)
12   BEHALF OF ALL OTHERS      )
     SIMILARLY SITUATED,       )   **ORDER GRANTING DEFENDANTS'**
13                             )   **MOTION TO DISMISS**
                  Plaintiff,   )
14                             )   **[Motion filed on August 30,**
          v.                   )   **2013 ]**
15                             )
     MONSTER BEVERAGE          )
16   CORPORATION, MONSTER      )
     ENERGY COMPANY, AND DOES  )
17   1-20, INCLUSIVE,          )
                               )
18                Defendants.  )
     _____  )
19

20       Defendants Monster Beverage Corporation and Monster

21   Energy Company's (collectively, "Monster" or

22   "Defendants") Motion to Dismiss or in the Alternative,

23   Motion to Strike, came before the Court for hearing on

24   October 21, 2013.  The Court considered all papers filed

25   in support of, and in opposition to, the Motion, and the

26   arguments put forth at the hearing, and for the reasons

27   set forth below, the Court GRANTS the Motion without

28   prejudice.

## I. BACKGROUND

**A.  Procedural Background**

Plaintiffs Alec Fisher, Matthew Townsend, and Connor Rucks[1] (collectively, "Plaintiffs"), on behalf of themselves, and putatively, others similarly situated, bring this action against Monster, seeking redress for Monster's allegedly "unfair and deceptive business and trade practices on behalf of anyone who purchased for personal consumption any of the Monster-branded energy drinks sold under the Monster Rehab® brand name and the original Monster Energy®."  (Second Amended Complaint ("SAC") ¶ 1 (Doc. No. 51.))

Plaintiffs allege six claims: (1) violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL Claim"); (2) violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq. ("FAL Claim"); (3) violations of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA Claim"); (4) breach of express and implied warranty ("Breach of Warranty Claim"); (5) violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. ("MMWA Claim"); and (6) unjust enrichment ("Unjust Enrichment Claim").

---

[1] Connor Rucks is no longer a Plaintiff in this Action.

Plaintiffs filed their First Amended Complaint on March 7, 2013. (Doc. No. 20.) Defendants filed a Motion to Dismiss, and on July 9, 2013, the Court granted Defendants' Motion to Dismiss the First Amended Complaint with limited leave to amend. (July 9, 2013 Minute Order Granting Defendants' Motion to Dismiss ("MTD I Order") (Doc. No. 48.)) The Court dismissed the Complaint on several grounds, including: (1) Plaintiffs Fisher and Rucks did not allege Article III standing sufficiently; (2) the allegations failed to meet Federal Rule of Civil Procedure Rule 9(b)'s specificity requirement; (3) Plaintiffs' consumer protection claims (UCL, FAL, and CLRA) based on Monster's failure to label and warn adequately were preempted; (4) failure to state a claim under the UCL, FAL, and CLRA; (5) failure to allege any representations constituting an express warranty; (6) allegations supporting the breach of implied warranty were preempted; and (7) failure to allege a quasi-contractual theory in support of their unjust enrichment claim.

The Court granted Plaintiffs limited leave to amend, instructing that Plaintiffs "may not pursue consumer protection claims that are preempted, i.e., that seek to impose requirements 'not identical' to the FDCA or those required by the FDA. Plaintiff is also instructed to comply with FRCP 8 ('a short and plain statement of the

claim') and FRCP 9(b) ('fraudulent conduct must be alleged with particularity.')."  (MTD I Order at 25.)

Plaintiffs filed their Second Amended Complaint on July 26, 2013.  Defendants filed their Motion to Dismiss, or in the Alternative, Motion to Strike, along with Appendices A and B on August 30, 2013.  Defendants also filed a Request for Judicial Notice in Support of their Motion to Dismiss Second Amended Complaint ("RJN"), the Declaration of Purvi G. Patel, and Exhibits 1-8.  (Doc. Nos. 59, 60-60-8.)  On September 25, 2013, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("Opp'n.") (Doc. No. 63) and Opposition to Defendants' Request for Judicial Notice ("Opp'n. to RJN.") (Doc. No. 64.).  On October 7, 2013, Defendants submitted their Reply in Support of Defendants' Motion to Dismiss Second Amended Complaint ("Reply") (Doc. No. 65.)  Defendants also filed (1) a Reply in support of its RJN ("RJN Reply") (Doc. No. 66; (2) a supplemental request for judicial notice (Doc. No. 67); (3) the Declaration of Eva Lilja in support of the supplemental request (Doc. No. 68); (4) the Declaration of Purvi Patel in support of the Motion to Dismiss (Doc. No. 69).

**B.   Request for Judicial Notice**

Monster filed a RJN requesting the Court to take judicial notice of eight exhibits, and a Supplemental RJN asking the Court to take judicial notice of two additional exhibits.  The Court finds it appropriate to take judicial notice of exhibits (1) a public letter from the Food and Drug Administration ("FDA") to Congress regarding the FDA's investigation into energy drinks (Doc. No. 59-1); (2) a public notice from the FDA announcing the FDA's investigation regarding the safety of caffeine in food products, available on the FDA's website (Doc. No. 59-2); (3) a letter from Monster to Margaret A. Hamburg, FDA Commissioner of Food and Drugs, in response to FDA's request for further substantiation (Doc. No. 59-3); (4) a letter from the American Beverage Association to Margaret A. Hamburg, FDA Commissioner of Food and Drugs, in response to the FDA's investigation regarding the safety of caffeine as an ingredient in energy drinks (Doc. No. 59-4); (5) a public notice from the Institute of Medicine of the National Academies ("IOM") announcing its two-day public workshop to discuss potential health impacts stemming from the consumption of caffeine, available on IOM's website (Doc. No. 59-5); and (6) an excerpt from the "Agenda Book" for the Institute of Medicine (IOM) Workshop on Potential Health Hazards Associate with Consumption of Caffeine in Food and Dietary Supplements (Doc No. 59-6).

1    Exhibits 1-4 are judicially noticeable because the
2    information "was made publicly available by government
3    entities [], and neither party disputes the authenticity
4    of the websites or the accuracy of the information
5    displayed therein." Daniels-Hall v. Nat'l Educ. Ass'n.,
6    629 F.3d 992, 998-99 (9th Cir. 2010) (courts may take
7    judicial notice of information posted on an official
8    government website).  The Court has taken judicial notice
9    of the existence of these documents, and does not accept
10   as true the facts or contents of the documents.  (See
11   Opp'n. to RJN at 6.)

12

13   Exhibits 5 and 6 are judicially noticeable because
14   they are "not subject to reasonable dispute [and] can be
15   accurately and readily determined from sources whose
16   accuracy cannot reasonably be questioned."  Fed. R. Evid.
17   201(b)(2).

18

19   The Court GRANTS Monster's RJN with respect to
20   exhibits 1-6.  The Court finds no need to rely on the
21   additional exhibits (7-10) in the disposition of this
22   Motion, and DENIES Monster's RJN for these exhibits.

23

24   **C.  Relevant Factual Allegations**
25   **1.  Common Factual Allegations**
26   In their Opposition, Plaintiffs divide their claims
27   against Monster into "on-label" and "off-label" claims.

28

1  (Opp'n. at 1.)  "On-label" claims are specific

2  misrepresentations on the labels and packaging of the

3  Monster Drinks.[2]  (Id. at 1.)  The "off-label" claims

4  concern Monster's false and deceptive marketing campaign

5  targeting children.  (Id. at 2.)

6

7      Plaintiffs allege three specific misrepresentations

8  on the labels of the Original Monster and Rehab Varieties

9  cans.  Plaintiffs allege the Rehab Varieties contained

10  the following two misrepresentations: (1) "quenches

11  thirst, hydrates like a sports drink, and brings you back

12  after a hard day's night"[3]  ("Hydrates Like A Sports

13  Drink Statement") (Id. at  5); (2) "RE-FRESH, RE-HYDRATE,

14  REVIVE" or "RE-FRESH, RE-HYDRATE, RE-STORE" ("Re-Hydrate

15  Statement").  (Id.)  Plaintiffs allege these statements

16  are misrepresentations because, in fact, Rehab Varieties

17

18      [2]It is unclear from the SAC and the Opposition
whether Plaintiffs allege that "Consume responsibly - Max
19  1 can per four hours, with limit 3 cans per day. Not
recommended for children, people sensitive to caffeine,
20  pregnant women or women who are nursing" ("Consume
Responsibly Statement") is an "on-label"
21  misrepresentation.  Although it appears the SAC alleges
the Consume Responsibly Statement is a misrepresentation
22  (see SAC ¶¶ 24-25, 42-45), the statement is not listed in
the Opposition as one of the "three on-label
23  misrepresentations."  (Opp'n. at 5-6.)  Relying on
Plaintiffs' arguments and interpretation of their SAC,
24  the Court has not considered the Consume Responsibly
Statement an alleged misrepresentation for the purposes
25  of this Motion.

