DAN MARMALEFSKY (BAR NO. 95477)
DMarmalefsky@mofo.com
PURVI G. PATEL (BAR NO. 270702)
PPatel@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: 213.892.5200
Facsimile:  213.892.5454

DANIEL J. WILSON (BAR NO. 299239)
DWilson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile:  415.268.7522

Attorneys for Defendants
MONSTER BEVERAGE CORPORATION and
MONSTER ENERGY COMPANY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW TOWNSEND and TED CROSS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MONSTER BEVERAGE CORPORATION and MONSTER ENERGY COMPANY,<br><br>Defendants. | Case No. EDCV12-02188 VAP (KKx)<br><br>**DEFENDANTS' MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF STEFAN BOEDEKER UNDER FED. R. EVID. 702**<br><br>The Honorable Virginia A. Phillips<br><br>Date:   January 29, 2018<br>Time:  2:00 p.m.<br>Ctrm:  8A<br><br>Trial Date:  none set<br><br>Date Action Filed: December 12, 2012 |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 29, 2018, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 8A of the Honorable Virginia Phillips, located at First Street Courthouse, 350 West 1st Street, Los Angeles, California, Defendants Monster Beverage Corporation and Monster Energy Company will, and hereby do, move this Court for an order striking the Expert Report of Stefan Boedeker (ECF No. 95-6), filed in support of Plaintiffs' Motion for Class Certification (ECF No. 95). Defendants seek to strike Mr. Boedeker's expert report and testimony on the ground that he fails to meet the standards required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

This motion is based upon this Notice of Motion and Motion, the accompanying memorandum of points and authorities, the Declaration of Dan Marmalefsky in Support of Defendants' Filings in Opposition to Plaintiffs' Motion for Class Certification and exhibits attached thereto, including the Expert Reports of Dr. Keith R. Ugone and Dr. Kent D. Van Liere, and all pleadings and papers on file in this action, and upon such other matters and arguments as may be presented to the Court prior to and at the time of the hearing of this motion.

This motion is made following a conference of counsel pursuant to Local Rule 7-3, which took place on October 6, 2017.

Dated:  October 16, 2017          Respectfully submitted,

**MORRISON & FOERSTER LLP**

By: */s/ Dan Marmalefsky*
         Dan Marmalefsky
*Attorneys for Defendants*
*Monster Beverage Corporation*
*and Monster Energy Company*

sf-3828846

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................. 1

II.   STATEMENT OF FACTS ...................................................... 2

    A.    Plaintiffs' Class Certification Allegations ..................... 2

    B.    Mr. Boedeker's Survey and Conjoint Analysis ................. 2

    C.    The Product "Attributes" in Mr. Boedeker's Survey ............ 3

    D.    Mr. Boedeker's Findings and Conclusions ......................... 4

        1.    Mr. Boedeker's findings and conclusions about why individuals purchase Monster Energy® drinks ......................... 4

        2.    Mr. Boedeker's findings and conclusions based on his conjoint analysis ......................... 4

III.   LEGAL STANDARD ............................................................... 6

IV.   ARGUMENT .............................................................................. 6

    A.    Mr. Boedeker's Survey Results Do Not Support His Conclusions ......................... 7

        1.    Other than "hydrates like a sports drink," Mr. Boedeker did not present survey respondents any of the Challenged Statements ......................... 7

            a.    The "Ideal Combo" Statement ..................... 8

            b.    The "RE-HYDRATE" Statement ..................... 10

            c.    The "Consume Responsibly" Statement ..................... 11

    B.    Mr. Boedeker's Testimony Is Irrelevant to the Issues in Dispute and Thus Is Not Helpful to the Fact Finder ......................... 14

        1.    Mr. Boedeker did not measure the impact of the Challenged Statements ......................... 14

        2.    Mr. Boedeker did not measure and cannot know how consumers interpret the statements he included in his survey ......................... 15

        3.    Mr. Boedeker cannot determine how much money Defendants allegedly received from the supposed price premiums ......................... 16

i

# TABLE OF CONTENTS
## (continued)

Page

C.    Mr. Boedeker's Testimony Suffers from Numerous Methodological Errors ........................................................ 19

    1.    Mr. Boedeker did not appropriately define and draw from the relevant universe ................................................ 19

    2.    Mr. Boedeker's choice of "attributes" in his conjoint analysis is flawed ........................................................ 20

    3.    Mr. Boedeker failed to replicate market conditions ................. 22

V.    CONCLUSION ............................................................................. 22

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-CV-01831-LHK, 2014 WL 5794873

6

   (N.D. Cal. Nov. 6, 2014) ...................................................................... 16

7

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*,
   383 F.3d 110 (3d Cir. 2004) ................................................................. 19

8

9

*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006) ............................................................... 16

10

11

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ............................................................ 6

12

13

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ............................................... 7, 19

14

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................... 6

15

16

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .................................................................. 6

17

18

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) .......................................................... 7, 20

19

20

*In re Front Loading Washing Mach. Class Action Litig.*,
   No. CIV. A. 08-51 (FSH), 2013 WL 3466821

21

   (D.N.J. July 10, 2013) ..................................................................... 20, 21

22

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ............................................................................... 7

23

24

*Gonzalez v. Proctor & Gamble Co.*,
   247 F.R.D. 616 (S.D. Cal. 2007) .......................................................... 14

25

26

*Gray v. Cty. of Riverside*,
   No. EDCV 13-00444-VAP, 2014 WL 5304915

27

   (C.D. Cal. Sept. 2, 2014) ........................................................................ 6

28

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) ........................................................................ 17

*Morales v. Kraft Foods Group, Inc.*,
   No. CV14-04387 JAK, 2017 WL 2598556
   (C.D. Cal. June 9, 2017) ...................................................................... 17

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ............................................................... 8

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ............................................................. 14

*THOIP v. Walt Disney Co.*,
   690 F.Supp.2d 218 (S.D.N.Y. 2010) .................................................... 22

