1  Azra Z. Mehdi (220406)
2  azram@themehdifirm.com
   THE MEHDI FIRM, PC
3  One Market
4  Spear Tower, Suite 3600
   San Francisco, CA 94105
5  (415) 293-8039
6  (415) 293-8001 fax

7  *Counsel for Plaintiffs and the [Proposed] Class*

8              **IN THE UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

10
11  TOWNSEND, et al.,                    CASE NO. 5:12-cv-02188 VAP (KKx)

12              Plaintiffs,              **PLAINTIFFS' OPPOSITION TO
                                         DEFENDANTS' MOTION TO
13  v.                                   STRIKE THE EXPERT REPORT
                                         AND TESTIMONY OF STEFAN
14                                       BOEDEKER UNDER FED. R. EVID.
15  MONSTER BEVERAGE                     702**
    CORPORATION, et al.,
16
17              Defendants.              DATE:     January 29, 2018
                                         TIME:     2:00 p.m.
18                                       JUDGE:    Honorable Virginia A. Phillips
                                         CTRM:     8A
19
20                                       Trial Date:   None
21                                       Date Action Filed: December 12, 2012
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................. 1

II.   FACTUAL BACKGROUND.............................................................................. 2

III.  LEGAL STANDARD FOR EVALUATING EXPERT OPINIONS IN CONNECTION WITH CLASS CERTIFICATION ........................................... 4

IV.  LEGAL ARGUMENT ........................................................................................ 6

    A.    Mr. Boedeker is Imminently Qualified to Opine on Damages ................. 6

    B.    Mr. Boedeker's Opinion is Relevant and Will Help the Jury to Understand the Evidence Regarding the Calculation of Damages........... 6

    C.    Mr. Boedeker's Opinion and Testimony Is Based on Scientific Principles and Supported by Facts and Data and Appropriately Applied to the Facts of This Case.................................................................. 8

    D.    Mr. Boedeker's Proposed Damages Methodology Is Reliably Connected to Plaintiffs' Theory of Liability ................................................ 11

          1.    Conjoint Analysis Is a Reliable and Accepted Method for Calculating Classwide Damages.......................................................... 11

          2.    Mr. Boedeker's Proposed Damages Model Satisfies Comcast ..................................................................................................... 11

          3.    Defendants Misrepresent Mr. Boedeker's Damages Model – Their Arguments that It Cannot be Used to Calculate Restitution Is Plain Wrong ................................................................. 14

    E.    Defendants' Criticisms of Mr. Boedeker's Opinion Are Without Merit and Go, at Most, to The Weight of The Testimony ...................... 17

          1.    Mr. Boedeker's Expertise Is Not in Interpreting Words on A Label, But Whether The Presence or Absence of Those Words Impacts The Price of That Product.................................... 17

          2.    Defendants' Exaggeration of Methodological Errors in Mr. Boedeker's Study Should be Discounted.......................................... 20

V.    CONCLUSION ................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 11-CV-01846-LHK, 2012 U.S. Dist. LEXIS 90877
   (N.D. Cal. June 29, 2012) ......................................................................21, 23

*Astiana v. Kashi Co.*,
   291 F.R.D. 493 (S.D. Cal. 2013) .......................................................................7

*Belfiore v. Procter & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. 2015) .........................................................................8

*Bimbo Bakeries USA, Inc. v. Sycamore*,
   No. 2:13-cv-00749, 2017 U.S. Dist. LEXIS 57805
   (D. Utah Mar. 2, 2017) ............................................................................ 9, 10, 24

*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-CV-01831-LHK, 2014 U.S. Dist. LEXIS 157575
   (N.D. Cal. Nov. 6, 2014) ...................................................................................16

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*,
   383 F.3d 110 (3d Cir. 2004) .............................................................................21

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ........................................................................5, 9

*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663, 38 Cal. Rptr. 3d 36 (2006) .........................................14

*Comcast Corp. v. Behrend*,
   569 U.S. 27, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) ........................ 1, 11, 12, 13

*In re ConAgra Foods, Inc. ("ConAgra II")*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015), *aff'd sub nom., Briseno v. ConAgra
   Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), *cert. denied,* 2017 U.S. LEXIS
   6249, 2017 WL 1365592 (Oct. 10, 2017)......................................................8, 9, 11

*Corcoran v. CVS Health*,
   No. 15-cv-03504-YGR, 2017 U.S. Dist. LEXIS 143327
   (N.D. Cal. Sept. 5, 2017)....................................................................................4

PLS. OPP. MTN. STRIKE EXPERT BOEDEKER          5:12-cv-02188 VAP (KKx)

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) .............................. 4, 5, 8, 11

*In re Dial Complete Mktg. & Sales Practices Litig.,*
    320 F.R.D. 326 (D. N.H. Mar. 27, 2017).................................................*passim*

*Dyson, Inc. v. Bissell Homecare, Inc.,*
    951 F. Supp. 2d 1009 (N.D. Ill. 2013) ........................................................18

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) ..................................................................4, 6

*Fisher v. Monster Beverage Corp.,*
    656 Fed. Appx. 819 (9th Cir. 2016).............................................................19

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,*
    618 F.3d 1025 (9th Cir. 2010) ...............................................................9, 19

*Guido v. L'Oreal, USA, Inc.,*
    No. 2:11-cv-01067-CAS(JCx), 2014 U.S. Dist. LEXIS 165777
    (C.D. Cal. July 24, 2014) .............................................................. 7, 11, 18

*Jinro Am. Inc. v. Secure Inv., Inc.,*
    266 F.3d 993 (9th Cir. 2001) ....................................................................5

*Kennedy v. Collagen Corp.,*
    161 F.3d 1226 (9th Cir. 1998).....................................................................5

*Khoday v. Symantec Corp.,*
    93 F. Supp. 3d 1067 (D. Minn. 2015) .........................................................11

*Korolshteyn v. Costco Wholesale Corp.,*
    No. 3:15-cv-709-CAB-RBB, 2017 U.S. Dist. LEXIS 38192
    (S.D. Cal. Mar. 16, 2017) .........................................................................8

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ...............................5

*Morales v. Kraft Foods Grp., Inc.,*
    No. LA CV14-04387, 2017 U.S. Dist. LEXIS 97433
    (C.D. Cal. June 9, 2017).......................................................................*passim*

*In re MyFord Touch Consumer Litig.,*
    No. 13-CV-03072-EMC, 2016 U.S. Dist. LEXIS 179487
    (N.D. Cal. Sept. 14, 2016) ...............................................................6, 9, 13

-iii-

*Nelson v. Mead Johnson Nutrition Co.*,
  270 F.R.D. 689 (S.D. Fla. 2010) ........................................................8

*NewCal Indus., Inc. v. IKON Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) .........................................................19

*In re NJOY Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ..............................................5

*Pulaski & Middleman LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ...........................................................14

*Sanchez-Knutson v. Ford Motor Co.*,
  310 F.R.D. 529 (S.D. Fla. Oct. 6, 2015) ...........................................11

*Schellenbach v. GoDaddy.com, LLC.*,
  No. CV-16-00746-PHX-DGC, 2017 U.S. Dist. LEXIS 105115
  (D. Ariz. July 7, 2017) .......................................................................7

*Senne v. Kansas City Royals Baseball Corp.*,
  315 F.R.D. 523 (N.D. Cal. 2016) ........................................................4

