# EXHIBIT 2

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

W. Neil Eggleston
To Call Writer Directly:
(202) 879-5016
neil.eggleston@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

October 28, 2013

**VIA Hand Delivery**

The Honorable John D. Rockefeller
The Honorable Richard J. Durbin
The Honorable Richard Blumenthal
The Honorable Edward J. Markey
United States Senate
Washington, D.C. 20510

Dear Senators Rockefeller, Durbin, Blumenthal, and Markey:

    I write in response to your September 25, 2013 letter to Mr. Rodney Sacks, Chairman and Chief Executive Officer of Monster Energy Company ("Monster"). Mr. Sacks appreciated the opportunity to testify before the Senate Commerce Science and Transportation Committee (the "Committee") on July 31, 2013. In responding to your letter of September 25, 2013, Monster also would like to address certain issues raised at the hearing and to update you on additional progress that Monster has made addressing those issues. Monster is continually making improvements to its policies, practices and business, and has taken several important steps to continue to responsibly manage its brand and further its outreach to consumers. Many recommendations suggested at the Committee hearing, contained in the "What's All the Buzz About" report, and raised in your September 25, 2013 letter have already been implemented by Monster. Indeed, as this response will reflect, Monster is in agreement with the substance of a substantial number of your proposed commitments.

    Before addressing your specific questions, Monster would like to reiterate what Mr. Sacks said at the hearing – Monster is, and has always been, committed to ensuring that the ingredients in its Monster energy drinks ("Monster Energy drinks") are safe and in regulatory compliance for their intended use. Because the safety of its products is Monster's number one priority, it has extensively and continually analyzed the substantial body of scientific and medical literature relating to the safety of caffeine and the other ingredients in its products, and will continue to do so. Based upon the overwhelming weight of the scientific evidence, as previously detailed in Monster's submissions, Monster has been and remains confident that the levels of caffeine and other ingredients in Monster Energy drinks are indeed safe for both adults and teenagers.

Beijing   Chicago   Hong Kong   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai

KIRKLAND & ELLIS LLP

October 28, 2013
Page 2

Monster is also committed to ensuring that its Monster Energy drinks are marketed in a lawful and responsible manner. Consistent with that commitment, Monster has had discussions with the American Beverage Association ("ABA") with a view to preparing guidelines the ABA anticipates will be adopted by all major energy drink companies. Because this has not yet been achieved, Monster has prepared proposed Model Energy Drink Guidelines (the "Proposed Model Guidelines"), which are attached as Exhibit A.[1] Building upon the ABA's existing Guidance for the Responsible Labeling and Marketing of Energy Drinks, the Proposed Model Guidelines would strengthen and formalize the industry's voluntary commitment to sound labeling, marketing and regulatory practices, including in ways directly responsive to the concerns raised at the July 31 hearing and in your September 25, 2013 letter. It is appropriate to note that the commitments set forth in the Proposed Model Guidelines, and detailed below in this letter, far exceed the efforts of other segments of the beverage industry whose products deliver substantially more caffeine to consumers, including younger consumers. The Proposed Model Guidelines may be superseded by ABA Guidelines if and when adopted by all major energy drink companies.

Monster supports efforts to encourage all major energy drink companies to adopt, implement and honor the Proposed Model Guidelines. This should include Starbucks, which is the fifth largest seller of energy drinks in the United States and widely markets and sells two shelf stable energy drinks (including its Doubleshot coffee energy drinks) in grocery and convenience stores alongside other energy drinks.[2] These products contain many of the same ingredients found in other energy drinks, including caffeine, ginseng, guarana, taurine and B vitamins, and like other energy drinks, are designed to be consumed cold. Surprisingly, Starbucks is not among the addressees of your letter despite selling far more energy drinks than most addressees. Starbucks' adoption and implementation of the Proposed Model Guidelines, along with all other major energy drink companies, would help render the impact of the Proposed Model Guidelines both more effective and competitively fair.

