**United States District Court**
**Central District of California**



FILED
CLERK, U.S. DISTRICT COURT

MAR 20, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY:_____BH_____DEPUTY

ED CV 12-2188-VAP (KKx)

**Order (1) DENYING in part and GRANTING in part Defendants' Motion to Strike Stefan Boedeker's Expert Report and Testimony, (Doc. No. 109);**
**(2) DENYING in part and GRANTING in part Defendants' Motion to Strike Thomas Maronick's Expert Report and Testimony, (Doc. No. 110);**
**(3) DENYING in part and GRANTING in part Plaintiffs' Motion to Exclude Kent Van Liere's Expert Report, (Doc. No. 129);**
**(4) DENYING in part and GRANTING in part Plaintiffs' Motion to Exclude Keith Ugone's Expert Report, (Doc. No. 137 (redacted); Doc. No. 150 (unredacted));**
**(5) DENYING Plaintiffs' Motion to Exclude Eva Lilja's Declaration, (Doc. No. 130);**
**(6) DENYING Plaintiffs' Motion for Class Certification, (Doc. No. 95)**

Matthew Townsend and Ted
   Cross, Individually and on
   Behalf of all Others Similarly
   Situated,

             Plaintiffs,

      v.

Monster Beverage Corporation
   and Monster Energy Company,

         Defendants.

On June 26, 2017, Plaintiffs Matthew Townsend and Ted Cross

(collectively, "Plaintiffs") filed their Motion for Class Certification.  (Doc. No.

95 ("Motion").)  Defendants Monster Beverage Corporation and Monster Energy Company (collectively, "Defendants" or "Monster") opposed the Motion on October 31, 2017, (Doc. No. 122 ("Opposition")), and Plaintiffs replied on December 5, 2017, (Doc. No. 126 (Reply"); Doc. No. 134).  Both parties also filed motions to strike or exclude testimony, expert reports, and declarations over the course of the briefing period, which are discussed in Section II below.

After consideration of the papers filed in support of, and in opposition to, the both parties' motions, as well as argument advanced at the March 19, 2018 hearing, the Court rules as follows.

## I. BACKGROUND

### A. Procedural Background

Plaintiffs bring this putative class action against Defendants, seeking redress for Monster's allegedly "unfair and deceptive business and trade practices on behalf of anyone who purchased for personal consumption any of the Monster-branded energy drinks sold under the Monster Rehab® brand name and the original Monster Energy®."  (Doc. No. 51 ("Second Amended Complaint" or "SAC") ¶ 1.)[1]

---

[1] Defendant Monster Beverage Company ("MBC") is a holding company that only conducts business through its wholly owned subsidiaries, including Defendant Monster Energy Company ("MEC").  (Opp'n at 1, n. 2.)  MEC markets and contract with independent companies to distribute Monster Energy drinks.  (*Id.*)  For purposes of this Motion, the two Defendants are indistinguishable.

In the operative Second Amended Complaint, Plaintiffs allege six claims: (1) violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL "); (2) violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL"); (3) violations of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"); (4) breach of express and implied warranty; (5) violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; and (6) unjust enrichment.  (*See* SAC.)

The Court dismissed Plaintiffs' Second Amended Complaint in its entirety on November 12, 2013.  (Doc. No. 72.)  Plaintiffs appealed the Court's ruling as to their first three claims — the UCL claim, FAL claim, and CLRA claim.  (Doc. No. 89.)  The Ninth Circuit affirmed the Court's dismissal of all claims by one of the named plaintiffs, Alec Fisher, all off-label claims, and the on-label claims related to caffeine-content.  (Doc. No. 79.)  The Ninth Circuit remanded for further proceedings Plaintiffs' UCL, FAL, and CLRA claims insofar as they challenge four specific on-label representations.  (Doc. No. 79.)  The court determined remand was appropriate because "[a]lthough the [four on-label] statements upon which Townsend and Cross relied were not strictly false, it is plausible that they were misleading, which is all that California law requires."  (Doc. No. 79 at 4.)

This case now proceeds on the narrowed UCL, FAL, and CLRA claims, which Plaintiffs seek to bring as a class action in the instant Motion.

## B. Factual Background

The four on-label representations that remain at issue are:

- "Hydrates Like a Sports Drink" ("Hydrates statement");
- "Re-hydrate;"
- "Consume Responsibly – Max 1 can every 4 hours, with limit 3 cans per day.  Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing." ("Consume Responsibly statement"); and
- "It's an ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can." ("Ideal Combo statement")

(Mot. at 1-2.)

Plaintiffs allege these four statements are misleading for varied reasons.  They claim that the Hydrates statement is misleading because "[t]o the extent that energy drinks, including Monster Drinks, have any hydrating qualities, they do *not* hydrate like a sports drink.  Sports drinks contain water, salt and sugar, and are designed to replenish the electrolytes and energy one's body loses during exercise."  (SAC ¶ 36 (emphasis in original).)  Further, Plaintiffs aver the Hydrates and Re-hydrate statements are misleading because "consumption of [Monster Rehab drinks] as prescribed on the label could cause severe dehydration because the combination of caffeine and guarana in energy drinks acts as a diuretic." (SAC ¶ 111.)  With respect to the Consume Responsibly and Ideal Combo statements, Plaintiffs allege both statements are misleading regarding

"potential health risks associated with frequent consumption of Monster Drinks."  (SAC ¶¶ 41, 113-14.)

Townsend avers that the Consume Responsibly statement led him to believe the drinks were "safe (or not unsafe)" to consume within the recommended limits.  (SAC  ¶ 24.)  Similarly, Cross claims he understood the Ideal Combo and Consume Responsibly to mean the drinks were "safe (or not unsafe)" to consume within the recommended limits.  (SAC ¶ 25.)  Yet, despite their beliefs and understandings of the safety of Defendants' drinks, they both allege that consuming Defendants' drinks was injurious to their health.  (SAC ¶¶ 24-25.)  They both also both assert that they would not have paid a premium for Defendants' drinks if they knew the drinks exposed them to health risks.  (SAC ¶¶ 24-25.)

Plaintiffs claim the challenged statements were uniformly made on the labels of particular types of Monster Drink cans.  (Mot. at 1.)  Specifically, they allege the Ideal Combo and Consume Responsibly statements appeared on Monster Energy's Original Green can, and the Hydrates, Re-hydrate, and Consume Responsibly statements appeared on relevant types of Monster Rehab cans.  (Mot. at 1-2; Opp'n at 3.)  The relevant types of Monster Rehab cans are Rehab Lemonade, Rehab Orangeade, Rehab Green Tea, Rehab Rojo Tea, and Rehab Protean.  (Mot. at 1; Opp'n at 3.)[2]

Plaintiffs contend the challenged statements were uniformly made and others were and are similarly affected by purchasing Monster Drinks at

_____

[2] References to Rehab or Rehab products in this Order are to these particular varieties.

a premium for the marketed purpose.  (SAC ¶¶ 70-82.)  They thus seek to certify the following two classes under Federal Rule of Civil Procedure 23:

(1) All persons who purchased the Original Monster Energy drink for personal use and not for resale from December 12, 2008 to the present ("Energy Class'); and

(2) All persons who purchased Monster Rehab Tea + Lemonade _ Energy, Monster Rehab Rojo Tea + Energy, Monster Rehab Green Tea + Energy, Monster Rehab Protean + Energy, and Monster Rehab Tea + Orangeade + Energy (collectively, "Monster Rehab") for personal use and not for resale from March 1, 2011 to the present ("Rehab Class").

(Mot. at 1.)

## II.    EVIDENTIARY MOTIONS AND OBJECTIONS

The Court first addresses the parties' evidentiary motions and objections in order to determine the scope of evidence to be considered in resolving the instant Motion for Class Certification.  Defendants filed two Motions to Strike, (Doc. Nos. 109, 110), as well as Objections (Doc. No. 153).  Plaintiffs filed three Motions to Exclude, (Doc. Nos. 130, 137, 153).  These motions and objections are addressed in turn below.

### A.  Legal Standard for Expert Witnesses

Federal Rule of Evidence Rule 702 governs the admissibility of expert testimony and provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court announced that the trial court acts as a "gatekeeper" to the admission of expert scientific testimony and must ensure that all admitted expert testimony is "not only relevant but reliable."  509 U.S. 579, 589, 597 (1993). The Supreme Court later clarified that this gatekeeping function extended beyond scientific testimony to all expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The proponent of the expert testimony has the burden of proving that the proposed expert testimony is admissible under Federal Rule of Evidence 702, *Daubert*, and its progeny.  *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  This means "the district court can exclude an expert's opinion if the expert fails to identify and defend the reasons" for his conclusions.  *Id.*  Where the expert's testimony is not the product of peer-reviewed research produced outside the course of litigation, "the expert 'must explain precisely how [he] went about reaching [his]

conclusions and point to some objective source . . . to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'" *Id.* at 597 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318-19 (9th Cir. 1995) ("*Daubert II*")) (formatting in original).

An expert's testimony is relevant when the testimony is "relevant to the task at hand, . . . *i.e.*, that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315 (9th Cir. 1995) (quoting *Daubert*, 509 U.S. at 597).  Relevancy requires opinions that would assist the trier of fact in reaching a conclusion necessary to the case.  *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998).

"A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) (holding that the trial court's decision in admitting or excluding expert testimony will be reviewed for abuse of discretion).  "In determining the reliability of a proffered expert, courts 'scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.'" *Claudia Morales, et al. v. Kraft Foods Group, Inc., et al.*, No. CV-14-04287-JAK (PJWx), 2017 WL 2598556, at *10 (C.D. Cal. June 9, 2017) (quoting Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendment)).  "[T]he district court must keep in mind Rule 702's broad parameters of reliability, relevancy, and

8

assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1988).

The Ninth Circuit has clarified that some challenges to experts' testimony and reports affect the weight, rather than the admissibility, of the expert's opinion: "Disputes as to the strength of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy*, 161 F.3d at 1231 (internal formatting omitted) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Still, the Supreme Court has cautioned that "conclusions and methodology are not entirely distinct from one another." *Gen. Elec.*, 522 U.S. at 146. As such, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Nothing in either *Daubert* or the Federal Rules of Evidence requires the admission of opinion evidence connected to existing data "only by the ipse dixit of the expert." *Id.*

## B. DEFENDANTS' MOTION TO STRIKE STEFAN BOEDEKER'S EXPERT REPORT AND TESTIMONY

Plaintiffs designated Stefan Boedeker as an economic damages expert. (Doc. No. 125 ("Boedeker Opp'n") at 1-4.) Mr. Boedeker is a statistician and economist by training. (Doc. No. 95-6 ("Boedeker Report") at 1.)[3] Plaintiffs retained Mr. Boedeker "to develop an economic loss model to quantify the damages, if any, suffered by the proposed class that are

---

[3] Defendants do not challenge Mr. Boedeker's qualifications as an expert. The Court therefore finds he is adequately qualified to opine as a damages expert.

attributable to the four misstatements" at issue in this action.  (Boedeker Report at 6.)  Defendants argue Mr. Boedeker's report and testimony should be stricken on multiple grounds, discussed below.

### i.    Mr. Boedeker's report

Mr. Boedeker conducted a consumer survey and choice-based conjoint analysis.  (Boedeker Report at 45.)  "The general idea behind Conjoint Analysis is that consumers' preferences for a particular product are driven by features or descriptions of features embodied in that product. Conjoint Analysis . . . stud[ies] consumers' decision-making processes, determining trade-offs between products, features, and price, as well as quantifying consumers' gains and/or losses of utility when choosing between different alternatives."  (Boedeker Report ¶ 68.)

Mr. Boedeker sought to determine the premium paid for contested attributes.  "An attribute is a tangible characteristic or feature of a product (color, price, etc.) or an intangible claim or statement made about a product ("100% organic," "toxin free," etc.).  Each attribute is made up of a varying number of levels – the minimum being two levels."  (Doc. No. 134-1, Ex. 1 ("Boedeker Rebuttal") ¶ 97.)  "By observing how respondents evaluate products in response to changes in the underlying attribute levels offered at different price levels, it is possible to estimate the impact (utility) each attribute level has on overall product preference and ultimately product choice."  (Boedeker Rebuttal ¶ 99.)

To measure the premium paid for each attribute, Mr. Boedeker measured the impact of the following relevant statements in his survey: (1)

"Long Lasting Energy;" (2) "RE-HYDRATE to Bring You Back;" (3) "Hydrates like a Sports Drink;" (4) "Ideal Combo of the Right Ingredients in the Right Proportion;" and (5) "Safe level of consumption <u>incorrectly</u> specified on label" or "Safe level of consumption <u>correctly</u> specified on label."  (Boedeker Report, Ex. B.)  Mr. Boedeker also measured which drink features drove respondents' purchasing decisions.  (Boedeker Report at 29-30.)

Based on the results of this survey and his analysis, Mr. Boedeker opined that survey respondents would have paid $1.82 less for a product that had only the Monster flavors and none of the attributes Plaintiffs allege Defendants falsely claimed.  (Boedeker Report at 45.)  He estimated that "Re-hydrate to bring you back" adds $0.66 in value to the can; "Hydrates like a sports drink" adds $0.41 in value; "Ideal Combo of the Right Ingredients in the Right Proportion" adds $0.58 in value; and the safe levels of consumption statement adds $1.61 in value.  (Boedeker Report at 43-44.)

### ii. Mr. Boedeker's conclusions regarding the Re-hydrate, Consume Responsibly, and Ideal Combo statements lack support.

Defendants contend Mr. Boedeker's survey data and conclusions regarding the price impact of the Re-hydrate, Consume Responsibly, and Ideal Combo statements are unreliable because the survey presented materially different versions of the statements.  (*See* Doc. No. 109 ("Boedeker Mot.") at 7-13.)  The Court agrees that the alterations render his data and opinions as to these statements unreliable and irrelevant.