26
      [3]In March 2013 Defendants changed the language on the
27  label to: "quenches thirst, fires you up, and is the
perfect choice after a hard day's night."  (SAC ¶ 5)
28

1   do not hydrate like a sports drink, and actually could

2   cause dehydration.  (SAC ¶ 6.)   The elevated levels of

3   caffeine in energy drinks can act as a diuretic and lead

4   to dehydration.  (SAC ¶¶ 36-37.)   To the extent the

5   Monster Drinks do hydrate, they do not hydrate like a

6   sports drink.  (SAC ¶ 36.)

7

8       Plaintiffs allege the labeling for Monster Original

9   drinks contains the following misrepresentation: "It's

10  the ideal combo of the right ingredients in the right

11  proportion to deliver the big bad buzz that only Monster

12  can" ("Ideal Combo Statement") (Id. ¶ 7.)   Plaintiffs

13  allege this statement is false and misleading because "it

14  is not the ideal combo of the right ingredients in the

15  right proportion" and the statement omits "material facts

16  regarding the potential health risks associated with the

17  frequent consumption of Monster Drinks."  (Id. ¶¶ 7, 41.)

18

19      Plaintiffs also allege "off-label" claims related to

20  Monster's advertising strategy.  (Opp'n. at 1-2.)

21  Plaintiffs allege that Monster specifically targets youth

22  between the ages of 9 to 24 despite the high caffeine

23  levels in Monster Drinks and the evidence of serious

24  health risks these levels may pose.  (SAC ¶ 12.)   In

25  addition, Monster fails to include specific warnings for

26  teenagers and youth.  (Id. ¶ 46.)   Plaintiffs argue that

27

28

1  targeting young people without including any warnings
2  directed at them is deceptive.  (Id. ¶ 50.)

3

4      Plaintiffs allege that Monster targets adolescents
5  and youth through a variety of strategies including, free
6  samples and other promotions at high schools (SAC ¶ 9),
7  references to sex and alcohol (id. ¶¶ 51-54), prize
8  promotions (id. ¶ 55), pages on the social networking
9  site, Facebook (id. ¶ 56), and sponsoring extreme sports
10 events and concerts (id. ¶ 48).  Monster has sought
11 endorsements from music celebrities and popular sports
12 figures.  (Id. ¶ 57.)  Few of these celebrities, however,
13 actually consume Monster Drinks.  (Id.)  Rather, Monster
14 invented "Monster Tour Water" for celebrities to consume,
15 which is water packaged in the same cans as Monster
16 Drinks.  (Id. ¶¶ 58-60.)

17

18     Monster's misrepresentations and deceptive
19 advertising campaign has caused serious bodily injury to
20 consumers and continues to pose a danger.  (Id. ¶¶ 62,
21 66.)  Consumption of Monster Drinks "can raise one's
22 heart rate" and increase blood pressure.  (Id. ¶ 65.)
23 Consumption of energy drinks may also result in "heart
24 palpitations."  (Id.)

25

26     Plaintiffs allege Monster has profited immensely and
27 has been unjustly enriched from its "false and

28

misleading" marketing, advertising, and labeling.  (<u>Id.</u> ¶ 15.)

### 2.   Allegations Specific to Individual Plaintiffs
#### i.   Plaintiff Alec Fisher

Plaintiff Fisher ("Fisher") first consumed a Monster Drink in or around 2007 at the age of sixteen.  (<u>Id.</u> ¶ 23.)  Monster sent trucks to park outside Fisher's high school and hand out free Monster Drinks.  (<u>Id.</u>)  The Monster employees did not ask people their ages before dispensing the free cans of Monster Drinks.  (<u>Id.</u>)  Fisher believed that the Monster Drinks were safe for consumption and saw nothing on the label of the Monster Drink can to believe otherwise.  (<u>Id.</u>)  Fisher most frequently consumed the Original Monster and Monster Energy Assault.[4]  If Fisher had known of the health risks of Monster Drinks he would not have consumed or purchased the drinks.  (<u>Id.</u>)

#### ii. Plaintiff Matthew Townsend

Plaintiff Townsend ("Townsend") has been purchasing and consuming a variety of Monster Drinks for the past six years, since he was 37 years old.  (<u>Id.</u> ¶ 24.)  Townsend first tried an Original Monster drink in June

---

[4]Monster Energy Assault is not a variety of Monster Beverages included in this action.

2007, which he purchased from a vitamin store.  (Id.)
Townsend read the label on an Original Monster drink and
decided to buy it because the label indicated that the
drink had 100 percent of daily values of vitamins B2, B3,
B6, B12 and supplements.  (Id.)  A few days later,
Townsend bought and consumed a Monster Drink instead of
coffee because he believed it was better than coffee
because of the vitamins.  Over the past six years,
Townsend has "tried every variety ever created,"
including Monster Original and the Rehab Varieties, and
frequently purchased multi-packs of Monster Drinks.  (Id.
¶ 24(a).)

    Plaintiff Townsend read the Monster Drink label and
made sure never to drink more than three cans a day as
prescribed on the label.  (Id.)  Townsend also read and
relied on the Rehab Varieties product label Hydrates Like
a Sports Drink Statement.[5]  (Id.)  Townsend believed

---

[5]Monster contends the Court should disregard this
allegation because it is "inconsistent" with FAC ¶ 32,
where Townsend alleged he was "amused by Monster's
comments on the back of the can, which he thought were
very clever."  (Mot. at 8.)  An "amended complaint may
only allege other facts consistent with the challenged
pleading."  Reddy v. Litton Indus., Inc., 912 F.2d 291,
297 (9th Cir. 1990) (citations omitted.)  Townsend's
statement that he relied on the Hydrates Like a Sports
Drink Statement on Rehab Varieties is not necessarily
inconsistent or contradictory to his statement he was
generally amused by Monster's comments on the back of the
cans.  Monster has a variety of different products, with
different labels that contain multiple "comments".
Furthermore, it is conceivable a person could both rely
on and be amused by a single comment.

(continued...)

Monster Drinks were safe for consumption, and he did not
see anything in the product labels to contradict this.
(Id.)

Plaintiff Townsend's addiction to Monster Drinks
resulted in serious health issues, beginning in the
summer of 2012.  (Id. ¶ 24(b).)  Townsend's heart
frequently pounded too fast, and he had chest pains and
trouble sleeping.  (Id.)  He attempted to stop drinking
Monster Drinks, but without the drinks, he experienced
severe headaches.  (Id.)

In September 2012, Townsend became faint and
feverish, and had a heightened heart rate.  (Id.)
Townsend went to the emergency room at a local hospital.
(Id.)  His blood pressure was registered at an average of
225 over 139, which is "critically high".  (Id.)

### iii.    Plaintiff Ted Cross

Plaintiff Cross ("Cross") began purchasing and
consuming Monster Drinks in or around 2008.  (Id. ¶ 25.)
For approximately two years, he consumed one can of
Original Monster per day.  (Id.)  After approximately two
years Cross increased his consumption to two cans per
day, a few days per week.  (Id.)  He frequently purchased

_____

(...continued)

Monster Energy Absolutely Zero and Java Monster Mean Bean.[6]  (Id.)

At a 2011 dental appointment on a morning when Plaintiff Cross had consumed two Monster Drinks, Cross's blood pressure registered at 260 mm Hg systolic.  (Id.) In October 2012, Cross experienced vision problems, dizziness, nausea, and a severe headache after drinking two Monster Energy Absolutely Zero drinks.  (Id.)  He was transported by ambulance to a hospital and operated on for a bleeding blood vessel in his brain.  (Id.)  At the time he was admitted to the hospital his blood pressure was 280 mm Hg systolic.  (Id.)

Plaintiff Cross relied on the Consume Responsibly Statement that Monster Drinks were safe to consume if limited to three cans per day.  (Id. ¶ 25(a).)  He also relied on the Ideal Combo Statement on the Original Monster label.  (Id.)  Cross understood this to mean that "Monster Drinks were safe (or not unsafe) for consumption and would provide energy without exposing people to health risks."  (Id.)  If he had known the "true facts," Plaintiff Cross would not have purchased and consumed Monster Drinks.

_____

[6]These two varieties of Monster Beverages are not included in Plaintiffs' claims.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief.   Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957) (holding that the Federal Rules require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (quoting Fed. R. Civ. P. 8(a)(2))); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). Recently, the Ninth Circuit clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

1    Although the scope of review is limited to the
2   contents of the complaint, the Court may also consider
3   exhibits submitted with the complaint, <u>Hal Roach Studios,</u>
4   <u>Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19
5   (9th Cir. 1990), and "take judicial notice of matters of
6   public record outside the pleadings." <u>Mir v. Little Co.</u>
7   <u>of Mary Hosp.</u>, 844 F.2d 646, 649 (9th Cir. 1988).