*Weiner v. Snapple Beverage Corp.*,
   No. 07 Civ. 8742(DLC), 2010 WL 3119452
   (S.D.N.Y. Aug. 5, 2010) ...................................................................... 18

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-CV-02724-LHK, 2014 WL 7148923
   (N.D. Cal. Dec. 15, 2014) .................................................................... 16

**Other Authorities**

Federal Rule of Evidence 702 ..................................................................... 6

DEFENDANTS' MOTION TO STRIKE S. BOEDEKER UNDER FED. R. EVID. 702

## I.      INTRODUCTION

Plaintiffs have submitted the expert report of Stefan Boedeker to support their claim that the Monster Energy® drink label statements at issue are material to consumers, as well as provide a model for calculating classwide damages.  The Court should reject Mr. Boedeker's report and testimony in its entirety.  His opinions, which rely on the results of a flawed consumer survey he performed, are unreliable and irrelevant.

*First*, Mr. Boedeker did not ask survey respondents about three of the four Challenged Statements.  Instead, he either asked about modified versions of the statements or something different altogether.  Therefore, Mr. Boedeker's conclusions about the materiality of or damages from three of the Challenged Statements are baseless and speculative.

*Second*, Mr. Boedeker openly admits that his survey was not intended to measure the impact of the actual Challenged Statements, but rather the effect of the presence or absence of a general product attribute.  But this is a false advertising case and words are what matter.  Mr. Boedeker did not ask survey respondents how they interpreted the Challenged Statements, and therefore cannot possibly determine whether and to what extent purchasers were deceived and thereby injured by the Challenged Statements.

*Third*, Mr. Boedeker did not take into account any real-world information about Monster Energy® drink sales, including the wholesale prices charged by Monster Energy for the products at issue.  Therefore, his opinions on alleged economic loss cannot be used to calculate restitution and are irrelevant.

*Fourth*, Mr. Boedeker's survey suffers from myriad methodological flaws that render his opinions fundamentally unreliable.

For these and the other reasons detailed below, Mr. Boedeker's testimony should be excluded.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs' Class Certification Allegations

Plaintiffs challenge four statements on cans of Monster Energy® Original Green® and Rehab® products as false or misleading:

1. Original Green®: "It's the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can" (**"Ideal Combo"**)

2. Rehab®: "hydrates like a sports drink"

3. Rehab®: "RE-HYDRATE"

4. Original Green® and Rehab®: "Consume responsibly – Max 1 can per four hours, with limit 3 cans per day.  Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing" (**"Consume Responsibly"**).

Plaintiffs seek to certify two nationwide classes:  a class of all Original Green® purchasers since December 2008; and a class of all Rehab® Lemonade, Rehab® Orangeade, Rehab® Green Tea, Rehab® Rojo Tea, and Rehab® Protean purchasers since March 2011.  (Notice of Motion and Motion for Class Certification ("Notice of Motion") at 1-2, ECF No. 95.)

### B.   Mr. Boedeker's Survey and Conjoint Analysis

Plaintiffs attempt to support their class certification motion with the expert report of Stefan Boedeker, a managing director at Berkeley Research Group. (Boedeker Report, Ex. A at 1, ECF No. 95-6.)  Mr. Boedeker's opinions are based on a consumer survey he conducted.  (*See* Boedeker Report ¶¶ 54-72, Ex. B at 18-30.)  After a screening process, Mr. Boedeker asked respondents the reasons why they purchased Monster Energy® drinks in the past 12 months.  (Boedeker Report, Ex. B at 15.)  He then presented respondents with hypothetical products that had two or more "attributes."  (*Id*. 18-30.)  Respondents were asked to identify which product they would be "most likely to purchase" and then asked whether they would actually purchase that product.  (*Id*.)  Each respondent was shown 12 hypothetical products.  (Boedeker Report ¶ 91.)

2

Mr. Boedeker describes the latter part of the survey and his evaluation of the results as a "conjoint analysis." (*See*, *e.g.*, Boedeker Report ¶¶ 51, 68-70.) Using the results of his survey, Mr. Boedeker performed what he calls "market simulations," in which he applied "advanced statistical estimation techniques" based on the survey data to form conclusions about the value of the Challenged Statements to consumers. (*Id.* ¶¶ 23, 101.)

### C.    The Product "Attributes" in Mr. Boedeker's Survey

The hypothetical products Mr. Boedeker showed to respondents had six attributes that he could manipulate, other than price. (Boedeker Report ¶ 91; *id.*, Ex. B at 18-30.) These attributes, and the options for each, were as follows (*id.*):

| Attribute | Option 1 | Option 2 | Option 3 | Option 4 |
|---|---|---|---|---|
| **Flavor** | Coffee & Mocha | Original Sweet & Sour | Fruit & Citrus | Cola |
| **Energy Statement on Label** | Long Lasting Energy | [no statement] | [no statement] | [no statement] |
| **RE-HYDRATE Statement on Label** | RE-HYDRATE to Bring You Back | [no statement] | [no statement] | [no statement] |
| **Comparison to a Sports Drink** | Hydrates like a Sports Drink | [no statement] | [no statement] | [no statement] |
| **Ingredients Statement on Label** | Ideal Combo of the Right Ingredients in the Right Proportion | [no statement] | [no statement] | [no statement] |
| **Consumption Safety Statement on Label** | Safe level of consumption <u>incorrectly</u> specified on label | Safe level of consumption <u>correctly</u> specified on label | No information on label regarding safe level of consumption | [no statement] |

### D.   Mr. Boedeker's Findings and Conclusions

#### 1.   Mr. Boedeker's findings and conclusions about why individuals purchase Monster Energy® drinks.

Based on the data Mr. Boedeker collected about why respondents purchase Monster Energy® drinks, Mr. Boedeker concluded that "[f]lavor appears to be the most important attribute, followed by price." (Boedeker Report ¶ 86.)  The next-most-important attributes were "long lasting energy," "brand," "functional benefit," extra caffeine," and "zero calories."  (*Id.*, Figure 11.)