*In re SFPP Right-Of-Way Claims*,
  No. SACV 15-00718, 2017 U.S. Dist. LEXIS 85973
  (C.D. Cal. May 23, 2017) ...................................................................4

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) .........................................................20

*Spann v. J.C. Penney Corp.*,
  307 F.R.D. 508 (C.D. Cal. 2015), *modified*, 314 F.R.D. 312
  (C.D. Cal. 2016) .................................................................................4

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012) ................................................1, 4, 6

*United States v. Pritchard*,
  993 F. Supp. 2d 1203 (C.D. Cal. 2014) ...........................................4, 6

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ...................4

*Weiner v. Snapple Bev. Corp.*,
  No. 01-civ-8742 (DLC), 2010 U.S. Dist. LEXIS 79647
  (S.D.N.Y. Aug. 3, 2010)................................................................15, 16

*Wendt v. Host Int'l, Inc.,*
  125 F.3d 806 (9th Cir. 1997) ........................................................................20

**Statutes, Rules, & Regulations**

Federal Rules of Civil Procedure
  Rule 23 ........................................................................................................4

Federal Rules of Evidence
  Rule 702........................................................................................1, 5, 6

**Secondary Authorities**

Brian Orme, *Formulating Attributes and Levels in Conjoint Analysis,*
  Sawtooth Software Research Papers Series (2002) .........................................18

Lancaster, Kelvin J., *A New Approach to Consumer Theory,*
  Journal of Political Economy 74 (2) (1966) ...............................................18

## I.   **INTRODUCTION**

Defendants' motion improperly attempts to propel the Court towards a merits-based class certification analysis, when in fact at this early stage of litigation all Plaintiffs must do is show that their expert's testimony is relevant, reliable, and useful to the evaluation of class certification and the trier of fact. *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012). Where damages are sought on a class-wide basis, it must be shown that their calculation is subject to common proof. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013). Plaintiffs have done that here by retaining the well-qualified and highly experienced Statistician and Economist, Stefan Boedeker. Mr. Boedeker submitted an expert report in connection with Plaintiffs' motion for class certification. [ECF 95-6] ("Boedeker Rpt."). He provided just over 7 hours of testimony on September 20, 2017.[1] His opinions and testimony are relevant and reliable and will assist the trier of fact in understanding the economic damages model Plaintiffs propose to use in this case. Defendants have moved to strike his report and testimony.  Defendants' Motion to Strike the Expert Report and Testimony of Stefan Boedeker Under Federal Rule of Evidence 702. [ECF 109]. ("Def. Mem.").

Defendants' innumerable criticisms bear highlighting for what they concede Mr. Boedeker's damages model accomplishes.  First and foremost, they concede that the survey results and conclusions relating to the "Hydrates like a Sports drink" misstatement are valid. *See* Def. Mem. at 7-13. Significantly, neither Defendants, nor their experts disprove, refute, or rebut various aspects of Mr. Boedeker's proposed

---

[1] Declaration of Azra Z. Mehdi in Support of Plaintiffs' Opposition to Defendants' Motion to Strike the Expert Report and Testimony of Stefan Boedeker under Federal Rule of Evidence 702 ("Mehdi Decl."), Ex. 1.

damages model, underscoring the futility of their challenges.[2] Instead, the vast majority of Defendants' challenges improperly address the merits of Plaintiffs' class certification motion or are entirely without merit. If entertained by the Court at all, Defendants' criticisms go toward the weight, not the admissibility of Mr. Boedeker's opinion and testimony. Defendants' Motion to Strike should be denied.

## II.   FACTUAL BACKGROUND

On June 26, 2017, Plaintiffs Matthew Townsend and Ted Cross filed a motion for certification of the following two nationwide classes:

i)    All persons who purchased the original Monster Energy drink for personal use and not for resale from December 12, 2008 to the present ("Monster Energy" Class); and

ii)   All persons who purchased Monster Rehab Tea + Lemonade + Energy, Monster Rehab Rojo Tea + Energy, Monster Rehab Green Tea + Energy, Monster Rehab Protean + Energy, and Monster Rehab Tea + Orangeade + Energy (collectively "Monster Rehab") for personal use and not for resale from March 1, 2011 to the present.

The specific label misstatements at issue and the product on which they appear are:

(1)    "Hydrates Like a Sports Drink" (Monster Rehab).

(2)    "RE-HYDRATE" (Monster Rehab).

(3)    "Consume Responsibly – Max 1 can every 4 hours, with limit 3 cans per day. Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing." (Monster Energy and Monster Rehab).

---

[2] Specifically, Defendants do not and cannot refute Mr. Boedeker's (i) theoretical economic damages model, (ii) the econometric method to model consumer choice preference, (iii) the statistical method of Hierarchical Bayesian Estimation, (iv) the methodology and application of market simulations performed, or (v) the confidence interval measurements of 95% with a less than +/-3% error presented as part of his damages model in the Boedeker Report.

2

(4)     "It's the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can." (Monster Energy).

Mr. Boedeker's task was simple – to develop an economic loss model to quantify the damages, if any, suffered by the proposed class that are attributable to the four misstatements identified above.  Boedeker Rpt. ¶4.

Mr. Boedeker designed an empirical study using generally accepted principles to collect raw data from Monster energy drink purchasers, which was then implemented by a reputable survey company. Using the results of the study, Mr. Boedeker then developed an econometric/statistical model to demonstrate (1) that there is a reliable methodology to estimate class-wide damages; (2) this methodology could isolate the value that purchasers of Monster branded energy drinks place on the presence or absence of one or more misstatements on the label; and (3) this methodology could then be used to calculate class wide damages. *Id.* Sections IV.C. & D., *infra*, enumerate the details of Mr. Boedeker's methodology, which is founded upon reliable scientific principles and supported by facts and data, and how the data is helpful to the trier of fact.

After conducting his meticulously designed survey, Mr. Boedeker logically and reliably concluded that:

(1) the economic loss from the "Hydrates like a Sports drink" misstatement is $0.66; Re-Hydrate is $0.41; Ideal Combo is $0.58 and Consume Responsibly is $1.61 (Boedeker Rpt. ¶¶116-118; 123-133);

(2) the small margins of error (+/-3% or less) at high levels of statistical confidence (95%) is strong evidence that the preferences and choices of the survey respondents show a large degree of homogeneity and that the misstatements had a material impact on the demand for Monster branded energy drinks because without the misstatements, putative class members would have paid a lower price (*Id.* ¶¶123-127);

(3) the proof of concept model proposed could be used to expand the results of the conjoint study to a complete model in order to calculate class-wide damages (or

3

additional aspects as the Court deems necessary) in the merits phase by multiplying the economic loss per unit as established above with the number of units purchased by class members during the class period. (*Id.* ¶133).