Apart from being a major energy drink producer, Starbucks is also the dominant market leader in coffeehouse coffee sales. As Monster has pointed out, coffeehouse brewed coffee such as Starbucks contains more than twice as much caffeine as a typical energy drink – a Starbucks

---

[1] These Proposed Model Guidelines apply to Monster Energy's activities relating to its Monster Energy drinks in the United States. Monster reserves the right to vary any portion of the Proposed Model Guidelines if and to the extent required by applicable law or changes in economic and/or competitive conditions affecting the energy drink segment including non-compliance with the Proposed Model Guidelines by other major energy drink companies.

[2] AC Nielsen Report for the 13 week period ending August 24, 2013 – all measured channels (Convenience, Grocery, Drug and Mass (including Walmart)).

KIRKLAND & ELLIS LLP

October 28, 2013
Page 3

16 oz medium cup, for example, contains approximately 330 mg of caffeine, whereas a Monster Energy 16 oz can (representing more than 80% of Monster Energy drinks sold) contains about 160 mg of caffeine; far less caffeine even than in a large fountain soda drink such as Mountain Dew. Moreover, teenagers (as well as adults) consume far more caffeine from coffee beverages (hot and cold) including Starbucks, than from energy drinks. A number of recent studies have established that, among beverages, coffee is the leading (or at least a leading) source of teenage caffeine consumption (more than 40% according to some studies), while energy drinks rank at the bottom (less than 7% according to some studies).[3] That teenagers are consuming more caffeine from coffee, in similar if not higher concentrations than energy drinks, with no known adverse safety concerns or controversy, confirms that energy drinks do not pose a genuine health risk for teenagers. Caffeine is found in a wide variety of products ranging from coffee (having among the highest caffeine content and highest average consumption), coffee energy drinks, sodas and teas to energy drinks (with among the lowest average caffeine consumption.) There is, therefore, no logical or plausible reason to apply different standards and requirements to different products containing caffeine, regardless of the source of the caffeine.

Monster's response to each of the questions posed in your September 25, 2013 letter is set forth below:

**Question 1. Will your company agree not to market your energy drink products to (a) children, defined in the ABA's Guidance for the Responsible Labeling and Marketing of Energy Drinks as individuals under the age of 12 or (b) children or minors, under the age of 18? If so, on what date will that commitment take effect?**

<u>Monster's Response to Question No. 1</u>: Monster does not market Monster Energy drinks to children, and has never done so. To the contrary, Monster labels every can of its Monster Energy drinks as "not recommended for children," and has done so since the introduction of its Monster Energy drinks in 2002. Monster accordingly agrees that it will not target its marketing of Monster Energy drinks to children as currently defined in the International Council of Beverage Associations' (ICBA) Global Policy on Marketing to Children as individuals under the age of 12 ("Children").

---

[3] See, for example, D. C. Mitchell (Penn State) et al, Caffeine Intakes from Beverages in the U.S., The FASEB Journal. 2013; 27:848.18, abstract found at
http://www.fasebj.org/cgi/content/meeting_abstract/27/1_MeetingAbstracts/848.18?sid=10c50c9f-afc1-4194-94aa-e2f0162eafe7 [Presented at Experimental Biology 2013, American Society for Nutrition Meeting].

KIRKLAND & ELLIS LLP

October 28, 2013
Page 4

Monster's foregoing agreement and the other agreements and commitments in this letter are incorporated into and/or are consistent with the Proposed Model Guidelines and, unless otherwise stated, are currently in effect.[4]

**Question 2.** **Will your company agree that in the future, you will not promote, encourage, or condone rapid or excessive consumption of energy drink products? If so, on what date will that change take effect?**

**Monster's Response to Question No. 2:** Monster does not promote or encourage excessive or unduly rapid consumption of its Monster Energy drinks. Nevertheless, to the extent that statements on Monster Energy drink can labels in the past may have been construed as promoting or encouraging excessive or unduly rapid consumption of Monster Energy drinks, Monster already has taken steps, and will continue to take commercially reasonable steps, to remove such language. Monster accordingly agrees in the future not to promote or encourage excessive or unduly rapid consumption of its Monster Energy drinks including on its Monster Energy drink labels and marketing and advertising materials.