In order for Plaintiffs to meet the Rule 23(b)(3) requirement of predominance, they must show that the same representations were

specifically made to each class member.  *Gonzalez v. Proctor and Gamble Co.*, 247 F.R.D. 616, 624-26 (S.D. Cal. 2007); *see also Caro v. Proctor & Gamble Co.*, 18 Cal. App. 4th 644, 668-69 (1993) (finding a common question did not predominate where the proposed class of consumers were exposed to varying juice descriptors).  Additionally, under Rule 23(b)(3), Plaintiffs must also present a damages model measuring only the damages attributable to their liability theory.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  Liability for UCL, FAL, and CLRA violations require a factfinder to determine that a defendant's particular representations are false or likely to mislead a reasonable consumer.  *See Kwikset Corp. v. Superior Court*, 41 Cal. 4th 310, 326-329 (2011); *see also* Doc. No. 79 at 2 (finding plaintiff Fisher did not have standing because he failed to allege that he relied on any specific misrepresentation by Defendant).  The exact wording of each statement is thus critical to Plaintiffs' claims and class certification.

Plaintiffs argue Mr. Boedeker's alterations to the statements are justifiable, within the purview of his expertise, and consistent with general principles of conjoint analysis.  (Boedeker Opp'n at 17-20.)  The Court disagrees, particularly in light of Mr. Boedeker's explanations — or lack thereof — of the changes.  Mr. Boedeker's abbreviation of the Ideal Combo statement, description of the Consume Responsibly statement, and embellishment of the Re-hydrate statement renders his survey as it relates to these statements irrelevant and any conclusions drawn from it and extrapolated to the actual alleged misrepresentations unreliable.

### 1.    Ideal Combo statement

Regarding the Ideal Combo statement, Mr. Boedeker shortened "It's the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can" to "Ideal combo of the right ingredients in the right proportion."  When asked during his deposition the reason for excluding "to deliver the big bad buzz" from his survey, Mr. Boedeker replied:

> That was . . . mainly the spacing issue.  If these boxes get too big and there's too much wording in there then, yeah, distract almost like the participants.  Because my study was not the goal to measure the consumer's interpretation of these statements, but my study was more like there's a statement of that kind and what is the difference between having that statement versus not having [] that statement.

(Doc. No. 114, Ex. B ("Boedeker Dep.") at 166:19-167:10.)  In other words, Mr. Boedeker's explanation was that the boxes in the grid of attributes were too small to fit the entire Ideal Combo statement.  He provides no further explanation as to his determination that 21 words would distract survey respondents while 10 words would not.  Mr. Boedeker further testified that he would have no way to determine the impact of the words "to deliver the big bad buzz" on consumers.  (Boedeker Dep. At 168: 18-169:13.)

Plaintiffs argue that Mr. Boedeker's omission of the latter half of the Ideal Combo statement was a "reasonable judgment call" because he included "the actionable portion" of the statement while omitting the "puffery portion."  (Boedeker Opp'n at 18-19.)  This argument is unpersuasive for multiple reasons.

13

First, Mr. Boedeker's testimony does not support this explanation for his decision, as detailed above.[4]  Second, whether a statement or a portion of a statement is puffery is a legal conclusion that Mr. Boedeker is not qualified to make.  *See Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) ("[T]he determination of whether an alleged misrepresentation 'is a statement of fact' or is instead 'mere puffery' is a legal question . . .  A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance.")

Finally, and most importantly, the second half of the statement is essential to understanding its meaning because it informs the consumer what purpose the phrase "right ingredients in the right proportion" serves.  Without the latter half of this statement, the consumer is left guessing whether the ingredients are the "ideal combo" for energy, hydration, flavor, or any other possible attributes an energy drink might tout.  Plaintiffs' Second Amended Complaint supports this by alleging that Plaintiff Cross "understood [the Ideal Combo statement] to mean that Monster Drinks were

---

[4] Mr. Boedeker describes the latter portion of the Ideal Combo statement as "puffery" for the first time in his Rebuttal Report, in which he states, "It is my opinion, that the chosen wording in the choice menu fully captures the essence of the first three statements at issue.  Defendants have shown no evidence that a full and verbatim copy of the entire 'puffery' slogan would make any difference."  (Boedeker Rebuttal ¶ 104.)  Mr. Boedeker provides no authority or evidence for this opinion.  Further, the burden is on Plaintiffs and Mr. Boedeker to respond specifically and substantively to Defendants' critiques.  *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 950-51 (C.D. Cal. 2015).  Mr. Boedeker's conclusory assertion that his chosen wording "fully captures the essence of the first three statements at issue" is not enough for the Court to deem his methodology reliable, particularly given that, as Plaintiffs highlight, Mr. Boedeker's expertise is not in interpreting words and his survey did not measure respondents' understanding or interpretation of the statements.  (*See* Opp'n at 8, 17.)

safe (or not unsafe) for consumption and would provide energy without exposing people to health risks."  (SAC ¶ 25(a).)  Thus, not only does Mr. Boedeker's survey fail to measure the specific Ideal Combo statement, his survey fails to capture the "sentiment" of the statement.[5]  The Court finds Mr. Boedeker's conclusion regarding the premium associated with the Ideal Combo statement is unsupported and unreliable.

## 2.    Re-hydrate statement

Plaintiffs allege Defendants' on-label "Re-hydrate" claim is false or misleading because Monster beverages are not hydrating.  (Mot. at 4; *see also* SAC ¶¶ 34, 87, 111.)  Mr. Boedeker's survey measured the impact of the statement, "Re-hydrate to bring you back."  When asked at his deposition why he chose this phrase, he responded, "I don't recall any specific reasoning why I chose those particular words."  (Boedeker Dep.

---

[5] Plaintiffs' prolix Second Amended Complaint conceivably could be read to allege that only the "ideal combo of the right ingredients in the right proportion" part of the sentence is false or misleading.  (*See* SAC ¶¶ 35, 89-90, 114, 123.)  In any event, Plaintiffs fail to raise this issue in the briefing on the instant motion.  Further, an attempt to challenge a sentence fragment would be improper.  For example, if an advertisement read, "This product stops hair loss in 1% of the population," a plaintiff could not maintain a false allegation claim by choosing to challenge only "This product stops hair loss." The complete statement would be required for a factfinder to determine whether the statement was misleading.  *See Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1399 (E.D. Cal. 1994) ("[I]f the alleged misrepresentation, in context, is such that no reasonable consumer could be misled, then the allegation may also be dismissed as a matter of law.").  The same applies here, as discussed above; the entire Ideal Combo sentence is required to understand its meaning and gauge whether it is misleading or false.  Finally, this reading of the Ideal Combo statement in its entirety is consistent with the Ninth Circuit's understanding of what statement Plaintiffs challenge in their complaint.  (*See* Doc. No. 79 at 3-5.)

147:6-13.)  His own interpretation of the phrase was, "rehydration to bring you back is bringing you back to a level of activity, energy."  (Boedeker Dep. 148:7-10.)  As to how respondents may have interpreted the phrase, Mr. Boedeker testified that there "[may be] potentially as many different interpretations as there are survey respondents."  (Boedeker Dep. 148:21-24.)

Plaintiffs provide no explanation for the change in the Re-hydrate statement, despite Plaintiffs' burden to show that Mr. Boedeker's report satisfies Rule 702.  Plaintiffs only offer a general explanation that the recommended methodology for conjoint analysis includes using concise statements with concrete meanings in describing attributes of the product at issue.  (Boedeker Opp'n at 18.)  Expanding the Re-hydrate statement conflicts with this objective, as Mr. Boedeker's own subjective interpretation of the statement illustrates.  Instead of focusing on the hydration portion of the embellished statement, his interpretation focused on the energy invoked by the "bring you back" portion of the statement.  This explanation reveals the importance of using the precise language of the statements at issue. Additionally, adding language that confuses the re-hydrates and hydration attributes with energy may be particularly critical to the analysis since Mr. Boedeker's survey shows that the energy attribute of a drink is a much stronger market driver than the hydration attribute.  (Boedeker Report at 30.)

Mr. Boedeker's inability to articulate any reason for changing the statement, particularly when the change makes the meaning of the representation *less* clear, significantly undercuts Plaintiffs' plea that Mr.

Boedeker should be afforded great deference to design his survey as he sees fit in view of his expertise.  Given Plaintiffs' claims, Mr. Boedeker's alteration of the Re-hydrate statement renders his survey as to this statement irrelevant and unreliable.

### 3.    Consume Responsibly statement

Plaintiffs allege the statement "Consume Responsibly – Max 1 can per four hours, with limit 3 cans per day.  Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing" is misleading because "consuming even three Monster Drinks (or less) per day as prescribed on the label can be unsafe for adults, and especially unsafe for the youth and children [who] Monster target[s] with its marketing." (SAC ¶ 90.)  Mr. Boedeker's survey did not provide this statement or any equivalent statement for the respondents to assess; instead, he described in broad terms the type of statement that might be on such a label by providing the options: "safe level of consumption incorrectly specified;" "safe level of consumption correctly specified;" "no information on label regarding safe level of consumption;" or nothing at all.  (Boedeker Report, Ex. B.)   Mr. Boedeker testified that he designed the question such that there was "a product choice that as the participant knows there's a safety statement on a label, they know it is correct, incorrect or it is not there at all and I want to see how does that determine [demand]."  (Boedeker Dep. 297:22-298:7.)

Mr. Boedeker's analysis of the "safe level of consumption" statements is untethered to Plaintiffs' theory of liability.  Plaintiffs allege they relied on the Consume Responsibly statement to determine the amount that is safe to

consume.  (SAC ¶¶ 24, 25(a).)  Plaintiffs' allegation is rooted in the assumption that the level of consumption is correctly specified.  Comparing the price impact of a correct, rather than an incorrect, safety statement is irrelevant; only a label perceived as being correct is at issue here.  Further, assigning a safety label the descriptor of "correct" or "incorrect" presumes that a consumer is making this determination at all, as well as potentially influencing such a statement's weight.

Finally, the term "safe consumption" is materially different from "consume responsibly;" as the Court has already discussed, the exact words matter in false advertising claims.  The exact statements on the label are at issue here; a generic safety label, which Mr. Boedeker made the object of his survey, is not.  (Boedeker Dep. 305:11-18.)  Mr. Boedeker's survey results thus do not assess the premium paid for the Consume Responsibly statement; it only assesses the value of various generic safety labels.

In sum, the Court agrees with Plaintiffs that Mr. Boedeker's expertise is in determining whether the presence of words on a label affects the price of a product, but this does not ameliorate his survey's shortcomings.  To be relevant to this action, the words he is evaluating must in fact be the words on Defendants' labels.  *See Kwikset*, 51 Cal. 4th at 326-27 ("[A] plaintiff proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements." (citations and formatting omitted)); *cf. In re Tobacco II Cases*, 46 Cal. 4th 298, 325-29 (2009) (finding "where . . . a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not

required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisement or statements" in order to successfully plead a claim under the UCL).  Mr. Boedeker cannot measure only the "sentiment of the words" for three of the alleged misstatements and then use these results to determine "the price premium attributable to each of the [actual] misstatements."  (Boedeker Opp'n at 13, 17.)  The data he collected does not support such conclusions.

In order to evaluate the price premium attributable to each of the alleged misstatements, Mr. Boedeker would have had to conduct a survey that included the specific statements themselves.  *See Gonzalez*, 247 F.R.D. at 623-24 (denying class certification where class members may have relied on different representations under California precedent "that refused to certify a class when the plaintiffs could not allege that the same representations were specifically made to each class member.").  He did this for only one of the misstatements — the Hydrates statement.  The Court therefore finds that his survey results, conclusions, and testimony regarding the Re-hydrate, Ideal Combo, and Consume Responsibly statements are irrelevant and unreliable, hence must be stricken.

### iii.   Defendants' remaining criticisms of Mr. Boedeker's testimony goes to the weight of his testimony, not its admissibility.

Defendants attack Mr. Boedeker's testimony on relevance grounds, arguing (1) he did not measure how consumers interpret the statements he included in his survey; and (2) he cannot calculate restitution because he did not consider any real-world wholesale or retail pricing information.

(Boedeker Mot. at 15-19.)[6]  Defendants also contend that Mr. Boedeker's survey suffers from the following methodological flaws: (1) failure to define and draw the relevant universe appropriately; (2) inclusion of some attributes and omission of others, leading to biased and unreliable results; and (3) failure to replicate market conditions.  (Boedeker Mot. at 19-22.)

In addition to countering each of these attacks on substantive grounds, Plaintiffs argue that any challenges to survey methodology go to the weight, rather than the admissibility, of the survey.  (Boedeker Opp'n at 20.)  The admissibility threshold for survey evidence in the Ninth Circuit is notably low.  The offering party need only show that the survey is relevant and conducted according to accepted principles.  *Fortune Dynamic Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)); *see also* 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268.1 (2d ed.) ("A 'principle' is a theory that can be used to explain the meaning of observations.").  "[I]ssues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001); *see also* 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268.1 (2d ed.) ("While 'principles' refers to the

---

[6] Defendants also challenge the relevance of Mr. Boedeker's survey because of his failure to include that full text of the challenged statements.  (Boedeker Mot. at 14.)  That argument does not apply to the Hydrates statement.  His report as it relates to the other three statements have already been stricken.  The Court therefore does not address this argument further.

theories an expert employs to explain observed facts, 'methods' refers to *how* the expert collects data and derives theories or opinions from them.") (emphasis in original).[7]

Here, Defendants' remaining survey criticisms fall into the latter category.  The substantive Ninth Circuit case law Defendants cite all address challenges like theirs in the course of the Rule 23(b) analysis.  *See Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at *8 (N.D. Cal. Dec. 15, 2014) (addressing challenges to the plaintiff's damages model as part of the Rule 23(b)(3) predominance inquiry); *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) (same); *Morales*, 2017 WL 2598556, at *26 (same).