8

9                     **III. DISCUSSION**
10    Monster has moved to dismiss, pursuant to Federal
11   Rules of Civil Procedure 8, 9(b), 12(b)(1), and 12(b)(6),
12   on the following grounds: (1) Plaintiffs lack standing;
13   (2) Plaintiffs fail to satisfy basic pleading standards
14   and the heightened pleading standard for the purported
15   deliberately deceptive conduct they allege; (3)
16   Plaintiffs fail to state a claim for relief; (4)
17   Plaintiffs' claims are preempted or subject to the FDA's
18   primary jurisdiction; and (5) Plaintiffs' SAC is not a
19   "short and plain statement" of facts showing Plaintiffs
20   are entitled to relief.

21
22
23
24
25
26
27
28

1   **A.   Standing**[7]

2       Monster argues that Plaintiffs Fisher, Townsend, and

3   Cross do not satisfy Article III standing requirements.

4   (Mot. at 10.)  If a plaintiff lacks standing under

5   Article III of the U.S. Constitution, then the Court

6   lacks subject matter jurisdiction.  <u>See</u> Fed. R. Civ. P.

7   12(b)(1).  Defendants make a facial attack on Plaintiffs'

8   standing, and when evaluating a facial attack, the Court

9   "must accept as true all material allegations in the

10  complaint, and must construe the complaint in"

11  Plaintiffs' favor.  <u>Chandler v. State Farm Mut. Auto.</u>

12  <u>Ins. Co.</u>, 598 F.3d 1115, 1121-22 (9th Cir. 2010).

13

14      Article III of the Constitution gives federal courts

15  jurisdiction over "cases and controversies."  U.S. Const.

16  Art. III § 2, cl. 2.  "In essence the question of

17  standing is whether the litigant is entitled to have the

18  court decide the merits of the dispute or of particular

19  ───────────────
        [7]In the SAC, Plaintiffs narrowed the definition of
20  "Monster Drinks"; the FAC included 28 different
    beverages, but the SAC only included the original Monster
21  Energy product and the products under the Monster Rehab
    brand name.  In the Opposition, Plaintiffs argue that
22  they continue to represent mislabeling claims concerning
    all varieties of Monster-brand energy drinks.  (Opp'n. at
23  12 n. 11.)  Plaintiffs mention this argument in a
    footnote, and have not sufficiently alleged facts showing
24  that all Monster-branded energy drinks are sufficiently
    similar to support standing for all Monster-branded
25  energy drinks.  <u>See Astiana v. Dreyer's Grand Ice Cream,</u>
    <u>Inc.</u>, 2012 WL 2990766, *1, 11 (N.D. Cal. July 20, 2012)
26  ("the critical inquiry seems to be whether there is
    sufficient similarity between the products purchased and
27  not purchased."); <u>Colucci v. ZonePerfect Nutrition Co.</u>,
    2012 WL 6737800, *1, 4 (N.D. Cal. Dec. 28, 2012).

28

issues." <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).
Standing, therefore, is a threshold issue in every
federal case.  <u>Elk Grove Unified Sch. Dist. v. Newdow</u>,
524 U.S. 1, 11 (2004); <u>Warth</u>, 422 U.S. at 517-18.  Claims
brought under California's UCL, FAL, or CLRA must satisfy
federal standing requirements under Article III as well.
<u>See</u> <u>Cantrell v. City of Long Beach</u>, 241 F.3d 674, 683
(9th Cir. 2001) (parties asserting state claims in
federal court must meet Article III standing
requirements).

     A plaintiff must satisfy "the irreducible
constitutional minimum of standing" by demonstrating: (1)
he has suffered an "'injury in fact' -- an invasion of a
legally protected interest which is (a) concrete and
particularized, and (b) actual or imminent, not
conjectural or hypothetical"; (2) there is a causal
connection between the injury and the conduct complained
of -- that is, the injury is "fairly traceable" to the
challenged action of the defendant, and not the result of
the independent action of some third party not before the
court; and (3) it is "likely," as opposed to merely
"speculative," that the injury will be redressed by a
favorable judicial decision.  <u>Lujan v. Nat'l Wildlife</u>
<u>Fed'n</u>, 504 U.S. 555, 560-61 (1992).  "At the pleading
stage, general factual allegations of injury resulting
from defendant's conduct may suffice . . . ."  <u>Id.</u>

1    For the purposes of Article III standing an injury
2  may be physical or economic.  See Sierra Club v. Morton,
3  405 U.S. 727, 733-34 (1972) ("[P]alpable economic
4  injuries have long been recognized as sufficient to lay
5  the basis for standing.")  In order to assert the type of
6  economic injury that Plaintiffs are alleging, they must
7  demonstrate they were allegedly deceived, and either
8  purchased a product they would not have otherwise
9  purchased, paid a premium or overpaid for the product,
10  or would have purchased an alternative product.  See
11  Pirozzi v. Apple Inc., 2012 WL 6652453, *1, 4 (N.D. Cal.
12  Dec. 20, 2012) ("Overpaying for goods or purchasing goods
13  a person otherwise would not have purchased based upon
14  alleged misrepresentations by the manufacturer would
15  satisfy the injury-in-fact and causation requirements for
16  Article III standing"); Lanovaz v. Twinings N. Am., Inc.,
17  2013 WL 675929, *1, 6 (N.D. Cal. Feb. 25, 2013) ("The
18  alleged purchase of a product that plaintiff would not
19  otherwise have purchased but for the alleged unlawful
20  label is sufficient to establish an economic injury-in-
21  fact for plaintiff's unfair competition claims."); Boysen
22  v. Walgreen Co., 2012 WL 2953069, *1, 7 (N.D. Cal. July
23  19, 2012) (an economic injury is sufficiently alleged if
24  plaintiff would have purchased an alternative beverage
25  "had defendant's [beverage] been differently labeled.");
26  Chavez v. Blue Sky Natural Beverage Co., 340 F. App'x
27  359, 360-61 (9th Cir. 2009) (unpublished) (Article III
28

standing where Plaintiff "purchased beverages that he otherwise would not have purchased in absence of the alleged misrepresentations.").

Although Article III standing may be satisfied with either a physical or an economic injury, standing under the UCL, FAL, and CLRA requires an economic injury.  <u>In re Sony Gaming Networks & Customer Data Sec. Breach Litig.</u>, 903 F. Supp. 2d 942, 965 (S.D. Cal. 2012).  To have standing under the UCL and FAL, a Plaintiff must allege he "has suffered injury in fact and has lost money or property as a result of the unfair competition."  <u>See</u> Cal. Bus. & Prof. Code §§ 17204, 17203; <u>Kwikset Corp. v. Superior Court</u>, 51 Cal. 4th 310, 320 (2011).  Similarly, the CLRA requires Plaintiffs to allege a "tangible increased cost or burden to the consumer."  <u>Meyer v. Sprint Spectrum L.P.</u>, 45 Cal. 4th 634 (2009). Accordingly, the Court evaluates standing both under Article III and the UCL, FAL, and CLRA statutory requirements.

**1.  Plaintiff Fisher**

In the MTD I Order, the Court dismissed all claims brought by Fisher because he failed to plead an "injury in fact" for the purposes of Article III standing.  (MTD I Order at 10.)  In the SAC, Plaintiff Fisher again fails to allege an injury.

1      Fisher alleges he suffered an economic injury because

2  he relied on specific misrepresentations in purchasing

3  Monster Drinks.  (Opp'n. at 16.)  As in the FAC, the SAC

4  does not allege Plaintiff Fisher relied on any specific

5  misrepresentations by Monster, and only states that

6  Fisher "had no reason to believe" that Monster Drinks

7  were "not safe or posed a health risk", and that if he

8  had known of the health risks he would not have continued

9  to purchase Monster Drinks.  (SAC ¶ 23.)  As before,

10 Fisher is not alleging Monster made any

11 misrepresentations or deceived him; rather, he alleges

12 only that Monster failed to label their products in a way

13 that would lead Plaintiffs to "believe" that the Monster

14 Drinks "could" be injurious to their health.[8]  The Court

15 finds Plaintiff Fisher has not alleged Article III

16 standing sufficiently, and accordingly the claims brought

17 by Plaintiff Fisher are DISMISSED.

18

19

_____

20      [8]Plaintiffs acknowledge this deficiency, and argue
that "to the extent Plaintiff Fisher did not rely upon a
21 specific misrepresentation, he also has standing by
virtue of being a Member of Monster's target group –
22 young adolescent males – when he began purchasing and
consuming Monster Drinks."  (Opp'n. at 17 n. 15.)
23 Plaintiff's membership in the target group does not
constitute a "concrete" or "actual" injury as required by
24 Article III.  See Johns v. Bayer Corp., 2010 WL 476688,
*1, 5 (S.D. Cal. Feb. 9, 2010) ("Plaintiff does not
25 allege exposure to a long-term advertising campaign . . .
He cannot expand the scope of his claims to include a
26 product he did not purchase or advertisements relating to
a product that he did not rely upon".).