With respect to the Challenged Statements, a *lower* percentage of respondents who were asked about Monster Energy® drinks mentioned "ideal combo of the right ingredients in the right proportion" and "hydrates like a sports drink," as a purchase driver compared to those who were asked about energy drinks manufactured by competitors, even though labels on competitor products never contained these statements.  (Van Liere Report ¶ 97, Table 11.)  Likewise, a similar or *lower* percentage of respondents who were asked about Monster Energy® drinks mentioned "re-hydrate to bring you back,"[1] despite, again, labels on competitor products not having this statement .  (*Id.*)  Finally, a *lower* percentage of respondents who were asked about Monster Energy® drinks identified safety as a purchase driver as compared to those who were asked about competitor products, which have never included the "Consume Responsibly" statement.  (*Id.*)

#### 2.   Mr. Boedeker's findings and conclusions based on his conjoint analysis.

After Mr. Boedeker ran his statistical "market simulations" based on how individuals responded to the 12 hypothetical products he presented to them, Mr. Boedeker drew conclusions about the supposed price premium associated with the Challenged Statements, though he did not accurately present three of the four

---

[1] As discussed below, no Rehab® label ever contained this specific phrase. (Section IV.A.1.b.)

Challenged Statements to respondents (Section IV.A.1).  The following chart summarizes Mr. Boedeker's conclusions about the alleged price premiums associated with each "Challenged Statement" (Boedeker Report ¶ 116), as well as information about: (i) how these premiums compare to the average retail prices of the products (*see* Rebuttal Expert Report of Keith R. Ugone, Ph.D. ¶ 29);[2] and (ii) the importance of the statements, according to the responses survey respondents provided when Mr. Boedeker asked them to rank certain product attributes (*see* Boedeker Report ¶ 86).

|  | Hydrates | Rehydrate | Ideal Combo | Safety |
|---|---|---|---|---|
| Boedeker Estimated Value | $0.41 | $0.66 | $0.58 | $1.61 |
| % of Average Retail Price ($2.24) | 18% | 29% | 26% | 72% |
| Importance Ranking Boedeker Survey | 9th | 8th | 10th | 11th |
| Percent of Survey Respondents Who Mentioned as Key Attribute | 7.3% | 8.7% | 7.2% | 6.5% |

Mr. Boedeker also concluded that, if a product had all of the Challenged Statements, it would command a price premium of $1.82.  (*Id.* ¶ 130.)  In the real world, of course, no Monster Energy® drink product had all of the Challenged Statements.  (Declaration of Eva Lilja in Support of Defendants' Opposition to Motion for Class Certification, Exs. A, B.)[3]  Furthermore, according to Mr. Boedeker, different combinations of the statements result in different price premiums.  (Boedeker Report ¶ 118.)  Mr. Boedeker claims that these price premiums are equivalent to consumers' "economic loss" caused by the Challenged Statements.  (*Id.* ¶ 130.)

Based on these findings, Mr. Boedeker concluded that "the [Challenged

---

[2] Defendants are concurrently filing Dr. Ugone's report in connection with their opposition to Plaintiffs' motion for class certification.  It is attached as Exhibit E to the Declaration of Dan Marmalefsky in support of Defendants' Filings in Opposition to Plaintiffs' Motion for Class Certification.

[3] Defendants are concurrently filing Ms. Lilja's declaration in connection with their opposition to Plaintiffs' motion for class certification.

Statements] had a material impact on the demand for Monster Drinks because the study has demonstrated that without those claims, class members would have paid a lower price for the product." (*Id*. ¶ 132.)

## III.   LEGAL STANDARD

Courts evaluating motions for class certification apply *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) to expert testimony. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. 2014).  Under *Daubert*, "[a] trial judge has a 'gatekeeping' obligation with respect to opinion testimony of experts." *Gray v. Cty. of Riverside*, No. EDCV 13-00444-VAP (OPx), 2014 WL 5304915, at *16 (C.D. Cal. Sept. 2, 2014) (quoting *Daubert*, 509 U.S. at 589).  "[T]he trial judge must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  The court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (quoting *Daubert*, 509 U .S. at 543).  Under Federal Rule of Evidence 702, courts may admit expert testimony if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue";

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *ConAgra Foods, Inc.*, 302 F.R.D. at 549 (citation and quotation marks omitted).

## IV.   ARGUMENT

Plaintiffs contend that Mr. Boedeker's testimony serves two purposes: (1) establishing that the Challenged Statements were material to consumers' decisions to purchase Original Green® and Rehab®; and (2) providing a model for "evaluating classwide damages."  (Memorandum of Points and Authorities in Support of Motion for Class Certification ("Mem.") at 5, 19-21, ECF No. 95-1.) Mr. Boedeker does not satisfy either purpose.

Expert testimony is inadmissible if "there is simply too great an analytical gap between the data and the opinion proffered."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Moreover, if expert survey evidence is to be admitted, the survey "must: (1) be 'conducted according to accepted principles'; and (2) be 'relevant' to the issues in the case."  *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 950 (C.D. Cal. 2015) (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (citation and quotation marks omitted).   Mr. Boedeker's report should be excluded on all three grounds.

### A.   Mr. Boedeker's Survey Results Do Not Support His Conclusions

Mr. Boedeker's testimony is unreliable because it draws conclusions that his survey results fail to support.  Therefore, there is "too great an analytical gap between the data and the opinion proffered" for his testimony to be admissible. *Joiner*, 522 U.S. at 146.

#### 1.   Other than "hydrates like a sports drink," Mr. Boedeker did not present survey respondents any of the Challenged Statements.

Although Mr. Boedeker claims to have measured the price impact of the Challenged Statements based on his survey results (Boedeker Report ¶ 130), his survey did not ask respondents about the Challenged Statements, except for "hydrates like a sports drink."  (Boedeker Report, Ex. B at 18-30.)  Instead, he showed them either materially different versions of the statements or, in the case of the "Consume Responsibly" statement, no version of the statement at all.