### III. LEGAL STANDARD FOR EVALUATING EXPERT OPINIONS IN CONNECTION WITH CLASS CERTIFICATION

"Expert testimony is liberally admitted under the Federal Rules." *United States v. Pritchard*, 993 F. Supp. 2d 1203, 1207 (C.D. Cal. 2014). On a motion for class certification, courts apply *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) to expert testimony. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). "[A]t the class certification stage, district courts are not required to conduct a full *Daubert* analysis. Rather, district courts must conduct an analysis tailored to whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance." *Tait*, 289 F.R.D. at 495. In *Tait*, the Court exhaustively analyzed *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011), Ninth Circuit precedent including *Ellis*, and extra-circuit precedent, to conclude that *Dukes* does not require a complete *Daubert* analysis and that *Ellis* suggests district courts only have to apply a tailored approach. *Id.* Since *Tait*, other Ninth Circuit district courts have adopted its analysis. "[A]t this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." *Corcoran v. CVS Health*, No. 15-cv-03504-YGR, 2017 U.S. Dist. LEXIS 143327, at *9-*10 (N.D. Cal. Sept. 5, 2017) (citations omitted). *See also In re SFPP Right-Of-Way Claims*, No. SACV 15-00718 JVS (DFMx), 2017 U.S. Dist. LEXIS 85973, at *7-*9 (C.D. Cal. May 23, 2017); *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 587 (N.D. Cal. 2016), *on reconsideration in part*, No. 14-CV-00608-JCS, 2017 U.S. Dist. LEXIS 32949, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017); *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 516 (C.D. Cal. 2015), *modified*, 314 F.R.D. 312 (C.D. Cal. 2016).

4

1    Generally, expert testimony is admissible if the party offering such evidence

2    shows that the testimony is both reliable and relevant. Fed. R. Evid. 702; *Kumho Tire Co.*

3    *v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *Daubert*, 509 U.S.

4    at 590-91.  Federal Rule of Evidence 702 permits expert testimony if

5         (a) the expert's scientific, technical, or other specialized knowledge will

6         help the trier of fact to understand the evidence or to determine a fact in

7         issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

8         is the product of reliable principles and methods; and (d) the expert has

9         reliably applied the principles and methods to the facts of the case.

10    Fed. R. Evid. 702. "'Disputes as to the strength of [an expert's] credentials, faults in his

11    use of [a particular] methodology, or lack of textual authority for his opinion, go to the

12    weight, not the admissibility, of his testimony.'" *Kennedy v. Collagen Corp.*, 161 F.3d 1226,

13    1231 (9th Cir. 1998) (quoting *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.

14    1995)). The Advisory Committee notes to Rule 702 concerning the 2000 amendment

15    explains that the addition of a requirements that the expert's testimony be based on

16    "'sufficient facts or data' [was] not intended to authorize a trial court to exclude an

17    expert's testimony on the ground that the court believes one version of the facts and not

18    the other." *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1070-71 (C.D.

19    Cal. 2015) (internal quotations and citations omitted).

20    Testimony is "relevant" if the knowledge underlying it has a "valid connection to

21    the pertinent inquiry." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir.

22    2014). An expert's opinion rests on a "reliable foundation" if it is rooted "in the

23    knowledge and experience of the relevant discipline." *Id.* at 1043-44. The test for

24    reliability is flexible and depends on the discipline involved. *Kumho*, 526 U.S. at 141; *see*

25    *also Jinro Am. Inc. v. Secure Inv., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) ("Rule 702 is

26    applied consistent with 'the liberal thrust' of the Federal Rules and their 'general

27    approach of relaxing the traditional barriers to "opinion testimony."') (citation omitted).

28    Furthermore, the exclusion of expert testimony is "the exception rather than the rule."

See Fed. R. Evid. 702, Advisory Committee Note to 2000 amendment. On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff's claims; instead, the testimony must be relevant in assessing "whether there was a common pattern and practice that could affect the class *as a whole*." *Ellis*, 657 F.3d at 983 (emphasis in original). Boedeker's opinion and testimony meet all the applicable standards here.

## IV. LEGAL ARGUMENT

### A. Mr. Boedeker is Imminently Qualified to Opine on Damages

There is no question Mr. Boedeker is highly qualified in the relevant field of expertise, i.e., economics and statistics. Defendants do not even attempt to challenge Mr. Boedeker's qualifications, but they bear noting here. For a complete recitation of Mr. Boedeker's impressive academic history, Plaintiffs respectfully refer the Court to his Report and accompany curriculum vitae. Boedeker Rpt. ¶2, Ex. A. Mr. Boedeker is currently a Managing Director at the Berkeley Research Group and specializes in the application of economic, statistical, and financial models to economic impact studies, complex litigation cases and other business issues. *Id.* at ¶3, at 53-66. Mr. Boedeker has over 25 years of experience in the application of economic, statistical, and financial models to a variety of areas, including complex litigation. *Id.* at ¶4. Mr. Boedeker's methodologies have been accepted by many federal courts, including in California. *See, e.g., In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326 (D. N.H. Mar. 27, 2017); *In re MyFord Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 U.S. Dist. LEXIS 179487 (N.D. Cal. Sept. 14, 2016). Mr. Boedeker is qualified not only by education and training, but also by knowledge, skill and experience. *United States v. Pritchard*, 993 F. Supp. 2d 1203, 1209 (C.D. Cal. 2014).

### B. Mr. Boedeker's Opinion is Relevant and Will Help the Jury to Understand the Evidence Regarding the Calculation of Damages

As stated, at this stage of litigation it is imperative only that Mr. Boedeker's testimony is relevant, reliable, and useful to the trier of fact and Court. *Tait*, 289 F.R.D.

6

at 495.  The objective of Mr. Boedeker's survey, report, and testimony was to show that an economic model can be established for calculating classwide damages attributable to the label misstatements and to show whether the misstatements had a material impact. Mr. Boedeker's study has done just that by determining the amount a purchaser overpaid for the mislabeled Monster branded energy drinks, thus assisting the trier of fact to understand issues relating to the proper methodology for the calculation of damages with respect to each misstatement.  Mr. Boedeker's opinion will likewise assist the Court in determining the classwide applicability of his damages calculation.

Notably, Plaintiffs need not show on class certification that they paid a premium for Monster branded energy drinks due to the presence or absence of certain misrepresentations or omissions.  Instead, they must merely provide a method for calculating that premium on a classwide basis. Indeed, the Central District has specifically addressed this point in *Guido v. L'Oreal, USA, Inc.*, No. 2:11-cv-01067-CAS(JCx), 2014 U.S. Dist. LEXIS 165777, at *23 (C.D. Cal. July 24, 2014). There, the Court held that the actual results of conjoint models "are irrelevant to commonality and predominance," and "[a]ll that matters is that the premium can be determined for each class member 'in one stroke.'"[3]

Mr. Boedeker's computer-generated statistical market simulation calculations demonstrated a 95% confidence level (+/- less than 3% margin of error) for the price premium attributable to each misstatement, which he concluded demonstrates materiality. Boedeker Rpt. ¶¶123-127, 131. Defendants' unsupported criticism of materiality, should be rejected. At this stage of the litigation, Plaintiffs are not even required to prove materiality. *Schellenbach v. GoDaddy.com, LLC.*, No. CV-16-00746-PHX-DGC, 2017 U.S. Dist. LEXIS 105115, at *15 (D. Ariz. July 7, 2017). Rather, Plaintiffs must simply demonstrate that materiality is capable of resolution as a common question of fact at the merits stage, which they clearly have.  *Astiana v. Kashi Co.*, 291 F.R.D. 493,

---

[3] For this reason, Defendants' complaints about the unreasonableness of the amount of price premium are irrelevant at this stage. Def. Mem. at 5, 18-19, n.12.