The foregoing agreement is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 3.** **Will your company commit to removing any past social media posts or other promotional messages or images that promote, encourage, or condone excessive or rapid consumption of your energy drink products, and, if so, by what date? Will your company commit to regularly monitoring your social media sites to ensure that in the future such messages and images are not posted?**

**Monster's Response to Question No. 3:** Monster has taken steps to monitor, and commits that it will continue in the future to use commercially reasonable efforts to regularly monitor, postings on Monster Energy social media sites to avoid or seek the removal of postings of messages and images that promote or encourage excessive or unduly rapid consumption of Monster Energy drinks.

The foregoing commitment is in effect and/or is incorporated in the Proposed Model Guidelines.

---

[4] Any reference in this letter to Monster's agreements or commitments being "in effect" means that Monster has adopted a policy to implement such agreement or commitment, has commenced implementation of such policy, and, to the extent implementation is not yet complete, will continue to use commercially reasonable efforts to promptly complete implementation of such policy.

**KIRKLAND & ELLIS LLP**

October 28, 2013
Page 5

**Question 4.** Will your company agree that in all future marketing and promotional messages, you will not use language implying that consumption of larger volumes of energy drinks or energy drinks with higher concentration of caffeine produces a more desirable effect? If so, on what date will that commitment take effect?

<u>**Monster's Response to Question No. 4**</u>: Monster is committed to adhering to generally accepted scientific principles and literature, not only for its product formulations, but also for its product benefit claims, and in providing consumers with a wide range of safe products from which they may choose for their refreshment and enjoyment. However, Monster respectfully submits that this Question 4, which may have been precipitated by a self-serving "commitment" offered by Red Bull[5], is not warranted on scientific or medical grounds, or for consumer protection or safety concerns. Accordingly, Monster does not believe it would be appropriate to commit to not make truthful informational statements that may help consumers choose among beverage options.

A larger volume of product, or a higher concentration of certain key ingredients, can provide additional refreshment and/or effectiveness for a claimed benefit, such as energy. This is true of energy drinks, coffee drinks (i.e., larger coffee sizes or more highly concentrated products such as espresso) and sodas, which are permitted to be sold in large serving containers and/or marketed as providing more desirable effects in larger or more highly concentrated forms. There is accordingly no legitimate rationale for a restriction on the ability of energy drink companies to highlight truthfully to consumers the added values that may be inherent in larger or more concentrated products.

---

[5] The language describing the proposed commitment in Question 4 (to which Monster did not agree during the hearing) mirrors that on page 4 of Red Bull's supplemental letter to the Committee, dated July 30, 2013. That letter also contained a purported "commitment" to limit container sizes to a maximum of 12 ounces, on the condition that "all producers of sugar-and-caffeine-containing beverages" also do so. Reading these two purported commitments together exposes Red Bull's self-serving, ulterior and anticompetitive motive in putting them forward. Left unsaid in Red Bull's letter is that 85% of Red Bull's sales are derived from cans of 12 ounces or less, while its U.S. competitors derive approximately 85% of their sales from cans of approximately 16 ounces. Red Bull, an Austrian company that once held a virtual monopoly in the energy drink industry based on its European model of selling products in 8-ounce containers, could unfairly recapture U.S. market share and power thereby severely damaging its U.S. competitors' enormous investment in meeting U.S. consumers' needs and choices if (a) container size is limited to 12 ounces; or (b) U.S. companies were no longer permitted truthfully to inform consumers that 16-ounce containers provide more value and potentially more benefit. That is why Red Bull's purported "commitment" was not made unconditionally, but instead was predicated on all U.S. energy drink, coffee and soft drink producers doing the same; plainly a non-starter. The Committee should neither encourage nor place its imprimatur on such anticompetitive behavior, or on Red Bull's attempt to garner an unfair market advantage, without any supportable health or safety justification.

## KIRKLAND & ELLIS LLP

October 28, 2013
Page 6

It is important to note that neither the container size nor the marketing description of an energy product determines the product's caffeine content. There is accordingly no accurate correlation between the size of the container and its caffeine content and certainly no safety correlation. Like many other energy drinks sold in the U.S., the wide range of Monster Energy drink sizes[6] and marketing descriptions are simply descriptions of the product and/or truthful representations of the product's contents. Monster provides on its Monster Energy drink product labels detailed information as to the volume and the ingredients—including the milligrams of caffeine per serving from all sources—allowing consumers to make responsible decisions as to the amount or type of product to consume.