Mr. Boedeker's survey data as to the Hydrates statement meets the threshold for admissibility.  Defendants do not contest that conjoint analysis as a general matter may be used to calculate damages in FAL, CLRA, and UCL cases.  Additionally, Mr. Boedeker's survey is probative of consumers'

---

[7] Binding Ninth Circuit precedent regarding courts' evaluation of survey evidence proffered by experts thus deviates from Rule 702.  As previously discussed, Rule 702(c) requires that expert testimony is "the product of reliable principles and methods."  The Ninth Circuit has altered this analysis such that challenges to the reliability of "principles" goes to the admissibility of survey evidence, but challenges to the reliability of "methods" — *i.e.* how the survey was designed — goes to the weight of survey evidence.  *See e.g. Fortune Dynamic*, 618 F.3d at 1037 (finding the district court abused its discretion by excluding an expert's survey evidence based on challenges to its design, failure to replicate real world condition, failure to screen participants properly, and "highly suggestive" questions); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292-93 (9th Cir. 1992) (finding that criticisms regarding suggestive questions and miscoding of survey responses goes to the weight, not the admissibility, of survey evidence).

perception and valuation of the Hydrates statement and is therefore relevant to the Court's Rule 23(b)(3) predominance analysis.

While the Court finds merit in Defendants' challenges to Mr. Boedeker's survey methodology, the Court deems it more appropriate to address these arguments in its Rule 23(b)(3) predominance analysis. *See In re 5-Hour Energy Mktg. and Sales Practices Litig.*, No. 13-ML-2438-PSG (PLAx), 2017 WL 2559615, at *4-5 (C.D. Cal. June 7, 2017) (addressing the defendants' challenges to the reliability of the plaintiffs' damages expert in the court's Rule 23(b) analysis instead of as an evidentiary question because the issues raised were "closely intertwined with the Rule 23(b) predominance analysis.").

### iv.   Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Strike Mr. Boedeker's testimony and report as it relates to the Ideal Combo, Re-hydrate, and Consume Responsibly statements.  The Court **DENIES** Defendants' Motion to Strike Mr. Boedeker's testimony and report as it relates to the Hydrates statement.

### C.   DEFENDANTS' OBJECTIONS TO NEW EVIDENCE SUBMITTED WITH PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION (*I.E.*, PORTIONS OF THOMAS MARONICK'S SUPPLEMENTAL REPORT)

Defendants object to new evidence included in Dr. Maronick's Supplemental Report, (Doc. No. 134-2 ("Maronick Suppl.")) and request that the Court strike it.  (Doc. No. 152 ("Maronick Obj.").)  The evidence at issue is Dr. Maronick's Study 2 and the portions of Dr. Maronick's Supplemental

Report based on Study 2, *i.e.*, Paragraphs 3c, 11-14, and 61-88, filed in support of Plaintiffs' Reply.  (Maronick Obj.)

Plaintiffs submitted Dr. Maronick's original report in support of their Motion on June 26, 2017.  This report contains data and results from a survey Dr. Maronick conducted between May 15 and 22, 2017.  (Doc. No. 95-5.)[8]  Defendants took Dr. Maronick's deposition on September 6, 2017 and filed a Motion to Strike Dr. Maronick as an expert on October 16, 2017.  (Doc. No. 110; Maronick Obj. at 1.)  Plaintiffs opposed Defendants' motion on November 13, 2017, and Defendants replied on December 5, 2017.  (Doc. Nos. 124, 128.)  The same day Defendants filed their reply, Plaintiffs filed their reply in support of their Motion for Class Certification and disclosed for the first time Dr. Maronick's second survey (Study 2), which he conducted approximately two months earlier, between October 5 and 11, 2017.  (Maronick Obj. at 2; Maronick Suppl. ¶ 67.)

Dr. Maronick states in his Supplemental Report that he designed Study 2 to "address any perceived flaws in my [original study], and to assess what impact, if any, these minor errors had on the resulting data and conclusions."  (Maronick Suppl. ¶ 3(c).)  "Specifically, [Dr. Maronick] wanted to evaluate whether there were substantial differences in the survey results if participants were asked if they 'purchased' Monster products instead of whether they 'consumed' them."  (Maronick Suppl. ¶ 62.)  He also rephrased other questions in response to Defendants' critiques and adjusted his survey population.  (Maronick Suppl. ¶ 62.)

---

[8] Dr. Maronick's study and Defendants' Motion to Strike his report is discussed in detail in Section II.D, *infra*.

Defendants object that Plaintiffs failed to disclose the report before Defendants filed their reply brief in support of the Motion to Strike Dr. Maronick's report.  Thus, Defendants argue, they were prejudiced because they had no opportunity to evaluate and respond to his conclusions based on Study 2.  (Maronick Obj. at 2.)  Defendants therefore request the Court strike Study 2, or, in the alternative, allow Defendants the opportunity to re-depose Dr. Maronick and file either a sur-reply to Plaintiffs' Motion for Class Certification or a supplemental brief in support of Defendants' motion to strike his report.  (Maronick Obj. at 4.)

Plaintiffs first argue Defendants should have filed their Objection as a motion to strike, thus triggering Local Rule 7-3.  This argument lacks merit; parties routinely challenge new evidence filed in support of a reply by objecting to such new evidence.  *See e.g. S.E.C. v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1087 n. 9 (9th Cir. 2010) (recognizing that the proper way for the defendant to challenge the plaintiff's new evidence submitted with their reply brief would be to file an objection).

Next, Plaintiffs argue Dr. Maronick's Study 2 is not new evidence because it uses the same methodology, evaluates the same statements, and arrives at the same conclusions.  (Doc. No. 160 ("Maronick Obj. Opp'n") at 1-6.)  These arguments lack merit — Dr. Maronick's Study 2 is new evidence.  It consists of several substantive changes to the design of the original survey, and the redesigned survey generated a new data set analyzed by Dr. Maronick.

Dr. Maronick generated an entirely new data set, a critical factor making this distinguishable from the cases Plaintiffs cite in support of their argument that Study 2 is admissible.  There is a distinction between advancing rebuttal arguments or means of evaluating existing underlying data or information, as discussed in cases cited by Plaintiffs, and generating entirely new data or information which could not conceivably have been appraised by the opposing party's expert.  *See Ohio Six Ltd. v. Motel 6 Operating L.P.*, No. CV 11-08102-MMM (Ex), 2013 WL 12125747, at *16-17 (C.D. Cal. Aug. 7, 2013) (permitting a rebuttal expert to offer a different means of valuing damages based on the same underlying information); *In re Beer Antitrust Litig.*, No. C-97-20644-JF, 2002 WL 1285320 (N.D. Cal. Apr. 3, 2002) (permitting a supplementary expert declaration that presents rebuttal arguments, not new evidence); *Zkey Investments, LLC v. Facebook Inc.*, 225 F. Supp. 3d 1147, 1158-59 (C.D. Cal. 2016) (finding textbooks and other patents the defendant's expert relied upon in rebutting the plaintiff's expert did not constitute new evidence).

The other three cases cited by Plaintiffs are inapposite because the court in each case considered the admissibility of expert testimony under Federal Rules of Civil Procedure 26 and 37.  *See A.C.T. 898 Prods. v. W.S. Indus., Inc.*, No. CV 16-0476, 2017 WL 2992741. At *2-3 (C.D. Cal. Apr. 11, 2017); *Negrete v. Allianz Life Ins. Co. of N. America*, No. CV 05-06838-CAS (MANx), 2013 WL 6535164, at *25-26 (C.D. Cal. Dec. 9, 2013); *Jones v. Weatherby, Inc.*, No. CV 08-210-JLQ, 2009 U.S. Dist. Lexis 62211, at *16-20 (E.D. Wash. July 20, 2009) (also finding the defendant's supplementary expert report admissible because the plaintiff had prevented the earlier

examination of the existing physical evidence that yielded new evidence, and the defendant offered to move jointly to re-open discovery to permit its expert to be deposed).

Generally, "reply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion." *Burnham v. City of Rohnert Park*, 1992 WL 672965, at *1 n. 2 (N.D. Cal. May 18, 1992) (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990).) "New evidence submitted as part of a reply is improper" because it does not allow the defendant an adequate opportunity to respond. *Morris v. Guetta*, 2013 WL 440127, *8 (C.D. Cal. Feb. 4, 2013). For this reason, the district court may decline to consider new evidence or arguments raised in reply, and generally "should not consider the new evidence without giving the non-movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *Deirmenjian v. Deutsche Bank, A.G.*, 2006 WL 4749756, at *6 n. 52 (C.D. Cal. Sept. 25, 2006).

The new evidence presented in the Reply must be stricken. Plaintiffs had two months to disclose Dr. Maronick's Study 2 and could have included it in their opposition to Defendants' Motion to Strike Dr. Maronick's testimony and report. They failed to do so. This failure is particularly troublesome since Plaintiffs contend that Dr. Maronick's Study 2 bolsters the validity of Dr. Maronick's first report; the timing of Plaintiffs' disclosure of the new evidence thus appears aimed at strategically limiting Defendants' opportunity to respond. Whatever Plaintiffs' motives in the timing of Study 2's disclosure, the Court is unwilling to alter the scheduling order for this case and further postpone the hearing on the Motion for Class Certification

as would be required to allow Defendants time to cross-examine and respond to the new evidence where such delays could have easily been prevented by Plaintiffs' earlier disclosure of the new survey evidence. *See Getz v. Boeing Co.*, 654 F.3d 852, 868 (9th Cir. 2011) (requiring the district court to permit the defendant an opportunity to respond to the plaintiff's new evidence filed in a reply prior to considering the evidence).

For the foregoing reasons, the Court **SUSTAINS** Defendants' Objection to Dr. Maronick's Supplemental Report and correspondingly **STRIKES** Dr. Maronick's Study 2 and Paragraphs 3c, 11-14, and 61-88 of Dr. Maronick's Supplemental Report.

### D. Defendants' Motion to Strike Thomas Maronick's Expert Report and Testimony

Plaintiffs retained Dr. Thomas Maronick "to design and implement an online survey to assess[] consumers' perceptions of claims made on certain [. . . ] varieties of Monster energy drink cans that are at issue in this litigation." (Doc. No. 98 ("Maronick Report") ¶ 4.) To this end, Dr. Maronick conducted a survey of people 18 years or older who drink Monster-branded energy drinks. (Maronick Report ¶ 14.) Survey participants were then shown one of four statements and then asked what the statement means to them in both an open-ended and close-ended question format. (Maronick Report ¶¶ 15-17.) The four statements shown were (1) "The ideal combo of the right ingredients in the right proportion to deliver the big buzz that only Monster can;" (2) "Re-hydrate;" (3) "We have a new drink. One that can do it all: a triple threat that quenches thirst, hydrates like a sports drink, and brings you back after a hard day's night;" and (4) "CONSUME

RESPONSIBLY – Max 1 can every 4 hours, with limit 3 cans per day. Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing." (Maronick Report ¶¶ 15-17, 23-31.)[9] Participants were also asked their reasons for drinking Monster Energy Drinks. (Maronick Report ¶¶ 21-22.)

Based on the data collected in this survey, Dr. Maronick offered a series of conclusions regarding why consumers buy Monster Energy Drinks, what the tested language communicates to consumers, and the degree of importance buyers place on particular statements. (Maronick Report ¶¶ 34-39.) Plaintiffs offer Dr. Maronick's survey and conclusions to show "how the materiality of a reasonable consumer's perception is a common question of fact to the class as a whole" as part of Plaintiffs' Rule 23(b)(3) predominance showing. (Doc. No. 124 ("Maronick Opp'n") at 6.) Defendants move to exclude the entirety or, alternatively, portions of Dr. Maronick's survey and conclusions on various grounds, discussed in turn below. (*See* Doc. No. 110 ("Maronick Mot.").)[10]

### i.   Relevancy of Dr. Maronick's report

Defendants argue Dr. Maronick's survey is not helpful, and hence should be stricken, because he did not ask survey participants about why they *purchased* Monster energy drinks; he asked only their understanding of each statement. (Maronick Mot. at 10-11.) As Dr. Maronick testified at his deposition, "the purpose

---

[9] The same "block" of survey participants were shown statements three and four. (Maronick Report ¶¶ 15-17, 23-31.)

[10] Defendants do not challenge Dr. Maronick's qualifications as an expert.

of [the] study was not to measure [the] incremental impact, it was to measure consumers' perceptions of the statements that were made on [Defendants'] cans." (Doc. No. 114-1, Ex. A ("Maronick Dep.") at 79:12-15.)

"On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiffs' claims; instead the testimony must be relevant in assessing 'whether there was a common pattern and practice that could affect the class as a whole.'" *In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *3 (quoting *Ellis*, 657 F.3d at 983). Here, Plaintiffs offer Dr. Maronick's survey to show materiality, a key component of the predominance inquiry. In the context of CLRA, FAL, and UCL claims, "[a] misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Kwikset Corp.*, 51 Cal. 4th at 332-33 (quoting *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 976-977 (1997));[11] *see*

---

[11] Defendants provide a slightly different test for when a statement is "material" in their briefing on this motion: "Whether an allegedly false or misleading statement is material depends on whether the statement is 'likely to influence the purchasing decision.'" (Maronick Mot. at 10 (quoting *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003).) This materiality test is derived from the Ninth Circuit's elements to establish a false advertising claim under the Lanham Act. *Rice*, 330 F.3d at 1181. This is not the phrasing of the test commonly employed in California state FAL, CLRA, and UCL causes of action which form the basis of the action here. The Court therefore employs the test for materiality embraced by the California courts, cited above, as the substantive claims are rooted in California law.