27

28

1          **2.    Plaintiff Townsend**

2          Plaintiff Townsend has alleged sufficient facts to

3    support standing.   Townsend frequently purchased "Monster

4    Drinks", which as defined in the SAC, includes Original

5    Monster and the Rehab Varieties.[9]   (SAC ¶ 8.)   Townsend

6    alleges he read and relied on the "Monster Drinks"

7    Consume Responsibly Statement and the Rehab Varieties'

8    Hydrates Like a Sports Drink Statement.   (<u>Id.</u>)

9    "Purchasing goods a person otherwise would not have

10   purchased based upon alleged misrepresentations by the

11   manufacturer" satisfies the injury in fact and causation

12   standing requirements.   <u>Pirozzi</u>, 2012 WL 6652453, at *4.

13   Townsend alleges that he relied on these representations

14   in purchasing Monster Drinks, and would not otherwise

15   have bought the drinks.   (SAC ¶ 24.)   Townsend has

16   adequately pled an economic injury.

17

18         In addition, Townsend alleges that as a result of his

19   consumption of Monster Drinks, he suffered physical

20

21         [9]Defendants argue that the SAC does not specifically
     allege that Townsend purchased any of the products from
22   the Monster Rehab variety.   Although Plaintiffs' use of
     "Monster Drinks" is confusing and at times inconsistent,
23   the Court must make all inferences in favor of the
     Plaintiffs.   When the Plaintiffs' definition of "Monster
24   Drinks" is applied, the SAC sufficiently alleges Townsend
     purchased all of the five Rehab drink varieties.   This is
25   consistent with other statements in the SAC that Townsend
     has consumed "every variety of energy drink created by
26   Monster, including every Monster Rehab product and
     Monster Energy."   (SAC ¶ 24(a).)

27

28

injuries, including his heart frequently pounding too fast, chest pains, trouble sleeping, high blood pressure, and a visit to the emergency room. (SAC ¶ 24(a).) This injury is also sufficient to meet the Article III injury, causation, and redressability requirements. Accordingly, Plaintiff Townsend has adequately alleged Article III standing and UCL, FAL, and CLRA statutory standing.

### 3. Plaintiff Cross

Plaintiff Cross has alleged sufficient facts to support standing for claims related to the Original Monster drink label. Cross frequently purchased multi-packs of Original Monster.[10] (Id. ¶ 25.) Cross alleges he read and relied on the Consume Responsibly and Ideal Combo Statements on the Original Monster label. (Id. ¶ 25(a).) Cross understood the Ideal Combo Statement to mean that "Monster Drinks were safe (or not unsafe) for

---

[10]Defendants argue Plaintiff Cross does not have standing for claims related to the Rehab Varieties because the SAC does not allege he ever purchased the Rehab varieties. (Mot. at 10.) Here, the Court agrees with Defendants. The SAC uses the term "Monster Drinks" to describe drinks purchased by Plaintiff Cross, but also states specifically that Cross drank a can of the "original Monster Energy" per day, and that Cross "bought and consumed Monster Energy Absolutely Zero and Java Monster Mean Bean." (SAC ¶ 9.) Here, it would not be fair to read the term "Monster Drinks" to include the Rehab variety, as defined in the SAC, since that reading is explicitly contradicted by other statements in the SAC. In paragraph 25, it seems that "Monster Drinks" only refers to the types of Monster beverages Plaintiff Cross consumed, which does not include the Rehab Varieties.

1   consumption and would provide energy without exposing
2   people to health risks" and he would not have purchased
3   Original Monster otherwise.  (Id.)  In other words
4   Plaintiff Cross has alleged he would not have purchased
5   the product but for the alleged misrepresentation.[11]  (Id.
6   ¶ 25.)  Accordingly, Plaintiff Cross has adequately
7   alleged an economic injury in fact in relation to the
8   claims involving the Original Monster sufficient for
9   Article III standing and UCL, FAL, CLRA statutory
10  standing.

11

12  **B.   Fed. R. Civ. P. 9(b) Particularity Requirements and**
13  **      Fed. R. Civ. P. 8 Plausibility Requirements**

14      Monster argues Plaintiffs fail to meet Rule 9(b)'s
15  particularity requirement.  The heightened pleading
16  standard of Rule 9(b) applies to state law claims
17  sounding in fraud that are brought in a federal action.
18  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1102-03 (9th
19  Cir. 2003).  The fraudulent conduct must be alleged with
20  particularity under Rule 9(b).  Kearns v. Ford Motor Co.,

21  _____
22      [11]Plaintiff Cross also alleges he suffered high blood
    pressure, a physical injury, after consuming two "Monster
23  Drinks."  It is unclear, however, whether the "Monster
    Drinks" consumed were among the varieties involved in the
24  instant action because Plaintiffs' use of the term
    "Monster Drinks" is confusing and inconsistent in SAC
25  paragraph 25.  Plaintiff Cross also alleges that after
    drinking two Monster Energy Absolutely Zero drinks, he
26  was hospitalized and underwent surgery for a bleeding
    blood vessel in his brain.  (SAC ¶ 10.)  Since Monster
27  Energy Absolutely Zero is a variety of drink not included
    in this action, Plaintiff Cross does not have standing
28  based on this injury.

567 F.3d 1120, 1125 (9th Cir. 2009). To meet the
particularity requirement, Plaintiffs must allege
adequately, "the who, what, when, where and how" of the
purportedly misleading statements.  <u>Vess</u>, 317 F.3d at
1106.  "[A] plaintiff must set forth more than the
neutral facts necessary to identify the transaction.  The
plaintiff must set forth what is false or misleading
about a statement, and why it is false."  <u>Decker v.</u>
<u>GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)</u>, 42 F.3d
1541, 1548 (9th Cir. 1994).

### 1.  Plaintiff Fisher

Plaintiff Fisher does not allege he was exposed to or
relied on any specific misrepresentations by Monster.
Fisher alleges he was exposed to Monster's marketing
strategy, part of Plaintiffs' "off-label" claims, when he
received a free Monster Drink at his high school when he
was sixteen, and that Monster employees were not asking
people their ages before dispensing Monster Drinks.  (SAC
¶ 23.)  Fisher does not allege what was false or
misleading about this transaction, except to state that
he "had no reason to believe that Monster Drinks were not
safe or posed health risks."  (<u>Id.</u>)  This is not
sufficient to support a fraud claim.  Accordingly, all
claims by Plaintiff Fisher are DISMISSED for lack of
particularity under Rule 9(b).

1    **2.  Plaintiff Townsend**

2         **i.  Original Monster**

3         Plaintiff Townsend alleges purchasing an Original

4    Monster drink in early June 2007 in a vitamin store, and

5    subsequently purchasing multi-packs of "Monster Drinks",

6    which as defined by Plaintiffs includes Original Monster

7    and Rehab Varieties, "frequently"  (SAC ¶ 25(a).)  In the

8    SAC, Townsend seems to allege he read and relied on the

9    Consume Responsibly Statement on the Original Monster and

10   Rehab Varieties (<u>Id.</u>)  In their Opposition, however,

11   Plaintiffs explicitly limit the "on-label"

12   misrepresentations at issue to three statements, which do

13   not include the Consume Responsibly Statement.  (Opp'n.

14   at 5, 13.)  Following Plaintiffs' interpretation of their

15   Complaint, the Court finds Plaintiff Townsend has not

16   alleged a specific misrepresentation in relation to

17   Original Monster, and therefore fails to meet the Rule

18   9(b) particularity requirements in relation to the

19   Original Monster drink.

20

21        **ii. Rehab Varieties**

22        Plaintiff Townsend fails to plead with particularity

23   his claims concerning Rehab Varieties.  The SAC does not

24   allege when, during a six-year period of time, Townsend

25   actually purchased a Rehab Variety drink, read the

26   Hydrates Like a Sports Drink Statement, and relied on the

27   statement in making the purchase.  The SAC merely alleges

28

that since 2007 he "frequently" purchased multi-packs of
"Monster Drinks", and that "Monster Drinks" is defined to
include all the Rehab Varieties.  (SAC ¶ 24(a).)
Townsend also does not allege what was false or
misleading about the Hydrates Like a Sports Drink
Statement.  (SAC ¶ 25.)

    Plaintiffs argue that other Courts have found that
alleging the product was purchased in a specific state
during a specific time period is sufficient to answer the
questions of "when and where" and put Defendants on
notice of the allegations.  See Jones v. ConAgra Foods,
Inc., 912 F. Supp. 2d 889, 902 (N.D. Cal. 2012)
("Plaintiffs' allegations that they bought the products
in California since April 2008 are sufficient to put
Defendant on notice of the claims against it."); Peviani
v. Natural Balance, Inc., 774 F. Supp. 2d 1066, 1071
(S.D. Cal. 2011) (Particularity requirement satisfied
where Plaintiff pleaded the year and vendor where product
was purchased).