7

1  Therefore, Mr. Boedeker's conclusions about the impact of the Challenged

2  Statements are unfounded and speculative.

3                    **a.**       **The "Ideal Combo" Statement**

4      Plaintiffs allege that the statement "It's the ideal combo of the right

5  ingredients in the right proportion to deliver the big bad buzz that only Monster

6  can" is false or misleading.  (Mem. at 3.)  Mr. Boedeker claims that, without this

7  supposed misrepresentation, consumers would have paid $.58 less for Original

8  Green®—26% of the average retail price.  (Boedeker Report ¶ 116.)

9      Mr. Boedeker, however, never presented the full statement as an attribute

10  option in his survey.  Instead, he included as an option "Ideal Combo of the Right

11  Ingredients in the Right Proportion," or nothing at all.  (Boedeker Report, Ex. B at

12  18-30.)  This phrasing omits the key portion of the statement:  "***to deliver the big***

13  ***bad buzz that only Monster can***."  The omitted language provides vital context for

14  the overall meaning of the statement because it identifies the purpose of the

15  "ingredients" and "proportions" in the product and why they are "ideal."  And the

16  stated purpose is critical to understanding the statement:  "***to deliver the big bad***

17  ***buzz***."  By removing this language, Mr. Boedeker transforms puffery[4]—a

18  representation that Monster Energy® can "deliver the big bad buzz"—into

19  something else altogether.

20      Mr. Boedeker has no reasonable explanation for this.  Instead, he stated in

21  his deposition that he wanted the format to consist of short phrases, whatever the

22  actual Challenged Statements:

23      **Q.**    You understand that on the back of Monster Energy Green there

24          is a sentence which reads "It's the ideal combo of the right
        ingredients in the right proportion to deliver the big bad buzz

25          that only Monster can?"  Is there a reason why you only used a
        portion of that sentence?

26  

27    [4] *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (Puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely[.]") (citation omitted).

28

**A.** This is a list of all fairly short, sometimes one or two words literally, so I wanted to kind of stay in line with the general format of these answer choices.

…

**Q.** Why did you exclude the words "to deliver the big bad buzz" from the options that you offered in your survey?"

**A.** That was, as I said, mainly the spacing issue.

(Declaration of D. Marmalefsky in support of Defendants' Filings in Opposition to Plaintiffs' Motion for Class Certification, Exhibit B ("Boedeker Dep."), filed concurrently herewith, Boedeker Dep. 145:11-20; 166:19-167:3.)

Mr. Boedeker further asserted that the actual "Ideal Combo" statement does not matter to his analysis:

**A.** …[M]y study was not [intended] to measure the consumer's interpretation of these statements, but my study was more like there's a statement of that kind and what is the difference between having that statement versus not having [] that statement.

…

**A.** It is about the content and the qualitative impact between having it and not having it.  But it is not so much about what the statements exactly said…

(*Id.* 167:5-15.)  In a false advertising case like this one, it *does* matter "what the statements exactly said."  (Section IV.B.1 (standards applicable in false advertising cases).)  And, even taking Mr. Boedeker at his word that he accurately measured "the difference between having []…a statement versus not having [] that statement," the statement whose presence or absence he supposedly measured the impact of was **not** the actual "Ideal Combo" statement.

Mr. Boedeker admitted, moreover, that he would have to resort to speculation to estimate the impact of the actual "Ideal Combo" statement:

**Q.** Would you agree you have no idea whether and, if so, in what respect the survey results would have differed if you had included the words "to deliver the big bad buzz?"

**A.** Right now my attribute has the words that are on here so what is [not] in the study right now *I haven't measured and therefore I haven't quantified it and I couldn't even speculate what the numbers would be*.

9

| | |
|---|---|
| 1 | |

**Q.**   Right.  So the answer to my question is yes, you agree that you have no idea as you sit here today whether and, if so, in what respect the survey results would have differed if you had included the words "to deliver the big bad buzz?"

**A.**   I think I said that I *don't have any data to conclude one way over the other, yes*.

(*Id*. 168:18-169:13, emphasis added.)  In other words, Mr. Boedeker would need to resort to speculation to offer an opinion as to the "Ideal Combo" statement.  His testimony regarding the "Ideal Combo" statement therefore is inadmissible.

### b.    The "RE-HYDRATE" Statement

Plaintiffs allege that the statement "RE-HYDRATE" is false or misleading. (Mem. at 2.)  Mr. Boedeker claims that, without this supposed misrepresentation, consumers would have paid $.41 less for Rehab®—29% of the average retail price. (Boedeker Report ¶ 116.)

Once again, the statement Mr. Boedeker presented as an attribute option was not the actual "RE-HYDRATE" statement; in his survey he presented "RE-HYDRATE to Bring You Back."  (*Id*., Ex. B at 18-30.)  Just as Mr. Boedeker did in regard to the "Ideal Combo" and "Consume Responsibly" statements, he deviated from the actual Challenged Statement, this time by adding "to Bring You Back."  Mr. Boedeker admitted in his deposition that **he does not even know why he did this**:

**Q.**   Let's look at the [attribute option] right above that, "Re-hydrate to bring you back."  Why did you include those words?

**A.**   The words or the general idea of the rehydration property?

**Q.**   The words "Re-hydrate to bring you back."

**A.**   I don't recall any specific reasoning why I chose those particular words.

(Boedeker Dep. 147:6-13.)

Mr. Boedeker admitted, moreover, that his arbitrary phrasing could be interpreted in countless different ways:

**Q.**   Would you agree that others, that people responding to this survey might have different interpretations [of "re-hydrate to bring you back"]?

| | |
|---|---|
| **A.** | That's entirely possible. ***It would surprise me if that weren't the fact.*** |
| **Q.** | Okay.  You would expect it, in other words? |
| **A.** | Yeah. ***I would expect that other people [would have] maybe potentially as many different interpretations as there are survey respondents***. |
| **Q.** | Okay. So in this case 600 or 912 depending upon how many were asked to answer this question? |
| **A.** | Yeah.  Again, I can't rule it out that many different interpretations. ***What I can probably rule out is that there's one, single, unambiguous, unique interpretation.*** |

(*Id*. 148:16-149:5, emphasis added.)