PLS. OPP. MTN. STRIKE EXPERT BOEDEKER          5:12-cv-02188 VAP (KKx)

505 (S.D. Cal. 2013).  Similarly, Defendants are wrong that Plaintiffs must show reliance on the misstatements on a classwide basis. Def. Mem. at 14. "[T]he determination of materiality, and thus reliance, is determined using objective criteria that apply to the entire class and do not require individualized determination." *Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-cv-709-CAB-RBB, 2017 U.S. Dist. LEXIS 38192, at *7-*8 (S.D. Cal. Mar. 16, 2017) (internal citations and quotations omitted).[4]

It is apparent that Defendants either misunderstood the purpose of Mr. Boedeker's opinion or intentionally mischaracterized it. Contrary to Defendants' misdirection, Mr. Boedeker was not measuring (1) purchasers' intent or thought processes leading to a purchase decision; (2) purchasers' understanding or interpretation of the misstatements; or (3) whether purchasers specifically relied on the misstatements. Nor was Mr. Boedeker required to measure any of the above to show that a methodology exists for calculating class-wide damages. Thus, Defendants' assertion that Mr. Boedeker's study should be excluded as unhelpful to the trier of fact is grossly inaccurate.

## C.   Mr. Boedeker's Opinion and Testimony Is Based on Scientific Principles and Supported by Facts and Data and Appropriately Applied to the Facts of This Case

Mr. Boedeker followed generally accepted methodologies, including the criteria set forth in the Reference Guide on Survey Research (3d ed.). The conclusions that flow from his research and analysis are valid and reliable.  It is well established in this Circuit that, "'as long as they are conducted according to accepted principles,' survey evidence should ordinarily be found sufficiently reliable under *Daubert*." *In re ConAgra Foods, Inc. ("ConAgra II")*, 90 F. Supp. 3d 919, 949 (C.D. Cal. 2015), *aff'd sub nom., Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), *cert. denied,* 2017 U.S. LEXIS 6249, 2017 WL

---

[4] *See also Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 n.2 (S.D. Fla. 2010) ("Ostensibly, a deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice. Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have. Consequently, the consumer suffers damages."); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 63 (E.D.N.Y. 2015) ("the injury is the price premium on every product sold").

1365592 (Oct. 10, 2017) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997)). *See also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1036 (9th Cir. 2010) ("survey evidence should be admitted [if it is] conducted according to accepted principles and [is] relevant") (internal quotation marks and citations omitted). "The Ninth Circuit has held that typically '[c]hallenges to survey methodology go to the weight given the survey, not its admissibility.'" *ConAgra II*, 90 F. Supp. 3d at 949 (collecting cases and quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)).

Mr. Boedeker's opinion rests on a reliable foundation, namely his extensive knowledge and expertise regarding statistics and economics, as well as his court-approved experience in the economic damages model he has proposed. *See, e.g., In re Dial Complete*, 320 F.R.D. 326; *In re MyFord Touch*, 2016 U.S. Dist. LEXIS 179487. Thus, his opinion is rooted "'in the knowledge and experience of the relevant discipline.'" *City of Pomona*, 750 F.3d at 1044 (citation omitted).

As Mr. Boedeker explains, a multi-step conjoint, Mixit Logit and Heirarchical Bayesian analysis can be used to determine whether Defendants' misstatements resulted in a price premium; to quantify that price premium, and to demonstrate that a methodology exists to calculate the resulting total dollar value of class-wide damages. The conjoint analysis methodology is comprised of three steps: data collection, data analysis, and, finally, damages calculation.

In order to collect data, Mr. Boedeker designed a survey and commissioned Amplitude Research, a globally reputable company to perform an online internet survey. Boedeker Rpt. ¶¶54-66. Courts accept the Internet as a proper method for conducting surveys and defendants do not challenge it. *Bimbo Bakeries USA, Inc. v. Sycamore*, No. 2:13-cv-00749, 2017 U.S. Dist. LEXIS 57805, at *9-*10 (D. Utah Mar. 2, 2017). To combat the criticism that internet surveys sometimes do not conform with the requirement for statistically random samples, Mr. Boedeker applied advanced statistical and re-sampling methods to obtain precision estimates and approximate confidence

PLS. OPP. MTN. STRIKE EXPERT BOEDEKER          5:12-cv-02188 VAP (KKx)

intervals at the customary 95% level to his survey results. Boedeker Rpt. ¶¶60-61; 119-127. Mr. Boedeker then used a well-accepted and recognized Choice Based Conjoint ("CBC") study to gather data regarding the perceived value of Monster branded energy drinks attributes and features, especially the specific misstatements at issue here. *Id.* ¶¶82-97.  Mr. Boedeker's survey was implemented in a relevant population sample of 912 respondents (of which 312 were screened out because they did not purchase Monster products) and from the remaining 600 respondents collected 1,536 price-attribute consumer preference CBC data points. *Id.* ¶¶83, 115.  Mr. Boedeker aimed to achieve a balance of demographics representative of the energy drink marketplace, as observed in the Mintel Study.  *Id.* ¶¶83, 88.  Of the 912 survey respondents who consume energy drinks, 32% are males aged 18-34, while 21% are females aged 18-34, 6% of respondents are males aged 55+ and 5% are females aged 55+ Boedeker Rpt. ¶83; (Figure 8).

Mr. Boedeker designed the survey to adhere to proper survey design criteria: it was balanced, orthogonal, and avoided order bias by randomizing the order in which the attributes in each choice set were set displayed. *Id.* ¶¶96-97.   By designing the CBC survey in this manner, Mr. Boedeker maximized the survey's efficiency and its ability to produce statistically significant data with calculable error rates. *Id.*

The survey was conducted in a "double-blind" fashion - neither Amplitude staff, nor the survey respondents were aware of the survey sponsor or the ultimate intention of the survey. *Id.* ¶¶64, 90. The data collection and initial tabulation was performed automatically and concurrent with online responses to minimize human input and possible error. *Id.* Additional quality control measures were implemented, including a demographic cross-check, elimination of respondents who indicated a failure or unwillingness to understand or adhere to survey guidelines, monitoring survey completion time, review of text field responses, straight-line testing, and other filtering techniques that result in superior data and higher quality feedback. *Id.* ¶65.  As detailed below, in addition to the conjoint analysis, Mr. Boedeker applied statistical and

10

1  econometric analysis to the raw data from the survey to estimate the price premium
2  attributable to each of the misstatements. *Id.* ¶¶73-81, 98-118.

3  Clearly, Mr. Boedeker was aware of, and properly designed his study to prevent,
4  any bias or error which would affect the data. Likewise, he employed generally accepted
5  principles in his survey design and relied on his own extensive experience. Thus, Mr.
6  Boedeker's opinions and testimony are relevant, reliable, and should be admitted.