Consumers should be free to exercise their preferences regarding container volume and caffeine content. The same is true with coffee and caffeinated soft drinks (although the caffeine content is typically not provided for coffee beverages or soft drinks). A consumer may permissibly decide to purchase a product with more caffeine, either by volume or concentration, and it is appropriate for an energy drink producer to highlight the added or different value or benefits consumers can receive by purchasing a larger or more concentrated (yet still safe) product.

**Question 5.** Will your company agree to not promote, encourage, or condone mixing energy drinks with alcohol? Similarly, will your company agree to not make any claim that the consumption of alcohol together with an energy drink counteracts or otherwise positively impacts the effect of alcohol consumption? If so, on what date will that commitment take effect?

**Monster's Response to Question No. 5:** It is Monster's policy not to promote or encourage mixing its Monster Energy drinks with alcohol. Monster accordingly agrees to continue to implement such policy.

Monster does not claim that the consumption of alcohol together with a Monster Energy drink counteracts or otherwise positively impacts the effect of alcohol consumption. Monster accordingly agrees to continue not to make any such claim.

The foregoing agreements are in effect and/or are incorporated in the Proposed Model Guidelines.

**Question 6.** Will your company agree to not promote, encourage, or condone the mixing of energy drinks with sleeping pills or other drugs? Similarly, will your company agree not

---

[6] 5, 7.5, 8, 8.3, 15, 15.5, 16, 18.6, 23 and 24 oz.

## KIRKLAND & ELLIS LLP

October 28, 2013
Page 7

to make any claim that the consumption of an energy drink in any way counteracts or otherwise positively impacts the effect of sleeping pills or other drugs? If so, on what date will that commitment take effect?

**Monster's Response to Question No. 6**: Monster has never promoted or encouraged, and will not promote or encourage, the mixing of its Monster Energy drinks with sleeping pills or other drugs. Monster has never claimed, and will not claim, that the consumption of a Monster Energy drink in any way counteracts or otherwise positively impacts the effect of sleeping pills or other drugs.

Monster accordingly agrees that it will continue to maintain this position.

**Question 7.** Will your company agree not to market your energy drink products in K-12 schools, including at any school-related events or activities? If so, on what date will that commitment take effect?

**Monster's Response to Question No. 7**: Monster does not market its Monster Energy drinks in K-12 schools, including at any K-12 school events or activities on K-12 school premises, and has asked its distributors to refrain from doing so. Monster accordingly agrees to continue not to directly market its Monster Energy drinks in K-12 schools, including at any K-12 school events or activities on K-12 school premises.

The foregoing agreement is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 8.** Will your company ensure that its energy drink products are not sold in K-12 schools, including in automated vending machines and concession stands? If so, on what date will that change take effect?

**Monster's Response to Question No. 8**: Monster does not sell Monster Energy drinks in K-12 schools, including in school automated vending machines and concession stands, and has asked its distributors to refrain from doing so. Monster accordingly agrees to continue not to directly sell Monster Energy drinks in K-12 schools, including in school automated vending machines and concession stands.

The foregoing agreement is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 9.** Will your company agree to not provide samples of your energy drink products in or within the immediate vicinity of K-12 schools? If so, on what date will that change take effect?

## KIRKLAND & ELLIS LLP

October 28, 2013
Page 8

**Monster's Response to Question No. 9**: Monster does not provide samples of Monster Energy drinks in or within the immediate vicinity of K-12 schools, and has asked its distributors to refrain from doing so. Monster accordingly agrees to continue not to directly provide samples of Monster Energy drinks in or within the immediate vicinity of K-12 schools.

The foregoing agreement is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 10.** **Will your company include binding contractual language in future contracts with distributors, promoters, or other third party entities prohibiting them from marketing, promoting, selling, or sampling to children and teenagers in K-12 schools? If so, on what date will such language be inserted into new contracts?**

**Monster's Response to Question No. 10**: Monster will seek to include contractual language in new written contracts to be entered into with distributors in the future prohibiting such distributors from marketing, promoting, selling or sampling Monster Energy drinks in K-12 schools.