Further, California courts maintain a misrepresentation may also be judged to be material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Kwikset Corp.*, 51 Cal. 4th at 332-33 (quoting Rest. 2d Torts, § 538, subd. (2)(b)). Plaintiffs here rely only on the

*also Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014) ("For purposes of class certification, the UCL, FAL, and CLRA are materially indistinguishable."  (citing *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 589 n. 3 (C.D. Cal. 2011)).  A statement may be considered material even if it does not affect a reasonable consumer's assessment of the pecuniary advantage of the transaction if the misstatement would affect another "sentimental" consideration.  Rest. 2d Tort § 538 (1977); *see e.g. Kumar v. Salov North America Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *8 (N.D. Cal. July 15, 2016) (finding that a misrepresentation regarding a product's origin may be a material misrepresentation); *In re Steroid Hormone Product Cases*, 181 Cal. App. 4th 145, 157 (2010) (finding that the legality of possessing or selling a product may be material to a consumer's purchasing decision).

One question presented in this case is whether a reasonable consumer, when determining whether to purchase one of Defendants' products, would find it important that the statements at issue were false or misleading.  Part and parcel of this inquiry is an understanding of how reasonable consumers perceive and interpret the statements at issue.  This understanding is necessary to determine whether Defendants' products did not in fact have the properties Defendants led consumers to believe they had.  Dr. Maronick's survey is relevant to this inquiry because it provides insight into how respondents understood Defendants' labels, even if it does not measure the impact of this understanding on consumers' ultimate

definition of materiality above.  (Doc. No. 95-1 at 16-17.)  The Court therefore does not address this alternative materiality test further.

purchasing decisions.  The Court therefore DENIES Defendants' Motion to Strike Dr. Maronick's report and testimony on relevancy grounds.

### ii.  Dr. Maronick's survey data and conclusions regarding the Ideal Combo statement are unreliable

Defendants challenge Dr. Maronick's survey as it relates to the Ideal Combo statement because his questions do not accurately reflect the challenged statement: he omitted the word "bad" from the "big bad buzz" portion of the Ideal Combo statement.  (Maronick Mot. at 19-20; Maronick Report at ¶¶ 23-24.)  Dr. Maronick then asked respondents what this shortened statement meant to them in both open-ended and close-ended question formats.  (Maronick Report at ¶¶ 23-24.)

When deposed about why he omitted the word "bad" from his questions regarding this statement, he responded, "That was a typo.  I didn't even realize it wasn't there until now."  (Maronick Dep. at 106:19-20.)  When asked whether the omission influenced respondents' answers, he replied that he could not "speculate as to whether it would have an impact" because he does not know.  (Maronick Dep. at 107:17-23.)  Dr. Maronick stated he "would expect that it would have no impact" on the accuracy of his results, but provided no explanation as to why not.  (Maronick Dep. at 107:3-11.)

Later, in his Supplemental Report dated November 30, 2017, in which he responded to Defendants' criticisms of his report, he notes in a footnote: "The word 'bad' was inadvertently left out of the [Ideal Combo] statement. However, there is no evidence that the omission had any effect, let alone a measurably significant one, on consumers' responses."  (Maronick Suppl. at

26, n. 39.)  Dr. Maronick also provides no evidence that the omission did *not* have any effect on consumers' responses, and Dr. Maronick does not contradict his deposition testimony that he does not know one way or the other whether the word "bad" would have changed the survey responses.[12] (Maronick Dep. at 112:6-13.)  Plaintiffs do not provide any other evidence regarding the consequence, or lack thereof, of the omission of the word "bad" on survey responses.

Plaintiffs' only response is that "Defendants cite no authority stating a survey question must contain every word of a challenged statement or particular phrase in order for the results to be admissible."  (Maronick Opp'n at 20.)  As previously noted, the proponent of the expert testimony, Plaintiffs here, has the burden of proving the admissibility and defending the reliability of the proposed expert's testimony.  *Lust ex rel. Lust*, 89 F.3d at 597-98. Thus, Plaintiffs' tactic of attacking the sufficiency of Defendants' arguments rather than pointing to affirmative evidence indicating the reliability of their expert's testimony is unpersuasive.

As discussed in detail in Section II.B(ii) *supra*, the specific representations are critical in false advertising cases.  Plaintiffs and Dr. Maronick provide no evidence to show that consumers understand "The ideal combo of the right ingredients in the right proportion to deliver the big

---

[12] As discussed in Section II.C *supra*, the Court strikes Dr. Maronick's second survey.  The Court notes, however, that even if the Court were to consider Dr. Maronick's second survey, Study 2 does not shed light on whether the omission of the word "bad" affected respondents' perception of the Ideal Combo statement because Dr. Maronick re-tested three of the four challenged statements, choosing not to re-test the complete Ideal Combo statement.  (*See* Maronick Suppl. ¶¶ 61-89.)

buzz that only Monster can" in the same way as the complete Ideal Combo statement.  They even decline to explain why Dr. Maronick "expects" the word "bad" would not have an impact on survey respondents' perception of the statement.  The Court therefore concludes that Dr. Maronick's survey cannot reliably be extrapolated to provide evidence of consumers' understanding of the Ideal Combo statement.  *See Schudel v. Gen. Elec. Co.*, 120 F.3d 991, 997 (9th Cir. 1997), *abrogated on other grounds by Weisgram v. Marley Co.*, 528 U.S. 440 (2000) (finding the district court abused its discretion in admitting expert testimony when the witness could not establish it was acceptable to extrapolate conclusions not directly tied to the underlying data).  Hence, the Court finds Dr. Maronick's survey results regarding the shortened Ideal Combo statement irrelevant, and any conclusions propounded regarding the complete Ideal Combo statement unsupported.

Accordingly, the Court STRIKES paragraphs 23, 24 and 35 as well as the phrase "Monster Energy as having the ideal combination of ingredients to provide energy in the appropriate balance and" in paragraph 39 from Dr. Maronick's report.

### iii.   Dr. Maronick's conclusions regarding why consumers buy Defendants' beverages are unreliable

Defendants argue Dr. Maronick's conclusions that (1) "the 'Consume Responsibly' warning on cans of Monster Energy Drinks is clearly important to [*sic*] Monster Energy Drink buyers," (Maronick Report at ¶ 38); and (2) "consumers rely on Monster's statements on can labels to buy Monster Energy drinks," (Maronick Report at ¶ 39), are not supported by his survey

and thus unreliable.  (Maronick Mot. at 11-14.)[13]  Defendants argue that because Dr. Maronick's survey did not determine whether respondents had ever purchased a Monster Energy drink nor measure the impact the challenged statements had on purchasing decisions, Dr. Maronick cannot conclude what is "clearly important" to purchasers nor why purchasers buy Monster Energy drinks.  (Mot. at 13.)

Plaintiffs concur that Dr. Maronick did not opine on whether the challenged statements factored into consumers' purchasing decisions.  (Maronick Opp'n at 13.)  Nevertheless, Plaintiffs argue Dr. Maronick can validly infer that his survey respondents purchased Monster Energy drinks.  (Maronick Opp'n at 12-14.)  In support, Plaintiffs cite Dr. Maronick's deposition testimony in response to the question why he did not ask survey respondents to identify the drink they most frequently purchased:

> In my judgment[,] they are the same thing.  In my experience[,] these are something that they buy for themselves.  This isn't the kind of thing where the primary food shopper would be buying it for a family. . . . They are buying it.  They are drinking it.  They are the ones that are holding this can in their hand.  So I think that was the appropriate language to use.

---

[13] Defendants also argue two conclusions drawn by Dr. Maronick in paragraph 35 are similarly unsupported.  (Maronick Mot. at 11-14.)  Since the Court has already struck this paragraph in the preceding subsection, the Court does not address these conclusions further.

(Doc. No. 124-1 ("Maronick Dep. II") at 72:4-14.)  Neither Plaintiffs nor Dr. Maronick point to any objective source in support of this opinion, such as relevant market research, nor provide any further support for it.[14]

The proponent of an expert is required to show that the witness's testimony is based on something "more than subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Plaintiffs fail to show that Dr. Maronick's assumption that energy drink consumers are energy drink purchasers is grounded in anything other than his unsupported speculation.[15]  Additionally, Dr. Maronick's conclusions regarding what is important to purchasers and what statements purchasers rely upon in deciding to buy Monster products is disconnected from the survey data. The Court therefore concludes these conclusions are unsupported and unreliable.

Accordingly, the Court STRIKES paragraph 38 and the first sentence of paragraph 39.

---

[14] Plaintiffs indicate that frequency of consumption is somehow tied to the likelihood that consumers are also purchasers.  (Maronick Opp'n at 12.)  Not only is this argument under-developed, but Plaintiffs provide no evidence, including from their own expert, that purchasing behavior is tied to frequency of consumption.  The Court therefore does not address this argument further.

[15] Plaintiffs could have supported this contention by citing Dr. Maronick's Study 2, which indicated in that sample group that 98.5% of respondents bought Monster Energy drinks for themselves.  (Maronick Suppl. at ¶ 72.)  But Plaintiffs chose not to disclose and discuss Dr. Maronick's second survey in the briefing on Defendants' Motion to Strike Dr. Maronick's expert testimony and report.  Instead, as discussed in Section II.C *supra*, Plaintiffs did not disclose Dr. Maronick's second survey until approximately three weeks later when they filed it along with their Reply in support of their class certification motion.  The Court therefore does not consider it in conjunction with this Motion.

### iv.  Dr. Maronick's conclusion regarding the contradictory nature of the representations at issue is unreliable

Defendants argue Dr. Maronick presents "absolutely no" support for the following conclusion in paragraph 39 of his report: "However, I find labels on Monster Rehab that say it re-hydrates or hydrates like a sports drink juxtaposed with a 3 cans per day consumption limit are inherently contradictory since sports drinks generally have no consumption limits on their labels."  (Maronick Mot. at 13.)  They highlight that Dr. Maronick's survey "includes no questions concerning whether respondents viewed any of the Challenged Statements as contradictory."  (Maronick Mot. at 13.)  The Court also notes that his report does not contain any kind of survey or discussion of sports drinks.  (*See* Maronick Report.)

Plaintiffs respond that this is a "common-sense observation based upon his survey results" and makes "logical sense."  (Maronick Opp'n at 11.)  Plaintiffs do not explain how this "observation" is in any way derived from his survey and there is no such connection apparent to the Court.  Further, Dr. Maronick's expertise is in marketing generally, and he does not profess to have any particular expertise in sports drinks.  Such a general observation is therefore outside the scope of his expertise.  The Court finds that this conclusion is *ipse dixit* and must be excluded.

Accordingly, the Court STRIKES the last sentence of paragraph 39 of Dr. Maronick's report.

### v.  Defendants' remaining criticisms of Dr. Maronick's report go to the weight, not the admissibility, of the survey evidence

36

Defendants lob a number of criticisms against the methodology Dr. Maronick employed in his survey, arguing he (1) did not appropriately define the relevant universe; (2) did not draw a representative sample of respondents; (3) omitted a control group, making it impossible for him to know whether respondents' perceptions are the results of the challenged statements or other factors; (4) failed to replicate marketplace conditions; and (5) asked suggestive or vague questions.  (Maronick Mot. at 14-19.)  In addition to disputing each attack, Plaintiffs argue these criticisms go to the weight, rather than the admissibility, of Dr. Maronick's survey.  The Court agrees.

As discussed in Section II.B(iii) *supra*, challenges to the methodology used in gathering survey evidence goes to the weight, rather than the admissibility, of a survey in the Ninth Circuit.  The enumerated criticisms here are all concern Dr. Maronick's methodology.  Thus, as with Mr. Boedeker's survey evidence, the Court considers these criticisms in the Court's Rule 23(b) predominance analysis as they relate to the weight of the survey evidence.

### vi.   Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Strike Dr. Maronick's testimony and report as to paragraphs 23, 24, 35, and 38, as well as paragraph 39 such that only the following remains: "Consumers perceive . . . Monster Rehab as providing hydration 'like a sports drink.'  Moreover, I find that consumers pay attention to consumption limits, (e.g., 'Limit 3 cans per day') when present on a label."  The Court

**DENIES** Defendants' Motion as to the remainder of Dr. Maronick's report and testimony.

### E. Plaintiffs' Motion to Exclude Kent D. Van Liere's Expert Report

Defendants retained Kent D. Van Liere to "design and conduct research to evaluate the messages consumers take from the labels and the extent to which allegedly misleading statements on the labels . . . were likely to influence purchasers' purchase decisions."  (Doc. No. 114-6 ("Van Liere Report") ¶ 1.)  To accomplish this, Dr. Van Liere conducted four surveys.  (Van Liere Report at 356.)  Studies 1 and 2 examined consumers' reasons for purchasing the relevant Monster beverages, and Studies 3 and 4 examined how consumers understood Defendants' labels and how the representations affected their purchasing decisions.  (Van Liere Report at 367-385.)

Defendants further retained Dr. Van Liere to evaluate the reliability of Mr. Boedeker's and Dr. Maronick's surveys.  (Van Liere Report ¶ 2.)  As to Mr. Boedeker's report, Defendants specifically asked Dr. Van Liere to assess whether the survey "reliably measures the value to purchasers of various attributes related to the claimed statements and whether the survey is designed to yield reliable results."  (Van Liere Report ¶ 2.)

Plaintiffs attack Dr. Van Liere's survey and report on multiple grounds, addressed in turn below.

### i. Dr. Van Liere is qualified to opine on Mr. Boedeker's consumer survey, but not to opine on the results of Mr. Boedeker's quantitative analysis

Plaintiffs direct a limited challenge to Dr. Van Liere's qualifications, arguing he is not qualified to evaluate Mr. Boedeker's report because (1) Dr. Van Liere is not educated or trained as an economist or statistician; and (2) Dr. Van Liere is incapable of performing or replicating Mr. Boedeker's survey. (Doc. No. 129 ("Van Liere Mot.") at 4-5.)

Dr. Van Liere obtained a Ph.D in Sociology with a specialization in research methods and statistics in 1979. (Van Liere Report at 409.) He has published extensively in journals, including on the use of sample surveys in product liability litigation, as well as technical reports that focus on consumer attitudes, choices, and behavior. (Van Liere Report at 348, 419-21.) Additionally, during his 30-year career he has conducted "several hundred studies for leading corporations and government agencies, including studies of employees, consumers, and businesses." (Van Liere Report ¶ 6.) Finally, earlier in his career, Dr. Van Liere was a tenured Associate Professor at the University of Tennessee, where he "taught undergraduate and graduate level courses in statistics, survey research methods, and social psychology." (Van Liere Report ¶ 7.)