    Another Court in this District found that a similar
pleading was not sufficient to meet the particularity
requirements under FRCP 9.  See Yumul v. Smart Balance,
Inc., 733 F. Supp. 2d 1117, 1124 (C.D. Cal. 2010) (Claim
dismissed when Plaintiff alleged purchasing the product
"repeatedly" throughout the class period but gave no

1  additional specifics and did not specify which retailers
2  the product was purchased from); see also Edmunson v.
3  Procter & Gamble Co., 2011 WL 1897625 (S.D. Cal. May 17,
4  2011) (Plaintiff did not allege when during the class
5  period, where, how many, or how many times he purchased
6  the product at issue or was exposed to the alleged
7  misrepresentations).

8

9       Assuming that Townsend's allegations that he
10  purchased the product within California since June 2007
11  is sufficient to meet the "when and where" requirements
12  and put Defendants on notice as to the claims, Plaintiff
13  Townsend still does not satisfy the Rule 9b particularity
14  requirements.   Townsend has not alleged with enough
15  particularity when the Rehab Variety drinks were
16  purchased because in March 2013 Defendants changed the
17  label on Monster Rehab varieties to remove the Hydrates
18  Like a Sports Drink Statement that Plaintiff relied on.
19  See Jones, 912 F. Supp. 2d at 903 (since Defendants
20  recently changed the label, it is "necessary to know more
21  specifically when Plaintiffs purchased" the products).
22  It should also be noted that the period of time alleged
23  in the SAC is longer than the class period, which is
24  December 12, 2008 to the present, so it is possible that
25  while Plaintiff Townsend may have purchased Rehab
26  Varieties between 2007 to 2008, he did not actually
27  purchase a Rehab Variety drink during the class period.
28

1   Plaintiff Townsend's claims related to the Rehab

2   Varieties as DISMISSED for failure to comply with Rule

3   9(b).

4

5       **3.   Plaintiff Cross**

6       Plaintiff Cross fails to plead with particularity his

7   claims related to Original Monster and the Rehab

8   Varieties.   Cross does not allege relying on any

9   misrepresentations in relation to the purchase of the

10  Rehab Varieties, and accordingly has failed to plead with

11  sufficient particularity any claims related to the Rehab

12  Varieties.[12]

13

14      With respect to the Original Monster drink, Plaintiff

15  Cross alleges that the misrepresentation he relied on was

16  the Ideal Combo Statement.   Plaintiff Cross believed this

17  statement meant the drinks "would safely provide energy

18  without exposing him to health risks."   (SAC ¶ 25(a).)

19  Assuming Plaintiff Cross meets the Rule 9(b)

20  particularity requirements, this claim would be dismissed

21  under the plausibility standards of Rule 8.   In order for

22  a statement to be a misrepresentation under CLRA, FAL,

23  and UCL, it must be likely to deceive a reasonable

24  _____

25      [12]As with Plaintiff Townsend, the SAC again appears
    to allege that Plaintiff Cross relied on the Consume
26  Responsibly Statement on both the original Monster Energy
    and the Monster Rehab varieties (see SAC ¶ 25(a)), but in
27  light of Plaintiffs' arguments in their Opposition, the
    Court has not analyzed this statement as a
28  misrepresentation.

1  consumer.   See Williams v. Gerber Products Co., 552 F.3d
2  934, 938 (9th Cir. 2008); Freeman v. Time, Inc., 68 F.3d
3  285, 289 (9th Cir. 1995).   Here, it is not plausible that
4  a reasonable consumer would understand the Ideal Combo
5  Statement to constitute a representation of safety.
6  Accordingly, Plaintiff Cross's claims are DISMISSED for
7  failure to comply with Rule 8.
8
9        **4.   "Off-label" Claims**
10       Plaintiffs' "off-label" claims in relation to
11  Monster's marketing and advertising strategy are not
12  plead with particularity.   Plaintiffs, relying on In re
13  Tobacco II Cases, 46 Cal.4th 298, 306 (2009), argue they
14  may base their UCL, FAL, and CLRA claims on Monsters'
15  prolonged marketing and advertising campaign even if the
16  Plaintiffs do not identify specific advertisements or
17  statements.   (Opp'n at 14.)   The decision in In re
18  Tobacco was "predicated on Plaintiff's exposure to an
19  'extensive and long-term advertising campaign.'"   Bronson
20  v. Johnson & Johnson, Inc., 2013 WL 1629191, *1, 3 (N.D.
21  Cal. Apr. 16, 2013).   In the SAC Plaintiffs have not
22  alleged a similarly extensive and lengthy advertising
23  campaign, and even if they had, the existence of a
24  prolonged marketing and advertising strategy does not
25  relieve Plaintiffs of the need to allege exposure to the
26  marketing strategy and particular misrepresentations
27  relied upon.   See id.; Kearns v. Ford Motor Co., 567 F.3d
28

1120, 1126 (9th Cir. 2009) (failed to allege particular
circumstances surrounding allegedly fraudulent marketing
materials); In re WellPoint, Inc. Out-of-Network UCR
Rates Litig., 903 F. Supp. 2d 880, 926 (C.D. Cal. 2012);
In re Ferrero Litig., 794 F. Supp. 2d 1107, 1112 (S.D.
Cal. 2011) (failed to allege exposure to marketing
materials); see also Comm. On Children's Television, Inc.
v. Gen. Foods Corp., 35 Cal. 3d 197, 219 (1983)
("Plaintiffs should be able to base their cause of action
upon an allegation that they acted in response to an
advertising campaign even if they cannot recall the
specific advertisements.").

    In regard to actual exposure to Defendants' marketing
strategy, the SAC merely alleges that Plaintiff Fisher
received a free "Monster Drink" from a truck parked
outside his high school, but as stated earlier, does not
allege what was false or misleading about this
transaction, as required under Rule 9(b).

    Although the Court finds that Plaintiffs' SAC is
subject to dismissal on a number of other grounds, as set
forth below, the Court finds the SAC should be DISMISSED
on the additional ground that the allegations fail to
meet Rule 9(b)'s specificity requirement.

## C.   Failure to State a Claim

Monster argues Plaintiffs' UCL, FAL, CLRA and breach of express and implied warranty claims fail as a matter of law because Plaintiffs have not alleged reliance or a duty to disclose and Plaintiffs' affirmative misrepresentations claims involve non-actionable "puffery."[13]   (Mot. at 19.)

### 1.   UCL, FAL, and CLRA Claims

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  Cal. Bus & Prof. Code § 17200.  "An act can be alleged to violate any or all of the three prongs of the UCL -- unlawful, unfair, or fraudulent."  Berryman v. Merit Prop. Mgmt., Inc., 152 Cal. App. 4th 1544, 1554 (2007).  "To support a claim for a violation of the UCL, a plaintiff cannot simply rely on general common law principles."  Textron Fin. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 118 Cal. App. 4th 1061, 1072 (2004).

---

[13]Monster also argues Plaintiffs' UCL, FAL, and CLRA claims fail as a matter of law because Monster's compliance with FDCA regulations provides a "safe harbor" under Cel-Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 182 (1999) for the conduct at issue.  (Mot. at 19.)  As the Court finds Plaintiffs' claims are dismissed on multiple other grounds, it is not necessary to address Monster's Cel-Tech safe harbor argument.

1    The FAL prohibits the dissemination of false or
2    misleading statements in connection with advertising.
3    Cal. Bus. & Prof. Code § 17500.  "Section 17500 has been
4    broadly construed to proscribe 'not only advertising
5    which is false, but also advertising which[,] although
6    true, is either actually misleading or which has a
7    capacity, likelihood or tendency to deceive or confuse
8    the public.'"  Colgan v. Leatherman Tool Group, Inc., 135
9    Cal. App. 4th 663, 679 (2006).

10

11    The CLRA makes illegal various "unfair methods of
12    competition and unfair or deceptive acts or practices
13    undertaken by any person in a transaction intended to
14    result or which results in the sale or lease of goods or
15    services to any consumer."  Cal. Civ. Code § 1770(a).
16    Conduct that is "likely to mislead a reasonable consumer"
17    violates the CLRA.  Colgan, 135 Cal. App. 4th at 680.