Given that Mr. Boedeker once again did not ask respondents about an actual Challenged Statement, his conclusions about the impact of the "RE-HYDRATE" statement that appears on Rehab® on product demand and price is speculative and unreliable.  This is compounded by the fact that, as Mr. Boedeker fully admits, the statement he arbitrarily chose to use instead of the actual Challenged Statement is amenable to innumerable interpretations.  Therefore, Mr. Boedeker's testimony should be excluded as to the "RE-HYDRATE" statement.

### c.    The "Consume Responsibly" Statement

Plaintiffs allege that the statement "Consume Responsibly – Max 1 can per four hours, with limit 3 cans per day.  Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing" is false or misleading.  (Mem. at 3-4.)[5]  Mr. Boedeker claims that, without this supposed misrepresentation, consumers would have paid $1.61 less for Original Green® and Rehab®—72% of the average retail price.  (Boedeker Report ¶ 116.)

But, Mr. Boedeker never presented the "Consume Responsibly" statement as an attribute option in his survey.  Instead, he included as options "safe level of consumption <u>incorrectly</u> specified," "safe level of consumption <u>correctly</u> specified,"

---

[5] As set forth in Defendants' Opposition to Plaintiffs' Motion for Class Certification, Defendants dispute that the full "Consume Responsibly" statement is at issue.

"no information on label regarding safe level of consumption," or nothing at all. (Boedeker Report, Ex. B at 18-30.)  Therefore, on its face, Mr. Boedeker's conclusion about the impact of the "Consume Responsibly" statement is baseless and speculative.[6]  In his report, Mr. Boedeker does not even attempt to explain how or why his survey data regarding these options allows him to make determinations regarding this statement, let alone with anything like the "95% confidence intervals" he touts.  (*Id*. ¶ 130.)

In fact, Mr. Boedeker admitted in his deposition that he was not attempting to measure the impact the words in the "Consume Responsibly" statement had on consumers.  Instead, he was measuring the impact on consumers learning that they had received inaccurate information about product safety:

> **Q.**   Am I correct that you don't know whether any particular words or phrases in [the "Consume Responsibly" statement] were ones that somebody was attributing or concluding were incorrect?
>
> **A.**   Again, my general expertise is not parsing out which words with which effect.  *Here, I'm looking at the qualitative effect that there's an information label about safety and it is either correct or not correct or not present.  That's what my model estimates.*
>
> **Q.**   Right.
> **A.**   …*I'm looking at the attribute at a more qualitative level rather than at the actual content.*
>
> **Q.**    Right.  And so as you phrased it, we have no idea what the impact would be on any purchaser of any portion of this being denoted as incorrect as opposed to just saying there is an incorrect statement?
>
> **A.**   *Again, my study doesn't answer the question that you phrased[, which is] which word has the impact, it just qualitatively speaks about if information about safety is correct or incorrect or not present.*
>
> **Q.**   So, for example, for all we know, all you're telling us is that the

_____

[6] The approach Mr. Boedeker took to the "Consume Responsibly" statement is completely inconsistent with his approach to the other statements, where he either presented respondents with the actual statement (for "hydrates like a sports drink") or some sort of variation of the statement (for the "RE-HYDRATE" and "ideal combo" statements).  This internal inconsistency further calls into question Mr. Boedeker's conclusions as to the "Consume Responsibly" statement.

words "not recommended for children" was an incorrect
statement?

A.  …I have not yet thought about or *I have not done a study that goes in and looks at the content of [the] particular statement [] word by word.*

…

Q.  Okay.  But as we all sit here today, as you worded your conjoint survey, we don't know specifically that any purchaser was reacting at all [to] any portion of the actual words that are reflected in [the "Consume Responsibly" statement]?

A.  *The participants in this study reacted to a safety label more like generically speaking because I didn't specify anything.*

Q.  Right

A.  *So therefore it is not related to actual wording in [the "Consume Responsibly" statement].*

(Boedeker Dep. 296:8-298:21, emphasis added.)

Mr. Boedeker also admitted that he would expect the results to be different if he were to use the actual words in the "Consume Responsibly" statement:

Q.  The problem – isn't the problem here that the wording in your conjoint analysis didn't use any of the words that were on the label for [the "consume responsibly" statement]?

A.  It didn't use any of the words because in this case on the safety [issue] I was interested in the category of safety in itself, right?  Now could *this be done to use the exact words, it could, and it would give an answer which is probably different than this one because it is a different attribute that I'm testing.*

(*Id*. 295:14-24, emphasis added.)

These admissions are fatal.  This is a false advertising case.  Words matter and the materiality of actual label statements is what is at issue.  (Section IV.B.1 (standards applicable in false advertising cases).)  Mr. Boedeker knows this, and presumably that is why he tries to offer conclusions about the impact of the "Consume Responsibly" statement.  But to do so, he must resort to speculation because his actual data says nothing about this statement.  Therefore, Mr. Boedeker's testimony as to the statement is inadmissible.

///

///

///

13

**B.      Mr. Boedeker's Testimony Is Irrelevant to the Issues in Dispute and Thus Is Not Helpful to the Fact Finder**

**1.      Mr. Boedeker did not measure the impact of the Challenged Statements.**

Mr. Boedeker repeatedly testified that he did not intend to measure the impact of the actual Challenged Statements.  (Section IV.A.1.)  Similarly, Mr. Boedeker admitted that his model does not address real-world purchasing decisions:

> **Q.**      Okay.  And so for purposes of your analysis it doesn't matter whether 90 percent of purchasers read those words [in the Challenged Statements] or two percent of purchasers read those words?
>
> **A.**      That is not an input to my model and it doesn't matter because my analysis, *my scope of retention, was focused on the change in demand rather than understanding what is on the label or reading it*.
>
> **Q.**      Right.  And, similarly, for purposes of your model it didn't matter whether even if someone read those words, those words led the consumer to make the decision to purchase the product?
>
> **A.**      *That was not part of my model*.