**D.    Mr. Boedeker's Proposed Damages Methodology Is Reliably Connected to Plaintiffs' Theory of Liability**

**1.    Conjoint Analysis Is a Reliable and Accepted Method for Calculating Classwide Damages**

10  Courts routinely admit evidence based on a conjoint analysis under *Daubert*,
11  including within this District. *See, e.g., ConAgra II*, 90 F. Supp. 3d at 1027 (granting class
12  certification, recognizing that "[c]onjoint analysis is regularly used in litigation to
13  translate the 'relative importance' of a product feature into a price premium paid by
14  consumers); *Guido*, 2014 U.S. Dist. LEXIS 165777, at *19 (holding that plaintiff's
15  expert's proposed conjoint analysis damages theory was not junk science, could be
16  applied on a class-wide basis for predominance purposes under *Comcast*, and was
17  consistent with plaintiff's theory of liability); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d
18  1067, 1082 (D. Minn. 2015) ("[C]onjoint analysis is generally a permissible method for
19  calculating damages."); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D.
20  Fla. Oct. 6, 2015) (rejecting as "unfounded" argument "that conjoint analysis, an analytic
21  survey method used to measure customer preferences for specific features of products,
22  is an improper damages theory post-*Comcast*"). Thus, a conjoint damages model has
23  wide acceptance.

**2.    Mr. Boedeker's Proposed Damages Model Satisfies Comcast**

25  Mr. Boedeker's damages model is consistent with *Comcast Corp.*, where the Court
26  held that plaintiffs must tie their damages theory to their liability theory, that their
27  damages theory must be subject to calculation by a "common methodology," and that
28  the damages theory be sufficiently described so that the district judge may perform

11

1   "rigorous analysis" of the same. *Comcast Corp.*, 569 U.S. at 34-35.

2         Plaintiffs' theory of liability is simple – Defendants sold cans of Monster Energy

3   and Monster Rehab that bore labels Plaintiffs allege were materially false and misleading.

4   Purchasers of such cans with the label misstatements paid a premium when they

5   purchased such mislabeled cans. Because of the presence of the misstatements and the

6   absence of any safety warnings, the true market price of Monster Energy and Monster

7   Rehab was substantially lower than the price actually paid by such purchasers.  "Price

8   premium" refers to the portion of Monster Energy and Monster Rehab's overall

9   purchase price attributable to the respective elements that the label indicated it provided,

10  but did not, and is a proper measure of class-wide damages.

11        Based on Mr. Boedeker's expert knowledge in the field of economics and statistics

12  and his understanding of the fundamental economic principle that price in a competitive

13  market is set by the intersection of supply and demand curves, Mr. Boedeker designed a

14  reliable damages model directly applicable to Plaintiffs' theory of liability. First, Mr.

15  Boedeker's survey determines consumer willingness-to-pay (i.e., demand) for the Ideal

16  Combo, RE-HYDRATE, Hydrates Like a Sports Drink, and Consume Responsibly

17  misstatements through a CBC survey. Boedeker Rpt. ¶¶53-72, 86-97.[5]  With the reliably

18  attained 1,536 CBC data points, Mr. Boedeker analyzed the data using well-accepted

19  econometric and statistical estimation techniques based on Mixit Logit Modeling and

20  Hierarchical Bayesian Estimation to quantify consumer willingness-to-pay for a Monster

21  branded energy drink. *Id.* ¶¶73-81, 98-107.  Next, Mr. Boedeker employed computer-

22  based market simulations to convert consumer willingness-to-pay into actual market

23  value isolating the price premium paid for each of the misstatements by calculating the

24  difference in equilibrium market value price premium and actual market value of

25  Monster energy drinks, both with and without the four attributes at issue.  *Id.* ¶¶108-

26  ――――――――――
27  [5] Like in the *Dial* case, "Boedeker's model is one in which quantity (the number of products with the offending claims actually sold) is held constant on the demand/supply graph in determining the likely market price of the product without the offending claim if sold in the actual market." *In re Dial Complete*, 320 F.R.D. 326, 2017 U.S. Dist LEXIS 44383, at *31.

28

12

118.  Mr. Boedeker's model identified the price premium attributable to each of the misstatements as follows: "Hydrates like a Sports drink" ($0.66); Re-Hydrate ($0.41); Ideal Combo ($0.58); and Consume Responsibly ($1.61).  *Id.* ¶¶116-118.

By isolating the premium paid for the contested attributes, Mr. Boedeker was able to measure what the equilibrium market price for Monster branded energy drinks would have been had Defendants not placed the misleading labels on Monster Energy and Monster Rehab drinks. As a cross-check, he calculated approximate 95% confidence intervals by creating 100 samples and tabulating all the results from all re-sampling iterations, which showed that the median economic value loss results only varied by a margin of (+/- 3%), indicating statistical significance and thus further reinforcing the reliability of his damages model and economic loss value results.  *Id.* ¶¶123-127. In this way, Mr. Boedeker ensured that Plaintiffs' proposed damages model was specifically tied to their liability theory, readily satisfying *Comcast.* As Mr. Boedeker explains, determining total class-wide damages would then require no more than multiplying the price premium isolated per unit with the total number of units purchased by class members to arrive at a reasonable and reliable measure thereof. *Id.* ¶133.

Damages models designed by Mr. Boedeker, substantially similar to the one proposed here, have already been accepted by other courts. *See, e.g., In re Dial Complete*, 320 F.R.D. 326 (certifying class based on Boedeker's model proposing to calculate the "Marginal Consumer's Willingness to Pay" for that product in the actual market in which the products with the allegedly false claims were sold" is capable of reliably calculating class-wide damages recoverable under the plaintiffs' theories of liability); *In re Myford Touch*, 2016 U.S. Dist. LEXIS 179487, at *49 (conjoint analysis "will allow the fact finder to calculate the diminution in value of Plaintiffs' vehicles" as a result of a faulty "infotainment" system).

### 3. Defendants Misrepresent Mr. Boedeker's Damages Model – Their Arguments that It Cannot be Used to Calculate Restitution Is Plain Wrong

As detailed above, there is little doubt that Mr. Boedeker's report and testimony present a reliable methodology for calculating restitution. "UCL and FAL restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Pulaski & Middleman LLC v. Google, Inc.*, 802 F.3d 979, 988-989 (9th Cir. 2015), applying *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 698, 38 Cal. Rptr. 3d 36 (2006). *See also Pulaski & Middleman LLC*, 802 F.3d at 989 ("the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information") (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329, 120 Cal. Rptr. 3d 741, 246 P.3d 877 (2011)).

Yet, relying on *Morales v. Kraft Foods Grp., Inc.*, No. LA CV14-04387 JAK (PJWx), 2017 U.S. Dist. LEXIS 97433 (C.D. Cal. June 9, 2017) and Defendants' expert Dr. Keith R. Ugone's apples-to-oranges analysis, Defendants contend that Mr. Boedeker's damages model cannot be used to calculate restitution or price premium charged in the real world because he relies solely on consumers' subjective values or their willingness to pay as a basis for damages. Def. Mem. at 16-19.

First, Defendants' assertion of Mr Boedeker's damages model is a blatant misrepresentation, a misreading of his report and disregard for his testimony. Mr. Boedeker testified exactly the opposite:

> [T]his "hydrates like a sports drink," . . . in the purchase situation, a purchaser reads that and I want to know what -- how does that impact the price they're willing to pay out of these choices that are offered. . . .But the subjective meaning of that to individual purchasers is really not what I'm measuring with my study, I'm measuring that they chose it in this combination and I'm using it to obviously calculate the relative utility that

14

1    this particular features carries with it.