The foregoing agreement is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 11.** **Will your company commit to including on the product label of your energy drinks a clear declaration of the total amount of caffeine present by serving and per container, and, if so, by what date will those labels be included?**

**Monster's Response to Question No. 11**: Early this year, Monster began to include and will continue including on all newly printed Monster Energy drink labels a clear declaration of the total amount of caffeine (from all sources) present by serving and per container. Monster accordingly commits to continue including such clear declaration on its labels.

The foregoing commitment is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 12.** **Will your company commit to voluntarily report to the FDA any serious adverse events associated with the consumption of your energy drink products of which you become aware? If so, on what date will that commitment take effect?**

**Monster's Response to Question No. 12**: Monster has, for many years, reported to the FDA serious adverse events alleged to be associated with the consumption of Monster Energy

**KIRKLAND & ELLIS LLP**

October 28, 2013
Page 9

drinks that were reported to Monster, in accordance with the adverse event reporting requirements of the Dietary Supplement and Nonprescription Drug Consumer Protection Act. When Monster made the decision to reposition Monster Energy drinks as conventional beverages, it determined that it would voluntarily continue to make such reports. Monster accordingly commits to continue to voluntarily report to the FDA such serious adverse events alleged to be associated with the consumption of Monster Energy drinks that are reported to Monster.

The foregoing commitment is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 13.** **Will your company commit to putting restrictions in place for any social media sites owned, managed, or operated by your energy drink product lines or managers that would restrict access for users under the age of 18, if such social media site has the capability to impose age restrictions? If not, is there an age under 18 for which you would commit to such restrictions? If so, what age and on what date would the restriction take effect?**

<u>Monster's Response to Question No. 13</u>: Several websites that bear the Monster brand and that are hosted on social media platforms, such as Facebook, promote participation in sports and other healthy, competitive lifestyle activities. With respect to Facebook sites, Monster is informed that Facebook does not allow anyone under the age of 13 to sign up to create a Facebook account. *See e.g.*, Facebook Terms of Use ("You will not use Facebook if you are under 13").

Separately, the Monster Army website prohibits minors under the age of 13 from becoming a member of the Monster Army or of the MonsterArmy.com Community Site and limits sponsorship benefits in the form of free or discounted Monster Energy drinks to athletes over the age of 16.

Monster agrees to continue to adhere to the foregoing restrictions.

**Question 14.** **Will your company restrict any advertising buys or purchases for TV, radio, print, internet, or mobile devices that directly target audiences that are more than 35% under the age of 18, and, if so, by what date will this restriction be adopted?**

<u>Monster's Response to Question No. 14</u>: As previously advised,[7] Monster generally does not conduct traditional advertising through measured media and does not typically collect

---

[7] See letter from W. Neil Eggleston of Kirkland & Ellis to The Honorable John D. Rockefeller IV, Chairman, Committee on Commerce, Science, and Transportation, United States Senate dated July 29, 2013, p. 2.

**KIRKLAND & ELLIS LLP**

October 28, 2013
Page 10

demographic information showing the composition of the audience, by age group, reached by its advertising and promotional activities. Monster does not target advertising or promotional activities towards Children. As noted above, since the introduction of Monster Energy drinks in 2002, all Monster Energy drink cans have contained a label expressly stating that the product is not recommended for children.

Monster accordingly agrees that it will not purchase advertising on television, radio or print media and, when audience data are available, internet and mobile media, in each case where the target audience is predominantly comprised of Children.

The foregoing agreement is in effect and/or is incorporated in the Proposed Model Guidelines.

**Question 15.** **Will your company agree to label any of your products that include caffeine in excess of the FDA's approved GRAS standard for caffeine in cola with either of the following statements:**

*"This product is not intended for individuals under 18 years or age, pregnant or nursing women, or for those sensitive to caffeine"*

**If you will agree to include either statement on your energy drink product(s), by what date will such statement be included?**

<u>Monster's Response to Question No. 15</u>: Caffeine is GRAS at the level used in Monster Energy drinks. Although Monster Energy drinks are safe for all consumers, since Monster Energy drinks were first produced in 2002, Monster has included an advisory statement on every can. The label currently states: "Consume responsibly. Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing."