The Court finds Dr. Van Liere's education, training, and experience qualifies him as an expert on the methodology, reliability, and design of consumer surveys, as well as the interpretations of their results. Five of the six criticisms Dr. Van Liere directed against Mr. Boedeker's report are within the scope of Dr. Van Liere's expertise. (*See* Van Liere Report ¶¶ 95-119.)

The final criticism Dr. Van Liere makes against Mr. Boedeker's report — that Mr. Boedeker's conjoint study produces an unrealistically large "economic loss" — is based on the reliability of Mr. Boedeker's quantitative methods. (*See* Van Liere Report ¶¶ 120-121.)  In this subsection, Dr. Van Liere concludes: "Given the price range that Monster Energy products typically sell for, Mr. Boedeker's estimate is simply implausible.  Put another way, Mr. Boedeker's results suggest that, for example, for an Original Green or Rehab drink priced at $2.24, approximately 81 percent of the value purchasers assign to that product are attributable to the four claims at issue, the majority of which appear on the back or side of the product label." (Van Liere Report ¶ 121.)  The reasoning for this conclusion is somewhat underdeveloped, but it is necessarily tied to Mr. Boedeker's quantitative analysis through which he arrived at his economic loss numbers totaling $1.82.  Dr. Van Liere is not qualified to opine on Mr. Boedeker's quantitative methods, and Defendants do not contend that they proffer him as an expert on quantitative methods.  (Boedeker Opp'n at 5.)  Consequently, paragraph 120 and 121 of Dr. Van Liere's report must be excluded.[16]

As to their second criticism, Plaintiffs provide no evidence or grounds for their assertion that Dr. Van Liere is incapable of replicating Mr. Boedeker's survey.  Plaintiffs also provide no case law supporting this ground for exclusion.  The only case cited in their motion, *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012), does not

---

[16] Insofar as Dr. Van Liere's opinion regarding Mr. Boedeker's value estimate is not based on Mr. Boedeker's quantitative methods, Dr. Van Liere provides no other support for this conclusion.  As such, this conclusion is *ipse dixit* and must be excluded.

suggest otherwise.[17]  In *Cholakyan*, the court excluded the contested expert because "[t]he evidence he has adduced does not adequately demonstrate that [he] exercised independent judgment; rather, it strongly suggests he took [another expert's] conclusions, engaged in little, if any, evaluation of their merits, and reproduced [the other expert's] declaration wholesale (*including its typographical errors*) as his own work."  *Id.* at 546 (emphasis in original).  The same cannot be said of Dr. Van Liere's consideration of Mr. Boedeker's report.  Further, the *Cholakyan* court recognized that an expert may validly use another expert's report as a reference point for his own assessments.  *Id.*  This is a more apt description of Dr. Van Liere's use of Mr. Boedeker's report.  Exclusion of Dr. Van Liere's rebuttal to Mr. Boedeker's report on this ground is thus denied.

### ii.   Dr. Van Liere's criticism of Mr. Boedeker's report is not cumulative to Dr. Ugone's criticism

Plaintiffs first argue Dr. Van Liere improperly relied on Dr. Ugone's opinion.  Dr. Van Liere cites Dr. Ugone's report once in his report in paragraph 120 for the average retail price of the beverages at issue.  He then refers to this average retail price only once more at paragraph 121.  Because the Court strikes these two paragraphs, as discussed above, the

---

[17] Plaintiffs cite two additional cases in their reply to Defendants' motion to strike.  (Doc. No. 161 ("Van Liere Reply") at 3 n. 2.)  These cases are inapposite.  In both, the court found that the expert at issue did not have the necessary qualification to present the damages model presented in *their own* reports.  *See In re Imperial Credit Indus., Ins. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003) and *Wolf v. Hewlett Packard Co.*, No. CV 15-01221-BRO (GJSx), 2016 WL 7743692, at *7-8 (C.D. Cal. Sep. 1, 2016).

Court does not address Plaintiffs' arguments regarding the propriety of Dr. Van Liere's reliance on Dr. Ugone's average price valuation.

Next, Plaintiffs contend Dr. Van Liere's criticism of Mr. Boedeker should be excluded as cumulative to Dr. Ugone's analysis. Rather than analyzing or arguing how Dr. Van Liere's criticism allegedly "parrots" Dr. Ugone, Plaintiffs simply cite scattershot paragraphs from both of Defendants' experts' reports. (*See* Van Liere Mot. at 6.) The Court is not persuaded. While a subset of Dr. Ugone's and Dr. Van Liere's criticisms of Mr. Boedeker are consistent and somewhat overlapping, the overall thrust of their analysis, their objectives in evaluating Mr. Boedeker's report, and the expertise they bring to bear on their analysis are distinct. While Dr. Van Liere focused on the reliability of Mr. Boedeker's consumer survey, Dr. Ugone focused on Mr. Boedeker's survey and analysis principally as it pertained to the overall reliability of Mr. Boedeker's economic damages model. The Court therefore does not find Dr. Van Liere's and Dr. Ugone's criticisms of Mr. Boedeker cumulative.

### iii.   Dr. Van Liere's report is relevant

Plaintiffs contest the relevancy of Dr. Van Liere's report under Rules 702, 401, and 403. All of their relevancy arguments under 401 and 403 and most of their relevancy arguments under 702 conflate their challenges to the reliability of Dr. Van Liere's survey with their relevancy objections. (*See* Van Liere Mot. at 15, 20, 23-24.) As discussed in Section II.A *supra*, relevancy

and reliability are two distinct inquiries.  The Court rejects Plaintiffs' improper and unsupported attempts to conflate them.[18]

Plaintiffs also make a series of relevancy arguments.  Without any explanation and with almost no support, Plaintiffs contend (1) Dr. Van Liere's report is unrelated to the Rule 23 inquiry because it "focuses on causation;" (2) Dr. Van Liere's report is not verifiable by his underlying data; and (3) his survey materials cannot be understood by a layman and would confuse jurors.  (Van Liere Mot. at 22-23.)  The Court's role is not to make or develop arguments on behalf of the parties, and Plaintiffs' failure to present cogent arguments is enough to deny these objections.[19]  *See e.g. Greenwood v.*

---

[18] Although the Court ultimately does not address Plaintiffs' challenges to Dr. Van Liere's survey on admissibility grounds, as discussed in Section II.E(iii) *infra*, Plaintiffs' improper conflation of reliability and relevancy is the culmination of their attack on Dr. Van Liere's survey.  (Van Liere Mot. at 20 ("While each of these flaws independently may not warrant exclusion, when compounded they make Dr. Van Liere's data so inherently unreliable as to be irrelevant and inadmissible.").)  Insofar as Plaintiffs' motion to exclude Dr. Van Liere's survey is based on this irrelevancy argument, it is DENIED.

Additionally, 401 and 403 objections do not bear on the Court's analysis of a class certification motion and are not grounds to exclude an expert witness.  *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 965 n.147 (C.D. Cal. 2015) ("Since a motion for class certification is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence . . . .  At the class certification stage, the court makes no findings of fact and announces no ultimate conclusions on Plaintiffs' claims." (internal quotations omitted)); *accord Waine-Golston v. Time Warner Entm't-Advance/New House P'ship*, No.  11-cv-1057– GPB(RBB), 2012 WL 6591610, at *9 (S.D. Cal. Dec. 18, 2012) ("Since a motion to certify a class is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence." (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (explaining that the class certification procedure "is not accompanied by the traditional rules and procedures applicable to civil trials"))).

[19] Notably, Plaintiffs chose not to address any of these initial arguments in their Reply despite Defendants' argument that they were made without

*Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for [a litigant], and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."); *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.").

The outcome is no different if the Court considers Plaintiffs' challenge to relevancy on the merits. Dr. Van Liere's report is relevant to the Court's Rule 23 inquiry. His survey is probative of the materiality of the challenged statements and provides useful analysis of Dr. Maronick's and Mr. Boedeker's surveys. The Court rejects wholesale Plaintiffs' relevancy challenges.

### iv.    Plaintiffs' other challenges to Dr. Van Liere's survey go to the weight of his report, not its admissibility

Plaintiffs argue Dr. Van Liere's survey suffers from the following flaws: (1) the survey asked respondents to recall when they first purchased a Monster Original Green or Rehab, making his survey results unreliable; (2) the use of 2012 as a cutoff point; (3) questions were designed to elicit responses that first came to respondents' minds; (4) marketplace conditions were not adequately replicated; (5) the universe of respondents was improperly defined; (6) Dr. Van Liere improperly analyzed differences between test and control groups; and (7) Dr. Van Liere erred in his statistical calculations. (Van Liere Mot. at 6-22.)

---

explanation or support. (*See* Van Liere Opp'n at 8 n. 6; *see generally* Van Liere Reply.)

Defendants argue none of these challenges bear on the admissibility of Dr. Van Liere's report.  (Doc. No. 157 ("Van Liere Opp'n") at 9-10.)[20] Plaintiffs likewise recognize that all of the arguments described above challenge Dr. Van Liere's survey design and methodology.  (Van Liere Mot. at 24-25.)  As the Court discussed in Section II.B(iii) *supra*, challenges to survey design and methodology go to the weight, not the admissibility, of survey evidence.  The Court therefore considers Plaintiffs' arguments as they relate to the Court's Rule 23(b) analysis.

### v.   Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion to Exclude Dr. Van Liere's expert report as to paragraphs 120 and 121, and **DENIES** Plaintiffs' Motion to Exclude Dr. Van Liere's expert report as to the remainder of the report.

### F.   Plaintiffs' Motion to Exclude Keith Ugone's Expert Report

Defendants retained Keith Ugone, an economist, as a rebuttal damages expert.  (Doc. No. 122-2 ("Ugone Report") ¶ 1.)  Defendants asked Dr. Ugone to determine (1) whether standard economic analysis can be used to quantify reliably economic injury and damages on a class-wide basis; and (2) whether Mr. Boedeker's proposed methodology for evaluating class-wide damages using common proof yields relevant and reliable results.  (Ugone Report ¶ 5.)  To this end, Dr. Ugone both critiqued Mr.

---

[20] Defendants nevertheless provide point-by-point rebuttal arguments to Plaintiffs' contentions.  (Van Liere Opp'n at 11-24.)

Boedeker's survey and analysis, as well as conducted his own analysis of sales and pricing data of Defendants' products.

Plaintiffs move to exclude Dr. Ugone's report.  (Doc. No. 150 ("Ugone Mot.").)  Plaintiffs devote much of their motion and reply to defending Mr. Boedeker's report against Dr. Ugone's attacks and lay out their reasons why they believe Mr. Boedeker should win this "battle of the experts," without specifying why these contentions provide a basis for exclusion of Dr. Ugone's report.  The Court does not address criticisms of Dr. Ugone's report that Plaintiffs failed to tie to a legal basis for exclusion.[21]  *See Sager v. USAA Cas. Ins. Co.*, No. CV 12-1015-FMO (MLGx), 2014 WL 12594137, at *4 (C.D. Cal. Mar. 31, 2014) ("It is axiomatic that "every brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it

---

[21] In particular, the Court does not address the following arguments made by Plaintiffs: (1) Dr. Ugone used Nielsen data, a third party which compiles retail sales and pricing data, in violation of Defendants' contract with Nielsen, (Ugone Mot. at 5); and (2) Dr. Ugone mischaracterizes Mr. Boedeker's report, (Ugone Mot. at 12-14.)

Regarding the second argument, Plaintiffs cite two cases in this portion of their brief, neither of which provide grounds for exclusion.  Plaintiffs cite *Wildwood Indus v. Genuine Mach. Design, Inc.*, No. 06-cv-00124-PRC, 2008 U.S. Dist. LEXIS 112145 (N.D. Ind. July 3, 2008) in the midst of a factual argument and do not connect it to a legal argument.  Plaintiffs offer the second case, *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326 (D. N.H. 2017), simply to show that another district court has deemed Mr. Boedeker's damages model adequate in its Rule 23(b)(3) analysis despite Dr. Ugone's criticisms.  This is immaterial to a motion to exclude, however, and the Court admonishes Plaintiffs for attempting to shoehorn additional arguments related to the merits of its class certification motion into a motion to exclude.

without consideration." (quoting *People v. Stanley*, 10 Cal. 4th 764, 793 (1995)). The remaining arguments are addressed in turn below.[22]

### i.   Dr. Ugone's report is relevant and helpful to a factfinder

Plaintiffs argue Dr. Ugone's opinion should be excluded as unhelpful to a factfinder because it "will create confusion and unnecessarily complicate a relatively straightforward damages model," referring to Mr. Boedeker's damages model.  (Ugone Mot. at 14.)[23]  The thrust of Plaintiffs' argument is that they disagree with one of a series of criticisms Dr. Ugone makes regarding Mr. Boedeker's damages model.  (Ugone Mot. at 14-15.) Defendants counter that Dr. Ugone's analysis of pricing data is helpful to determine whether Mr. Boedeker's price premium conclusions are reliable, and his technical criticisms of Mr. Boedeker's work are helpful to determine the weight the Court should afford Mr. Boedeker's opinion.  (Doc. No. 156 ("Ugone Opp'n") at 4-7.)

The Court agrees with Defendants.  First, Plaintiffs' argument only pertains to approximately three paragraphs of Dr. Ugone's report and excluding Dr. Ugone's opinion in its entirety, as Plaintiffs request, based on

---

[22] Plaintiffs do not challenge Dr. Ugone's qualifications as an expert.  The Court therefore finds he is qualified to opine as an expert in economics and damages modeling.