18

19    Claims under the UCL, FAL, and CLRA are governed by
20    the reasonable consumer test.  Williams v. Gerber Prods.
21    Co., 552 F.3d 934, 938 (9th Cir. 2008) (citations
22    omitted).  Under this test, the plaintiff must show that
23    members of the public are likely to be deceived.  Id.
24    However, for a statement to be actionable, there is no
25    requirement that the statement be false —these laws also
26    prohibit "advertising which, although true, is either
27    actually misleading or which has a capacity, likelihood
28

33

1   or tendency to deceive or confuse the public."  Id.
2   (citation and alteration omitted).  Under California law,
3   "whether a business practice is deceptive will usually be
4   a question of fact not appropriate for decision" on a
5   motion to dismiss, and it is a "rare situation" where
6   granting a motion to dismiss a false advertising claim is
7   appropriate.  Id. (citations omitted)
8
9       Plaintiffs' claims sound in fraud.  When claims under
10  the UCL, FAL, or CLRA sound in fraud, "plaintiffs are
11  required to prove actual reliance on the allegedly
12  deceptive or misleading statements, and that the
13  misrepresentation was an immediate cause of the injury-
14  producing conduct."  Sateriale v. R.J. Reynolds Tobacco
15  Co., 697 F.3d 777, 793-94 (9th Cir. 2012); Low v.
16  LinkedIn Corp., 900 F. Supp. 2d 1010, 1026 (N.D. Cal.
17  2012).  "For fraud-based claims under all three consumer
18  statutes the named Class members must allege actual
19  reliance to have standing."  In re Sony Gaming Networks
20  and Customer Data Security Breach Lit., 903 F. Supp. 2d
21  942, 969 (S.D. Cal. 2012).
22
23      Plaintiffs allege three specific "on-label"
24  misrepresentations: (1) Hydrates Like A Sports Drink
25  Statement, (2) Re-hydrate Statement, and (3) Ideal Combo
26  Statement.  The Court previously held that the Hydrates
27  Like a Sports Drink Statement and Ideal Combo Statement
28

1  are non-actionable "puffery" and accordingly fail to

2  support claims under the UCL, FAL, and CLRA.[14]  (MTD I

3  Order at 21.)

4

5      Non-actionable puffery includes statements that are

6  "either vague or highly subjective" as opposed to

7  "specific, detailed factual assertions."  Newcal Indus.,

8  Inc. v. Ikon Office Solution, 513 F.3d 1038, 1053 (9th

9  Cir. 2008) ("a statement that is quantifiable, that makes

10  a claim as to the "specific or absolute characteristics

11  of a product," may be an actionable statement of fact

12  while a general, subjective claim about a product is non-

13  actionable puffery.")

14

15      Plaintiffs argued in their Opposition and at the

16  hearing that the Hydrates Like a Sports Drink and the Re-

17  hydrate Statements (together, "Hydration Statements") are

18  ───────────────
   [14]Plaintiffs argue that even if the statements are
   non-actionable puffery on their own, the statements must

19  be considered as part of the Monster Drink packaging as a
   whole.  (Opp'n. at 20.)  Plaintiffs fail to allege what

20  specific statements or elements of the Original Monster
   and Rehab Varieties labels and packaging, when considered

21  together as a whole, constitute an actionable
   misrepresentation. See Williams, 552 F.3d at 939 n.3

22  (Statement that snacks are "nutritious" could, standing
   on its own, constitute puffery, but statement not

23  dismissed as puffery because it "contributes to the
   deceptive packaging as a whole."); Henderson v. J.M.

24  Smucker Co., 2011 WL 1050637, *1, 4 (C.D. Cal. Mar. 17,
   2011) ("even if certain statements would be

25  non-actionable on their own, where there are multiple
   statements at issue, we must consider the packaging as a

26  whole.").  The Court is not convinced, based on the on-
   label misrepresentations alleged, that the statements

27  considered together as a whole amount to an actionable
   misrepresentation.

28

1   false and misleading statements.  Plaintiffs argue these
2   statements are not puffery because they are quantifiable
3   and describe absolute and specific qualities.  See
4   Newcal, 513 F.3d at 1053.  Plaintiffs argue that these
5   are specific statements, "designed to induce consumers"
6   to rely on the statement and "choose Monster Drinks over
7   other sports drinks."[15]  (Opp'n. at 20.)  Therefore,
8   Plaintiffs argue the Hydration Statements are not
9   puffery, because puffery is a statement that is
10  "extremely unlikely to induce consumer reliance."
11  Newcal, 513 F.3d at 1053.

12

13      Defendants argue that the statements are too vague
14  and indeterminate.  (Reply at 11 n. 18.)  Defendants
15  argue the term "like" is "so vague and indeterminate that
16  is will be understood as a mere expression of opinion."
17  (Reply at 11 n. 8); see Baltazar v. Apple, Inc., 2011 WL
18  3795013, at *4-6 (N.D. Cal. Aug. 26, 2011) (claim that
19  iPad is "just like a book" is mere puffery).  Finally,
20  Defendants argue that "sports drink" is an undefined term
21  that is "used by industry and has not been defined by the
22  agency [the FDA]."  (Reply at 11 n. 18.)  To claim
23  something is "like a sports drink" is too vague and
24  indeterminate to be a misrepresentation.

25

26  _____

27      [15]Plaintiffs have not alleged any facts supporting
    the claim that Plaintiffs chose Rehab Varieties over
28  other sports drinks.

1    The Court finds that both the "Hydrates Like a Sports
2    Drink" and "Rehydrate" statements are non-actionable
3    puffery.[16]  The concept of "re-hydration" or "hydration"
4    is difficult to measure concretely, and has no
5    discernable meaning in the context of energy drinks or
6    beverages  See Viggiano v. Hansen Natural Corp., 2013 WL
7    2005430, *1, 10 (C.D. Cal. May 13, 2013) ("premium soda"
8    mere puffery because it has no concrete, discernable
9    meaning).  Both Hydration Statements are "vague",
10   "subjective", and unlikely to induce consumer reliance.
11   Accordingly all of Plaintiffs "on-label" claims under the
12   UCL, FAL, CLRA are dismissed as non-actionable puffery.

13

14   Plaintiffs have also failed to allege actual reliance
15   on the alleged Re-hydration Statement, as well as all of
16   the "off-Label" claims regarding Monster's marketing and

17

18   _____

19   [16]Plaintiffs argue for the first time in their
     Opposition that the statements related to hydration
20   (Hydrates Like a Sports Drink and Re-hydrate) are
     nutrient content and structure/function claims.  This
21   argument should have been made in the SAC.  In addition,
     this argument fails on the merits.  A nutrient claim
22   requires Monster to make a claim about a level of
     nutrient in the product.  For example, "Healthy" has been
23   found by FDA regulations to constitute an "implied
     nutrient content claim" because it characterizes the
24   level of nutrients in a product.  See Chacanaca v. Quaker
     Oats Co., 752 F. Supp. 2d 1111, 1117 (N.D. Cal. 2010).
25   "Hydrates like a Sports Drink" or "Re-hydrate" cannot, at
     this time, be similarly linked to a characterization of
26   nutrients in a product.  In addition, the hydration
     statements are not structure or function claims because
27   they do not claim that a specific nutrient in the drink
     hydrates or re-hydrates.
28

1  advertising strategy.[17]  Accordingly, Plaintiffs' claims

2  under the UCL, FAL, and CLRA are DISMISSED for failure to

3  state a claim.

4

5      **2.  Breach of Express and Implied Warranty**

6      Defendants argue that none of the "on-label"

7  misrepresentations constitute "warranties" and Plaintiffs

8  fail to state a claim for breach of express or implied

9  warranty.

10

11     Under California law, an express warranty is created

12 by "[a]ny affirmation of fact or promise made by the

13 seller to the buyer which relates to the goods and

14 becomes part of the basis of the bargain . . . ."  Cal.

15 Comm. Code § 2313(1)(a).  "Statements that are puffery

16 are not actionable under a theory of breach of express

17 warranty."  In re Clorox Consumer Litig., 894 F. Supp. 2d

18 1224, 1235 (N.D. Cal. 2012).  The Court has found that

19 all three specific misrepresentations the Plaintiffs

20 identify are non-actionable puffery, and accordingly

21 Plaintiffs' breach of warranty claims are DISMISSED for

22 failure to state a claim.

23

24

25 ───────────────

       [17]To the extent Plaintiff Fisher was exposed to
26 Monster's marketing campaign when he received a free
   Monster Drink at his high school, the Court has dismissed
27 this claim for failure to comply with Rule 9(b) and
   failure to state a claim.
28

1   Generally, an implied warranty of merchantability
2   ("IWM") accompanies every retail sale of consumer goods
3   in the state.  Cal. Civ. Code § 1792.  An IWM guarantees
4   that "consumer goods meet each of the following: (1) Pass
5   without objection in the trade under the contract
6   description; (2) Are fit for the ordinary purposes for
7   which such goods are used; (3) Are adequately contained,
8   packaged, and labeled; (4) Conform to the promises or
9   affirmations of fact made on the container or label."
10  Cal. Civ. Code § 1791.1(a).

12  Plaintiffs argue Monster Original and the Rehab
13  Varieties do not conform to the "container's promises or
14  affirmations."  (Opp'n. at 23.)  This argument is based
15  on the same three misrepresentations discussed above in
16  relation to the express warranty claim.  As stated above,
17  these statements are non-actionable puffery and
18  Plaintiffs' breach of implied warranty claims are
19  DISMISSED for failure to state a claim.