(Boedeker Dep. 18:7-23, emphasis added.)

Instead, Mr. Boedeker was measuring the impact of the presence or absence of a general product attribute.  This is why, according to him, he did not include three of the four Challenged Statements in his survey.  (Section IV.A.1.)  But this is a false advertising case, and Plaintiffs must show that the *specific representations* were material and relied upon by consumers, not some general concept of "safety" or "hydration."  *See*, *e.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011) ("If the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified"); *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624-26 (S.D. Cal. 2007) (no presumed reliance if some class members may not have relied upon the alleged misrepresentations).  Mr. Boedeker's survey offers no convincing way to bridge the gap between what he measured and what Plaintiffs must demonstrate for a class to be certified.  Therefore, his survey and the analysis based on it are irrelevant.

14

### 2.   Mr. Boedeker did not measure and cannot know how consumers interpret the statements he included in his survey.

Plaintiffs' theory of liability is that purchasers interpret the Challenged Statements to be representations that Original Green® and Rehab® are safe (the "Ideal Combo" and "Consume Responsibly" statements) or provide hydration ("RE-HYDRATE" and "hydrates like a sports drink" for Rehab® only), and that this is deceptive because the products supposedly are not safe or hydrating.  (*See*, *e.g.*, Mem. 4, 17.)  Therefore, Mr. Boedeker cannot possibly estimate the damages of consumers allegedly being misled in this fashion unless he knows that his survey respondents interpret the statements in the same way that Plaintiffs understand the Challenged Statements.

Mr. Boedeker, however, did not ask a single question addressing how respondents interpreted his survey statements:

> **Q.**   So it is accurate to say that in the work you did in this case you weren't looking at the question of what any particular words on a label meant to the purchaser of that product?
>
> **A.**   If I understand you correctly, ***I did not go after the meaning***, I just portrayed two different statements and then the consumer picked one, a product that had one of those statements associated with it, but ***I did not see ultimately what's going on inside the consumer to pick one over the other***.

(Boedeker Dep. 16:22-17:6, emphasis added.)

Furthermore, to the extent Plaintiffs claim that Mr. Boedeker can piggyback on Plaintiffs' other expert Thomas Maronick's conclusions about how consumers interpret the Challenged Statements, they are wrong.  First, as described in Defendants' motion to strike Dr. Maronick's testimony, Dr. Maronick's survey is fundamentally flawed and should be excluded.  Second, even if Dr. Maronick's survey were not excluded, Dr. Maronick's findings demonstrate that consumers do *not* share Plaintiffs' interpretation of the Challenged Statements[7] or, at minimum,

---

[7] For example, Dr. Maronick found that, at most, fewer than 10% of consumers interpret the "Ideal Combo" statement to be a safety representation (Maronick

(Footnote continues on next page.)

do not provide the data necessary to know one way or another.[8]  Third, putting all

of this aside, even if Dr. Maronick *did* conclusively determine that consumers share

Plaintiffs' interpretation of the Challenged Statements—which he did not—Mr.

Boedeker *still* would not be able to rely on Dr. Maronick's conclusions because

Mr. Boedeker did not test the same statements as Dr. Maronick.

Because Mr. Boedeker cannot know how his survey respondents interpreted

the statements at issue, his conclusions are irrelevant.  (*See* Van Liere Report

¶¶ 108-112) (Mr. Boedeker's findings cannot be tied to Plaintiffs' theory of liability

because Mr. Boedeker did not ascertain how respondents understood statements he

tested).)

### 3.   Mr. Boedeker cannot determine how much money Defendants allegedly received from the supposed price premiums.

Mr. Boedeker's report is irrelevant and unhelpful for a third reason:

Mr. Boedeker presents no way of calculating restitution.  Under the UCL and FAL,

"restitution is the only available remedy."  *Colgan v. Leatherman Tool Grp., Inc.,*

135 Cal. App. 4th 663, 695 (2006).  As Judge Koh in the Northern District

explained, restitution contemplates a methodology that attaches a dollar value to the

"consumer impact" caused by the defendant's alleged conduct.  That is, restitution

measures the difference between the market price actually paid and the "true market

price" that "reflects the impact of the unlawful, unfair, or fraudulent business

practice[]," sometimes referred to as the "price premium."  *Werdebaugh v. Blue

Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at *8 (N.D. Cal.

Dec. 15, 2014); *see also Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-

---

(Footnote continued from previous page.)

Report ¶¶ 23-24) and fewer than 25% percent interpret "rehydrates like a sports drink" to communicate a hydration message (*id.* ¶ 28).

[8]  For example, the responses to Dr. Maronick's questions about the meaning of the "Consume Responsibly" statement reveal nothing about whether consumers believe the statement to be a safety representation.  (*Id.* ¶¶ 30-33.)

1   LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014). Although, under the CLRA,

2   "actual damages" are available, price premium is still the only proper

3   measurement.[9] *See¸ e.g.*, *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 330 (2011)

4   (economic loss to a consumer who relies on a label that misrepresents the product is

5   the difference between the product "as labeled" and the product "as it actually is").

6         Mr. Boedeker, however, offers no way of determining restitution because his

7   report takes into account no real-world information about the sale and pricing of

8   Original Green® or Rehab®, including their wholesale prices and retail prices.

9   Instead, Mr. Boedeker admits that his conclusions about price premium are based

10  on how survey respondents subjectively valued the product attributes he displayed

11  for them, or their "willingness to pay." (*See*, *e.g.*, Boedeker Report ¶¶ 108-115.)