2    Mehdi Decl., Ex. 1 at 178:4-20; *see also id.* at 197:11-16 ("The meaning of the statements

3    was not part of my survey . . . I never figured out the meaning or what the consumers

4    thought the meaning was to them subjectively."). Moreover, unlike the expert in *Morales*,

5    whose conjoint analysis damages methodology was entirely subjective and lacked any

6    market-based component," Mr. Boedeker's damages model, as noted above, includes

7    computer simulated market studies in order to translate willingness-to-pay responses

8    from the CBC survey data into the difference in implicit true market price or equilibrium

9    price that would have existed without the label misstatements. *See* Section IV.D.2, *supra*.

10   Clearly, an individual consumer's willingness to pay was not solely used to determine

11   economic loss, but rather to assess if a survey participant in the study would buy (or not

12   buy) a certain product combination. *Id.*[6] Defendants' reliance on *Morales* is misplaced

13   because the court's analysis of the conjoint analysis there is distinguishable. In *Morales*,

14   the court concluded that although willingness-to-pay is an appropriate means to measure

15   restitution damages that may be awarded for false advertising under applicable Ninth

16   Circuit law, because the *Morales* expert "did not measure the market value of the Product

17   either with the 'natural cheese' label or without it . . . [but] [r]ather [] measured how

18   much consumers value that label," it was an insufficient basis for calculating restitution.

19   2017 U.S. Dist. LEXIS 97433, at *72.

20       Similarly, Defendants' reliance on Dr. Ugone's wholesale price analysis to

21   challenge Mr. Boedeker's methodology, is both misplaced and dishonest.  Def. Mem. at

22   18-19. Defendants contend that *Weiner v. Snapple Bev. Corp.,* No. 01-civ-8742 (DLC), 2010

23   U.S. Dist. LEXIS 79647, at *32, n.19 (S.D.N.Y. Aug. 3, 2010) lends support for Dr.

24   Ugone's conclusion that "line pricing" is compelling evidence of a lack of price premium.

25   Def. Mem. at 18, n.11.  Not only does *Weiner* not stand for that proposition, this

26

27   [6] Defendants' assertion is belied not only by Mr. Boedeker's report and his deposition
     testimony, but also by the thousands of lines of code provided to Defendants in the
28   Mathematica program used by Mr. Boedeker showing elaborate statistical market
     simulations, further calling into question such a blatantly false assertion by Defendants.

conclusion was expressly rejected by Judge Lucy Koh in *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 U.S. Dist. LEXIS 157575, at *33 (N.D. Cal. Nov. 6, 2014), another case cited by Defendants: "Contrary to Dole's suggestion, the court in *Weiner* did not conclude that '"Snapple's use of line pricing was compelling evidence of no premium. . . . The court's footnote says nothing about whether line pricing itself implicates harm to consumers.'" *Id.* Judge Koh rejected Defendants' efforts to exclude expert testimony on the basis of use of retail price information. Indeed, Judge Koh found:

> That Dole employs line pricing and elects not to charge wholesalers a higher price for products labeled "All Natural Fruit" does not categorically mean that *consumers* do not value that label on their food products. Neither case Dole cites indicates that wholesaler line pricing in any way forecloses the existence of a consumer premium for products bearing the "All Natural Fruit" labeling claim.

*Id.* at *32-*33 (emphasis in original).[7]

Notably, analysis of wholesale prices is irrelevant in the context of certification of a class of individual consumers because as Defendants' concede Monster does not sell directly to consumers. Def. Mem. at 17, n.9. Regardless of the profitability of the product, the consumer would have overpaid if the demand for the product with the misstatements had been lower. More importantly, Dr. Ugone's analysis would provide unreliable results because consumers seeking to purchase Monster Energy or Monster Rehab are not faced with wholesale prices when they make the decision to buy the product based on information available to them at the point of purchase. Similarly, Dr. Ugone's assertion that there were no price increases or decreases upon the introduction

---

[7] Judge Koh rejected plaintiffs' expert's damages model for flaws not present in this case, which included among others, a failure to control for variables such as Dole's advertising expenditures, the prices of competing and complementary products, the disposable income of consumers, and population; relying solely on a coefficient lifted from an unrelated 2007 study on yogurt. *Id.* at *34-*35.

or removal of certain of the misstatements on the labels is based on incomplete data and hence not a credible challenge.

Mr. Boedeker has appropriately applied scientific principles and methods to the facts and data and arrived at a damages model that is sufficiently connected to Plaintiffs' theory of liability.

### E.   Defendants' Criticisms of Mr. Boedeker's Opinion Are Without Merit and Go, at Most, to The Weight of The Testimony

Defendants quibble about Mr. Boedeker's survey and methodology, mostly without support.  Even if any of their criticisms were supported, which, as shown below, they are not, none of them are valid reasons to exclude Mr. Boedeker's.

### 1.   Mr. Boedeker's Expertise Is Not in Interpreting Words on A Label, But Whether The Presence or Absence of Those Words Impacts The Price of That Product

Defendants criticize Mr. Boedeker's survey as not supporting his conclusions because he did not use the exact or entire wording of the Rehydrate, Consume Responsibly, and Ideal Combo misstatements.  Def. Mem. at 7-11. Firstly, Defendants do not challenge the use of the "Hydrates like a Sports Drink" misstatement, which when viewed with their acceptance of Mr. Boedeker's economic and statistical methodologies (*see supra* note 2), leads to the reasonable conclusion that they accept the economic loss value elicited from the presence of this misstatement on the label as valid, relevant, and reliable.

Mr. Boedeker's decision not to use the exact or entire wording of the remaining 3 misstatements was a professional judgement he was entitled to make. Mehdi Decl., Ex. 1 at 167:2-168:17, 188:3-14. It is not fatal to his opinion because the purpose of his study was not to measure a consumer's interpretation of those specific words. Rather, Mr. Boedeker testified repeatedly that the purpose of his study was to determine the impact of the presence or absence of the sentiment of the words on a consumer's decision to purchase and hence the impact on price. *Id.* at 17:24-18:23, 23:19-26:11, 35:1-17 ("See,

17

1   I'm not evaluating words, that's very important. I'm evaluating a product with a

2   particular set of attributes compared to a product with a different set of attributes all

3   associated with a price point and then I'm evaluating what does a participant

4   choose . . . ."); 146:14-23 ("My survey and my study is not about measuring meaning or

5   intention."); 167:2-19.

6          More importantly, one must view Mr. Boedeker's choice of attributes in the

7   context of the conjoint analysis he was performing.  Conjoint analyses "grow[] naturally

8   and directly out of research . . . conducted independent of the litigation" and have not

9   been "developed . . . expressly for purposes of testifying." *Guido*, 2014 U.S. Dist. LEXIS

10  165777, at *18 (citing *Daubert*, 43 F.3d at 1317).  The economic theory of choice

11  underlying conjoint analysis asserts that consumers view products as composed of

12  various attributes with different levels, placing a certain value on each of those

13  characteristics (the combination of attributes and levels). Boedeker Rpt. ¶¶34-52, relying

14  on Lancaster, Kelvin J., *A New Approach to Consumer Theory*, Journal of Political Economy

15  74 (2), at 132–157 (1966). Hence, in generating attributes and levels, it is recommended,

16  among other things that "levels should be concise statements with concrete meaning"

17  because "when faced with too much information, respondents often resort to

18  simplification strategies to deal with the difficulty of the task."  Mehdi Decl., Ex. 2 (Brian

19  Orme, *Formulating Attributes and Levels in Conjoint Analysis*, Sawtooth Software Research

20  Papers Series, at 1 (2002)).  Moreover, the exact wording matters in surveys when specific

21  language from one label is being compared to specific language on another label, for

22  example in trademark cases. *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009,

23  1021 (N.D. Ill. 2013) ("'standards for replicating market conditions for a consumer

24  confusion survey in a trademark infringement case cannot be applied wholesale'" to

25  cases alleging false advertising").