Monster previously responded to questions regarding the safety, labeling and marketing of Monster Energy drinks.[8] For the reasons set forth in that response, Monster respectfully submits that there are no scientific grounds for safety concerns regarding consumption of Monster Energy drinks by teenagers and that broad concerns regarding safety for teenagers compared to adults are not evidence based.

---

[8] See letter from Miriam J. Guggenheim of Covington & Burling to The Honorable Edward J. Markey, The Honorable Richard J. Durbin and The Honorable Richard Blumenthal, Congress of the United States dated February 8, 2013. This letter was provided to the Committee on July 11, 2013.

**KIRKLAND & ELLIS LLP**

October 28, 2013
Page 11

  Monster will accordingly agree to continue to include the following advisory statement on labels of Monster Energy drinks: "Consume responsibly. Not recommended for children, people sensitive to caffeine, pregnant women, or women who are nursing."

**Question 16.** **Will your company commit to not feature, recruit, or sponsor children under the age of 18 in energy drink marketing campaigns, including promotion on social media? If not, is there an age under 18 for which you would commit to not feature, recruit, or sponsor in energy drink marketing campaigns? If so, what age and on what date will such commitment take effect?**

  <u>Monster's Response to Question No. 16</u>:  As Monster previously advised the Committee,[9] like many other popular food and beverage companies, Monster sponsors a variety of events and athletes. Monster's primary sponsorships involve motor sports that are aligned with Monster's brand image, such as NASCAR, Supercross, Motocross, MotoGP, off-road truck racing, Formula 1 racing, and the Dakar Rally. The primary demographic for such motor sports, as well as action sports, is young adults who are 18 years of age or older, not Children or young teenagers. Other sponsorships include smaller commitments to action sports, such as athletes who compete in events like the X Games. The X Games is open to athletes and spectators that span a broad range of ages, but is primarily attended or watched by persons who are 18 years of age or older.

  Like many other food producers, the beverage industry in general, and the energy drink category in particular, provide and support significant opportunities for the encouragement and development of competitive sports activities in many fields. As part of its amateur athlete development efforts, Monster has sponsored young athletes under the age of 18 in the hope that they will mature into successful professional athletes who will help promote the Monster brand to its primary demographic. Other energy drink producers do the same. Thus, for example, as Red Bull described in its July 30, 2013 letter to the Committee (at p. 5), it "supports up and coming and top potential athletes under the age of 18… and provide[s] a platform for skilled athletes, some under 18 years of age…" Without the support provided by Monster and other energy drink companies, talented athletes in many sports would not be able to develop their potential at an early age. Some beneficiaries of their support have become world class champions in numerous sports categories. From time to time Monster also sponsors exceptional and talented teenage athletes and artists with potential to excel and who already compete in major sporting events and/or performances.

---

[9]  See letter from W. Neil Eggleston of Kirkland & Ellis to The Honorable John D. Rockefeller IV, Chairman, Committee on Commerce, Science, and Transportation, United States Senate dated July 29, 2013, p. 3.

**KIRKLAND & ELLIS LLP**

October 28, 2013
Page 12

    Monster accordingly commits not to feature Children consuming or promoting Monster Energy drinks or images featuring persons where those pictured are predominantly Children, on its Monster Energy managed Monster Energy drink websites. In addition, Monster commits not to sponsor or promote Children in its Monster Energy drink marketing campaigns, nor sponsor or promote events and/or activities that are intended for an audience predominantly comprised of Children.

    The foregoing commitments are in effect and/or are incorporated in the Proposed Model Guidelines.

**Question 17.**   **The National Collegiate Athletic Association and the National Federation of State High School Associations has advised student athletes to avoid energy drinks and other stimulants because they may be detrimental and are not effective forms of fuel or hydration. The American Beverage Association has drawn a functional difference between energy drinks and sports drinks. Does your company commit to not market its energy drinks as sports drinks or in a manner that could confuse its energy drink products with that of a typical sports drink, which contains electrolytes and other ingredients intending to hydrate the body, and if so by what date will that commitment take effect?**

    <u>Monster's Response to Question No. 17</u>:   Monster respectfully notes that any preexisting ABA guideline distinguishing between energy drinks and sport drinks was only applicable before certain energy drinks such as Monster Rehab and Rockstar Recovery were developed, both of which contain electrolytes and provide hydration benefits, thereby eliminating any scientific or factual basis for precluding hydration and related claims for such energy drink varieties. When Monster and Rockstar became members of the ABA, the ABA acknowledged that any such provision in its prior guideline would not apply to Monster Rehab, Rockstar Recovery and similar products in light of such products' ingredients.