[23] Plaintiffs titled a subsection of their motion, "Dr. Ugone's retail price analysis from the Nielsen data is flawed, rendering his conclusions evaluating prices paid by individuals irrelevant."  (Ugone Mot. at 7.)  In this subsection, however, Plaintiffs only make arguments regarding the reliability, rather than the relevancy, of Dr. Ugone's report.  (*See* Ugone Mot. at 7-8.)  The Court therefore addresses their argument in the Section II.F(ii) *infra* regarding the reliability of Dr. Ugone's report.

such a narrow challenge would be unreasonable.  Second, Dr. Ugone's evaluation of Mr. Boedeker's report is helpful in determining the merits of Mr. Boedeker's conclusions.  Finally, Dr. Ugone's technical criticisms of Mr. Boedeker's model relate only to the relative strength or weakness of Mr. Boedeker's analysis and are not grounds for exclusion.  *See Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."); *see also Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011) ("There is an important difference between what is *unreliable* support and what a trier of fact may conclude is *insufficient* support for an expert's conclusion." (emphasis in original)).

### ii.    The reliability of Dr. Ugone's report

Plaintiffs argue Dr. Ugone's analysis is unreliable because Dr. Ugone (1) did not standardize the Nielsen data; (2) ignored sales volume; (3) improperly aggregated sales data; and (4) improperly relied on Defendants' data without independently verifying it.

As to Plaintiffs' first criticism, Defendants and Dr. Ugone fail to explain adequately the reasons why Dr. Ugone did not need to standardize the Nielsen data or consider sales volume data.  *See Lust ex rel. Lust*, 89 F.3d at 597 (Where the expert's testimony is not the product of peer-reviewed research produced outside the course of litigation, "the expert 'must explain precisely how [he] went about reaching [his conclusions and point to some objective source . . . to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'"

(quoting *Daubert II*, 43 F.3d at 1318-19)).  Instead, Defendants seek to shift the burden to Plaintiffs to demonstrate that Dr. Ugone's analysis is unreliable.  But the burden is on Defendants as the party proffering Dr. Ugone's report and testimony to show that his analysis *is* reliable.  Aside from Dr. Ugone's conclusory assertion that his use of Nielsen data is "consistent with standard economic practice," he provides no outside authority demonstrating this to be the case.  (Doc. No. 154 ("Ugone Suppl. Report") at 34-36.)  Consequently, the Court STRIKES paragraphs 48 through 56.

Plaintiffs' second and third criticisms do not bear on the reliability of Dr. Ugone's results.  Plaintiffs argue that Dr. Ugone should have accounted for sales volume in order to calculate consumer demand.  (Ugone Mot. at 6-7.)  Dr. Ugone was calculating the price premium associated with the Challenged Statements, however, not consumer demand.  This criticism therefore does not bear on Dr. Ugone's results.

Plaintiffs also contend Dr. Ugone aggregates "price points across all products in all sales channels and multiple time periods."  (Ugone Mot. at 7 (emphasis omitted).)  This argument is fallacious.  Dr. Ugone did not aggregate price points across products; he analyzed each product at issue separately.  This criticism therefore does not justify exclusion of Dr. Ugone's opinion.

Finally, as to Plaintiffs' final argument, Dr. Ugone did not rely on Defendants' "self-serving projections."  (Ugone Mot. at 11.)  He considered statements from Defendants' Vice President of New Product Development

and third-party data collected by Nielsen, as well as legal documents, deposition transcripts, and publicly available information regarding Defendants and its products.  (Ugone Report, Ex. 3.)  Dr. Ugone was not required to verify independently each data point before incorporating it into his analysis.  Whether his opinion should be accepted, and the relative strength or weakness of the factual underpinnings of his opinion, go to the weight of his testimony, not its admissibility.  *See In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab. Litig.*, No. MDL 10-02172-CJC, 2012 WL 4904412, at *3 (C.D. Cal. Sept. 20, 2012) (finding that an expert's reliance on the defendant's statements, pleadings, and publicly available government documents did not render his opinion inadmissible and the objections to the underlying facts go to the weight of the expert's opinion); *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352, n. 5 (9th Cir. 1987), *opinion modified on reh'g,* 866 F.2d 318 (9th Cir. 1989) ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility." (quoting *Taenzler v. Burlington Northern,* 608 F.2d 796, 798 n. 3 (8th Cir.1979)).

### iii.   Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion to Exclude Dr. Ugone's expert report as to paragraphs 48 through 56 and **DENIES** Plaintiffs' motion as to the remainder of Dr. Ugone's report.

### G. Plaintiffs' Motion to Exclude Portions of Eva Lilja's Declaration and Related Portions of Defendants' Expert Reports

Eva Lilja is Defendant Monster Energy Company's Vice President of New Product Development and a fact witness for Defendants.  (Doc. No. 155 ("Lilja Opp'n") at 1.)  Defendants submitted a declaration from Ms. Lilja in support of their Opposition to Plaintiffs' Motion for Class Certification, (Doc. No. 115), and information from her declaration was cited as support by Defendants' experts in their respective reports.  Ms. Lilja's declaration and the accompanying exhibits include information regarding (1) when certain label statements appeared on particular Monster beverage products; (2) approximately when consumers first or last purchased products containing a particular label statement; (3) how long it takes from the date a new label is finalized for a can to be sold to consumers; and (4) copies of the labels at issue during the relevant time periods.  (*See* Doc. No. 115.) Plaintiffs move to exclude Eva Lilja's declaration and the portions of Dr. Ugone's and Dr. Van Liere's reports that incorporate information derived from her declaration.  (Doc. No. 130 ("Lilja Mot.").)

#### i. Rule 26 does not warrant exclusion of Ms. Lilja's declaration

Plaintiffs first argue Ms. Lilja's declaration should be excluded because Defendants failed to include her in their Rule 26(a) or Rule 26(e) disclosures.  (Lilja Mot. at 2-5.)  Defendants do not dispute that they did not formally offer Ms. Lilja's name in their Rule 26 disclosures.  (*See* Lilja Opp'n.)  Nevertheless, Defendants counter that they did not violate Rule 26 because Defendants submitted a declaration from Ms. Lilja in support of

their motion to dismiss Plaintiffs' Second Amended Complaint in October

2013, (Doc. No. 68).  (Lilja Opp'n at 2-3.)  In the 2013 declaration, Ms. Lilja

states,

> This declaration is based on my personal knowledge and, if
> called as a witness, I could and would testify competently to the
> matters set forth herein.  I have been the Vice President for
> New Product Development since January 2010.  In this role, I
> am responsible for and am familiar with the packaging Monster
> Energy Company uses for its products, including the product
> label for Monster Rehab Tea + Lemonade + Energy.

(Doc. No. 68 ¶¶ 1-2.)  She continues on to verify the accuracy of

Defendants' product label from December 2012.  (Doc. No. 68 ¶ 3.)

Additionally, Defendants point out that Plaintiffs identified Ms. Lilja in their

own initial disclosures on March 24, 2017, in which Plaintiffs enumerated

"the timing of the introduction of Monster Energy drink brands," "labeling or

label change decisions," and "sales data" among the subjects on which Ms.

Lilja would have discoverable information.  (Doc. No. 134-5 at 147-48.)

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires parties to

provide to other parties "the name . . . of each individual likely to have

discoverable information — along with the subjects of that information —

that the disclosing party may use to supports its claims or defenses."  Fed.

R. Civ. P. 26(a)(1)(A)(i).  The disclosure obligation is ongoing: "A party who

has made a disclosure under Rule 26(a) . . . must supplement or correct its

disclosure in a timely manner if the party learns that in some material

respect the disclosure . . . is incomplete or incorrect, and *if* the additional or

corrective information has not otherwise been made known to the other

parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e) (emphasis added).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  Alternatively, the Court may (1) "order payment of the reasonable expenses . . . caused by the failure;" (2) "inform the jury of the party's failure;" or (3) "impose other appropriate sanctions."  *Id.*  The Ninth Circuit has recognized that district courts have "particularly wide latitude" to exercise their discretion to issue sanctions under Rule 37(c)(1).  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Finally, "[t]he party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless."  *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

The Court finds Ms. Lilja and the subject of her declaration were sufficiently disclosed in writing when Defendants previously offered her as a declarant and witness in support of their October 2013 motion to dismiss.  At that time, Defendants offered her as an authority on their labeling practices, explicitly acknowledging that she is "responsible for and [] familiar with the packaging Monster Energy Company uses for its products."  This is much more than a "passing reference in a deposition" or listing her in a lengthy catalog of names in an interrogatory response, as in the cases cited by Plaintiffs.  *See Pinterest Inc. v. Pintrips, Inc.*, No. 13-CV-04608-HSG, 2015 WL 2268498, at *5-6 (N.D. Cal. May 14, 2015) (finding the plaintiff's listing

of two witnesses among a list of 75 other persons in an interrogatory response did not satisfy its Rule 26 obligation); *Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 863 (9th Cir. 2014) (finding that another witness's "passing reference in a deposition to a person with knowledge or responsibilities who could conceivably be a witness does not satisfy a party's disclosure obligations.").

Further, even if Defendants' prior submission of a declaration by Ms. Lilja on the same subject matter for which they now offer her was not enough, their failure to disclose her would be harmless because Plaintiffs had already identified this witness in their own Rule 26 disclosures. Plaintiffs strenuously argue they are prejudiced by Defendants' non-disclosure by emphasizing that Ms. Lilja's declaration contains specific information diverging from other discovery produced by Defendants. (Doc. No. 159 at 6-11.) Such discrepancies are noted by the Court and considered in weighing the parties' evidence on the class certification motion insofar as they are applicable to the Court's analysis. In any event, these discrepancies would not have been revealed through Defendants' Rule 26 disclosure. Defendants' Rule 26 disclosure would have simply identified Ms. Lilja as possessing information regarding the same subject areas that Plaintiffs' own Rule 26 disclosure indicated. Notably, Plaintiffs do not identify a subject matter area they were unaware of because of Defendants' failure to include Ms. Lilja in their Rule 26 disclosure.

The Court therefore **DENIES** Plaintiffs' Motion to Exclude Ms. Lilja's declaration.[24]

## III.    MOTION FOR CLASS CERTIFICATION

### A. LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast*, 569 U.S. at 33 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal court." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011)). A party seeking class certification must (1) "'be prepared to prove that there are *in fact* sufficiently numerous parties, common question of law or fact,' typicality of claims or defenses, and adequacy of representation, as

---

[24] Plaintiffs' Motion to Exclude Ms. Lilja offered what appeared to be a separate ground for exclusion based on purportedly factually contradictory information in Ms. Lilja's declaration.  (Lilja Mot. at 6-9.)  Plaintiffs opened this section, "Ms. Lilja's Declaration should also be excluded for reasons independent of Rule 37."  (Lilja Mot. at 6.)  In their Reply, however, Plaintiffs clarify that this portion of their Motion was still based on Rules 26 and 37. (Doc. No. 159 at 11-12.)  The Court therefore considered these arguments in the finding on Plaintiffs' Motion under Rules 26 and 37 above and does not address Defendants' Local Rule 7-3 argument.  Insofar as Plaintiffs also "intended to suggest violations of 18 U.S.C. § 1621 (Perjury)" with their comment that Ms. Lilja's declaration should be excluded for reasons independent of Rule 37, the Court finds that a Rule 26 motion to exclude is an inappropriate vehicle to address such a complaint.  (Doc. No. 159 at 12, n. 6.)

required by Rule 23(a);" and (2) "satisfy through evidentiary proof at least one of the provision of Rule 23(b)." *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350) (emphasis in original).

Under Rule 23(b), class certification is appropriate if (1) there is a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; or (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. Fed. R. Civ. P. 23(b)(1–3).  Here, Plaintiff seeks to certify a class seeking damages under Rule 23(b)(3).  (Mot. at 22-24.)[25]

---

[25] Plaintiffs also sought to certify a class under Rule 23(b)(2) in their initial Motion. (Mot. at 22-24.)  During the course of the briefing period on this motion, the Ninth Circuit issued its decision in *Davidson v. Kimberly-Clerk Corp.*, 873 F.3d 1103 (9th Cir. 2017), a putative class action alleging violations of the CLRA, FAL, and UCL. In *Davidson*, the Ninth Circuit resolved a circuit split regarding when a consumer has standing to seek injunctive relief in an action based on the claims Plaintiffs assert here.  The court held, "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." *Davidson*, 873 F.3d at 1115 (quoting *Summers v. Earthe Island Inst.*, 555 U.S. 488, 493 (2009)).  The threat of future harm might be that a consumer "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to," or that the possibility that a consumer "might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." *Id.*  In either instance, the plaintiff must intend to purchase the product at issue in the future.

District courts are given broad discretion to grant or deny a motion for class certification. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). The party seeking class certification bears the burden of showing affirmative compliance with Rule 23. *See Wal-Mart*, 564 U.S. at 350. This requires a district court to conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. Nevertheless, the merits can be considered only to the extent they are "relevant to determining whether the Rule 23 prerequisites to class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

Because Plaintiffs' Motion can be resolved conclusively at the Rule 23(b)(3) stage, the Court addresses only this step of the class certification analysis.

### B. RULE 23(B)(3) ANALYSIS

The Rule 23(b)(3) predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," focusing on "the relationship between common and individual issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (further noting that the express purpose of Rule 23(b)(3) is to "achieve economies of time, effort, and expense and promote [] uniformity of

---

Here, Plaintiffs concede they have testified they do not intend to purchase either Monster Energy or Monster Rehab in the future. (Reply at 25.) Plaintiffs have thus informed the Court they no longer intend to pursue certification of a Rule 23(b)(2) class in light of the *Davidson* ruling. (*Id.*) The Court thus DENIES as moot Plaintiffs' motion for class certification under Rule 23(b)(2).

decision as to persons similarly situated."). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1778 (2d ed. 1986)). Plaintiffs contend their UCL, FAL, and CLRA claims present such a common question.