21  **D.  Preemption**
22  Monster argues Plaintiffs' claims should be dismissed
23  because Plaintiffs' claims are expressly preempted,
24  impliedly preempted, and subject to the FDA's primary
25  jurisdiction.  (Mot. at 13-19.)  Specifically, Monster
26  argues that the Food, Drug, and Cosmetic Act ("FDCA") and
27  the Nutrition Labeling and Education Act ("NLEA"), and

39

1  their implementing regulations, detail the federal

2  provisions prohibiting "misbranding" of food and grant

3  the FDA exclusive authority to ensure that foods are

4  properly labeled.  (<u>See</u> Mot. at 12.)  Plaintiffs argue

5  that their claims are not preempted because the "off-

6  label" claims are in a field, marketing and advertising[18],

7  that is not subject to federal preemption, and their on-

8  label claims[19] are merely enforcing state labeling

9  requirements that are identical to federal counterparts.

10  (Opp'n. at 3.)

11

12       The Supremacy Clause of the United States

13  Constitution empowers Congress to enact legislation that

14  preempts state law.  <u>See</u> <u>Gibson v. Ogden</u>, 22 U.S. 1, 82

15  (1824); <u>Law v. General Motors Corp.</u>, 114 F.3d 909, 909

16  (9th Cir. 1997).  "Federal preemption occurs when: (1)

17  _____

18       [18]The Court does not address preemption of the "off-label" claims by the Federal Trade Commission as they are already dismissed based on the Plaintiffs failure to

19  allege Article III standing and comply with Rule 9(b) in regard to these "off-label" claims.  The Court notes that

20  to the extent the "off-label" claims are failure to warn or inadequate warning claims they are expressly preempted

21  and subject to the FDA's primary jurisdiction.

22       [19]The Court does not address preemption or the FDA's primary jurisdiction of the UCL, FAL, and CLRA "on-label"

23  claims related to the Hydrates Like a Sports Drink Statement and Re-hydrate Statement because those claims

24  are subject to dismissal on other grounds.  Claims related to the Hydrates Like a Sports Drink Statement are

25  dismissed for failure to met the Rule 9(b) particularity requirements and failure to state a claim.  Claims

26  related to the Re-hydrate Statement are dismissed for lack of standing, failure to met the Rule 9(b)

27  particularity requirements, and failure to state a claim.

28

Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field."  Chae v. SLM Corp., 593 F.3d 936, 941 (9th Cir. 2010).

There is a presumption against preemption of state laws.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) ("we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress'"); In re Farm Raised Salmon Cases, 42 Cal. 4th 1077, 1088 (2008) (noting that consumer protection laws such as the UCL, FAL, and CLRA are within the states' historic police powers and therefore subject to the presumption against preemption).

The FDCA empowers the FDA (a) to protect public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled," 21 U.S.C. § 393(b)(2)(A); (b) to promulgate regulations implementing the statute; and (c) to enforce its regulations through administrative procedures.  See 21 C.F.R. § 7.1, et seq. The FDCA deems a food "misbranded" if its labeling is "false or misleading in any particular."  21 U.S.C. § 343(a).

1   Congress amended the FDCA by enacting the NLEA "to
2   'clarify and to strengthen the Food and Drug
3   Administration's legal authority to require nutrition
4   labeling on foods, and to establish the circumstances
5   under which claims may be made about the nutrients in
6   foods.'"  <u>Nutritional Health Alliance v. Shalala</u>, 144
7   F.3d 220, 223 (2d Cir. 1998) (citing H.R. Rep. No. 101-
8   538, at 7 (1990)).

9

10   **1.   Express Preemption**

11   Monster argues Plaintiffs' claims are expressly
12   preempted because they seek to impose labeling and
13   warning requirements "not identical" to what the FDA has
14   mandated.  (Mot. at 12.)  The NLEA added an express
15   preemption provision to the FDCA, prohibiting a state
16   from "directly or indirectly establish[ing]" requirements
17   for food or any labeling requirements for food that are
18   not identical to certain requirements set forth in 21
19   U.S.C. § 343.  <u>See</u> 21 U.S.C. § 343-1(a).  21 U.S.C. § 343
20   sets forth when a food is deemed misbranded.

21

22   The NLEA preemption provision does not preempt state
23   laws on the same subject; rather, "it allow[s] States to
24   adopt requirements identical to the federal standards,
25   which could then be enforced under state law." <u>Kosta</u>,
26   2013 WL 2147413, at *6.  Therefore, preemption only
27   occurs when a state law claim requires a party to go
28

42

1   beyond the FDA regulations by, for example, "includ[ing]
2   additional or different information on a federally
3   approved label . . . ."   Kanter v. Warner-Lambert Co., 99
4   Cal. App. 4th 780, 795 (2002); Chacanaca v. Quaker Oats
5   Co., 752 F. Supp. 2d 1111, 1121-23 (N.D. Cal. 2010) (UCL
6   and other state law claims that sought to impose labeling
7   requirements not identical to FDA regulations were
8   expressly preempted); see also Kosta, 2013 WL 2147413, at
9   *7.  A state law claim imposes a "not identical"
10  requirement if:
11
12      the State requirement directly or indirectly imposes
13      obligations or contains provisions concerning the
14      composition or labeling of food, or concerning a food
15      container, that (i) Are not imposed by or contained
16      in the applicable provision [or regulation] or (ii)
17      Differ from those specifically imposed by or
18      contained in the applicable provision [or
19      regulation].
20   21 C.F.R. § 100.1(c)(4).
21
22      As the Court previously found, Plaintiffs' consumer
23  protection claims based on inadequate labeling regarding
24  the amount of caffeine or the failure to warn are
25  preempted because they seek requirements beyond what is
26  imposed by the FDA.  (See MTD I Order at 15-17.)
27  Although Plaintiffs claim to have removed all claims
28

regarding caffeine content (Opp'n. at 5), Defendants
rightly point out that there remain many allegations
"attacking Monster's warning labels or lack there of."
(Reply at 7; Mot. at 13-15 (citing SAC ¶¶ 7, 8, 23, 45.)
For example, Plaintiffs allege the Ideal Combo statement
is false and misleading because of the omission of
material facts regarding potential health risks.  (SAC ¶
41.)  Accordingly, the Ideal Combo Statement claim,
although also subject to dismissal on other grounds, is
preempted and DISMISSED because it is in essence a
failure to warn claim.

    In addition, although unclear what Plaintiffs'
allegations are in relation to the Consume Responsibly
Statement, to the extent Plaintiffs claim the statement
is a specific misrepresentation and fails to warn of the
dangers of caffeine, or inadequately labels the drinks in
regard to caffeine content, these claims are preempted
and DISMISSED.

        **2.  Implied Preemption**
    Monster argues Plaintiffs' claims are impliedly
preempted because they indirectly seek to enforce FDA
regulations through state consumer protection statutes.
(Mot. at 14-15.)  Defendants argue this is preempted
because there is no private right of action to enforce
the FDCA.  (<u>Id.</u> (relying on <u>POM Wonderful LLC v. Coca-</u>

Cola Co., 679 F.3d 1170, 1175 (9th Cir. 2010)).  As noted
in the MTD I Order, the Court is not persuaded by
Defendants' argument that POM Wonderful prohibits
lawsuits that indirectly bring claims to enforce alleged
FDA violations.  (MTD I Order at 14.)  The POM Wonderful
Court limited the ruling to the federal Lanham Act, and
declined to address whether plaintiff's state law claims
were preempted.  POM Wonderful, 679 F.3d at 1179; see
also Brazil v. Dole Food Co., Inc., 2013 WL 1209955, at
*7 (N.D. Cal. Mar. 25, 2013); Kosta v. Del Monte, 2013 WL
2147413 (N.D. Cal. May 15, 2013).  Defendants have not
demonstrated that Plaintiffs' claims are impliedly
preempted.

### 3.  Primary Jurisdiction Doctrine

"The primary jurisdiction doctrine allows courts to
stay proceedings or to dismiss a complaint without
prejudice pending the resolution of an issue within the
special competence of an administrative agency . . . and
is to be used only if a claim involves an issue of first
impression or a particularly complicated issue Congress
has committed to a regulatory agency." Clark v. Time
Warner Cable, 523 F.3d 1110, 1114 (9th Cir. 2008).  A
court traditionally weighs four factors in deciding
whether to apply the primary jurisdiction doctrine: "(1)
the need to resolve an issue that (2) has been placed by
Congress within the jurisdiction of an administrative

body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." Syntek Semiconductor Co. v. Microchip Tech., Inc., 307 F.3d 775, 781 (9th Cir. 2002).

"[T]he doctrine is a 'prudential' one, under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." Clark, 523 F.3d at 1114. "Normally, if the court concludes that the dispute which forms the basis of the action is within the agency's primary jurisdiction, the case should be dismissed without prejudice so that the parties may pursue their administrative remedies." Syntek, 307 F.3d at 782; Astiana v. Hain Celestial Group., Inc., 905 F. Supp. 2d 1013, 1015-16 (N.D. Cal. 2012) (dismissing claims where the absence of FDA rules or policy statements would require court to make an independent determination that would "risk undercutting the FDA's expert judgments and authority").