12  Mr. Boedeker's report contains no information on how much money Defendants

13  actually received from the sale of Original Green® or Rehab® in the marketplace

14  on a per-can basis or otherwise. For example, Mr. Boedeker did not consider any

15  data on the prices at which Monster Energy sells Monster Energy® drinks to

16  distributors and retailers.[10]

17        Without this data, or any analysis based on it, Mr. Boedeker cannot possibly

18  speak to the money Defendants received through the sale of Monster Energy®

19  drinks, let alone the specific amounts attributable to the Challenged Statements.

20  Therefore, Mr. Boedeker's opinions as to the alleged "economic loss" purchasers

21  suffered because of the Challenged Statements (*see*, *e.g.*, *id.* ¶ 130) are irrelevant

22  because they cannot be used to calculate restitution or the supposed price premium

23  charged in the real world. *See Morales v. Kraft Foods Group, Inc.*, No. CV14-

24  04387 JAK (PJWx), 2017 WL 2598556, at *26 (C.D. Cal. June 9, 2017) (expert's

25  _____

26  [9] Regardless, Plaintiffs do not suggest they have a model to calculate damages based on anything other than supposed price premium.

27  [10] Monster Energy generally does not sell Monster Energy® drinks directly to consumers. (Lilja Decl. ¶ 6.)

28

1   computation of economic loss through conjoint analysis incapable of determining

2   restitution because did not reveal how much money defendant actually received

3   from statement).

4        The importance of real-world data is demonstrated by the expert report of

5   Defendants' damages expert, Dr. Ugone.  Unlike Mr. Boedeker, Dr. Ugone

6   analyzed real-world data to determine whether there is a price premium associated

7   with any of the Challenged Statements.  His analysis proves there is not.  For

8   example, at the wholesale level Monster Energy charges the same price for all 16

9   and 15.5 oz. products with a given packaging configuration (e.g., 24-pack).  (Ugone

10  Report ¶¶ 40(a), 43 n.84.)[11]  After introducing the "Ideal Combo" statement,

11  Monster Energy did not increase the wholesale price of Original Green® then or for

12  almost three years thereafter.  (*Id*. ¶¶ 40(a), 43.)  Nor did Monster Energy drop the

13  wholesale price of Original Green® or Rehab® when Monster Energy removed the

14  "hydrates like a sports drink" statement and the "limit 3 cans per day" portion of the

15  "Consume Responsibly" statement.  (*Id*. ¶¶ 43-45.)

16       In addition to wholesale prices, Dr. Ugone analyzed the prices at which

17  retailers sell Monster Energy® drinks to consumers.  Dr. Ugone found that the

18  retail price of Original Green® did not appreciably increase in the six-month period

19  after the "Ideal Combo" statement was introduced.  (*Id*. ¶¶ 48-49, 51.)  He also

20  found that the retail prices of Original Green® and Rehab® did not materially

21  decrease after the removal of the "limit 3 cans per day" portion of the "Consume

22  Responsibly" and "hydrates like a sports drink" statements, and any decrease was

23  temporary, extremely small (a maximum of 4%), and attributable to factors

24  completely unrelated to the removal of the statement (e.g., the seasonality of the

25  products).  (*Id*. ¶¶ 51-55.)  Dr. Ugone's findings further demonstrate the

26  ────────────────

27  [11] This "line pricing" is compelling evidence of a lack of price premium.
    *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742(DLC), 2010 WL 3119452, at
28  *8, *10 n.19 (S.D.N.Y. Aug. 5, 2010).

unreliability of Mr. Boedeker's conclusions that there is *any* price premium based on the Challenged Statements, let alone a premium amounting to a large percentage of the purchase price, as Mr. Boedeker contends.[12]

### C.   Mr. Boedeker's Testimony Suffers from Numerous Methodological Errors

Methodological problems that call into question the reliability of the survey justify exclusion.  *See*, *e.g.*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 949-50 (excluding survey where methodological problems indicated it was not "conducted according to accepted principles and reliable") (internal quotations omitted); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,* 383 F.3d 110, 121 (3d Cir. 2004) (excluding survey because the "methodology was fundamentally flawed," and rejecting contention that flawed methodology went to the weight, rather than the admissibility).

Mr. Boedeker's methodology is fundamentally flawed, making his opinions unreliable.  First, Mr. Boedeker failed to ask what Monster Energy® drink product(s) respondents had purchased and therefore he has no idea whether any of the respondents are putative class members.  Second, Mr. Boedeker botched the selection of product attributes in his survey.  Third, Mr. Boedeker made no attempt to replicate how consumers encounter the products in the marketplace.  Therefore, Mr. Boedeker's conclusions are unreliable.

### 1.   Mr. Boedeker did not appropriately define and draw from the relevant universe.

Plaintiffs' survey expert, Dr. Maronick, explained that there are "guidelines and standards generally employed in the field of survey research."  (Expert Report of Thomas Maronick ("Maronick Report") ¶ 11, ECF No. 95-5.)  These require that

---

[12] As Dr. Ugone concluded, moreover, the price premiums Mr. Boedeker claims are manifestly unreasonable.  (*Id.* ¶¶ 29, 69.)

1    the "relevant universe be defined appropriately" and a "representative sample be

2    drawn from the relevant universe." (*Id.*)

3        Plaintiffs seek to certify two nationwide classes:  a class of all Original

4    Green® purchasers since December 2008; and a class of all Rehab® Lemonade,

5    Rehab® Orangeade, Rehab® Green Tea, Rehab® Rojo Tea, and Rehab® Protean

6    purchasers since March 2011.  (Notice of Motion at 1.)  Therefore, it is these

7    individuals whose purchasing decisions matter.  Mr. Boedeker, however, did not

8    ask respondents questions to identify the specific Monster Energy® drinks that the

9    respondents purchased, and thus failed to identify whether respondents ever

10   purchased any of the products on which the proposed classes are based.