26         With respect to the "Ideal Combo" misstatement, Mr. Boedeker decided to leave

27  out the puffery portion of the statement ("to deliver the big bad buzz that only Monster

28  can"), rather than the actionable portion that is "quantifiable, that makes a claim as to

18

the 'specific or absolute characteristics of a product'" ("It's the ideal combo of the right ingredients in the right proportion") – another reasonable judgment call. *NewCal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (quoting *Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)). Additionally, by finding that "it is plausible that [the misstatements] were misleading," the Ninth Circuit already rejected Defendants' arguments of puffery. *Fisher v. Monster Beverage Corp.*, 656 Fed. Appx. 819, 823 (9th Cir. 2016).

In Mr. Boedeker's judgment, placing the entire statement into a single choice box would have overloaded the information on the choice menus, which could have created a bias due to simplification strategies or could have caused respondents to not completely read the information. Hence, Mr. Boedeker determined that he would use "concise statements" that fully captured the essence of the Rehydrate, Consume Responsibly, and Ideal Combo misstatements. Mehdi Decl., Ex. 1 at 145:17-20, 166:16-18. More importantly, the Rehydrate and Ideal Combo attributes were designed as a binary choice– the statement either appears on the label or it does not – appropriate criteria for the purpose here. *Id.* at.167:5-15.

The goal of the inclusion of the Consume Responsibly attribute was to assess consumers' preference about the presence of a statement regarding safe consumption while allowing for the scenario where the information about the safe consumption is either correct or incorrect. *Id.* at 295:18-24. Defendants' accusation that Mr. Boedeker's presentation of this attribute is leading, is also without merit because "in conjoint analysis, there is no right answer . . . the operating question is, does it change the decision making, does that distort the decision making." *Morales*, 2017 U.S. Dist. LEXIS 97433, at *45-*46. In any event, "technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Fortune Dynamic*, 618 F.3d at 1038 (internal quotation marks and citations omitted).

Misguidedly, Defendants make much of the possibility of multiple interpretations

19

of the misstatements at issue here, but Mr. Boedeker embraces this.  He testified: "Everybody has a different perception and a different expectation when they read [the attributes] and my study now summarizes, aggregates all of those different interpretations with the sole purpose of seeing does it have an impact on the price." Mehdi Decl., Ex. 1 at 178:21-24, 191:6-10.  This rationale applies equally to the Rehydrate, Consume Responsibly, and Ideal Combo misstatements.

Notably, Defendants neither challenge the language in the Mr. Boedeker's choice menu as failing to represent a concise summary with concrete meaning, nor do they present any evidence or legal authority — because it does not exist — that a full and verbatim copy of the entire misstatement would have produced different results.  Hence, the criticism that Mr. Boedeker's failure to include the entire statement warrants exclusion of his report, is unfounded.

### 2.    Defendants' Exaggeration of Methodological Errors in Mr. Boedeker's Study Should be Discounted

The Ninth Circuit has stated that "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).  Far from saying that methodological flaws render a survey inadmissible, the court in *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997), specifically stated: "Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Id.* at 1143 n.8.  Overall, Mr. Boedeker properly employed his best judgment as an experienced economist/statistician in the design of his survey, and the results and conclusions flowing therefrom are valid.  Any argument as to Mr. Boedeker's methodology go towards the weight to be given to his opinion, rather than exclusion.

### a.    Mr. Boedeker's Relevant Universe Was Appropriate

Ignoring controlling authority, Defendants contend methodological errors justify exclusion. Def. Mem. at 19-22.  Specifically, Defendants assert that Mr. Boedeker did not draw from relevant universe because he did not ask survey respondents specifically

1   if they had purchased the Monster Energy or Monster Rehab varieties at issue in this

2   case. Def. Mem. at 19-20. Defendants conflate the issue of the relevant universe.  A

3   "universe" is "'that segment of the population whose perceptions and state of mind are

4   relevant to the issues in the case.'"  *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans*

5   *City*, 383 F.3d 110, 118-19 (3d Cir. 2004) (quoting *McCarthy on Trademarks and Unfair*

6   *Competition* § 32:159 (4th ed. 2003)).  Mr. Boedeker's relevant universe included only

7   actual purchasers of Monster products, and thus, putative class members, screening out

8   any survey respondents who had **not** purchased Monster branded energy drinks.

9   Boedeker Rpt. ¶¶82-85.

10       There is no requirement that the universe of those surveyed overlap entirely with

11   the putative class. *Morales*, 2017 U.S. Dist. LEXIS 97433, at *38.  Defendants offer no

12   explanation for why actual Monster drink purchasers are not part of the proper universe,

13   thus warranting exclusion. Indeed, even if a survey is underinclusive, it may still be

14   probative. *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK), 2012 U.S. Dist.

15   LEXIS 90877, at *38-*39 (N.D. Cal. June 29, 2012) (citing *Vision Sports, Inc. v. Melville*

16   *Corp.*, 888 F.2d 609, 615 (9th Cir. 1989)) (declining to exclude an expert's conjoint

17   analysis opinion based on his willingness-to-pay survey and finding that recent Samsung

18   purchasers – as opposed to potential Samsung purchasers - are at least members of the

19   relevant universe of survey participants).

20       As a general rule, "'courts within the Ninth Circuit are reluctant to exclude survey

21   evidence on the basis of an overinclusive or underinclusive target population.'" *Morales*,

22   2017 U.S. Dist. LEXIS 97433, at *34 (citation omitted). In *Morales*, plaintiffs alleged that

23   they were misled by Kraft's use of the term "natural cheese" on its "Natural Cheese Fat

24   Free Shredded Fat Free Cheddar Cheese." *Id.* at *1. Plaintiffs' expert screened out survey

25   respondents who had not purchased Kraft shredded cheese during the prior six months,

26   but did not specifically ask whether, during that time period, they had purchased the

27   product at issue in the case -- Kraft Natural Cheese Fat Free Shredded Fat Free Cheddar

28   Cheese. *Id.* at *15. He explained that he did not believe that "the value of the natural

21

1    cheese attribute . . . for people who were included in this study, even though they did

2    not buy Kraft natural cheese, would be different." *Id.*  Thus, he concluded that asking

3    about the specific product at issue "would detract from the quality of the study in making

4    it more arduous and would not impact the findings substantially." *Id.* at *32 (citation

5    omitted). The same logic applies here.