    The published scientific literature documents the hydrating/rehydrating benefits of hypotonic beverages such as Monster's Rehab products. In fact, Monster's selection of electrolytes for its Monster Rehab products is consistent with human clinical trial literature relating to the electrolytes lost in human sweat and the fact that replacing sweat sodium is key to rapid delivery of water. Based on the foregoing and a substantial body of generally accepted and reliable scientific and medical literature, certain Monster Energy drinks, such as the Rehab line, do provide electrolytes and other ingredients intended to hydrate the body.

    While there is no regulatory definition of "sports drink," they are often distinguished from other beverages by the presence of varying amounts of electrolytes. See, e.g., FDA, Compliance Policy Guide Sec. 510.800 Beverages — Serving Size Labeling (Dec. 2010) at 4, available at www.fda.gov/downloads/ICECI/.../UCM238854.doc ("this term ["sports drinks"] is

**KIRKLAND & ELLIS LLP**

October 28, 2013
Page 13

used by industry and has not been defined by the agency"). Monster's Rehab Tea + Lemonade + Energy product, for example, contains similar, and in some instances, more sodium and more potassium per fluid ounce than Gatorade and Powerade, popular beverages marketed as sports drinks.

Thus, as previously advised:[10]

(a) Monster makes truthful energy-related and hydration/rehydration statements for certain of its Rehab product lines (containing sodium, potassium, magnesium, and calcium) that are similar to claims made by some sports drink producers such as helping to restore electrolytes and rehydrate the body. Such statements are substantiated by competent and reliable scientific evidence including from human studies published in peer-reviewed scientific journals, textbooks and published articles;

(b) Regulatory bodies and authoritative reviews have concluded that water and beverages that contain water, including those containing caffeine with or without carbohydrate-electrolyte combinations, can be considered hydrating, rehydrating, and/or to be without adverse effect on measures of hydration; and

(c) Two well-known professional sports medicine organizations, the American College of Sports Medicine and the International Society of Sports Nutrition, agree that caffeine and energy drinks enhance human performance and do not cause dehydration or loss of electrolytes during exercise.

For those reasons, Monster respectfully declines to make the commitment requested in Question 17.

Monster also feels compelled to address the unfortunate and inaccurate analogy drawn at the July 31 hearing between the tobacco industry and the energy drink industry. The assertion in relation to the tobacco industry was that "a couple thousand die each day from having smoked." There is no doubt that it has been scientifically and conclusively established that smoking cigarettes is carcinogenic and causes cancer and deaths to smokers. In stark contrast, however, there has never been a single death that has been scientifically and conclusively established to have been caused by an energy drink, despite the fact that over 50 billion energy drinks have been consumed around the world for over 25 years. Consequently, no fair analogy can be drawn

---

[10] See letter from Miriam J. Guggenheim of Covington & Burling to The Honorable Edward J. Markey, The Honorable Richard J. Durbin and The Honorable Richard Blumenthal, Congress of the United States dated February 8, 2013, pp. 9, 12 and 13.

## KIRKLAND & ELLIS LLP

October 28, 2013
Page 14

between cigarette smoking and drinking an energy drink, nor can or should one be drawn between the tobacco and energy drink industries.

    In closing, Monster shares your deep commitment to protecting the health and safety of consumers, including children and teenagers. Monster takes pride in being a responsible corporate citizen, and believes its marketing practices reflect that. Monster looks forward to continuing this dialogue to develop common sense guidelines with policy makers and Monster's industry colleagues for the marketing, sales and consumption of energy drinks. To this end, Monster has prepared the Proposed Model Guidelines, which it believes addresses substantially all of the concerns raised by the Committee and others. Monster agrees to adopt, implement and honor the Proposed Model Guidelines. Monster and Rockstar (who Monster believes is willing to agree to promptly adopt, implement and honor the Proposed Model Guidelines) represent more than 50% of the volume of energy drinks sold in the U.S. Monster supports efforts to encourage all major energy drink companies to adopt, implement and honor the Proposed Model Guidelines, and believes that many energy drink companies will do so.