"For purposes of class certification, the UCL, FAL, and CLRA are materially indistinguishable. Each statute allows Plaintiff to establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person would consider a material misrepresentation." *Forcellati*, 2014 WL 1410264, at *9; *see also Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011) ("[U]nder the UCL, FAL, and CLRA[,] . . . injury is shown where the consumer has purchased a product that is marketed with a material misrepresentation, that is, in a manner such that members of the public are likely to be deceived."). In other words, in false advertising actions in California, a showing of materiality gives rise to an inference of reliance and causation. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 576 (C.D. Cal. 2014); *In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *6-7; *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009) ("If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class."). Thus, here, Plaintiffs must show that the challenged statements are material and likely to mislead or

deceive consumers on a classwide basis.  *See In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *6.

In addition to the materiality inquiry, "plaintiffs must show that 'damages are capable of measurement on a classwide basis'" to satisfy Rule 23(b)(3).  *Id.* at *9 (quoting *Comcast*, 569 U.S. at 35).  "Under *Comcast*, Plaintiffs must . . . show that their proposed damages models match their theory of liability in the case."  *Id.* (citing *Comcast*, 569 U.S. at 35).  In other words, the model must measure damages resulting from the particular injury alleged by plaintiffs.  *Comcast*, 569 U.S. at 36.

The Court addresses these two inquiries in turn.

### i.  Material Misrepresentation

### 1.  Legal Standard

As previously discussed in Section II.D(i), in the context of CLRA, FAL, and UCL claims, "[a] misrepresentation is judged to be 'material' if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  *Kwikset Corp.*, 51 Cal. 4th at 332-33 (citation omitted); *see also Caro*, 18 Cal. App. 4th at 668 ("A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment.  Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did." (internal formatting and citations omitted)).  A statement may be considered material even if it does not affect a reasonable consumer's assessment of the pecuniary advantage of the transaction if the misstatement would affect another "sentimental" consideration.  Rest. 2d

Tort § 538 (1977).  "If the misrepresentation . . . is not material as to all class members, the issue of reliance would vary from consumer to consumer and the class should not be certified."  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011), *abrogated on other grounds by Comcast*, 599 U.S. 27; *see also Webb v. Carter's Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011) ("[W]here individual issues as to materiality predominate, the record will not permit [an inference of reliance as to the entire class].").

Further, the challenged statements must be likely to deceive a reasonable consumer.  "The UCL, CLRA, and FAL, prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *4 (N.D. Cal. July 15, 2016) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951, 45 P.3d 243 (2002), *as modified* (May 22, 2002)) (formatting in original).  "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.  Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).  Thus, Plaintiffs must show the challenged statements were (1) material and (2) likely to deceive.

Plaintiffs' evidence overwhelmingly goes to the second part of this inquiry, focusing on consumers' understanding of the challenged

statements, but they present very little evidence regarding the materiality of the statements.  Plaintiffs thus fail to carry their burden of showing that the alleged misrepresentations at issue here justify a presumption of reliance.  This, in turn, is fatal to Plaintiffs' attempt to demonstrate affirmatively that their action for damages complies with Rule 23(b)(3).

### 2. Re-hydrate, Consume Responsibly, and Ideal Combo Statements

Plaintiffs principally rely on Dr. Maronick's reports to show materiality.  (Mot. at 17-19; Reply at 14-18.)[26]  The admissible portions of Dr. Maronick's reports present survey evidence regarding how respondents understand the Hydrates, Re-hydrate, and Consume Responsibly statements.  (*See* Sections II.B, II.C *supra*.)  Survey respondents were people "18 years or older who drink Monster branded energy drinks."  (Maronick Report ¶ 14.)

Dr. Maronick's report does not provide insight into consumers' purchasing decisions.  As discussed in Section II.D(iii) *supra*, survey respondents were not necessarily persons who purchased Monster branded energy drinks, and the evidence does not support the assumption that consumers are purchasers.  Further, Dr. Maronick expressly testified that his object was *not* to measure the impact of the challenged statements on purchasing decisions.  (Maronick Dep. 91:23-92:10.)  For instance, when asked whether he cared if a statement had any impact on respondents' purchasing decisions, Dr. Maronick replied,

---

[26] The Court does not address portions of Plaintiffs' Motion or Reply based on stricken portions of Dr. Maronick's reports, as these arguments are now unsupported.

> That wasn't my assignment to measure the impact on purchase.  It was the consumers' interpretation of these claims and the allegations in the complaint are that they are misleading.  My job was simply to get consumers' perceptions of that phrase or term that on the top of this Rehab can.
>
> Q: And you have no idea at all whether those words have even a one percent impact on any purchase decision?
>
> . . .
>
> [Dr. Maronick:]  That is correct, I did not measure the importance issue.

(Maronick Dep. 117:3-22).  Plaintiffs do not contend otherwise.  (Maronick Opp'n at 13.)  Instead, Plaintiffs argue they can show materiality by measuring consumers' understanding of the challenged statements.  (Mot. at 17-19.)  This is not the test for materiality, however.

Rather, to show materiality, Plaintiffs must demonstrate that the statements were a factor in consumers' purchasing decision.  As one court in the Ninth Circuit explained, it is critical to "explain *how* the challenged statements, together or alone, were a factor in any consumer's purchasing decisions."  *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014).  While a challenged statement need not be the sole or even dominant factor in consumers' purchasing decisions, a survey needs "to assess whether the challenged statements were in fact material to [consumers'] purchases, as opposed to, or in addition to, price, promotions, retail positioning, taste, texture or brand recognition."  *Id.*; *see also In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *8 ("Absent a consumer survey or other market research to indicate how consumer reacted to the [challenged] statements,

and how they valued these statements compared to other attributes of the product and the [relevant] market generally, Plaintiffs have not offered sufficient evidence of materiality across the class.").  Dr. Maronick's survey is not tethered to consumers' purchasing behavior.  It is only probative of whether three of the statements are misleading, not material.

Mr. Boedeker's report could potentially fill this gap in Plaintiffs' materiality argument since his objective was, in part, to determine each challenged statement's value to consumers.  Plaintiffs cite to Mr. Boedeker's report for his conclusion that the challenged statements had a material impact on demand in the course of their predominance argument.  (Mot. at 19.)  As a threshold matter, however, Mr. Boedeker's report is only admissible as it relates to the Hydrates statement, for the reasons discussed in Section II.B *supra*.  Plaintiffs thus cannot compensate for Dr. Maronick's failure to measure the impact on purchasing decisions for the Ideal Combo, Consume Responsibly, and Re-hydrate statements by citing to Mr. Boedeker's report.  The Court therefore does not address these three challenged statements further; Dr. Maronick's report alone is not sufficient to establish materiality across the class for the Consume Responsibly and Re-hydrate statements, and Plaintiffs present no admissible evidence to show the materiality of the Ideal Combo statement.

### 3.      Hydrates Statement

The Court now turns to whether Plaintiffs have shown with evidence subject to common proof that the Hydrates statement was material to consumers' purchasing decisions and likely to deceive a reasonable

consumer.  Plaintiffs fail to make a satisfactory showing on either ground for multiple reasons, a few of which are discussed here.

First, Plaintiffs do not establish that the Hydrates statement has a common meaning.  "Where plaintiffs fail to establish a controlling definition for a key term in an alleged misstatement, courts have found that materiality is not susceptible to common proof."  *In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *8 (citing six Ninth Circuit district court cases in support).  Neither the open-ended nor close-ended survey questions regarding the meaning of the Hydrates statement isolated the statement itself.  Dr. Maronick's open-ended Question 23 asked, "What does the statement that Monster Rehab is a '… triple threat that quenches thirst, hydrates like a sports drink, and brings you back after a hard day's night' mean?" (Maronick Report, Ex. C at 8.)[27]  Close-ended Question 24 asked, "Does the statement that Monster Rehab Energy Drink 'Rehydrates' or that it '. . . hydrates like a sports drink' say or suggest that Monster Rehab has the same level of electrolytes as a sports drink?"  (*Id.*)  Dr. Maronick thus did not solicit an answer that illuminates how consumers understand the Hydrates statement alone.  He even acknowledged during his deposition that he did not distinguish the Hydrates and Re-hydrate statements, and his survey does not provide an understanding of how consumers interpret one statement versus the other.[28]  Plaintiffs therefore cannot use Dr. Maronick's

---

[27] There is a typographical error in Dr. Maronick's report; he misquotes the statement at issue in survey Question 23 by replacing "hydrates" with "rehydrates."  (Maronick Report ¶ 28.)  The challenged statement was properly phrased in the actual survey given to consumers.  (Maronick Report, Ex. C at 8 (Q23).)

[28] Dr. Maronick testified as follows:

survey to show that there is a common understanding of the Hydrates statement.  Plaintiffs present no other evidence to do so.

Further, consumers' responses to these questions do not support Plaintiffs' theory of why the Hydrates statement is likely to deceive.  In response to Question 23, the open-ended question where two responses were accepted per survey respondent, 24.2% of respondents stated they understood the statement to mean "energizes;" 24.2% said "rehydrates/aids rehydration;" 15.9% stated "thirst quenching;" 5.1% replied "electrolytes mention/additives;" and 47.8% provided miscellaneous responses.  (Maronick Report ¶ 28.)  Plaintiffs allege the "Hydrates" statement is misleading because it does not contain electrolytes like a sports drink.  (SAC ¶¶ 36-37.)  Yet, only approximately 5% of respondents understood a

---

> Q: [In Question 24,] you are asking [survey respondents] to select among seven options for the word 'rehydrates' or the words 'hydrates like a sports drink,' correct?
>
> A: Yes.
>
> Q: Do you know whether the responses are about 'Rehydrates' or about 'Hydrates like a sports drink'?
>
> A: No, I do not.
>
> Q: Is there a reason why you combined two questions with one set of options?
>
> A: Because it seemed to be asking the same question.  They seemed to be focusing on the same issue.
>
> Q: Do you think 'Rehydrates' and 'Hydrates like a sports drink' have the same meaning?
>
> A: I believe my expectation was that they were similar, yes.

(Maronick Dep. 119:25, 120:8-24.)  Dr. Maronick does not explain why that was his expectation nor does he provide evidence to support it.

phrase containing the Hydrates statement to mean Defendants' drinks contain electrolytes.  This falls far short of showing that a significant portion of the general consuming public or of targeted consumers were misled by the Hydrates statement on the basis that the drinks do not provide electrolytes.[29]   Additionally, respondents' answers do not support any single common understanding of the Hydrates statement across the class; this indicates that claims related to this statement require an individual inquiry.

Plaintiffs point to the results of Question 24, which asked consumers specifically to compare the electrolyte content of a sports drink versus a Monster Rehab Energy drink containing the Hydrates and Re-hydrate statements, to bolster their claim.  (Reply at 15; Maronick Report, Ex. C at 8.)  In response to that question, 80.6% of respondents stated that Monster Rehab definitely or probably has the same amount of electrolytes as a sports drink.  (Maronick Report ¶ 29.)[30]  This response does not change that only a very small fraction of survey respondents understood the statements to mean the drink contains electrolytes or other additives without prompting to think about electrolytes.  Additionally, it is unclear whether the Re-hydrate statement or the Hydrates statement led consumers to this conclusion.

---

[29] In response to Dr. Maronick's open-ended survey question asking what the Re-hydrate statement means, only approximately 8% of respondents mentioned electrolytes or additives.  (Maronick Report ¶ 25.)  Thus, insofar as Dr. Maronick conflated the Re-hydrate and Hydrates statements in his survey, his results regarding the Re-hydrate statement lead to the same conclusion.

[30] Dr. Maronick inaccurately describes Question 24 in his report summarizing the findings.  (*Compare* Maronick Report ¶ 29 *and* Maronick Report, Ex. C at 8.)  Despite the question asking about two of the challenged statements, as discussed above, he states the question asked only about the Hydrates statement.  (Maronick Report ¶ 29.)  This does not appropriately capture the question and thus is discounted by the Court.

Unfortunately for Plaintiffs, the answers to the open-ended questions indicate that electrolytes are more often associated with the Re-hydrate statement than the Hydrates statement.  (Maronick Report ¶¶ 25, 28.)  Results from Question 24 thus do not affirmatively show that a significant portion of the general consuming public or of targeted consumers understand the Hydrates statement to mean the drinks contain electrolytes.

Finally, Plaintiffs fail to show the Hydrates statement is material to all class members.  While the statement does not have to be a driving factor in the purchasing decision, it must be *a* factor in the decision; otherwise, it is not material.  Plaintiffs' own experts' results do not indicate that the Hydrates statement factored into consumers' purchasing decision on a classwide basis.  When Dr. Maronick asked in an open-ended format why respondents chose Defendants' energy drinks as opposed to another brand, so few respondents listed hydration as a purchase driver that Dr. Maronick did not list it as a quantifiable reason.  (Maronick Report ¶ 21.)[31]  Even when respondents were prompted with optional reasons for selecting Defendants' products, only 25.2% of respondents selected hydration as a purchase motivator.  (Maronick Report ¶ 22, Ex. C at 3 (Q11).)[32]

---

[31] Accepting two responses per respondent, Dr. Maronick found the reasons consumers drink Defendants' beverages as follows: Energy boost/pick-me-up (62.4%); Taste (29.0%); Flavor (4.7%); Help keep/stay awake/alert/focused (11.2%); Like it (2.7%); Healthy/Safe (1.3%); Caffeine Mentioned (1.7%); Miscellaneous (13.3%).

[32] The reasons respondents could select were: price, brand, buzz, hydration, taste, caffeine, other (specify).  (Maronick Report, Ex. C at 3.)