Monster argues the primary jurisdiction doctrine applies because Congress has vested the FDA with

1  jurisdiction over issues involving food safety and
2  labeling, the FDA has specialized expertise in the
3  "technical and policy" questions involved here; the FDA's
4  expertise is necessary because this is an issue of first
5  impression; and the FDA has commenced a science-based
6  evaluation of the safety of caffeine-containing food
7  products, including energy drinks.  (Mot. at 16-17.)  The
8  Court finds that Monster has sufficiently alleged that
9  the FDA has primary jurisdiction because the agency has
10  special competence over the matters involving the "off-
11  label claims", inadequate warnings, and failure to warn
12  issues in this case.
13
14      First, the matters at issue here have been placed by
15  Congress within the jurisdiction of the FDA pursuant to
16  statute and regulations that require the FDA's expertise.
17  The FDA has regulatory authority over food labeling.  <u>See</u>
18  21 U.S.C. § 341, <u>et seq</u>.  The FDCA establishes a uniform
19  federal scheme of food regulation to ensure that food is
20  labeled in a manner that does not mislead consumers.  <u>See</u>
21  <u>id.</u>  Food labeling enforcement is a matter that Congress
22  has indicated requires the FDA's expertise and uniformity
23  in administration.
24
25      Second, Plaintiffs' claims ultimately involve
26  "technical and policy claims" about the effects of
27  caffeine and whether Monster should be allowed to
28

47

1  advertise and label their products in a way that appeals

2  to a younger demographic.  See Monster Beverage Corp. v.

3  Herrera, 2013 WL 4573959, *1, 15 (C.D. Cal. Aug. 22,

4  2013).  To the extent that Plaintiffs have removed claims

5  about the caffeine content, Plaintiffs remaining claims

6  are still grounded in allegations about

7  misrepresentations about the effects of high levels of

8  caffeine in energy drinks and how these effects should be

9  explained to the public, and to youth in particular.

10  Plaintiffs allege the claims are about the conduct of a

11  single company (Opp'n. at 10), but throughout the SAC

12  Plaintiffs cite to studies examining the effects of

13  "energy drinks," demonstrating that issues raised in the

14  SAC affect an entire industry.[20]

15

16      Third, the FDA has taken an interest in investigating

17  and resolving whether energy drinks, including Monster,

18  contain unsafe levels of caffeine.  (See Exs. 1-6 to

19  Mot.)  Unlike cases cited by Plaintiffs where the FDA has

20  declined, despite repeated requests, to act, the FDA's

21  interest in regulating the safety of caffeine weighs in

22  favor of exercising the primary jurisdiction doctrine.

23  See Jones, 912 F. Supp. 2d at 898.

24      [20]See SAC ¶ 12 ("Energy Drinks: What Teenagers (and
25  Their Doctors) Should Know"); id. ¶ 36 (2009 Mayo Clinic
    study on energy drinks); id. ¶ 38 (National Council on
26  Sports & Fitness "Youth and Energy Drinks"); id. ¶¶ 62-66
    (Drug Abuse Warning Network (DAWN) reports related to
27  energy drinks); Ex. C to SAC (Letter to FDA Commissioner
    Hamburg Re: The Use of Caffeine in Energy Drinks.)
28

1    The Court finds Plaintiffs' claims based on the Ideal
2  Combo Statement, the Consume Responsibly Statement, and
3  other allegations related to the failure to warn or
4  adequately label Monster Drinks in relation to caffeine
5  content, are preempted by the FDA under the Primary
6  Jurisdiction Doctrine.  In finding these claims preempted
7  under the Primary Jurisdiction Doctrine, the Court notes
8  that these claims may be actionable in the future if the
9  FDA ceases their investigation and pending regulation of
10 the safety of caffeine in food products and energy
11 drinks.  See Janney v. Mills, 2013 WL 1962360, *1, 7
12 (N.D. Cal. May 10, 2013) (holding that since the FDA
13 repeatedly declined to promulgate regulations governing
14 the use of "natural" as it applies to food products, the
15 FDA has signaled a relative lack of interest and referral
16 to the FDA would likely prove futile).  Accordingly,
17 these claims are DISMISSED WITHOUT PREJUDICE.

18

19 **E.   MMWA Claim**
20    Plaintiffs allege that Monster violated the MMWA.
21 Plaintiffs allege Monster's "written affirmations of
22 fact, promises and/or descriptions [] are each a 'written
23 warranty' and/or there exists an implied warranty for the
24 sale of [the Monster Drinks] within the meaning of the
25 MMWA, i.e., that they are safe for consumption."  (SAC ¶
26 144.)

27

28

49

To succeed on a claim under the MMWA, a plaintiff
must plead successfully a breach of state warranty law.
See Birdsong v. Apple, Inc., 590 F.3d 955, 958 n. 2
(2009).  Since Plaintiffs have failed to state a claim
for breach of an express or implied warranty, their MMWA
claim is properly DISMISSED.  Id.

**F.   Unjust Enrichment**

Monster argues that Plaintiffs' Unjust Enrichment
Claim should be dismissed because it is not an
independent cause of action.  (Mot. at 25.)  Plaintiffs
argue they are entitled to plead the claim in the
alternative, based on a quasi-contract theory.  (Opp'n.
at 24.)

"[A] claim for unjust enrichment cannot stand alone
without a cognizable claim under a quasi-contractual
theory or some other form of misconduct." Berenblat v.
Apple, Inc., 2009 WL 2591366, at *6 (N.D. Cal. Aug. 21,
2009).  Plaintiffs have not alleged any quasi-contractual
theory.  Plaintiffs' other claims have been dismissed, as
well.  Accordingly, since it cannot stand alone, the
Court DISMISSES the Unjust Enrichment Claim.

**G.   Fed. R. Civ. P. 8**

Monster argues that Plaintiffs' SAC should be
dismissed because it fails to satisfy FRCP 8.  (Mot. at

4-5.)  FRCP 8 requires "a short and plain statement of
the claim showing that the pleader is entitled to
relief."  Fed. R. Civ. P. 8(a)(1).  "[A] district court
has the discretion to dismiss a prolix complaint that
fails to comply with the requirements of Rule 8,
notwithstanding the existence of a viable cause of
action."  <u>Bravo v. L.A. County</u>, 2008 WL 4614298,*1, 2
(C.D. Cal. Oct. 10, 2008).

    In the Order dismissing the FAC, the Court noted that
many of the allegations in the FAC are unnecessary and
irrelevant, and provided a list of examples.  (MTD I
Order at 24 n. 8.)  Surprisingly, many of the facts
specifically noted by the Court as irrelevant and
unnecessary were present in the SAC.[21]  The Court again
reiterates that almost all of the information in the SAC
related to the advertising and marketing strategy of
Monster is irrelevant, as none of the Plaintiffs have
alleged any exposure to Monster's marketing, aside from
reading can labels.  Although Plaintiffs' claims are
dismissed on other grounds, the Court notes Plaintiffs'
failure to comply with Rule 8.

--------

    [21]<u>See</u> <u>e.g.</u> MTD I Order at 24 n.8 and compare to: SAC ¶
11 ("Joe Camel always seems to be on the move. . . or
just hanging out with other hip young camels."; <u>id.</u> ¶ 55
(Monster gear promotion is remarkably similar to the now-
banned Joe Camel promotional advertising..."); <u>id.</u> ¶ 53
(transcript of a video with Ash Hodges); <u>id.</u> ¶ 54 (("It
is commonly known that MILF is an acronym for 'Mother/Mom
I'd Like to F*#k.' <u>See</u> en.wikipedia.org/wiki/MILF.").

# IV. CONCLUSION

For the reasons set forth above, the Court:

(1) DISMISSES Plaintiffs' UCL, FAL, and CLRA claims related to the Hydrates Like a Sports Drink Statement for failure to comply with Rule 9(b) and failure to state a claim for relief;

(2) DISMISSES Plaintiffs' UCL, FAL, and CLRA claims related to the Re-hydrate Statement for lack of standing, failure to comply with Rule 9(b), and failure to state a claim for relief;

(3) DISMISSES Plaintiffs' UCL, FAL, and CLRA claims related to the Ideal Combo Statement for failure to comply with Rule 8, failure to state a claim for relief and preemption;

(4) DISMISSES Plaintiffs' "off-label" UCL, FAL, and CLRA claims related to Monster's marketing and advertising campaign for lack of standing, failure to comply with Rule 9(b), failure to state a claim, and preemption to the extent they are based on claims Monster failed to warn or adequately label the Monster Drinks;

(5) DISMISSES Plaintiffs' claims for breach of express and implied warranty for failure to state a claim;

(6) DISMISSES Plaintiffs' MMWA claim for failure to state a claim;

(7) DISMISSES Plaintiffs' unjust enrichment claim for failure to state a claim.

1        Accordingly, the Court GRANTS Monster's Motion and
2    dismisses Plaintiffs' SAC without prejudice.

6    Dated:   November 12, 2013
7                        VIRGINIA A. PHILLIPS
               United States District Judge