11       Therefore, Mr. Boedeker failed to draw a representative sample from the

12   relevant universe, as required by "guidelines and standards generally employed in

13   the field of survey research."  (Maronick Report ¶ 11.)  His survey fails to meet the

14   Ninth Circuit's requirement that surveys be "conducted according to accepted

15   principles."  *Fortune Dynamic, Inc.*, 618 F.3d 1025 at 1036; *see also In re Front*

16   *Loading Washing Mach. Class Action Litig.*, No. CIV. A. 08-51 (FSH), 2013 WL

17   3466821, at *7 (D.N.J. July 10, 2013) (Dr. Maronick's survey unreliable in part

18   because he "can't say for sure whether any survey-takers actually owned [the

19   relevant product]"); *see also* Van Liere Report ¶¶ 123-24 (survey population flawed

20   and over-inclusive if, as here, not limited to those who purchased products at issue);

21   Ugone Report ¶ 70(b) (same).  This warrants exclusion.

22           **2.    Mr. Boedeker's choice of "attributes" in his conjoint**
                     **analysis is flawed.**
23

24       In choosing the product "attributes" to show respondents, Mr. Boedeker did

25   not include three of the four Challenged Statements.  This alone is a flaw so

26   fundamental that Mr. Boedeker's survey is unreliable.  (Section IV.A.1; *see also*

27   Ugone Report ¶¶ 63-68 (explaining why statements Mr. Boedeker used instead of

28   the "Ideal Combo," "RE-HYDRATE" and "Consume Responsibly" statements do

not permit him to reliably draw conclusions about Challenged Statements).  But that is not all.

To "better understand[] what drives purchasing decisions" for Monster Energy® drinks, Mr. Boedeker asked respondents why they buy the products. (Boedeker Report ¶ 86.)  The responses confirmed that consumers overwhelmingly do not purchase Monster Energy® drinks for safety or hydration reasons, or because of the Challenged Statements.  (*Id*. Figure 11.)  Rather, they revealed that there are product attributes far more important than the Challenged Statements, such as "brand," "extra caffeine," and "zero calories."  (*Id*.)  Mr. Boedeker failed to include these attributes in his conjoint analysis, as well as attributes that respondents ranked as more or nearly as important as any of the Challenged Statements such as "nutritional benefit," and "all-natural ingredients."  (*Id*.)

By failing to include numerous attributes that his own survey shows are important purchase drivers, Mr. Boedeker artificially inflated the importance of and drew undue attention to the limited attributes he chose to present to respondents. (*See* Van Liere Report ¶¶ 113-16 (Mr. Boedeker's choice of attributes unnaturally exaggerated significance of statements Mr. Boedeker tested); Ugone Report ¶¶ 58-62.)  This failure also prevented Mr. Boedeker from measuring whether (and to what extent) the omitted attributes affected the impact of the included attributes. For example, respondents who place value on the Monster Energy® brand may associate high quality products with the brand, and therefore place less incremental value on attributes like "hydrates like a sports drink."  (Ugone Report ¶ 62.)

Finally, although Mr. Boedeker admits that "[f]lavor appears to be the most important attribute" to Monster Energy® drink purchasers (Boedeker Report ¶ 86), he included flavors that do not correspond to Original Green® or Rehab® as options.  Instead, he included as flavor options "Coffee & Mocha," "Cola," and "Original Sweet & Sour."  (*Id*. Ex. B at 18-30.)  This compromises the reliability of his results.  (Ugone Report ¶ 70(c).)

21

### 3.     Mr. Boedeker failed to replicate market conditions.

Mr. Boedeker's methodology also is fundamentally flawed because his survey did not replicate at all how consumers would actually encounter the Original Green® or Rehab® and the Challenged Statements in the marketplace.  Putting aside that he never showed respondents three of the four Challenged Statements, Mr. Boedeker presented respondents with a choice menu of attributes that is not based on how the cans appear in real life and does not reflect how consumers would organize their thinking about the contested portions of the product labels.  For example, Mr. Boedeker's choice menu gave equal visibility to all the attributes when, in reality, the Challenged Statements appear on different parts of the cans in different fonts and sizes.  Or, for example, Mr. Boedeker's choice menu omitted all sorts of other information consumers in real life would receive from the product label, such as a nutritional fact panel and the prominent statements on Rehab® products that they are "10 calories" and "non-carbonated."

This profound disconnect between how respondents encountered the products in Mr. Boedeker's survey and how consumers would encounter the products in real life renders the results unreliable.  *See THOIP v. Walt Disney Co.*, 690 F.Supp.2d 218, 241 (S.D.N.Y. 2010) (excluding survey because it "failed to replicate actual marketplace conditions in which consumers encountered the products at issue" and therefore it was "not a reliable indicator of consumer confusion"); *see also* Van Liere Report ¶¶ 99-107 (Mr. Boedeker's failure to replicate market conditions render his conclusions unreliable).

## V.     CONCLUSION

Mr. Boedeker's survey fails to address the materiality of the Challenged Statements to purchasing decisions—the relevant inquiry on Plaintiffs' class certification motion.  His report provides conclusions that his survey results do not support, and his findings are irrelevant.  Finally, Mr. Boedeker committed numerous methodological errors in designing his survey—errors that violate the

1  very standards and criteria that Plaintiffs' survey expert identifies as generally

2  accepted within the field.

3        For the foregoing reasons, Defendants respectfully request that the Court

4  exclude Mr. Boedeker's report and testimony.

5

6  Dated:  October 16, 2017          MORRISON & FOERSTER LLP

7

8                            By:  */s/ Dan Marmalefsky*

9                               Dan Marmalefsky

10                              ***Attorneys for Defendants***
                            ***Monster Beverage Corporation and***
                            ***Monster Energy Company***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 16th day of October, 2017, the foregoing document was filed electronically on the CM/ECF system, which caused all CM/ECF participants to be served by electronic means.

*/s/ Dan Marmalefsky*
Dan Marmalefsky
***Attorneys for Defendants***
***Monster Beverage Corporation***
***and Monster Energy Company***