### b.    Mr. Boedeker's Choice of Attributes Was Based on Generally Accepted Principles

8    Next, Defendants argue that Mr. Bodeker's choice of attributes in the survey is

9    flawed because the preliminary survey respondents rated attributes other than hydration,

10   safety and the specific misstatements at issue here, higher.  Def. Mem. at 20-21.  A review

11   of Mr. Boedeker's report illustrates Defendants' flawed logic.  Mr. Boedeker opined that

12   preliminary survey responses showed that respondents preferred Monster over other

13   brands of energy drinks based on flavor, price, long lasting energy, and brand. Boedeker

14   Rpt.¶86; Figure 11. Before respondents reached the conjoint choice menu, they were

15   aware that Monster was the only brand at issue. Hence, Defendants' suggestion that

16   "brand" was a far more important product attribute than the misstatements at issue, is

17   redundant. Moreover, Mr. Boedeker included the other remaining "key attributes," i.e.,

18   flavor, price, and long-lasting energy in his choice menus. *Id.* Figure 12.

19   Defendants' argument that Mr. Boedeker's failure to include other attributes like,

20   "extra caffeine," "zero calories," "nutritional benefit" or "all-natural ingredients" –

21   which they incorrectly categorize as "important purchase drivers," warrants exclusion of

22   his opinion, is absurd and has been rejected.  Brian Orme, also cited by Defendants,

23   found that typically, respondents have a difficult time dealing with more than about six

24   attributes in full-profile conjoint analyses like CBC, and when faced with too much

25   information, respondents often resort to simplification strategies to deal with the

26   difficulty of the task. Mehdi Decl., Ex 2 (Orme, *supra* at 4); *see also* Mehdi Decl., Ex. 1 at

27   167:2-19.  In *Morales*, 2017 U.S. Dist. LEXIS 97433, at *44 (emphasis added), the expert

28   testified that

22

> [T]he key concern and everything that we worry about in conjoint analysis relates to verisimilitude and not distorting decision making. *If you have a large number of attributes*, . . . you are, therefore, required to present a list of -- of long attributes in the stimuli. And *a consumer may not be actually processing all those things in real life*. . . . [W]e generally want to, again, as I said, not distort the decision making.

Accepting this explanation, the court declined to exclude the expert's testimony. *Id.* Indeed, Mr. Boedeker faced a similar challenge, which was rejected in *In re Dial Complete*, 320 F.R.D. 326 (holding that Mr. Boedeker's decision not to weight other attributes that may well be important to liquid hand soap consumers (e.g., brand name, or scent, or shape, or color of the product) is "insufficient to exclude an expert's conclusion" because those issues are either curable, or go to weight, not admissibility). Overall, "dissatisfaction with the description of the [] features in the survey likewise goes to weight, not admissibility." *Apple, Inc.*, 2012 U.S. Dist. LEXIS 90877, at *38-*39.

### c. Mr. Boedeker Replicated Market Conditions Consistent with Generally Accepted Principles

Defendants' challenge to Mr. Boedeker's survey for failure to replicate how consumers would "actually encounter" the labels in the marketplace, must also fail. Defendants provide no support or evidence that actual images must be presented to respondents in a conjoint choice menu analysis. Def. Mem. at 22. Defendants expert Dr. Kent Van Liere posits - without any academic support - that respondents must view actual images with and without the misstatements at issue to replicate market conditions in any reasonable way. Expert Report of Dr. Kent Van Liere [ECF Doc. 114-6] at ¶¶99-107. This statement is simply incorrect. Images are only used when attributes cannot adequately be described in words. Mehdi Decl., Ex. 2 (Orme, *supra* at 4). Where the false advertising at issue related only to words on a label, the presence or absence of the actual images is not relevant, and "would probably be a mistake" and "bias the results in favor of the graphical or multimedia attributes." *Id.* Significantly, surveys need not simulate

23

1   the buying experience with exactitude.  *Bimbo Bakeries*, 2017 U.S. Dist. LEXIS 57805, at

2   \*9-\*10 (declining to exclude online survey acknowledging that "[i]t is likely true

3   consumers typically do not buy bread online and conducting an online survey may not

4   be the best way to most accurately simulate the bread buying experience").

5        Mr. Boedeker testified that his expertise is "statistical analysis, the econometric

6   analysis of data, but not what ultimately the intention of the consumer is."  Mehdi Decl.,

7   Ex. 1 at 16:5-8, 21:12-23:21, 99:18-25, 146:14-23, 231:11-14 (testifying that reliance and

8   measuring intent are not his expertise, but that of an ad perception psychologists).

9   Hence, Defendants' claim that Mr. Boedeker's surveys fail to "analyze how consumers

10  would organize their thinking about the contested portions of the product labels," is

11  ludicrous. Mr. Boedeker relied on his experience, training and on the empirical data he

12  gathered to analyze how Monster energy drink purchasers value one or more of the

13  misstatements at issue, *i.e.*, what would they be willing to pay for a product with or

14  without a false statement.  That is sufficient for admitting Mr. Boedeker's survey.

15       Similarly, Defendants' criticism that Mr. Boedeker's survey choice menus gave

16  equal visibility to all attributes, while omitting certain other attributes like calories or

17  carbonation, must fail. First, Defendants offer no evidence that conjoint choice menus

18  must include "ALL" attributes.  Second, the inclusion of all attributes in a choice menu

19  would have actually resulted in a phenomenon called "cognitive overloading," which

20  "leads to consumers not processing the choice tasks with the attention they would

21  accord in the marketplace." *Morales*, 2017 U.S. Dist. LEXIS 97433, at \*10; *see also* Mehdi

22  Decl., Ex. 2 (Orme*, supra* at 4) ("When faced with too much information, respondents

23  often resort to simplification strategies to deal with the difficulty of the task," leading to

24  unreliable data.). Finally, to prove that a survey technique is unreliable the party must do

25  more than speculate that there may have been a better way of completing the survey.

26  *Bimbo Bakeries*, 2017 U.S. Dist. LEXIS 57805, at \*9-\*10.  Dr. Van Liere did not perform

27  a conjoint survey with actual images, nor did he replicate all other conditions that he

28  contends must be present to make a conjoint survey reliable.  All of Defendants' alleged

methodological errors are without merit, and more properly suited go to the weight of testimony, rather than its admissibility.

## V.   **CONCLUSION**

Mr. Boedeker is highly qualified. His report and testimony are based on sufficient facts or data and his opinion and testimony is the product of reliable principles and methods. Most significantly, Mr. Boedeker has appropriately applied the principles and methods to the specific facts of this case, and has reliably connected his damages calculation to Plaintiffs' theory of liability.  Mr. Boedeker's opinion is relevant and reliable and will assist the trier of fact in determining the appropriate methodology to measure class wide damages.  For all the foregoing reasons, and those articulated in all briefs filed in support of Plaintiffs' motion for class certification and any argument that the Court deems necessary, Defendants' motion to strike Mr. Boedeker's report and testimony should be denied.

DATED: November 13, 2017          Respectfully submitted,

THE MEHDI FIRM, PC


/s/Azra Z. Mehdi
Azra Z. Mehdi


One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 fax
azram@themehdifirm.com

# PROOF OF SERVICE

Townsend, et al. vs. Monster Beverage Corporation, et al.
CASE NO.: 5:12-cv-02188 VAP (KKx)

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action.  My business address is: One Market, Spear Tower, Suite 3600, San Francisco, CA 94105.

That on November 13, 2017, I served the following document(s) entitled: **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF STEFAN BOEDEKER UNDER FED. R. EVID. 702** on ALL INTERESTED PARTIES in this action via the Court's ECF Notification system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 13, 2017, at San Francisco, California.

        */s/ Azra Z. Mehdi*
        AZRA Z. MEHDI