Sincerely,

W. Neil Eggleston

cc: Ranking Member Thune
Senate Commerce Committee Members

Exhibit A

## Proposed U.S. Model Guidelines

The following are commitments that major energy drink manufacturers have agreed to voluntarily adopt regarding the labeling and marketing of their respective energy drinks ("Energy Drink/s"):

### Labeling

- Energy Drink/s will be labeled as conventional foods/beverages, and not as dietary supplements.

- Energy Drink labels will include a clear declaration of the total amount of caffeine (from all sources) in the container, on a per can/bottle basis and, for multi-serving containers, on a per serving basis (e.g., "caffeine content: xx mg/8 fl oz; yy mg/per can."). This quantitative caffeine declaration will be separate and apart from the ingredient statement and the Nutrition Facts Panel.

- Energy Drink labels will include an advisory statement conveying substantially the following: "CONSUME RESPONSIBLY: Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing."

- Energy Drink labels will not promote or encourage mixing Energy Drink/s with alcohol nor make any claims that the consumption of alcohol together with Energy Drink/s counteracts the effects of alcohol.

- Energy Drink labels will not promote or encourage excessive or unduly rapid consumption of Energy Drink/s.

### Marketing

- Energy drink manufacturers will not target their marketing of Energy Drink/s to children under 12 years of age ("Children") as defined in the International Council of Beverages Association's (ICBA) Global Policy on Marketing to Children and per the American Beverage Association's ("ABA") guidance for the industry. Furthermore, energy drink manufacturers will not sponsor or promote Children in their Energy Drink marketing campaigns, nor will they sponsor or promote events and/or activities that are intended for an audience predominantly comprised of Children.

- Energy drink manufacturers will not directly sell or market their Energy Drink/s in K-12 schools, in accordance with the industry's School Beverage Guidelines and the ABA's statement regarding the Sale of Energy Drinks in Schools. In addition, energy drink manufacturers will not market or sell their Energy Drink/s at K-12 school events or activities on K-12 school premises, and will use commercially reasonable efforts to encourage third party distributors that deliver and sell their Energy Drink/s to comply with these practices.

- Energy drink manufacturers will not provide Energy Drink samples or product coupons to Children, nor will they provide Energy Drink samples or product coupons in the immediate vicinity of K-12 schools. In addition, energy drink manufacturers will use commercially reasonable efforts to encourage their third-party distributors that deliver and sell their Energy Drink/s to comply with these practices.

- Energy drink manufacturers will not feature Children consuming or promoting Energy Drinks or images featuring persons where those pictured are predominantly Children, on their respective company-managed Energy Drink websites.

- Energy drink manufacturers will not purchase advertising on television, radio or print media and, when audience data are available, Internet and mobile media, in each case where the target audience is predominantly comprised of Children.
- Energy drink manufacturers will not promote or encourage excessive or unduly rapid consumption of their Energy Drink/s in any marketing or advertising materials.

P:00821527:07565.001

MNSTR_TOWNSEND00000015
MNSTR_TOWNSEND00000001

### Energy Drink Reports

- Although not required by law, in a manner consistent with the serious adverse event reporting requirements applicable to dietary supplements pursuant to the Dietary Supplement and Nonprescription Drug Consumer Protection Act, energy drink manufacturers will voluntarily report to the U.S. Food and Drug Administration any serious adverse events reported to them by consumers that are alleged to be associated with consumption of their Energy Drink/s.

### Compliance

Energy drink manufacturers will modify their Energy Drink labels and practices as set forth above, as soon as commercially practicable.

---

\* These Proposed Model Guidelines apply to energy drink manufacturers' activities in the United States. Energy drink manufacturers reserve the right to revisit any portion of the Proposed Model Guidelines to the extent required by applicable law or changes in economic and/or competitive conditions affecting the energy drink segment, including non-compliance with the Proposed Model Guidelines by major energy drink manufacturers.