Similarly, Mr. Boedeker allowed his survey respondents to select as many attributes as they wanted in response to the question, "why do you purchase Monster more than (or instead of) other brands?"  (Boedeker Report, Ex. B at 15.)  The Hydrates statement was listed as one of 16 potential attributes in response.  (*Id.*)  Only 7.3% of respondents selected the Hydrates statement as a factor in their purchasing decision.  Plaintiffs' evidence therefore does not show that the Hydrates statement is material to most consumers' purchasing decision.  *See Badella v. Deniro Marketing LLC*, No. C 10-03908 CRB, 2011 WL 5358400, at *8-9 (N.D. Cal. Nov. 4, 2011) (finding there was no predominance where the defendants showed people joined the advertised activity for many different reasons, and plaintiff failed to point to common evidence to show the representations were material to others); *Jones*, 2014 WL 2702726, at *15-16 (finding that while the challenged statements may be material to some customers, the plaintiff's materiality expert did not demonstrate that they are necessarily material to reasonable consumers where there were a number of reasons a customer might buy the product and there was a lack of evidence demonstrating the impact of the challenged label statements).

In sum, Plaintiffs have not shown that there is a common answer to the question of whether a reasonable consumer would consider any of the challenged statements a material misrepresentation.  In other words, there are significant individualized issues related to proof of reliance.  Consequently, the Court finds Plaintiffs cannot maintain an action under Rule 23(b)(3).  While these grounds alone are enough to defeat Plaintiffs'

motion for class certification, the Court nevertheless briefly discusses why Plaintiffs fail to satisfy the second piece of the predominance inquiry.

### ii. Damages

As previously discussed, in order to show a proposed class is sufficiently cohesive to warrant adjudication by representation, Plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. This requires Plaintiffs to present a damages model consistent with their theory of liability. *Id.* at 35. While "[c]alculations need not be exact," the model must measure *only* those damages attributable to Plaintiffs' theory of liability. *Id.*

Plaintiffs seek restitution under all of their claims, as well as damages under their CLRA claims. (Mot. at 20.) "The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118 (C.D. Cal. 2015) (citing *Werdebaugh v. Blue Diamond Growers,* No. 12–CV–2724–LHK, 2014 WL 2191901, *22 (N.D.Cal. May 23, 2014)). After producing evidence that attaches a dollar value to the goods received by the consumer, restitution can "be determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." *Id.*; *see also In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *10. Plaintiffs must therefore present

a damages model that can determine the price premium attributable to Defendants' use of the challenged statements.  *Id.*

Plaintiffs rely entirely on Mr. Boedeker's report to satisfy the damages model requirement under Rule 23(b)(3) for all of their claims.  (Mot. at 19-21; Reply at 18-22.)   For the reasons discussed in Section II.B, his report is only admissible as it relates to the Hydrates statement.  Plaintiffs therefore do not put forward any admissible evidence for modeling the price premium attributable to the Ideal Combo, Re-hydrate, and Consume Responsibly statements.  The Court proceeds with evaluating the adequacy of Mr. Boedeker's model as it relates to the Hydrates statement only.

As previously discussed in Section II.B, Mr. Boedeker proposes using choice based conjoint analysis to evaluate damages in this action.  (*See* Boedeker Report.)  Plaintiffs argue this analysis allowed Mr. Boedeker to isolate the value in price associated with each of the challenged statements. (Mot. at 21.)  They further contend that this analysis is consistent with their theory of liability because it shows that but-for the statements, all class members would have paid less for the Monster energy drinks.  (Mot. at 21.)

Defendants do not contest that, as a general matter, conjoint analysis and its willingness-to-pay modeling may measure how consumers value the statements on a label.  *See e.g. Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *11-12 (C.D. Cal. July 24, 2014) (holding that conjoint analysis was an appropriate method for determining the price premium for a misleadingly labeled product).   Defendants contend that Mr. Boedeker's use and application of conjoint analysis is fundamentally flawed,

particularly in light of his defective survey.  (Opp'n at 33-36.)  They also argue Mr. Boedeker's damages model is not consistent with Plaintiffs' theory of liability.  (*Id.*)

Mr. Boedeker's model is not an adequate measure of damages for a number of reasons.  Most critically, Mr. Boedeker's survey design suffers from focalism bias, rendering it useless for the purpose of determining price premiums attributable to the challenged statements.  "Focalism bias is widely discussed in the conjoint [analysis] literature and occurs when respondents pay more attention to a product attribute or feature in the choice exercises than they ordinarily would in the actual purchase process, thus increasing the apparent relative subjective value they assign to the attribute in the conjoint study."  (Van Liere Report ¶ 113 (citing Häubl, G., Dellaert, B. G., and Donkers, B. "Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search." *Marketing Science*, 29(3):438-455 (2010) ("Focalism.  Research in psychology has shown that people tend to overweight whatever information is most salient or most accessible at a particular moment and neglect other relevant considerations.")).)

Mr. Boedeker asked respondents why they purchase Defendants' products in order to understand better what drives respondents' purchasing decisions.  (Boedeker Report ¶¶ 86-87; Ex. B at 15.)  Respondents could choose multiple attributes from a sixteen attribute list.  (*Id.*)  Respondents answered as follows: Flavor (42.8%); Price (25.9%); Long Lasting Energy (25.3%); Brand (23.8%); Functional Benefit (19.6%); Extra Caffeine (15.4%); Zero Calories (12.2%); Re-hydrates (8.7%); Hydrates like a Sports Drink (7.3%); Ideal Combo (7.2%); Safe Quantity (6.5%); Nutritional Benefit

(5.6%); Safe Ingredients (4.5%); All-Natural Ingredients (4.4%); No Artificial Sweeteners (4.1%); and Organic (2.1%).  (Boedeker Report ¶ 86.)  Mr. Boedeker concluded, "Flavor appears to be the most important attribute, followed by price.  Brand is the fourth most important attribute."  (Boedeker Report ¶ 86.)

In determining the price premium associated with each attribute, Mr. Boedeker examined only the following categories: flavor of the product; energy statement on label; Re-hydrate statement on label; comparison to a sports drink; ingredients statement on label; consumption safety statement on label; and price per 16 ounce can.  (Boedeker Report ¶ 91.)   Defendants argue Mr. Boedeker's failure to include attributes deemed important purchase drivers by respondents artificially inflates the importance of and drew undue attention to the limited attributes presented to respondents in the conjoint analysis.  (Boedeker Mot. at 21; Opp'n at 34.)  Further, this "failure also prevented Mr. Boedeker from measuring whether (and to what extent) the omitted attributes affected the impact of the included attributes." (Boedeker Mot. at 21.)

In support, Defendants rely upon Dr. Van Liere, who opined,

Focalism bias is a very real problem in Mr. Boedeker's conjoint survey.  This is because the way in which purchasers were shown the claimed statements in the choice sets allowed them to see and attend to them in ways they would not normally encounter them in the marketplace.  For example, as noted above, several of the claimed statements on the actual products appear on the side of the container not on the front. Unless a purchaser looked at all sides of the can, there are some label statements that he or she may never consider. Moreover, the statements that appear on Monster Energy®

drinks are contained within other text and with graphics, such
that the purchaser may not attend to the statements even if he
or she looks at all sides of the can in an actual purchasing
situation.   Yet, in Mr. Boedeker's survey respondents are
essentially forced to consider these attributes isolated from their
context.   The claimed statements were shown in the choice
exercises in a way that removed their usual context on the
label, and as though they were equally prominent on the label.
Mr. Boedeker also omitted the nutrition label, which would have
been available to potential purchasers.

(Van Liere Report ¶ 114.)  Dr. Van Liere concludes this subsection of his
report, "When attributes are displayed in a way that draws undue attention
or omits information that would have been potentially salient in the
marketplace, this can lead to inflated or unrealistic results from conjoint
analysis.  This is what happened in the Boedeker survey."  (Van Liere
Report ¶ 49. (citing Posavac, S.S.; Brakus, J.J.; Jain, S.P.; Cronley, M.L.
"Selective Assessment and Positivity Bias in Environmental Valuation."
*Journal of Experimental Psychology: Applied*, Vol 12(1):43-49 (2006)
(finding based on their experiments that "(a) when an [] entity is the focus of
assessment in a survey, positively biased evaluations often result; (b)
positivity bias in evaluation translates to real monetary allocation decisions;
and (c) selective information processing contributes to these effects.")
(formatting in original)).)

Plaintiffs and Mr. Boedeker offer no substantive response to this
criticism.  (*See* Boedeker Rebuttal; Boedeker Opp'n.)  Instead, Plaintiffs
argue why the number of attributes presented to consumers was suitable.
(Boedeker Opp'n at 22-23.)  This does not address why the particular
attributes selected were appropriate, or how the results are reliable despite
the presentation of a small subset of attributes.

Mr. Boedeker ultimately used the conjoint analysis results to value the product premium associated with each alleged misstatement.  As previously discussed, Mr. Boedeker opined that survey respondents would have paid $1.82 less for a product that had only the Monster flavors and none of the attributes Plaintiffs allege Defendants falsely claimed.  (Boedeker Report at 45.)[33]  In other words, the attributes that ranked 8th, 9th, 10th, and 11th out of 16 attributes, with less than 10% of all survey respondents even mentioning each attribute as important to their purchasing decision, constitute approximately 81% of the value of the overall product, based on a product price of $2.24.  At the maximum price point Mr. Boedeker considered, $3.49, the challenged statements would constitute 52% of the value of the beverage.  These incongruous results support Defendants' complaint that Mr. Boedeker's survey fatally suffers from focalism bias.

Plaintiffs have failed to justify adequately Mr. Boedeker's attribute selection for the conjoint analysis or illustrate how the price premium determination is reliable in light of Dr. Van Liere's well-supported criticisms. Mr. Boedeker has not, for example, reproduced his conjoint analysis with different variable attributes to see if the estimated price premium is reliable, controlled for other highly-valued attributes, nor tried to price these other attributes.  *See In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *10-11 (finding the plaintiffs' damages model inadequate under Rule 23(b)(3) where it failed to account for consumer preferences and

---

[33] Mr. Boedeker estimated that "Re-hydrate to bring you back" adds $0.66 in value to the can; "Hydrates like a sports drink" adds $0.41 in value; "Ideal Combo of the Right Ingredients in the Right Proportion" adds $0.58 in value; and the safe levels of consumption statement adds $1.61 in value.  (Boedeker Report at 43-44.)

the relative value that consumers ascribe to different aspects of the product).

Further, Plaintiffs' inability to establish a common meaning and show that the Hydrates statement is likely to deceive compounds the problem here.  In order to tie a damages model for a misleading statement to a theory of liability, a plaintiff must show that the price premium paid was for the attribute consumers believed the product contained.  *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 1023-24 (rejecting the plaintiffs' damages model where it calculated only the price premium attributable to the defendant's use of the challenged statement, rather than the portion of that premium attributable to plaintiffs' theory of liability – *i.e.*, that the defendant's '100% Natural' label caused putative class members to believe the products contained no genetically modified organisms or GMO ingredients);  *see also In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *11 (rejecting the plaintiffs' damages model where it fails to ascribe a relative value to each of the contested product's features).  In other words, Plaintiffs here would have to show that consumers paid a price premium for a drink they believe contained electrolytes in order for it to align with their theory of liability for the Hydrates statement.  Plaintiffs make no such showing.

Other problems plague Plaintiffs' damages model.  The Court need not address them, however, because the foregoing reasons suffice to find Plaintiffs' damages model deficient under Rule 23(b)(3).

In sum, Plaintiffs fail to make an adequate showing as to either prong of the predominance inquiry.  The Court thus **DENIES** Plaintiffs' Motion for Class Certification.

## IV.   CONCLUSION

For the reasons stated above, the Court:

- **GRANTS** Defendants' Motion to Strike Mr. Boedeker's testimony and report as it relates to the Ideal Combo, Re-hydrate, and Consumer Responsibly statements.  The Court **DENIES** Defendants' Motion to Strike Mr. Boedeker's testimony and report as it relates to the Hydrates statement.

- **SUSTAINS** Defendants' Objection to Dr. Maronick's Supplemental Report and correspondingly **STRIKES** Dr. Maronick's Study 2 and Paragraphs 3c, 11-14, and 61-88 of Dr. Maronick's Supplemental Report.

- **GRANTS** Defendants' Motion to Strike Dr. Maronick's testimony and report as to paragraphs 23, 24, 35, and 38, as well as paragraph 39 such that only the following remains: "Consumers perceive . . . Monster Rehab as providing hydration 'like a sports drink.'  Moreover, I find that consumers pay attention to consumption limits, (e.g., 'Limit 3 cans per day') when present on a label."  The Court **DENIES** Defendants' Motion as to the remainder of Dr. Maronick's report and testimony.

- **GRANTS** Plaintiffs' Motion to Exclude Dr. Van Liere's expert report as to paragraphs 120 and 121, and **DENIES** Plaintiffs' Motion to Exclude Dr. Van Liere's expert report as to the remainder of Dr. Van Liere's report.

- **GRANTS** Plaintiffs' Motion to Exclude Dr. Ugone's expert report as to paragraphs 48 through 56 and **DENIES** Plaintiffs' motion as to the remainder of Dr. Ugone's report.

- **DENIES** Plaintiffs' Motion for Class Certification in its entirety.[34]

**IT IS SO ORDERED.**

Dated:   3/20/18

Virginia A. Phillips
United States District Judge

---

[34] Defendants also filed a Request for Judicial Notice of the Original Gatorade label from October 2013.  (Doc. No. 116.)  Defendants cite to this label in support of their argument on the merits that Plaintiffs cannot show that the Hydrates statement is, in fact, deceptive because Rehab drinks contain electrolytes.  (Opp'n at 25, n. 19.)  This argument on the merits is irrelevant to the Court's resolution of Plaintiffs' Motion for Class Certification.  The Court therefore **DENIES as moot** Defendants' Request for Judicial Notice.

During the March 29, 2018 hearing on this Motion, Plaintiffs requested leave to file an amended motion for class certification in order to address the issues raised in this Order.  Plaintiffs did not provide meritorious grounds for such an amendment; they argued only that they believe this action should be certified as a class and they could prevail on such a motion given another opportunity. In light of the prejudice Defendants would suffer from having to defend against such a burdensome motion again, as well as the Court's inability to discern a viable ground for certification from the well-developed record, the Court **DENIES** Plaintiffs' Request.